UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

YISRAEL Z. HEILMANN,                         Civil Action No. _____


                        Plaintiff,          **COMPLAINT**

                                            **JURY TRIAL DEMANDED**

        -against-


YESHIVA UNIVERSITY, SAPIR AMAR, and MOSHE DAVIDOVICS,


        Defendants.

------------------------------------X



**Plaintiff Yisrael Z. Heilmann**, proceeding pro se but expecting to retain counsel, files this

Complaint against Defendants Sapir Amar and Moshe Davidovics, and alleges as follows:

# Parties

1. **Plaintiff Yisrael Z. Heilmann** is an adult individual who was present in New York, New York at all relevant times. Plaintiff is a citizen of Germany. He was living and studying in New York City during the events described herein, and at all times had lawful status in the United States as an international student.

2. **Defendant Yeshiva University** is a private university with its principal campus located at 500 West 185th Street, New York, NY. Yeshiva University is incorporated in New York and receives federal funding for its programs, making it subject to federal and state laws prohibiting discrimination on the basis of disability.

3. **Defendant Sapir Amar** is an adult individual residing in New York, New York. Upon information and belief, Amar is a citizen of Israel but was present in New York on a student visa as a graduate student. His address is believed to be at or near 500 West 185th Street, New York, NY. Amar also has ties to Florida (with a secondary residence in Miami). His mother is believed to be Deborah "Debby" Amar, a former Israeli consul to Panama.

4. **Defendant Moshe Davidovics** is an adult individual residing in New York, New York, with an additional family domicile in Tennessee. Upon information and belief, Davidovics is a United States citizen and a college student in Manhattan, also associated with the vicinity of 500 West 185th Street, New York, NY.

# Jurisdiction and Venue

5. **Subject-Matter Jurisdiction:** This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship. Plaintiff is a citizen of a foreign state (Germany), whereas Defendants include citizens of New York and/or other U.S. states. In addition, this Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise in part under federal statutes, including the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. The Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367.

6. **Personal Jurisdiction:** This Court has personal jurisdiction over all Defendants because they reside in, are domiciled in, and/or conduct business or studies in New York, and because the acts giving rise to this Complaint occurred within the State of New York.

7. **Venue:** Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). A substantial part of the events or omissions giving rise to the claims occurred within this District (specifically on or near Yeshiva University's campus at 500 West 185th Street in Manhattan). Additionally, all Defendants reside in this District for purposes of § 1391.

8. **Conditions Precedent:** All conditions precedent to the filing of this lawsuit have been satisfied, complied with, or are waived.

# Factual Background

9. **Campus Context:** At all relevant times, Plaintiff and Defendants were students at or associated with Yeshiva University in New York City. They knew each other as classmates or through the campus community. The events described below occurred on or near Yeshiva University's Wilf Campus in Manhattan (around 500 West 185th Street, New York, NY).

10. **Initial Theft on March 13, 2024:** On March 13, 2024, at approximately 12:00 PM, Plaintiff discovered that personal property had gone missing from his usual study area on campus. The missing items included an Apple laptop charger (with cable) and an Apple Pencil, which Plaintiff had left at a desk in a public study space. Plaintiff promptly reported the suspected theft to campus security, expecting an investigation. No immediate action was taken at that time, causing Plaintiff concern.

11. **Confrontation with Amar (March 13, 2024):** Later on March 13, 2024, at approximately 5:00 PM, Plaintiff observed Defendant Sapir Amar in a common area on campus in possession of an Apple charging cable that looked identical to Plaintiff's missing charger. Plaintiff asked to inspect the charger and recognized distinctive markings on it (including minor burn marks and a personalized label) matching his stolen property. When confronted by Plaintiff about the charger, Amar became defensive. Plaintiff notified campus security of the situation and requested an inquiry into the theft.

12. **Hostile and Racially Charged Response by Amar:** Instead of cooperating, Amar reacted with hostility and harassment. He vehemently denied stealing the charger and directed ethnic slurs at Plaintiff, who is of European heritage. Amar made derogatory remarks in English and

Hebrew, implying that Plaintiff's background made him untrustworthy. For example, Amar insinuated that such behavior "might be normal where you come from, but not in the U.S.," and taunted Plaintiff by asking if he needed to repeat himself in Plaintiff's native language. These comments were intended to demean and intimidate Plaintiff because of his heritage.

13. **Threats of Retaliation:** Along with the insults, Amar issued explicit threats in an effort to intimidate Plaintiff from pursuing the matter. Amar boasted that he had powerful connections and claimed he could cause trouble for Plaintiff. He mentioned that his mother was an Israeli diplomat and suggested he could have Plaintiff expelled from the university or even deported from the United States. Amar warned Plaintiff that if he continued to accuse Amar of theft, Plaintiff would "pay a price." These threats caused Plaintiff serious distress and fear of retaliation.

14. **Lack of Immediate Consequences:** Despite Plaintiff's report of the theft and Amar's threatening conduct on March 13, 2024, no immediate disciplinary action or protective measures were taken by campus authorities that day. Plaintiff remained fearful and anxious following this confrontation, worried not only about his missing property but also about Amar's aggressive behavior and threats.

15. **Dormitory Intrusion on March 20, 2024:** In the late evening of March 20, 2024 (approximately 1:00 AM on March 21), Defendant Amar escalated his harassment. Amar trespassed into Plaintiff's on-campus residence (dormitory room) without permission. Plaintiff awoke and found Amar in his room; Plaintiff immediately and explicitly demanded that Amar leave. Amar refused to leave and instead grew more aggressive, shouting at Plaintiff and reiterating the threats he had made previously. During this intrusion, Amar again threatened to

harm Plaintiff and his family and boasted of his diplomatic connections. Plaintiff was terrified by Amar's sudden appearance and menacing conduct in the middle of the night within Plaintiff's own living space.

16. **Destruction of Evidence:** During the dormitory confrontation on March 20, 2024, Amar destroyed potential evidence of his prior wrongdoing. After the March 13 theft incident, Amar had written a short note to Plaintiff concerning the charger (possibly an apology or explanation). In the course of the March 20 altercation, Amar grabbed that note (which was in Plaintiff's possession), tore it to pieces, and pocketed the fragments, deliberately destroying evidence that might have implicated him in the theft. This act demonstrated Amar's consciousness of guilt and desire to eliminate proof of his misconduct.

17. **Intervention and Continued Harassment:** The tense standoff in Plaintiff's dorm room ended only when Plaintiff's roommate entered the room, alerted by the commotion. Upon the roommate's appearance, Amar finally agreed to leave the immediate room. However, even as he stepped out into the hallway, Amar insisted that Plaintiff follow him outside, urging that they "settle this." Hoping to avoid further violence in the confined space of his room and to de-escalate the situation in a more public area, Plaintiff stepped into the hallway with Amar.

18. **Extended Hallway Confrontation:** Once in the hallway, Amar continued to berate and threaten Plaintiff for approximately 20–25 minutes. During this period, Amar showed no remorse and instead attempted to justify himself. At one point, Amar began contacting other students via phone or messages, directing them to find and send him photographs of any Apple charging cables they had that resembled Plaintiff's charger. Upon information and belief, Amar was attempting to fabricate a defense by showing that many similar chargers exist, to cast doubt on

Plaintiff's identification of his charger. One student later reported feeling uneasy about Amar's request to help in this way. Amar's coordination of others to collect images was a calculated effort to retaliate against Plaintiff's accusation and to bolster Amar's own denial.

19. **Lingering Fear:** Throughout the night of March 20–21, 2024, Plaintiff remained on edge due to Amar's threats and unpredictable aggression. Plaintiff reported Amar's trespass and threats to campus security that night, but no effective action was taken immediately to ensure Plaintiff's safety. Plaintiff was left fearful of what Amar might do next.

20. **Violent Assault in Early Hours of March 21, 2024:** Mere hours after the dormitory incident, in the early morning of March 21, 2024, Defendant Amar carried out a brutal physical assault on Plaintiff. At approximately 12:45 AM, Plaintiff was present in the same campus study area near 500 West 185th Street. Despite the prior confrontations, Plaintiff had gone to this common area because it was normally a safe, public space open late for studying. Amar was also present there and had sprawled his belongings to claim a particular study spot. When Plaintiff walked by, Amar immediately tried to assert control over the space, declaring that the area was "his spot" and attempting to bar Plaintiff from sitting nearby. Plaintiff refused to be bullied and asserted that it was a public study area open to all students.

21. **Escalation from Verbal to Physical:** Amar reacted with sudden rage. He began yelling at Plaintiff, hurling insults and threats. Sensing the situation was deteriorating, Plaintiff held up his smartphone, intending either to record the encounter or call for help if needed. Plaintiff also had a small plastic water bottle in his other hand. Amar's temper then exploded into violence: he lunged at Plaintiff, snatched the water bottle from Plaintiff's hand, and flung its contents into

Plaintiff's face while shouting. Water splashed into Plaintiff's eyes, momentarily blinding and disorienting him. Before Plaintiff could recover or retreat, Amar launched a physical attack.

22. **Physical Attack by Amar:** Immediately after dousing Plaintiff, Amar struck Plaintiff with his fists multiple times and kicked him. Plaintiff tried to shield himself, but Amar's onslaught was relentless. During the attack, Amar grabbed a large hard-plastic chair and lifted it as a weapon. He swung the chair and smashed it against Plaintiff's body, delivering a heavy blow that knocked Plaintiff off balance. Amar then shoved Plaintiff forcefully to the floor. Plaintiff fell hard onto his right side, and his head struck the ground with significant impact. Plaintiff was left stunned, in severe pain, and partially incapacitated by this blow.

23. **Continued Beating:** Even after Plaintiff was down on the ground; Amar did not stop. Amar proceeded to kick Plaintiff repeatedly while Plaintiff lay defenseless, targeting Plaintiff's torso and head. Plaintiff curled up to protect himself, but each kick inflicted further injury. The attack finally ceased after Plaintiff, battered and unable to stand, begged for mercy and a few other students in the distance reacted with alarm, prompting Amar to step back.

24. **Aftermath – Lack of Immediate Aid:** The library was relatively quiet at that late hour, and no security or police officer was present during the assault. The entire attack unfolded within minutes. There were no eyewitnesses who saw the full sequence from start to finish, as most people had left for the night. One university staff member arrived on the scene just as the incident concluded (emerging from a nearby elevator), at which point Amar had stopped the attack. That staff member did not witness the assault itself but saw Plaintiff injured on the floor and Amar standing nearby.

25. **Role of Defendant Moshe Davidovics:** Defendant Moshe Davidovics was present in the vicinity toward the tail end of the assault. Davidovics, also a student, had been some distance away within the same large area but was not initially next to the altercation. He became aware of the situation only after hearing the commotion and by the time he looked over, Plaintiff had already been knocked to the ground. Photographs and video stills later showed the distance between where Davidovics was originally situated and the spot of the altercation, confirming he could not clearly see the critical moments of the attack.

26. **Amar and Davidovics Coordinate a False Narrative:** In the immediate aftermath of the assault, while Plaintiff was injured on the floor, Defendant Davidovics approached Amar. Rather than checking on Plaintiff or calling for help right away, Davidovics spoke quietly with Amar. During this conversation (parts of which were observed by the arriving staff member and partially captured on Plaintiff's phone, which was recording), Amar can be heard or seen indicating for Davidovics to "provide the statement we discussed," and offering something to Davidovics in return by saying "I will help you with your pre-med courses." In other words, immediately after the assault, Amar solicited Davidovics's cooperation in covering up what had happened. Amar offered an inducement (academic help) to Davidovics in exchange for Davidovics supporting Amar's version of events. This strongly suggests a pre-existing agreement or an on-the-spot conspiracy between Amar and Davidovics to falsify the narrative of the incident and protect Amar.

27. **Plaintiff's Injuries:** As a direct result of Defendant Amar's vicious assault and battery, Plaintiff sustained severe and painful physical injuries, as well as subsequent psychological trauma. These injuries include, but are not limited to:

- **Head and Brain Injuries:** Plaintiff suffered a traumatic brain injury (TBI) with concussion symptoms. He experienced loss of consciousness or memory of parts of the attack, cognitive difficulties, and ongoing symptoms such as headaches, dizziness, and trouble concentrating.

- **Hearing Loss:** Plaintiff incurred hearing loss and persistent tinnitus (ringing in the ears) as a result of the blows to his head. Medical evaluations after the incident confirmed a noticeable hearing impairment in one ear.

- **Orthopedic Injuries:** Plaintiff sustained sprains and bruises to his wrists and arms (from attempting to shield himself and from the impact of the chair). He also suffered contusions, lacerations, and deep bruising on his right side and hip from hitting the floor, as well as bruises and abrasions on his torso and head from Amar's kicks.

- **Emotional and Psychological Injuries:** The attack (and the events leading up to it) caused Plaintiff to develop severe emotional distress, including symptoms of post-traumatic stress disorder (PTSD) and anxiety. He has experienced nightmares, flashbacks of the assault, hypervigilance, and a constant fear of another attack. Plaintiff has required ongoing psychological counseling and therapy. His ability to focus on his studies and his overall quality of life have been greatly diminished due to the trauma.

28. **Medical Documentation:** Plaintiff's injuries were documented by medical professionals in the immediate aftermath of the assault. Hospital records from the early morning of March 21, 2024 (shortly after the incident) note Plaintiff's head injury from being hit with a chair and the associated symptoms. Follow-up evaluations by doctors confirmed the TBI diagnosis and the extent of the hearing loss. Mental health professionals subsequently diagnosed Plaintiff with PTSD directly linked to the trauma of the assault and the preceding harassment.

29. **Defendants' False Narrative and Defamation:** Following the assault, Defendant Amar immediately began fabricating a false version of events to excuse his behavior and blame Plaintiff. With Defendant Davidovics's help, a narrative was conveyed to law enforcement and university officials suggesting that Plaintiff was the aggressor or instigator of the confrontation, and that Amar acted in self-defense. In particular, Defendant Moshe Davidovics provided a false statement claiming to have witnessed the incident and portraying it in a light favorable to Amar. Upon information and belief, Davidovics told NYPD officers and campus security that Plaintiff initiated the physical altercation or somehow "brought it on himself." Davidovics's statement downplayed or omitted Amar's use of the chair as a weapon, contradicting clear video evidence. These statements by Davidovics were knowingly false and made with the intent to cast Plaintiff as a perpetrator rather than the victim, in order to shield Amar from blame.

30. **Video and Photographic Evidence Contradicting Defendants:** The assault was captured on Plaintiff's smartphone (which began recording during the confrontation) and/or surveillance cameras in the area. This video evidence conclusively shows that Amar was the aggressor: Amar initiated the attack without physical provocation, used a chair to strike Plaintiff, and continued to beat Plaintiff while he was down. Photographs from the aftermath also show the positions of Amar and Davidovics, indicating that Davidovics was too far away to have clearly seen the start of the incident. In short, objective evidence completely disproves the false story that Amar and Davidovics attempted to propagate.

31. **Reputational Harm to Plaintiff:** Despite the evidence, the false accusations initially spread by Defendants caused significant harm to Plaintiff's reputation and standing. In the immediate aftermath, Plaintiff had to defend himself against rumors that he had been the aggressor. Within

the university community, some individuals heard the distorted account and viewed Plaintiff

with suspicion or concern, until the truth was clarified. Plaintiff experienced humiliation and

embarrassment from being wrongly branded as a violent troublemaker. The defamatory claims

also posed a risk to Plaintiff's academic career—had they been believed, Plaintiff could have

faced university discipline or even criminal charges. Even though video evidence eventually

exonerated Plaintiff, the ordeal of being falsely accused exacerbated his emotional distress and

made his recovery more difficult.

32. **Malicious and Outrageous Conduct:** The conduct of Defendants Amar and Davidovics was

intentional, willful, and carried out with malice or reckless disregard for Plaintiff's rights.

Amar's actions were not a spontaneous mistake; they were deliberate attacks spurred by personal

animosity (including bias against Plaintiff's heritage), accompanied by explicit threats and slurs.

Davidovics's actions, while not physical, were also calculated and malicious: he chose to side

with Amar and deliberately lie to harm Plaintiff's reputation in order to protect Amar (especially

after Amar offered him a quid pro quo academic favor). Both Amar and Davidovics knew their

actions would cause Plaintiff serious harm—physically, emotionally, and reputationally—and

acted in conscious disregard of that risk. Such egregious misconduct warrants the imposition of

punitive damages to punish and deter.

33. **Post-Assault Academic Difficulties and Denial of Accommodations:** Plaintiff's injuries

and trauma following the March 21, 2024 assault significantly interfered with his ability to

continue his coursework. In the weeks following the incident, Plaintiff struggled with severe

headaches, dizziness, hearing problems, and PTSD symptoms that made attending classes and

completing assignments extremely challenging. Plaintiff requested reasonable accommodations

from Defendant Yeshiva University to help him cope with his new disabilities while pursuing his education. Specifically, Plaintiff asked for academic accommodations such as a **Reduced Course Load ("RCL")** for the remainder of the term (allowing him to take fewer credits without penalty) and other measures (for example, permission to attend some classes remotely or extended time for assignments and exams). These accommodations were recommended by his medical providers as necessary for his recovery.

34. **Yeshiva University's Failure to Accommodate:** Yeshiva University administrators denied Plaintiff's requests for reasonable accommodations. Despite being provided with documentation of Plaintiff's medical conditions and disabilities (including the TBI and PTSD), the University declined to implement the suggested RCL or equivalent adjustments. Instead, Plaintiff was effectively required to maintain a full course load and standard academic requirements, or risk failing or withdrawing from courses. Yeshiva University provided no meaningful alternative support for Plaintiff. This refusal to accommodate Plaintiff's disabilities forced him to attempt to keep up with his studies under grievous conditions, exacerbating his stress and impeding his recovery. Plaintiff alleges that Yeshiva University's actions in ignoring his documented disabilities and refusing reasonable accommodations constitute unlawful discrimination on the basis of disability.

35. **Evidentiary Support:** Plaintiff has preserved evidence supporting all claims in this Complaint. This evidence includes medical records and hospital reports documenting his physical injuries and psychological trauma; photographs and video recordings of the March 21, 2024 assault; communications (emails and correspondence) with Yeshiva University officials regarding his accommodation requests; and statements from witnesses and other students

corroborating aspects of Plaintiff's account. Plaintiff will produce this evidence during discovery to substantiate the allegations and will rely on it at trial.

36. As a result of the foregoing events and actions, Plaintiff has suffered tremendous harm. He now brings the following causes of action against Defendants Sapir Amar, Moshe Davidovics, and Yeshiva University, under both New York law and applicable federal law, seeking to hold them accountable for their wrongdoing.

## Causes of Action

### Count I – Assault (New York Common Law; Against Defendant Sapir Amar)

37. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

38. On March 21, 2024, at Yeshiva University's Wilf Campus in New York, Defendant Sapir Amar intentionally attempted to cause – and did cause – Plaintiff to experience apprehension of imminent harmful and offensive contact. Amar's conduct during the late-night confrontation (lunging at Plaintiff, grabbing Plaintiff's water bottle and throwing water in his face, raising a chair as a weapon, and making violent gestures) was intended to, and did, place Plaintiff in immediate fear for his physical safety. A reasonable person in Plaintiff's position would have feared imminent bodily harm under those circumstances, as Plaintiff in fact did.

39. Amar's actions were intentional and without Plaintiff's consent. Plaintiff had not consented to any physical confrontation or threatening behavior. Amar willfully initiated the confrontation and acted with malice.

40. As a direct and proximate result of Amar's actions, Plaintiff was placed in imminent apprehension of harmful contact. Plaintiff genuinely feared for his life and well-being in the moments leading up to and during Amar's attack. This intense apprehension and anticipation of being violently harmed constitute the tort of assault under New York law.

41. **Damages – Assault:** As a result of Defendant Amar's assaultive conduct, Plaintiff suffered damages including emotional and psychological distress, extreme fear, and anxiety associated with the threat of imminent harm (even before the physical blows occurred). The mental anguish of believing he was about to be severely injured is a direct consequence of Amar's actions.

42. Amar's conduct was willful, wanton, and malicious, justifying an award of punitive damages for the assault. Amar's use of ethnic slurs and extreme threats concurrent with the assault further evidences his malicious intent and outrageous conduct, warranting punitive damages to punish and deter such behavior.

## Count II – Battery (New York Common Law; Against Defendant Sapir Amar)

43. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

44. Defendant Sapir Amar committed battery against Plaintiff by intentionally making harmful and offensive physical contact with Plaintiff without consent. On March 21, 2024, Amar punched and kicked Plaintiff multiple times, struck Plaintiff with a chair, and shoved Plaintiff to the ground, all deliberate acts of physical violence.

45. At no point did Plaintiff consent to any physical touching by Amar. To the contrary, Plaintiff had a right to be free from such violence in a university setting. Amar's contact with Plaintiff was uninvited, unlawful, and undertaken with the intent to cause physical injury.

46. As a direct and proximate result of Amar's intentional physical attacks, Plaintiff sustained significant bodily injuries. These injuries include, among others, a traumatic brain injury, hearing loss, contusions, sprains, and other physical harm as detailed above. The physical impact and injuries satisfy the "harmful or offensive contact" element of battery.

47. Amar's physical contact was not only harmful but also deeply offensive to a reasonable sense of personal dignity. Being doused with water, beaten with fists and feet, and struck with a hard object (a chair) is conduct that any reasonable person would find highly offensive and unacceptable.

48. **Damages – Battery:** Plaintiff is entitled to recover all damages flowing from Amar's battery. These damages include, but are not limited to: past and future medical expenses for treatment of his injuries; physical pain and suffering endured during and after the attack; mental anguish and emotional trauma (including PTSD and anxiety) directly resulting from the violent assault; and lost educational opportunities or setbacks due to the time and difficulty of recovery.

49. Amar's egregious and malicious conduct in committing a violent battery – especially one motivated in part by bias and carried out with a dangerous instrument (the chair) – warrants an award of punitive damages. Such an award is necessary to punish Amar for his willful wrongdoing and to deter similar violent misconduct.

## Count III – Defamation (New York Common Law; Against Defendant Moshe Davidovics)

50. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

51. Defendant Moshe Davidovics made false and defamatory statements about Plaintiff, with knowledge of their falsity or with reckless disregard for the truth, and with the intention of harming Plaintiff's reputation.

52. In the immediate aftermath of the March 21, 2024 assault, and on one or more occasions thereafter, Davidovics communicated to third parties (including NYPD officers, campus security personnel, university administrators, and fellow students) a false account of the incident that cast Plaintiff as the aggressor and Defendant Amar as an innocent party or as acting in self-defense.

53. Specifically, Davidovics falsely stated in substance that Plaintiff initiated or provoked the altercation and that Amar either did nothing wrong or acted only in response to Plaintiff's aggression. Davidovics's statements conveyed the false impression that Plaintiff committed an assault or other misconduct, when in fact Plaintiff was the victim of Amar's unprovoked attack. Davidovics also falsely downplayed Amar's use of a chair as a weapon, suggesting that Plaintiff exaggerated his injuries.

54. Davidovics's statements were published to one or more third parties without privilege. Upon information and belief, Davidovics gave an official statement to campus security and/or the NYPD on March 21, 2024 repeating these false accusations against Plaintiff. He also repeated the false narrative in casual conversations with other students and staff. Each time Davidovics

communicated this false story to someone other than Plaintiff, it constituted a new publication of defamatory matter.

55. The statements made by Davidovics were defamatory per se under New York law because they accused Plaintiff of serious criminal conduct (namely, being the aggressor in a violent assault). Falsely accusing someone of a crime or wrongdoing in their profession/education is inherently defamatory, as it exposes the person to public contempt, ridicule, aversion, or disgrace.

56. Davidovics's false statements were made with actual malice. He knew that his portrayal of the incident was false (or at least had serious doubts about its truth, given that he did not witness the start of the fight and video evidence showed the contrary), yet he made these statements to assist Amar and to injure Plaintiff. Any qualified privilege that might apply to statements made to law enforcement or university officials is vitiated by this malice and knowing falsehood.

57. As a direct and proximate result of Davidovics's defamation, Plaintiff has suffered damage to his reputation and good name. Plaintiff was subjected to suspicion and scorn by those who heard the false allegations, until they were disproven. He experienced humiliation, embarrassment, and emotional distress knowing that he was being falsely branded as a violent wrongdoer.

58. The defamatory statements also threatened Plaintiff's academic and professional future. They prompted investigations in which Plaintiff had to clear his name, and if believed, could have led to academic discipline or criminal charges. Plaintiff's standing in his university community was harmed, requiring him to expend effort to prove his innocence.

59. **Damages – Defamation:** Plaintiff is entitled to recover presumed damages for defamation per se, as well as actual damages in an amount to be proven at trial. The law presumes that false statements accusing someone of a crime cause reputational harm; in this case, Plaintiff can also demonstrate concrete harm in the form of damage to relationships, stress-related health impacts, and other losses stemming from the defamatory statements. Furthermore, Plaintiff seeks an award of punitive damages against Defendant Davidovics for his malicious conduct in spreading lies. Falsely accusing the victim of an assault of being the aggressor is reprehensible conduct, and punitive damages are warranted to punish Davidovics and deter others from similar defamation.

## Count IV – Civil Conspiracy (New York Common Law; Against Defendants Sapir Amar and Moshe Davidovics)

60. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

61. After the events of March 13–21, 2024, Defendants Sapir Amar and Moshe Davidovics formed an agreement and common plan to engage in unlawful acts against Plaintiff and to conceal their wrongdoing. In particular, Amar and Davidovics conspired to: (a) cover up Amar's assault and battery of Plaintiff, and (b) defame Plaintiff by falsely portraying him as the aggressor in the incident. Their coordinated actions demonstrate a meeting of the minds to harm Plaintiff both physically and reputationally.

62. **Overt Acts:** In furtherance of this conspiracy, each Defendant committed overt and unlawful acts:

- *Amar:* Amar carried out the violent assault and battery on Plaintiff, thereby initiating the physical harm that was the subject of the conspiracy. Immediately after the assault, Amar enlisted Davidovics's aid in covering up the truth, instructing him to stick to a pre-arranged false story and offering to reward him (with academic assistance) for his cooperation.

- *Davidovics:* Davidovics agreed to participate in the conspiracy by providing a false witness statement that aligned with Amar's fabricated narrative. Knowing he had not witnessed the crucial moments and that Amar was at fault, Davidovics nevertheless told authorities and others that Plaintiff started the fight and Amar acted in self-defense. This deliberate falsehood was intended to shield Amar from consequences and to further harm Plaintiff's reputation.

63. By their conspiracy, Defendants acted in concert to injure Plaintiff. Under New York law, civil conspiracy is not an independent tort but serves to hold conspirators jointly liable for the underlying torts committed pursuant to the agreement. Here, the underlying torts include Amar's assault and battery and Davidovics's defamation. By virtue of their conspiracy, each Defendant is jointly and severally liable for all the harm caused by the other's wrongful acts in furtherance of their agreement. In other words, Amar is liable not only for the physical injuries he inflicted but also for the reputational harm caused by the false narrative, and Davidovics is liable not only for the defamation but also for the physical and emotional injuries inflicted by Amar, since those were the intended results of their joint plan.

64. The conspiracy between Amar and Davidovics directly and proximately caused additional harm to Plaintiff beyond the acts of either one alone. Because of their coordinated effort,

Plaintiff not only endured a violent attack but also had to face a united front of false accusations afterward. This compounded Plaintiff's distress, prolonging his trauma and complicating his efforts to seek justice and recover. The concerted cover-up attempt forced Plaintiff to fight against a false narrative even as he was coping with severe injuries.

65. Defendants acted intentionally, willfully, and with malice in agreeing to and executing their conspiracy. Their objective was to injure Plaintiff and evade accountability through deceit. Such collusive and fraudulent conduct is utterly reprehensible and demonstrates a wanton disregard for Plaintiff's rights.

66. **Damages – Civil Conspiracy:** As a result of the conspiracy, Plaintiff has suffered all the damages associated with the underlying torts of assault, battery, and defamation, as detailed above. Additionally, the conspiracy itself exacerbated Plaintiff's emotional distress and resulted in further costs (such as the need to clear his name). Plaintiff is entitled to recover compensatory damages for all these harms. Moreover, because Defendants' conspiratorial conduct was willful and malicious, Plaintiff seeks punitive damages against both Amar and Davidovics to punish their coordinated wrongdoing and to deter similar conduct in the future.

## Count V – Trespass (New York Common Law; Against Defendant Sapir Amar)

67. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

68. Defendant Sapir Amar committed trespass against Plaintiff by unlawfully entering and remaining in Plaintiff's residence without consent on March 20, 2024. Specifically, in the late night/early morning hours of March 20–21, Amar entered Plaintiff's dormitory room (a space occupied and controlled by Plaintiff) without permission or authority.

69. Amar knew he had no consent or legal right to enter Plaintiff's private living space. Plaintiff explicitly told Amar to leave, yet Amar refused and continued to occupy the room and adjacent hallway while menacing Plaintiff. Amar's presence in Plaintiff's room after being told to depart was intentional and unlawful.

70. By intruding into Plaintiff's dwelling and refusing to leave, Amar interfered with Plaintiff's possessory rights to his property and personal space. This intentional intrusion constitutes trespass. No privilege or justification existed for Amar's entry; he entered for his own hostile purposes.

71. As a direct and proximate result of Amar's trespass, Plaintiff suffered harm including fear, emotional distress, and the violation of his sense of security in his own residence. Plaintiff was terrified and felt unsafe in his dorm room due to Amar's unlawful presence and threatening behavior.

72. Amar's trespass was committed with malice and oppression, as it was accompanied by threats and harassment. **Damages – Trespass:** Plaintiff is entitled to nominal damages for the trespass itself and compensatory damages for the emotional distress and other consequences resulting from the incident. In addition, given the egregious circumstances of this trespass (occurring at night and in conjunction with intimidation), Plaintiff seeks punitive damages to punish Amar and deter such invasions of privacy and security.

## Count VI – Intentional Infliction of Emotional Distress (Against All Defendants)

73. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

74. The actions of all Defendants, as described above, were extreme, outrageous, and beyond the bounds of decency in a civilized society. Defendants either intended to cause severe emotional distress to Plaintiff or acted in reckless disregard of the high probability that their conduct would cause such distress. In particular:

- **Amar:** Engaging in a pattern of harassment, threats (including ethnic slurs and threats of violence), and ultimately a brutal, hate-fueled assault on Plaintiff is extreme and outrageous conduct. Amar's conduct was calculated to terrorize and harm Plaintiff.

- **Davidovics:** Conspiring to cover up a violent assault by falsely accusing the innocent victim (Plaintiff) of being the aggressor is also extreme and outrageous. Davidovics knew that by spreading falsehoods, he would compound Plaintiff's trauma and potentially subject Plaintiff to undeserved punishment, which is utterly intolerable behavior.

- **Yeshiva University:** Refusing to provide reasonable accommodations or support to Plaintiff in the wake of his serious injuries—effectively ignoring his disabilities and forcing him to fend for himself academically—was conduct carried out with callous disregard for Plaintiff's wellbeing. In the context of the trauma Plaintiff had suffered, the University's indifference to his plight was extreme and outrageous, exacerbating his distress.

75. Defendants' extreme conduct was the actual and proximate cause of Plaintiff's severe emotional distress. As a result of being terrorized, brutally beaten, falsely maligned, and then denied support, Plaintiff suffered and continues to suffer severe emotional distress, including PTSD, anxiety, depression, humiliation, and loss of the ability to enjoy daily life. These

emotional injuries are outlined in Plaintiff's medical records and were a foreseeable consequence of Defendants' outrageous actions.

76. Defendants acted with the intent to cause, or with reckless disregard of the likelihood of causing, such emotional distress. Amar intentionally inflicted fear and physical harm, fully expecting Plaintiff to suffer emotionally. Davidovics intentionally spread damaging lies, knowing it would cause Plaintiff grief and reputational damage. Yeshiva University's officials acted (or failed to act) despite knowing of Plaintiff's condition, displaying deliberate indifference to the substantial likelihood that forcing an injured student to continue without accommodations would cause him great distress.

77. **Damages – IIED:** Plaintiff is entitled to compensatory damages for the severe emotional pain and suffering inflicted by the Defendants' actions, including costs of therapy and the life-altering impact on his mental health. Furthermore, given the malicious and reckless nature of Defendants' conduct (especially the conduct of Amar and Davidovics), Plaintiff seeks punitive damages against each Defendant to punish them for their outrageous behavior and to deter such conduct in the future.

## Count VII – Disability Discrimination (ADA & Rehabilitation Act; Against Defendant Yeshiva University)

78. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

79. Defendant Yeshiva University is an educational institution that is subject to federal and state laws prohibiting discrimination on the basis of disability, including Title III of the Americans with Disabilities Act (42 U.S.C. § 12181 *et seq*., as an entity operating places of public

accommodation) and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794, as a recipient of federal financial assistance). Yeshiva University is also subject to analogous New York State and New York City human rights laws that require reasonable accommodations for persons with disabilities.

80. In the aftermath of the assault, Plaintiff became a qualified individual with disabilities as defined under these laws. Plaintiff's diagnosed conditions (including TBI, hearing impairment, and PTSD/anxiety disorder) substantially limited one or more major life activities, such as learning, concentrating, and communicating. Plaintiff duly notified Yeshiva University of his medical impairments and his need for accommodations.

81. Plaintiff requested reasonable accommodations from Yeshiva University to enable him to continue his education on an equal basis with non-disabled students. These requests included a reduced course load (temporarily taking fewer classes without academic penalty) and related academic adjustments (such as flexibility with attendance or deadlines) for the period of his recovery. Such accommodations were necessary because of Plaintiff's disabilities and would not have imposed an undue hardship on the University or fundamentally altered its academic program.

82. Yeshiva University denied Plaintiff's requested accommodations and failed to engage in a good-faith interactive process to explore feasible alternatives. The University effectively required Plaintiff to continue under the standard course load and conditions, despite knowing of his disabilities and limitations. By doing so, Yeshiva University failed to make reasonable modifications to its policies, practices, or procedures when such modifications were necessary to accommodate Plaintiff's disabilities.

83. By refusing to provide reasonable accommodations, Yeshiva University excluded or denied

Plaintiff the equal opportunity to participate in and benefit from its educational services and

programs, on the basis of his disabilities. This conduct constitutes unlawful discrimination under

Title III of the ADA (which prohibits disability-based discrimination by private entities offering

public accommodations, including educational institutions) and under Section 504 of the

Rehabilitation Act (which prohibits disability discrimination by any program receiving federal

funds). It also violates New York State and City laws that require educational institutions to

accommodate students with disabilities.

84. Yeshiva University's failure to accommodate Plaintiff was intentional, or at minimum,

showed deliberate indifference to Plaintiff's federally protected rights. The University was made

aware of Plaintiff's serious medical condition and the need for accommodation through medical

documentation and direct requests, yet it took no meaningful action to assist him. This deliberate

disregard for Plaintiff's rights and needs resulted in worsening of Plaintiff's physical and mental

health and forced him to abandon or significantly curtail his academic activities.

85. **Damages and Relief – Disability Discrimination:** As a direct and proximate result of

Yeshiva University's discriminatory conduct, Plaintiff suffered additional injuries including loss

of educational opportunities, academic setbacks, emotional distress, and aggravation of his

physical symptoms due to stress. Plaintiff is entitled to injunctive relief requiring Yeshiva

University to implement and provide appropriate reasonable accommodations (both for Plaintiff

and to ensure future compliance for other students), and prohibiting the University from

engaging in further discrimination. Plaintiff also seeks to recover compensatory damages for his

losses to the extent permitted under Section 504 and applicable law. Furthermore, Plaintiff seeks

an award of his reasonable attorneys' fees and costs in pursuing this claim, as provided by the ADA, the Rehabilitation Act, and other applicable laws.

# Evidentiary Support

86. Plaintiff possesses substantial evidentiary support for the allegations in this Complaint. This evidence includes, **but is not limited to:** documented communications relevant to the incidents (for example, any notes or electronic messages involving Defendant Amar's admission or discussions of the charger theft), witness accounts from individuals who observed parts of the events or their aftermath (such as Plaintiff's roommate who intervened on March 20, other students present during the assault's aftermath, and campus staff or security who responded), **medical records** and reports documenting Plaintiff's injuries (including hospital records from March 21, 2024 and subsequent medical evaluations confirming Plaintiff's TBI, hearing loss, and PTSD diagnosis), as well as **video and photographic evidence** capturing the March 21 assault and the scene (which corroborate Plaintiff's version of events and refute Defendants' false narrative).

87. Plaintiff will make such evidentiary materials available through the discovery process or promptly upon request, as required by the Federal Rules of Civil Procedure. All allegations herein have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery, in compliance with Rule 11(b)(3) of the Federal Rules of Civil Procedure.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff **Yisrael Z. Heilmann** respectfully demands judgment against

Defendants, jointly and severally, as follows:

**A. Compensatory Damages:** An award of compensatory damages, jointly and severally against

Defendants, in an amount to be determined at trial, but in all events well in excess of $75,000,

for the physical injuries, pain and suffering, medical expenses, lost educational opportunities,

emotional distress, and reputational harm that Plaintiff has suffered due to Defendants' wrongful

acts;

**B. Punitive Damages:** An award of punitive and exemplary damages against each Defendant to

punish their malicious, willful, and reckless conduct and to deter such conduct in the future, as

follows:

1. **Defendant Sapir Amar:** An award of **$10,000,000 (Ten Million U.S. Dollars)** in
   punitive and compensatory damages.

2. **Defendant Moshe Davidovics:** An award of **$2,500,000 (Two Million Five Hundred
   Thousand U.S. Dollars)** in punitive and compensatory damages.

3. **Defendant Yeshiva University:** An award of **$100,000,000 (One Hundred Million U.S.
   Dollars)** in punitive and compensatory damages.

**C. Injunctive Relief:** An injunction requiring Defendant Yeshiva University to take appropriate

remedial action to accommodate Plaintiff's disabilities and to comply with its obligations under

the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. This

includes, but is not limited to:

- Providing Plaintiff with requested reasonable classroom accommodations, such as a reduced course load and academic adjustments.

- Implementing institutional policies and mandatory staff training to ensure compliance with disability law.

- Guaranteeing that no student with disabilities is denied reasonable accommodations in the future.

- Reversing any wrongfully assigned grades that resulted from denied accommodations or missed academic opportunities.

- Immediate reinstatement of Plaintiff's student status at Yeshiva University.

**D. Attorneys' Fees and Costs:** An award of Plaintiff's reasonable attorneys' fees and litigation costs, as provided by law (including but not limited to the ADA and Rehabilitation Act), including any applicable pre- and post-judgment interest on monetary awards.

**E. Further Relief:** Such other and further relief as the Court deems just and proper, including any additional relief necessary to restore Plaintiff to the position he would have been in had Defendants' unlawful conduct not occurred and to protect Plaintiff from further harm.

**Non-Waiver Clause:**

Nothing contained in this Complaint shall be construed as a waiver of any rights, claims, or legal theories Plaintiff may have under state or federal law, including but not limited to those arising under the laws of the State of New York and the United States. Plaintiff expressly reserves the right to assert all available claims under applicable laws against any responsible parties related to the events described herein. Furthermore, it shall not be deemed a waiver of any rights to amend

this Complaint to conform to the evidence or to assert additional claims as warranted by law, pursuant to Rule 15 of the Federal Rules of Civil Procedure.

**JURY TRIAL DEMANDED:**

Plaintiff hereby demands a trial by jury on all issues so triable as of right.

**PLAINTIFF PRO SE STATEMENT:**

Plaintiff, **Yisrael Z. Heilmann**, appears pro se in this action.

Respectfully submitted,

Dated: March 20, 2025

**/s/ Yisrael Z. Heilmann**

**Yisrael Z. Heilmann, Plaintiff Pro Se**

Address: 447 Broadway, 2nd FL 945, New York, NY, 10013

Phone: 3474898828

Email: yzh2@protonmail.com