**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**YISRAEL Z. HEILMANN,**

Plaintiff,

– against –

**YESHIVA UNIVERSITY, et al.,**

Defendants.

**Case Nos.**
25-cv-02431, 25-cv-02491, 25-cv-04272, 25-cv-04274, 25-cv-04277,
25-cv-04278, 25-cv-04371, 25-cv-04569, 25-cv-04570, 25-cv-04571,
25-cv-04572, 25-cv-04573

---

Date: June 11, 2025

**Re: Submission of Supplemental Exhibits in Advance of Rule 16 / Rule 26(f) Conference**

Honorable Judge Lehrburger:

In advance of the Initial Pretrial Conference scheduled for June 12, 2025 at 2:30 PM, Plaintiff respectfully submits the following materials in accordance with the Court's June 3, 2025 Order (ECF No. 35). These exhibits are intended to assist the Court with (1) procedural coordination of the twelve pending related civil actions, and (2) efficient scheduling under Rule 16 and Rule 26(f).

---

**Submitted Exhibits:**

- Exhibit A – Matrix of Non-Duplicative Claims and Legal Theories

  A structured breakdown of the twelve actions currently pending before the Court, outlining the distinct factual foundations, causes of action, defendants, and requested remedies. This matrix supports Plaintiff's modular litigation strategy and demonstrates compliance with Rule 11(b).

- Exhibit B – Proposed Rule 26(f) Case Management Plan

  A unified proposal for discovery scheduling across all actions, promoting judicial economy and minimizing duplicative effort. This plan reflects a good-faith effort to coordinate timelines and ensure fairness while preserving the integrity of each lawsuit.

- Exhibit C – Letter from Plaintiff's Insurance Provider and massages of retailation and misconduct University officials

  Submitted in support of Plaintiff's request for narrowly tailored early discovery. The document affirms ongoing insurance involvement and justifies the need for document preservation and financial discovery related to coverage and liability.

  Further exhibits (Dr. Asher massage and Dr. Cypess Email) contain visual documentation and contemporaneous screenshots corroborating Plaintiff's claims of administrative misconduct, including potential evidence spoliation, retaliatory messaging, and improper handling of sensitive student information by Defendants Dr. Asher and Dr. Rebecca Cypess.

- Exhibit D – Further Concerns Regarding Evidence Spoliation and False Fabrication Allegation

  A concise summary of Plaintiff's concerns regarding (i) the risk of ongoing spoliation of key documents by Defendants, including deleted emails and unreproduced consent forms,

and (ii) Seyfarth Shaw LLP's false allegation that Plaintiff fabricated a legal citation in a Rule 11 Safe Harbor notice. The exhibit highlights Defendants' refusal to produce documentation central to their defense and outlines the reputational and procedural harm caused by their unsupported accusation. Plaintiff respectfully requests early judicial oversight and preservation measures to ensure evidentiary integrity and fair adjudication.

---

**Note Regarding Conference Topics:**

Consistent with the Court's direction, Plaintiff confirms that the content of these exhibits will be addressed orally at the conference. Plaintiff does not seek preemptive rulings through this letter and submits these materials solely to aid the Court's review in preparation for the June 12 proceeding.

Should Defendants raise any objections to this submission, Plaintiff respectfully requests the opportunity to respond during the conference or as otherwise directed by the Court.

---

Respectfully submitted,

**/s/ Yisrael Z. Heilmann**

Yisrael Heilmann
Pro Se Plaintiff
447 Broadway, 2nd Floor, Suite #945
New York, NY 10013
Email: yzh2@protonmail.com

Dated: June 11, 2025

**\*\*To all counsel of record\*\***

# *Exhibit* A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**YISRAEL Z. HEILMANN,**

Plaintiff,

– against –

**YESHIVA UNIVERSITY, et al.,**

Defendants.

**Case Nos.**
25-cv-02431, 25-cv-02491, 25-cv-04272, 25-cv-04274, 25-cv-04277,
25-cv-04278, 25-cv-04371, 25-cv-04569, 25-cv-04570, 25-cv-04571,
25-cv-04572, 25-cv-04573

**To the Honorable Judge Lehrburger:**

## PLAINTIFF'S STATEMENT OF NON-DUPLICATION AND RULE 11 COMPLIANCE

**In Response to ECF No. 35**

Plaintiff **Yisrael Z. Heilmann** respectfully submits this Statement pursuant to the Court's Order dated June 3, 2025 (ECF No. 35), which raises concerns regarding the multiplicity of pending actions. Plaintiff affirms that each complaint was filed in good faith and in full compliance with Rule 11(b) of the Federal Rules of Civil Procedure. Each of the twelve cases arises from a distinct nucleus of operative fact, involves different defendants or statutory frameworks, and seeks redress for legally and factually independent harms.

For the reasons below, Plaintiff respectfully opposes any wholesale consolidation or dismissal and urges the Court to preserve the integrity and modular design of these actions.

---

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 11(b) requires that claims be nonfrivolous, factually grounded, and legally warranted. While courts discourage duplicative litigation, Rule 18 permits the joinder of multiple claims, and Rule 20(a)(2) governs joinder of defendants based on common transactions or occurrences. Consolidation under Rule 42(a) is discretionary and must not prejudice the fair adjudication of any party's rights. *See Hall v. Hall*, 138 S. Ct. 1118, 1125 (2018).

Claim-splitting is disfavored only where a plaintiff seeks multiple recoveries for the same injury. Where each action arises from distinct factual allegations and seeks separate relief, the doctrine does not apply. *See Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011).

---

## II. MODULAR STRUCTURE MATRIX: DEMONSTRATION OF NON-DUPLICATION

| Case Number | Title / Short Name | What It's About | Why It's Distinct |
|---|---|---|---|
| 1_25-cv-02431-AT-RWL | **Assault_Battery** | Violent assault by student (3/21/2024) | Physical tort; no university staff involved; separate from academic/administrative claims |
| 1_25-cv-02491-AT-RWL | **False Imprisonment** | Unlawful confinement by YU staff (3/25/2024) | Different date, actors, and legal basis than assault case |
| 1_25-cv-04272-AT-RWL | **National Origin Discrimination** | Years-long harassment based on ethnicity | Title VI claim; predates assault; involves different actors and systemic hostility |
| 1_25-cv-04274-AT-RW | **Age Discrimination** | Housing denial and administrative bias based on Plaintiff's age | Housing-related exclusion soley because of age ; unrelated to disability, academics, or physical misconduct |
| 1_25-cv-04277-AT-RW | **Defamation Complaint** | NYSDHR response falsely stated no assault, no medical issue (Dec 2024) | Post-assault reputational harm; purely documentary and reputational |
| 1_25-cv-04278-AT-RWL | **Abuse of Process** | NYSDHR misuse and April 9, 2025 threat letter meant to silence Plaintiff through sanctions threats and legal intimidation. | Focuses on coercion via legal process and misuse of administrative/judicial procedure; distinct from reputation or discrimination allegations. |
| 1_25-cv-04371-AT-RWL | **Disability Discrimination** | Denial of ADA/§504 accommodations after documented medical trauma | Arises from medical need post-assault; separate legal protections and burdens |
| 1_25-cv-04569-AT-RWL | **Obstruction of Justice** | Coordinated administrative concealment, pressuring witnesses and spoliation of evidence | The lawsuit focused on coordinated administrative concealment, witness intimidation, and spoliation of evidence |

| 1_25-cv-04570-AT-RWL | **Fraudulent Billing** | $27,500 invoice sent after lawsuit filing | It centers on a post-litigation, targeted act of financial retaliation, unlike your other claims which are primarily about physical misconduct, academic sabotage, or defamation. |
|---|---|---|---|
| 1_25-cv-04571-AT-RWL | **FERPA_HIPAA_GDPR Privacy Violations** | Disclosure of records after consent revoked; system-wide privacy breach | Separate statutes (FERPA, HIPAA, GDPR); different defendants and harms |
| 1_25-cv-04572-AT-RWL | **Retaliation** | Threatening communication and procedural retaliation after assault complaint to NYPD, | March 2024 until today; could not be included earlier under Rule 15 |
| 1_25-cv-04573-AT-RWL | **RICO** | Enterprise-wide misconduct: suppression, retaliation, and pattern of abuse Pattern of misrepresentation in donor and tuition reporting (2022–2025) | Public fiduciary fraud; distinct from personal claims; involves fundraising depts. |

## III. ARGUMENT

### 1. Each Case Involves Distinct Events, Dates, and Defendants

The events giving rise to each action are chronologically and substantively different. For instance, the physical assault on March 21, 2024 (2431) and the staff-led confinement on March 25, 2024 (2491) occurred on separate days, involved unrelated personnel, and constituted independent torts.

### 2. Different Statutory Frameworks Necessitate Separate Proceedings

The claims invoke divergent legal doctrines: ADA (disability), ADEA (age), Title VI (national origin), common law torts, RICO, and education privacy statutes. Each claim entails different burdens of proof, elements, and remedies. Consolidation would risk conflation of legal standards and jury confusion.

### 3. Several Claims Arose After Initial Filings

Claims in cases 04278, 04571, and 04573 are based on events that occurred after the first wave of litigation. These claims could not have been included in initial pleadings without violating Rule 11. Their separate filing is therefore not only permissible but required by law.

### 4. No Duplicative Relief Is Sought

Plaintiff does not seek overlapping recovery. Each case addresses a distinct harm—whether physical, reputational, academic, administrative, or retaliatory. No single right or injury is asserted in more than one lawsuit.

### 5. Judicial Efficiency Supports Modular Management, Not Forced Merger

Modular litigation enables focused discovery, tailored settlement negotiations, and targeted judicial management. It preserves judicial economy by preventing a bloated, unmanageable omnibus action and allowing for efficient case-specific resolution.

---

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court:

- Acknowledge that each of the twelve actions is non-duplicative and Rule 11 compliant;
- Decline to consolidate factually and legally distinct actions, except by mutual consent under Rule 26(f);
- Permit modular case management to preserve adjudicative clarity and procedural fairness.

Plaintiff remains committed to full cooperation under the Federal Rules and welcomes structured coordination under Rule 16 and Rule 26, without compromising the unique posture of each legal claim.

---

Respectfully submitted,

**/s/ Yisrael Z. Heilmann**

Yisrael Heilmann
Pro Se Plaintiff
447 Broadway, 2nd Floor, Suite #945
New York, NY 10013
Email: yzh2@protonmail.com

Dated: June 11, 2025
**To all counsel of record**

# *Exhibit* B

Form as of August 20, 2021

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------------

_____
                                 Plaintiff(s),

    -against-

_____
                                Defendant(s).

--------------------------------------------------------------------------------

**25** CIV. NO. _____

**[Proposed] Civil Case Management Plan and Scheduling Order**

The parties submit this [Proposed] Civil Case Management Plan and Order pursuant to Federal Rule of Civil Procedure 26(f):

1.    **Meet and Confer:**  The parties met and conferred pursuant to Fed. R. Civ. P. 16(c) and 26(f) on _____.

2.    **Alternative Dispute Resolution / Settlement:**

    **a.**    Settlement discussions have ___ / have not ✗ taken place.

    **b.**    The parties have discussed an informal exchange of information in aid of early settlement and have agreed to exchange the following:

    **c.**    The parties have discussed use of alternative dispute resolution mechanisms for use in this case, such as (i) a settlement conference before the Magistrate Judge, (ii) participation in the District's Mediation Program, and (ii) retention of a private mediator.  The parties propose the following alternative dispute mechanism for this case:

1

**d.**      The parties recommend that the alternative dispute resolution mechanism designated above be employed at the following point in the case (e.g., within the next 30 days; after exchange of specific information; after deposition of plaintiff; etc.):

**e.**      The use of any alternative dispute resolution mechanism does not stay or modify any date in this Order.

3.      **The Parties' Summary of Their Claims, Defenses, and Relevant Issues:**

Plaintiff(s):

Defendant(s):

4.      **The Parties' Asserted Basis of Subject Matter Jurisdiction:**

5.      **Subjects on Which Discovery May Be Needed:**

Plaintiff(s):

<u>Defendant(s):</u>

6.  **Initial Disclosures** pursuant to Fed. R. Civ. P. 26(a)(1) will be exchanged no later than _____.

7.  **Amended Pleadings:**

    a.  No additional parties may be joined after _____.  Any motion to join after this date will need to meet the good cause requirements of F.R.C.P. 16.

    b.  No amended pleadings may be filed after _____.  Any motion to amend after this date will need to meet the good cause requirements of F.R.C.P. 16.

8.  **Fact Discovery:**

    a.  All fact discovery shall be completed by _____.

    b.  Initial requests for production were/will be served by _____. Any subsequent requests for production must be served no later than 45 days prior to the discovery completion deadline.

    c.  Initial interrogatories shall be served by _____. Any subsequent interrogatories must be served no later than 45 days prior to the discovery completion deadline.

    d.  Depositions shall be completed by _____.

    e.  Requests to admit shall be served by_____.

    f.  The parties propose the following limits on discovery:

    g.  Except as otherwise modified in 8(f) above, the parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York.  The interim fact discovery deadlines may be altered by the parties on consent without application to

3

the Court, provided that the parties meet the deadline for completing fact discovery.

**h.**     The parties would like to address at the conference with the Court the following disputes, if any, concerning fact discovery:

**9.     Expert Discovery (if applicable):**

**a.**     The parties do ___ / do not ✗ anticipate using testifying experts.

**b.**     Anticipated areas of expertise:

**c.**     Expert discovery shall be completed by _____.

**d.**     By _____, the parties shall meet and confer on a schedule for expert disclosures, including reports, production of underlying documents, and depositions, provided that (i) expert report(s) of the party with the burden of proof shall be due before those of the opposing party's expert(s); and (ii) all expert discovery shall be completed by the date set forth above.

**e.**     The parties would like to address at the conference with the Court the following disputes, if any, concerning expert discovery:

**10.     Electronic Discovery and Preservation of Documents and Information:**

(If appropriate for the case, use the Court's Joint Electronic Discovery Submission and Proposed Order available at: http://nysd.uscourts.gov/judge/Lehrburger.

**a.**     The parties have ___ / have not ✗ discussed electronic discovery.

**b.**     If applicable, the parties shall have a protocol for electronic discovery in place by _____.

**c.**     The parties would like to address at the conference with the Court the following disputes, if any, concerning electronic discovery:

**11.**    **Anticipated Motions** (other than summary judgment, if any)**:**

**12.**    **Summary Judgment Motions:**  No less than 30 days before a party intends to file a summary judgment motion, and in no event later than the close of discovery, the party shall notify this Court, and the District Judge, that it intends to move for summary judgment and, if required by the District Judge's Individual Practices, request a pre-motion conference.

If pre-motion clearance has been obtained from the District Judge where required, summary judgment motions must be filed no later than 30 days following the close of all discovery if no date was set by the District Judge or, if a date was set by the District Judge, in accordance with the schedule set by the District Judge.  If no pre-motion conference is required, summary judgment motions must be filed no later than 30 days following the close of discovery.

Any summary judgment motion must comply with the Federal Rules of Civil Procedure, the Local Rules of this District, and the Individual Practices of the District Judge to whom the case is assigned.

**13.**    **Pretrial Submissions:**  The parties shall submit a joint proposed pretrial order and any required accompanying submissions 30 days after decision on the summary judgment motion(s), or, if no summary judgment motion is made, 30 days after the close of all discovery.

**14.**    **Trial:**

**a.**     All parties do ___ / do not _X_ consent to a trial before a Magistrate Judge at this time.

**b.**     The case is _X_ / is not ___ to be tried to a jury.

**c.**    The parties anticipate that the trial of this case will require _____ days.

**15.**    **Other Matters the Parties Wish to Address (if any):**

**16.**    The Court will fill in the following:

A status conference will be held before the undersigned on _____ at _____.m. in Courtroom 18D, 500 Pearl Street.

The parties shall submit a joint status letter by _____ no longer than __ pages.

SO ORDERED.

Dated:

_____
ROBERT W. LEHRBURGER
United States Magistrate Judge

PLAINTIFF(S):                    DEFENDANT(S):

_____    _____
ATTORNEY NAME(s):                ATTORNEY  NAME(s)

6

7

_____       _____

_____       _____
ADDRESS                                               ADDRESS

TEL: _____       TEL:_____

EMAIL: _____       EMAIL:_____

7

# *Exhibit* C

Prepare. Protect. Prevail.™



THE
HARTFORD

Business Insurance
Employee Benefits
Auto
Home

April 16, 2025

Via Certified Mail
Return Receipt Requested

Yisrael Z. Heilmann
447 Broadway, 2nd FL 945
New York, NY 10013

Re:  Yisrael Heilmann vs. Yeshiva University; Sapir Amar, Moshe Davidovics, United
States District Court; Southern District of New York: Case 1:25-cv-02431-UA

Dear Mr. Heilmann:

This letter is to provide you with written notice, pursuant to section 3420 of the New York Insurance Law, that Twin City Fire Insurance Company ("Hartford") has disclaimed coverage for the above-captioned lawsuit filed against our insured, Yeshiva University. We set forth the specific grounds for Hartford's disclaimer below.

The Lawsuit alleges intentional infliction of emotional distress as a result of an assault and discrimination. The Hartford policy contains an exclusion that precludes coverage for injuries arising from exposure to intentional acts and discrimination. Accordingly, there is no coverage afforded to Yeshiva University under the terms of the policy.

Hartford reserves all of its rights and defenses under any policies issued to Yeshiva University, and any obligations Hartford may have are subject to the terms and conditions of those policies. Neither this communication, nor any prior or subsequent communications, should be construed as a waiver of any rights, positions or defenses held by Hartford, nor shall it be construed as an admission on any rights, duties or obligations by Hartford.

Very truly yours,

Kara Doneski

cc: avi.mimun@yu.edu

© 2023 by The Hartford. Classification Company Confidential. No part of this document may be reproduced, published, or used without the permission of The Hartford.

12:42



+1 (516) 680-4848 >

iMessage
Thu, Mar 21 at 7:16 AM

Hi it's Dr Asher,
I know you're in the hospital, I hope you are ok. do you think you will be returning soon?

Thu, Mar 21 at 8:55 AM

Hi, I am Yisrael, how are you? Thank you for asking. Not good at all. Not sure how severe this is, they need to put me into a machine. They hope there is no internal brain bleeding. I will let you know later. I can't right now determine if I comeback and when.

I just spoke to the hospital, they aren't worried, they are not concerned about you. Sometimes they offer scans to be extra careful but if you don't want a scan, you can tell them. They know you have some pain, but ask them if you have to do the scan. You can advocate for yourself here.

They do not think it's severe

Thu, Mar 21 at 12:24 PM

Good morning,
I hope you could sleep a little bit more than me. I am discharged now, there no severe injuries.

 iMessage



Sincerely,

# Yisrael Heilmann

On Sep 24, 2024, at 4:15 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Yisrael,
We received the attached letter from a lawyer claiming to represent you. Are you saying you did not retain this lawyer?
Thank you,
Rebecca Cypess

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

_____

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Monday, September 23, 2024 1:09 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>

# *Exhibit* D

« up

643 F.2d 1229

1981-1 Trade Cases 63,886

CHRYSLER CORPORATION, Plaintiff-Appellant,

v.

FEDDERS CORPORATION, Fedders International Corporation, Airtemp Corporation, Airtemp International Corporation, Fedders World Trade Corporation and Interclisa, S.A., Defendants-Appellees.

*No. 78-1287.*

**United States Court of Appeals, Sixth Circuit.**

*Argued April 11, 1980.*
*Decided and Filed March 18, 1981.*
*Rehearing and Rehearing En Banc Denied May6, 1981.*

William G. Christopher, Avern Cohn, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., Robert Ehrenbard, Kelley, Drye & Warren, William C. Heck, New York City, for plaintiff-appellant.

Gilbert E. Gove, Miller, Canfiled, Paddock & Stone, Detroit, Mich., for Fedders.

John H. Fildew, Fildew, Bilbride, Miller & Todd, Charles D. Todd, III, Detroit, Mich., for Interclisa.

Lawrence N. Weiss, Weisman, Celler, Spett, Modlin & Wertheimer, Russell E. Brooks, Richard C. Tufaro, Milbank, Tweed, Hadley & McCloy, New York City, for defendants-appellees.

Before EDWARDS, Chief Judge, BOYCE F. MARTIN, Jr., Circuit Judge, and PHILLIPS, Senior Circuit Judge.

BOYCE F. MARTIN, Circuit Judge.

Chrysler Corporation appeals the dismissal of its complaint charging Fedders Corporation and others with violations of the antitrust laws. The case arose after Chrysler entered into an agreement with Fedders to sell virtually all the assets of Chrysler's Airtemp Division. The Airtemp Division was engaged in the business of designing, manufacturing, marketing, and servicing non-automotive air-conditioning systems. The assets acquired by Fedders included the stock of various subsidiaries connected with the Airtemp operation, but excluded two subsidiaries

https://law.resource.org/pub/us/case/reporter/F2/643/643.F2d.1229.78-1287.html?utm_source=chatgpt.com

in Australia and South Africa. Chrysler also covenanted, with certain exceptions, not to compete in the non-automotive air-conditioning market for a period of five years.

After the contract was executed, Chrysler became dissatisfied with the agreement. According to the complaint filed below, Fedders has never paid Chrysler several million dollars due under the contract.

On November 14, 1977, Chrysler brought this action under § 4 of the Clayton Act, 15 U.S.C. § 15, alleging that the defendants had violated § 1 of the Sherman Act, 15 U.S.C. § 1. The complaint charged the defendants with conspiring to manipulate the non-automotive air-conditioning market in a manner calculated to lessen and eliminate competition. In addition to the antitrust claim, Chrysler alleged twenty-two pendant claims for relief under state law.

On February 10, 1978, all the defendants except Interclisa moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the antitrust claim on the grounds that it failed to state a cause of action and that Chrysler lacked standing to sue under § 4 of the Clayton Act. They also moved under Rule 12(b)(1) to dismiss the other claims for lack of diversity.

On February 24, 1978, the District Court granted the motion to dismiss the antitrust claim. It specifically found that Chrysler met the standing requirements articulated by this Court in Malamud v. Sinclair Oil Corp., 521 F.2d 1142 (6th Cir. 1975), but went on to hold that Malamud is "wrong" in light of the Supreme Court's decision in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The District Court characterized Chrysler's claim as a breach of contract action which lacked the element of "antitrust injury" required by Brunswick. Because this essential element was missing, the court held that Chrysler did not have standing to sue under § 4 of the Clayton Act.

On March 10, 1978, defendant Interclisa, a Spanish corporation, filed a Rule 12(b)(2) and 12(b)(6) motion to dismiss the complaint against it. Interclisa alleged, in addition to the arguments advanced by the Fedders defendants, that the court lacked in personam jurisdiction over Interclisa. The District Court agreed and granted the motion, holding that Interclisa had insufficient contacts with the forum to support jurisdiction under either the Michigan long arm statute, M.C.L.A. § 600.715(2), or § 12 of the Clayton Act, 15 U.S.C. § 22. The court also denied Chrysler's request for further discovery on the question of Interclisa's forum contacts.

On appeal, Chrysler contends that it succeeded in making out a cause of action under § 1 of the Sherman Act and that it satisfies this circuit's requirements for standing to sue under § 4 of the Clayton Act. It argues that our opinion in Malamud is unaffected by the Supreme Court's Brunswick decision and that, in any event, its complaint alleges "antitrust injury." Chrysler also claims that the District Court erred in dismissing the complaint against Interclisa on jurisdictional

grounds and in refusing to allow Chrysler to conduct further discovery of jurisdictional facts.

We hold that Brunswick does not negate our decision in Malamud. Rather, the effect is cumulative; Brunswick merely adds to the standing requirements set out in Malamud. Insofar as Chrysler claims that the defendants eliminated it as a competitor in the non-automotive air-conditioning market, the District Court correctly concluded that Chrysler failed to allege "antitrust injury" and therefore lacked standing under § 4 of the Clayton Act. However, certain of Chrysler's other allegations do satisfy this circuit's post-Brunswick standing test and should not have been dismissed.

Finally, we affirm the District Court's finding that it lacked personal jurisdiction over Interclisa and uphold its exercise of discretion in denying Chrysler's request for further discovery.

I. Chrysler's Standing Under § 4 of the Clayton Act

In Malamud, supra, this Court addressed the troublesome question of standing to sue under § 4 of the Clayton Act. The plaintiffs in that case fell into three categories: 1) the individuals Jack and Ann Malamud, who were also the officers, directors, and sole shareholders of the corporate plaintiffs; 2) Malco Petroleum, a petroleum distributing corporation; and 3) three real estate investment corporations.

In 1965, Malco and Sinclair Oil executed a distribution agreement. The parties had an understanding that Sinclair would provide financial assistance to the Malamuds' investment companies in their efforts to acquire and develop new service station properties. In early 1966, however, Sinclair declined to help finance several proposed real estate ventures, whereupon Malco unsuccessfully sought an early termination of the contract. After the contract expired, the plaintiffs filed suit, alleging that Sinclair's failure to provide financing and refusal to permit an early contract termination violated § 1 of the Sherman Act and § 3 of the Clayton Act.

Sinclair sought and was denied summary judgment. On a motion for reconsideration, it argued that all of the plaintiffs lacked standing because none of them had been "directly" injured. The District Court rejected this contention and held that all the plaintiffs had standing as defined in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). However, it went on to find that neither the individual plaintiffs nor Malco could possibly satisfy the further requirement that their injury bear a "direct" and causal relationship to the alleged antitrust violations. As for the investment company plaintiffs, however, a determination of the "directness" of their injury presented mixed questions of law and fact. Accordingly, the District Court denied summary judgment against the investment firms. It subsequently certified for appeal the threshold question of their standing to sue.

We affirmed the lower court's finding that the investment companies had standing but rejected its application of the "direct injury" test as a means of limiting standing under § 4. 521 F.2d at 1149. The concept of "direct injury," derived from Loeb v. Eastman Kodak, 183 F. 704 (3rd Cir. 1910), focuses on the relationship between the plaintiff and the defendant. If the alleged injury is "remote," such as that of a stockholder or creditor of a corporation injured by the defendant, standing is denied. Loeb, supra; Gerli v. Silk Association of America, 36 F.2d 959, 960 (S.D.N.Y.1919). We also rejected the "target area" test, another means of circumscribing standing under § 4. That standard requires the plaintiff to be within the area of the economy allegedly injured by the defendant, In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); In Re Beef Industry Antitrust Litigation, 600 F.2d 1148 (5th Cir. 1979), and has spawned numerous and often inconsistent opinions attempting to delineate its scope. See Berger and Bernstein, An Analystical Framework for Antitrust Standing, 86 Yale L.J. 809, 830 (1977).

The two approaches to standing described above purport to derive from the causative language in § 4 itself, i. e., absent a showing that the plaintiff suffered "direct injury" or was within the "target area," no injury "by reason of anything forbidden in the antitrust laws" is deemed to have occurred. Our refusal to apply either theory was based on the belief that both demand too much from a plaintiff at the pleading stage of his case. In effect, they require a court "to make a determination on the merits of a claim under the guise of assessing the standing of the claimant." 521 F.2d at 1150. (emphasis in original).

We decided in Malamud that the appropriate test for standing in an antitrust action is the one articulated by the Supreme Court in Association of Data Processing Service Organizations v. Camp, supra, a case involving standing under the Bank Service Corporation Act of 1962, 12 U.S.C. § 1864. That standard requires (1) an allegation that the defendant caused the plaintiff injury in fact, and (2) that the interest which the plaintiff seeks to protect is arguably within the zone of interests protected by the relevant antitrust laws. 521 F.2d at 1151. In essence, we repudiated any "proximate cause" limitations on antitrust standing in favor of the less stringent requirement that the plaintiff be protected by the substantive antitrust law. See Berger and Bernstein, supra, at 838-39.

Two years after Malamud, the Supreme Court decided the Brunswick case. There, the plaintiffs sought treble damages against the Brunswick Corporation, one of the two largest manufacturers of bowling equipment in the United States. During the retail bowling boom in the 1950's, the majority of Brunswick's sales were on extended credit terms. The early 1960's brought a sharp decline in the industry, and Brunswick encountered great difficulty in collecting the debts created by the earlier expansion. Brunswick began repossessing the equipment and, where possible, reselling it in place to third parties. Where resale was impossible, Brunswick acquired and operated certain defaulting retail centers. The

plaintiffs were retail bowling centers in competition with the acquired centers in three markets. They alleged that Brunswick's acquisitions in those markets violated § 7 under the "deep pocket" theory of Reynolds Metals Co. v. F. T. C., 309 F.2d 223 (D.C.Cir.1962), and F. T. C. v. Proctor and Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). The plaintiffs argued that but for Brunswick's acquisitions the acquired centers would have gone out of business, and the plaintiffs would have gained customers and realized increased profits. Thus, they concluded, they were injured in their business by reason of Brunswick's § 7 violation and were, therefore, entitled to treble damages under § 4.

The Supreme Court rejected this theory of recovery, holding that § 4 requires a plaintiff to prove more than just a § 7 violation and a causal link between that violation and the alleged injury. 429 U.S. at 489, 97 S.Ct. at 697. The Court noted that the plaintiffs' real complaint was that Brunswick's acquisition of the bowling centers preserved competition, thereby depriving the plaintiffs of the increased profits which would have resulted from the reduction of competition. The Court stated:

Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause." Zenith Radio Corp. v. Hazeltine Research, 395 U.S. at 125, 89 S.Ct. at 1577.

Id. (footnote omitted). Since the plaintiffs offered no alternative theory to support their damage award, the Court directed that a judgment notwithstanding the verdict be entered in favor of Brunswick. Id. at 490, 97 S.Ct. at 698.

We disagree with Chrysler's suggestion that the holding in Brunswick is limited to treble damage actions for violations of § 7 of the Clayton Act. Although that decision was an "intermeshing" of § 7's prohibitions with the § 4 remedy, 429 U.S. at 486, 97 S.Ct. at 696, it primarily addresses the boundaries of the treble damage section. The Supreme Court was concerned with bringing antitrust recovery in line with the purposes of the antitrust laws. Id. at 487, 97 S.Ct. at 696. We see no reason why its holding should not be applicable where, as here, the statutory prohibition upon which a treble damage action is based is found in the Sherman Act.

We also disagree with Chrysler's assertion that nothing in Brunswick mandates any change in the Malamud standing tests. Although the Supreme Court did not explicitly describe the issue in Brunswick as one of standing, that decision clearly establishes that a plaintiff must plead an injury of the type § 4 was intended to remedy before his case will be heard. That Brunswick involved a controversy which had already been tried in the District Court does not, as Chrysler argues, limit its

relevance to the causation of antitrust damage. If the failure to prove cognizable damages requires a judgment for the defendant notwithstanding the verdict, 429 U.S. at 491, 97 S.Ct. at 698, it follows that a failure to allege cognizable damages compels the dismissal of the complaint.

Thus, we interpret Brunswick to mean that the pleading of "antitrust injury" is an essential component of standing under § 4 of the Clayton Act.[1]  Other courts have reached a similar conclusion. John Lenore & Co. v. Olympia Brewing Co., 550 F.2d 495 (9th Cir. 1977); Hardwick v. Nu-Way Oil Co., 443 F.Supp. 940 (S.D.Tex.1978); aff'd, 589 F.2d 806, cert. denied, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979); Juneau Square Corp. v. First Wisconsin National Bank, 445 F.Supp. 965 (E.D.Wis.1978); L&H Investments, Ltd. v. Belvey Corp., 444 F.Supp. 1321 (W.D.N.C.1978).

As we have already observed, Brunswick merely adds to the Malamud standing requirements; it does not, as the District Court suggests, prove Malamud "wrong." Brunswick in no way alters our rejection of the "direct injury" and "target area" approaches to antitrust standing. Indeed, we reiterate here our admonition against making a determination on the merits under the guise of assessing the standing of the claimant. "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

In order to establish standing in an antitrust action, this circuit continues to require (1) that the plaintiff allege injury in fact and (2) that the interest which the plaintiff seeks to protect is arguably within the zone of interests protected by the statute in question. Brunswick adds to that standard the requirement that the plaintiff allege antitrust injury when seeking treble damages under § 4 of the Clayton Act. Unlike the "direct injury" and "target area" tests, Brunswick does not inject an element of proximate cause into the standing inquiry; rather, it compels the court to focus on the type of injury pleaded and its relationship to the alleged anticompetitive conduct.

In the present case, Chrysler's primary allegation is that it has been eliminated from competition with the defendants by the virtual destruction of the Airtemp Division and its affiliated foreign subsidiaries. Chrysler contends that Fedders' failure to fulfill its obligations under the contract gave the Fedders defendants the financial power to effect this destruction. Chrysler does not suggest that the contract itself violates the antitrust laws; rather, it claims that Fedders' subversion of that agreement was the anticompetitive means of eliminating Chrysler from the market.

We hold that these alleged injuries do not constitute "anti-trust injury" within the meaning of Brunswick, supra. By contracting to sell virtually all the assets of the Airtemp Division and all but two of its foreign subsidiaries, Chrysler

voluntarily withdrew from competition in the non-automotive air-conditioning market. It did not contemplate continuing to compete in that market and in fact covenanted not to do so except through the Australian and South African subsidiaries.

Even if a breakdown of competitive conditions in the market has indeed occurred, Chrysler's loss is not attributable to that change. Chrysler would have suffered an identical loss if the defendants had failed to make payments under the contract for reasons unrelated to the alleged antitrust violations. Cf. Brunswick, supra, at 487, 97 S.Ct. at 696. Moreover, if the defendants had fulfilled their obligations as agreed, Chrysler would have no complaint, yet would still be divested of its assets and precluded from competing in the market. See A. D. M. Corp. v. Sigma Instruments, Inc., 628 F.2d 753 (1st Cir. 1980). Therefore, to the extent that Chrysler alleges damages resulting from its elimination from competition with the defendants through the Airtemp Division and the subsidiaries included in the contract for sale, it lacks the "essential connection between injury and the aims of the antitrust laws" necessary to establish standing. A. D. M. Corp., supra, at 754.

However, Chrysler does not lack standing to pursue all of the allegations in its complaint. The claim that it has been injured as a purchaser of air-conditioning equipment by the defendants' anticompetitive acts is clearly an allegation of "antitrust injury." See Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). Chrysler also satisfies both requirements of the standing test set out in Malamud. That claim cannot be dismissed on the pleadings; on remand, Chrysler must be given an opportunity to support its allegation with proof.

Chrysler's contention that it has been injured by the destruction of Chrysler South African and Chrysler Australia, the two subsidiaries excluded from the agreement, is also an allegation of "antitrust injury." As a shareholder of those subsidiaries, Chrysler has pleaded injury which reflects the anticompetitive nature of the challenged conduct. This claim satisfies Malamud 's requirements as well; it alleges injury in fact, and Chrysler's interest as the parent of a subsidiary destroyed by a § 1 violation is arguably within the zone of interests protected by the antitrust laws. The real question regarding this alleged injury is not one of standing, but of directness. When we rejected the "direct injury" approach to standing in Malamud, we explicitly characterized the issue of "directness" as "one that must be resolved upon some factual showing." 521 F.2d at 1150. Though the District Court may conclude that Chrysler is too remote from the violation to maintain an action for these damages, see Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963), it may not dismiss the claim on the theory that Chrysler lacks standing to assert it. Such a result would contravene the liberal standing requirements adopted by this circuit in Malamud.

II. Jurisdiction Over Interclisa

Chrysler asserts that the District Court had personal jurisdiction over Interclisa under the Michigan long arm statute, M.C.L.A. § 600.715(2), and under § 12 of the Clayton Act, 15 U.S.C. § 22.

A. Jurisdiction under the long arm statute.

The Michigan long arm statute, available to Chrysler pursuant to Rule 4(e) of the Federal Rules of Civil Procedure, provides for limited in personam jurisdiction over a corporation whose relationship with the state arises from "(t)he doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort." Chrysler's antitrust claim is a form of tort action. See Weinstein v. Norman M. Morris Corp., 432 F.Supp. 337 (E.D.Mich.1977).

The Michigan statute confers on the state courts the maximum scope of personal jurisdiction permitted by the due process clause of the Fourteenth Amendment. Microelectronic Systems Corp. v. Bamberger's, 434 F.Supp. 168 (E.D.Mich.1977). Due process requires that defendants have such minimum contracts with the forum state that maintenance of an action would not offend "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The only contacts which Chrysler asserts that Interclisa has had with the State of Michigan are the acts of Interclisa's codefendants. Chrysler alleges that Interclisa conspired to violate the antitrust laws and that "critical acts" in furtherance of the conspiracy were performed in Michigan by Interclisa's coconspirators. Chrysler claims that those acts and their consequences are attributable to Interclisa for the purpose of establishing the minimum contacts necessary to the court's exercise of personal jurisdiction.

This court has not addressed the question of whether the acts of a coconspirator, performed in the forum state in furtherance of the conspiracy, constitute sufficient minimum contacts to establish personal jurisdiction over an absent coconspirator who has no other contact with the forum. The leading case on this "conspiracy theory" of jurisdiction is Leasco Data Processing Equipment Corp. v. Maxwell, 319 F.Supp. 1256 (S.D.N.Y.1970), a securities fraud action under the Securities Exchange Act of 1934. There, one of the defendants, an English solicitor, challenged the District Court's jurisdiction over him under the New York long arm statute. He argued that allegations of his participation in a conspiracy which acted in New York through another defendant were, without more, insufficient to support jurisdiction. In holding that it did not have personal jurisdiction over the alien defendant,[2] the court stated that "mere allegations of conspiracy and even the presence of one co-conspirator within the jurisdiction do not give jurisdiction over all the alleged coconspirators." 319 F.Supp. at 1261. It added that the plaintiff's allegations of conspiracy were totally unsupported and were denied by the alien defendant by affidavit. The court noted that "(t)o meet due process

requirements there must be a factual showing of conspiracy and also of a connection between the acts of the conspirator who was present in the jurisdiction and the conspirator who was absent." Id.

The Leasco approach has been adopted in several jurisdictions where the question has arisen. See, e. g., McLaughlin v. Copeland, 435 F.Supp. 513 (D.Md.1977); Chromium Industries v. Mirror Polishing and Plating Co., 448 F.Supp. 544 (N.D.Ill.1978). Other courts have rejected the coconspirator theory as an impermissible means of enlarging the "transacting business" test of § 12 of the Clayton Act. See Weinstein v. Norman M. Morris Corp., supra; West Virginia v. Morton International, Inc., 264 F.Supp. 689 (D.Minn.1967); I. S. Joseph Co., Inc. v. Mannesmann Pipe and Steel Corp., 408 F.Supp. 1023 (D.Minn.1976).

The Leasco requirement that a plaintiff make a factual showing of conspiracy has been criticized because of the difficulties of pleading and proving conspiracy. Thus, in Mandelkorn v. Patrick, 359 F.Supp. 692 (D.D.C.1973), the court exercised personal jurisdiction over the non-resident defendants as a result of their alleged participation in a conspiracy to violate 42 U.S.C. §§ 1983 and 1985, despite the plaintiffs' failure to make a factual showing of conspiracy. However, the Mandelkorn court found it significant that the defendants had denied neither the existence of nor their participation in the alleged conspiracy. It specifically noted that the situation would have been quite different if the defendants had denied the allegations. 359 F.Supp. at 396-97. See also Centronics Data Computer Corp. v. Mannesmann, A.G., 432 F.Supp. 659 (D.N.H.1977).

In the present case, Chrysler's allegation of a conspiracy including Interclisa and the Fedders defendants is unsupported by any factual assertions. In support of its motion to dismiss, Interclisa filed two affidavits of its managing director, Alfredo Calzada Atienza. Those affidavits state, in pertinent part, that Interclisa was not involved in the contract negotiations between Chrysler and Fedders and had no knowledge of or connection with any conspiracy. Chrysler did not submit counter-affidavits and, as the trial court pointed out, offered no reason to doubt any of the statements in Mr. Calzada's affidavits. Under these circumstances we hold that Chrysler's totally unsupported allegations of conspiracy cannot constitute sufficient contacts with Michigan to justify an exercise of personal jurisdiction over Interclisa by the District Court.

Similarly, the allegation of conspiratorial activities with tortious consequences in the forum state is insufficient to support jurisdiction under the long arm statute in the absence of some minimal factual showing of Interclisa's participation in the conspiracy. Cf. Weinstein, supra, 432 F.Supp. at 345.

In light of our holding on this issue, we need neither adopt nor reject the "conspiracy theory" of in personam jurisdiction as a general principle of law in this circuit.

B. Jurisdiction under § 12 of the Clayton Act.

Chrysler advances a second basis for its assertion that Interclisa is subject to the personal jurisdiction of the District Court. According to Chrysler's theory, jurisdiction over a foreign corporation being sued on a federal cause of action may be founded on the corporation's contacts with the United States as a whole as opposed to its contacts with the forum state.[3]  This "national contacts" or "aggregate contacts" concept is based on the proposition that a court's jurisdictional power to render a binding judgment on federal questions must be examined in light of the due process clause of the Fifth rather than the Fourteenth Amendment. Edward J. Moriarty & Co. v. General Tire and Rubber Co., 289 F.Supp. 381 (S.D.Ohio 1967). Although the "minimum contacts" test developed in the International Shoe line of cases deals with Fourteenth Amendment due process restrictions on the states, the rationale of those cases applies equally to the Fifth Amendment, since the sovereign powers of the United States are at least as broad as those of the states. Amburn v. Harold Forster Industries, Ltd., 423 F.Supp. 1302, 1304 (E.D.Mich.1976). The court in Moriarty, supra, described the appropriate application of the minimum contacts test to state and federal governments:

Thus, in our view, the judicial jurisdiction over the person of the defendant does not relate to the geographical power of the particular court which is hearing the controversy, but to the power of the unit of government of which that court is a part. The limitations of the concept of personal jurisdiction are a consequence of territorial limitations on the power of the respective forums. Thus, as applied to the states, the constitutional test for personal jurisdiction involves a determination as to whether the defendant has certain minimal contacts with the forum state, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

By the same token, we feel that the appropriate inquiry to be made in a federal court where the suit is based upon a federally created right is whether the defendant has certain minimal contacts with the United States, so as to satisfy due process requirements under the Fifth Amendment. For a thorough discussion of this theory, see Green, "Federal Jurisdiction in Personam of Corporations and Due Process," 14 Vanderbilt L.Rev. 967 (1961); Note, "Jurisdiction of Federal District Courts over Foreign Corporations," 69 Harv.L.Rev. 508 (1956). Also see, Jaftex Corp. v. Randolph Mills, Inc., 282 F.2d 508 (2 Cir. 1960); Gkiafis v. Steamship Yiosonas, 342 F.2d 546 (4 Cir. 1965); Mutual International Export Co. v. Napco Industries, Inc., 114 U.S.App.D.C. 392, 316 F.2d 393 (1963); Lone Star Package Car Co. v. Baltimore & O. R. Co., 212 F.2d 147 (5 Cir. 1954); Goldberg v. Mutual Readers League, Inc., 195 F.Supp. 778 (E.D.Pa.1961); Bar's Leaks Western v. Pollock, 148 F.Supp. 710 (N.D.Cal.1957); Singleton v. Atlantic Coast Line R. R. Co., 20 F.R.D. 15 (E.D.Mich.1956).

It may well be neither unfair nor unreasonable as a matter of due process to aggregate the nonforum contacts of an alien corporate defendant in order to

establish personal jurisdiction. In Engineered Sports Products v. Brunswick Corp., 362 F.Supp. 722 (D.Utah 1973), the court observed: "Due Process or traditional notions of fair play and substantial justice should not immunize an alien defendant from suit in the United States simply because each state makes up only a fraction of the substantial nationwide market for the offending product." Id. at 728. Otherwise, a foreign corporation "could commit serious torts or contract breaches without ever having enough contacts with any one forum to give those injured an opportunity to seek redress." Centronics Data Computer Corp. v. Mannesmann, A.G., supra, 432 F.Supp. at 664. Thus, although the theory has not yet been generally accepted, and there is no specific statutory authority for it, see 4 Wright & Miller, Federal Practice and Procedure : Civil § 1075 at 304, n.29 (1976), it has been adopted by several courts. See Holt v. Klosters Rederi A/S, 355 F.Supp. 354 (W.D.Mich.1973); Cryomedics, Inc. v. Spembly, Ltd., 397 F.Supp. 287 (D.Conn.1975); Centronics, supra; Amburn, supra. See also Wells Fargo and Co. v. Wells Fargo Express Company, 556 F.2d 406 (9th Cir. 1977) (aggregating contacts may be proper when a federal statute such as § 12 of the Clayton Act authorizes worldwide service of process); Moriarty, supra (decided on other grounds).

The present case, however, does not require us to decide whether the "aggregate contacts" theory is consistent with the due process clause of the Fifth Amendment. Even if we were to hold that nonforum contacts can properly support personal jurisdiction over an alien defendant in antitrust actions, Chrysler has failed to establish that Interclisa has sufficient contacts with the United States as a whole.

The test for determining the sufficiency of the nexus between the forum and the defendant was formulated by the Supreme Court in Hanson v. Denkla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958):

The application of (the) rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. Id. at 253, 78 S.Ct. at 1239.

The uncontroverted affidavits submitted by Interclisa in support of its motion to dismiss establish that Interclisa has never: qualified to do business anywhere in the United States; maintained an office or warehouse, or owned or leased any real or personal property in the United States; sold any of its products in or for distribution in the United States; hired any employees or representatives in the United States; or borrowed any money in the United States.

Chrysler contends that Interclisa's purchases of American parts for its air-conditioning products and its use of technology originating in the United States constitute sufficient contacts for jurisdictional purposes.[4]  We hold that these allegations are insufficient to support the exercise of personal jurisdiction. Interclisa's alleged purchases are unrelated to the events giving rise to this

litigation. Moreover, there is no indication of how many, if any, purchases were actually made, or whether such purchases represent a substantial portion of Interclisa's parts supply. Compare Crusader Marine Corp. v. Chrysler Corp., 281 F.Supp. 802 (E.D.Mich.1968) with Eastern Pre-Cast Corp. v. Giant Portland Cement Co., 311 F.Supp. 896 (E.D.Pa.1970). Under these circumstances we must conclude that Interclisa lacks sufficient minimum contacts with the United States, and that maintenance of this action against it would offend "traditional notions of fair play and substantial justice." International Shoe, supra.

Finally, Chrysler asserts that it should at least have been permitted to conduct discovery concerning jurisdictional facts, and that the District Court's refusal to do so was error.

We agree that discovery may be appropriate when a defendant moves to dismiss for lack of jurisdiction. Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972). However, it is well established that the scope of discovery is within the sound discretion of the trial court. See, e. g., H. K. Porter Co., Inc. v. Goodyear Tire and Rubber Co., 536 F.2d 1115 (6th Cir. 1976). A ruling by the trial court limiting or denying discovery will not be cause for reversal unless an abuse of discretion is shown. Federal Rule of Civil Procedure 26(b); H. L. Moore Drug Exch., Inc. v. Smith, Kline and French Laboratories, 384 F.2d 97 (2d Cir. 1967).

Inasmuch as Chrysler failed to offer any factual basis for its allegations of conspiracy, it was well within the trial court's discretion to deny Chrysler's request for discovery. We reach the same conclusion with respect to Chrysler's allegation that Interclisa made purchases in the United States. The District Court expressly found that there is no reasonable basis to expect that further discovery would reveal contacts sufficient to support personal jurisdiction. See Budde v. Ling-Tempco-Vought, Inc., 511 F.2d 1033, 1035 (10th Cir. 1975). Although it may have been advisable for the District Court to grant Chrysler's request to conduct discovery, we cannot say that its refusal to do so was an abuse of discretion.

Accordingly, the judgment of the District Court is affirmed in part and reversed in part. The case is remanded for proceedings consistent with this opinion.

---

[1] But see Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573 (3rd Cir. 1979), which treats antitrust injury and standing as related but analytically distinct aspects of the "problem of determining when a person is sufficiently 'injured in his business or property by reason of anything forbidden in the antitrust laws.' " Id. at 582. See also Handler, Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term 1977, 77 Col.L.Rev. 979, 994-97 (1977)

---

[2] This aspect of the court's decision was vacated on appeal to permit further discovery as to jurisdictional facts. Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (1972). See p. ---- infra

---

[3] Of course, Congress or the Supreme Court may impose restrictions on the in personam

power of federal courts. These restrictions may be found in venue statutes, the Federal Rules of Civil Procedure, and in the federal statutes under which the plaintiff brings his action

In this case, Chrysler claims that venue is proper under 28 U.S.C. § 1391(d), which provides that an alien may be sued in any district. It further asserts that service of process is authorized by the second clause of § 12 of the Clayton Act, notwithstanding Chrysler's inability to satisfy the venue provisions in the first clause of that section.

Section 12 provides:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

Interclisa, on the other hand, argues in its brief that the service of process provision in the second clause of § 12 is available only when the forum contact requirements of the first clause are met. We need not decide this question because, as Chrysler points out, Interclisa's failure to object to service of process or venue in its Rule 12(b) motion below constitutes a waiver of any such objection here. Federal Rules of Civil Procedure, Rule 12(h).

However, the existence of proper venue is not enough, in itself, for in personam jurisdiction to result from extra-territorial service of process. Mariash v. Morrill, 496 F.2d 1138, 1143 (2d Cir. 1974). In order to obtain personal jurisdiction, the plaintiff has the burden of establishing that the defendant has had such minimal contacts with the forum that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe, supra.

---

[4] Chrysler further alleges that Interclisa's denials are "pregnant with admissions" of other contacts such as product sales within the United States. We decline to draw such inferences and note that the first Calzada affidavit explicitly denies that Interclisa has sold any of its products in or for distribution in the United States



CC∅ | TRANSFORMED BY PUBLIC.RESOURCE.ORG

<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 14a0682n.06

No. 13-5951

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Sep 02, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KNC INVESTMENTS, LLC, a California Limited Liability Company, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| v. | ) ) | THE EASTERN DISTRICT OF KENTUCKY |
| LANE'S END STALLIONS, INC., a Texas Corporation, | ) ) ) | |
| Defendant-Appellee. | ) | OPINION |

BEFORE:  WHITE, DONALD, and O'MALLEY, Circuit Judges.[*]

**BERNICE BOUIE DONALD, Circuit Judge.**  The instant appeal involving KNC Investments, LLC ("KNC") and Lane's End Stallions, Inc. ("Lane's End") arose following this Court's remand to the district court—via sealed per curiam order—to determine whether subsequent events mooted the issues KNC raised in its prior appeal, No. 12-5650.  On remand, the district court found that no live case or controversy remained and accordingly granted Lane's End's motion to dismiss the case for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  For the following reasons, we **AFFIRM** the judgment of the district court.

---

[*]The Honorable Kathleen M. O'Malley, United States Court of Appeals for the Federal Circuit, sitting by designation.

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

I.

Lane's End serves as Syndicate Manager for the owners of interests in the Lemon Drop Kid Syndicate ("the Syndicate"). Lemon Drop Kid is a Thoroughbred horse. The agreement establishing the Syndicate transferred ownership of Lemon Drop Kid from the original, single owner into syndicate form to provide for the horse's management and supervision. The Syndicate consists of forty equal fractional ownership interests ("Fractional Interests"). A holder of a Fractional Interest is an Owner. Each Owner has various rights under the agreement, including breeding Nominations.

On February 28, 2011, KNC purchased Fractional Interest No. A05 in the Syndicate from its previous Owner. At the time of this purchase, the Original Syndicate Agreement ("Original Agreement"), effective November 30, 2000, governed the rights and responsibilities of the Owners and the Syndicate Manager. The Original Agreement contained a procedure whereby thirty-four of the forty Owners of Fractional Interests could amend it.

After buying Fractional Interest No. A05, KNC became concerned about some of Lane's End's business practices. Those practices included Lane's End's making contracts related to the Syndicate in its own name, failing to segregate the Syndicate's assets from those of other syndicates managed by Lane's End, and handling of breeding Nominations.

On January 17, 2012, KNC filed suit against Lane's End, as Syndicate Manager, in the United States District Court for the Eastern District of Kentucky, asserting four claims and seeking declaratory relief, injunctive relief, and damages. In May of 2012, the district court granted Lane's End's motion to dismiss and denied KNC's motion for discovery. KNC appealed to this Court.

- 2 -

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

Before this Court adjudicated KNC's prior appeal, the other thirty-nine Owners of Fractional Interests in the Syndicate voted to amend the Original Agreement and expressly to ratify Lane's End's past actions as Syndicate Manager.  Lane's End then sought to dismiss the appeal as moot based on the Amended Syndicate Agreement ("Amended Agreement").  This Court remanded to the district court to determine in the first instance whether the Amended Agreement mooted KNC's claims.  On remand, the district court found that no live case or controversy remained and accordingly granted Lane's End's Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction.  KNC again appealed to this Court.

## II.

## A.

In granting Lane's End's motion to dismiss for lack of subject-matter jurisdiction, the district court decided only the question of whether KNC's claims are now moot in light of the Amended Agreement.  Because the district court considered only the issue of mootness on remand, we confine our review to that issue.  *Wright v. Holbrook*, 794 F.2d 1152, 1157 (6th Cir. 1986) ("[T]he general rule is that this court will not consider issues not raised in the district court."); *see also Norfolk & W. Ry. Co. v. City of Oregon*, 210 F.3d 372, at \*4 (6th Cir. 2000) (Table) ("The district court limited its remand to that issue and, likewise, our review is similarly limited." (footnote omitted)).

We generally review de novo a district court's decision to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).  *Howard v. Whitbeck*, 382 F.3d 633, 636 (6th Cir. 2004).  If the lower court, however, "does not merely analyze the complaint on its face, but instead inquires into the factual predicates for jurisdiction, the decision on the Rule 12(b)(1) motion

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

resolves a 'factual' challenge rather than a 'facial' challenge, and we review the district court's factual findings for clear error." *Id.* (citing *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1133-35 (6th Cir. 1996); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). Lane's End's challenge to the existence of subject-matter jurisdiction in this case is a factual one because the district court analyzed the complaint in light of the Amended Agreement, which Lane's End contends deprives the court of a "factual predicate[]" for jurisdiction. *Id.* We therefore review the district court's factual findings for clear error and its legal conclusions de novo. *See Howard*, 382 F.3d at 636.

B.

This Court has stated that "'[t]he test for mootness is whether the relief sought would, if granted, make a difference to the legal interest of the parties.'" *Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 348 (6th Cir. 2010) (quoting *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006)). The "heavy burden of demonstrating mootness" lies with the party claiming that the case is moot. *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 530-31 (6th Cir. 2001) (citing *Cnty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979)). We agree with the district court that Lane's End met its burden to prove the mootness of this controversy in light of the Amended Agreement, which now expressly ratifies Lane's End's past conduct.

KNC's Complaint asserts four claims against Lane's End. Count I seeks a declaratory judgment, based on the Original Agreement, requiring Lane's End to segregate the Syndicate's funds and business dealings. Count II seeks a permanent injunction, based on the Original Agreement, to prevent Lane's End from commingling the Syndicate's funds or making Syndicate

- 4 -

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

contracts in the name of Lane's End.  Count III seeks a declaratory judgment, based on the Original Agreement, requiring Lane's End to allocate excess Nominations to Syndicate Members and requiring Lane's End to give the Owners first priority to purchase any Nominations sold by the Syndicate.  Count IV seeks compensatory and punitive damages for Lane's End's alleged violations of its fiduciary duties to the Owners under the Original Agreement.  All the claims KNC brought in the district court therefore were based on the Original Agreement.

Events that transpired after KNC filed its Complaint, however, prevent it from asserting any claims under the Original Agreement.  The other thirty-nine Owners of Fractional Interests in the Syndicate—all save for KNC—voted in May and June of 2012 to amend the Original Agreement.  The Amended Agreement addresses the actions taken by Lane's End that KNC complains of in this litigation.  Specifically, the language of the Amended Agreement expressly ratifies all of Lane's End's past actions regarding the handling of Syndicate funds, making contracts in the name of Lane's End, and allocating breeding Nominations.  Kentucky law permits such ratification, even with the consent of a simple majority of the owners.  *See Weisbord/Etkin/Goldberg v. Gainesway Mgmt. Corp.*, No. 2007-CA-000280-MR, 2008 WL 820950, at *5-6 (Ky. Ct. App. Mar. 28, 2008) ("The appellants provide no convincing authority in law or in the express language of the Agreement to support the view that such a post facto approval of the transfer of one share must be approved by all the members of the syndicate.").[1]

---

[1]We recognize that the *Weisbord* court reached this conclusion in a case where the syndicate agreement was not amended, which is different from the situation here.  We cite this case only to demonstrate that the other Owners of Fractional Interests in the Syndicate were permitted under Kentucky law to ratify Lane's End's past conduct without KNC's consent.

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

Accordingly, the district court's factual conclusion—based on the affidavit submitted by Thomas Hyams, Secretary and Treasurer of Lane's End—that the other thirty-nine Owners in the Syndicate followed the proper procedures for ratifying Lane's End's prior actions is not clearly erroneous. KNC failed to present probative evidence to the district court rebutting Hyams' affidavit, and the Amended Agreement specifically ratifies all of Lane's End's past actions. This Court thus cannot grant any relief that "would . . . make a difference to the legal interest of the parties." *Wedgewood*, 610 F.3d at 348 (quoting *Ford*, 469 F.3d at 504) (internal quotation marks omitted).

C.

KNC nonetheless contends that the district court committed two legal errors in granting Lane's End's Rule 12(b)(1) motion to dismiss. First, KNC argues that the district court failed to follow the mandate in our prior remand order, which KNC construes to contain a requirement that the district court decide disputed issues of material fact via the discovery process. Second, KNC argues that the other Owners' decision to amend the Original Agreement cannot moot its claim seeking compensatory and punitive damages for Lane's End's alleged violations of fiduciary duties to the Syndicate.

In remanding to the district court to determine in the first instance whether this case is moot, we neither held that there were disputed issues of fact nor required the district court to conduct discovery. In *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229 (6th Cir. 1981), this Court held that whether or not to allow discovery prior to deciding a motion to dismiss for lack of jurisdiction is within the discretion of the district court. *Id.* at 1240 ("A ruling by the trial court limiting or denying discovery will not be cause for reversal unless an abuse of discretion is

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

shown."). The instant case is analogous to *Chrysler Corp.* because KNC did not present any probative evidence to the district court to support its allegations that Lane's End acted improperly during the amendment process in May and June of 2012. *See id.* ("Inasmuch as Chrysler failed to offer any factual basis for its allegations of conspiracy, it was well within the trial court's discretion to deny Chrysler's request for discovery."). The district court therefore did not abuse its discretion in denying as moot KNC's discovery request.

KNC's second argument, that the amendment of the Original Agreement cannot moot its claim for damages regarding Lane's End's alleged breach of fiduciary duties, has some superficial appeal. Indeed, this Court has stated: "[W]here a claim for injunctive relief is moot, relief in the form of damages for a past *constitutional violation* is not affected." *Gottfried v. Med. Planning Servs., Inc.*, 280 F.3d 684, 691 (6th Cir. 2002) (emphasis added) (citing *Univ. of Tex. v. Camenish*, 451 U.S. 390, 393-94 (1981); *Powell v. McCormack*, 395 U.S. 486, 495-500 (1969)). Even where a past constitutional violation is at issue, however, "[t]he key question is whether [the plaintiff] has a *viable* claim for damages." *Id.* Setting aside the fact that KNC has not alleged a constitutional violation in this case, KNC's claim for damages is no longer viable in light of the Amended Agreement.

Although KNC correctly points out that the district court improperly relied on its own non-final order of dismissal to conclude that KNC's claim for alleged breaches of fiduciary duties was moot, that improper reliance does not constitute a reversible error. *See City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994) (citing *Hilliard v. U.S. Postal Serv.*, 814 F.2d 325, 326 (6th Cir. 1987)) ("[W]e may affirm on any grounds supported by the record, even though they may be different from the grounds relied on by the district court."). KNC's

- 7 -

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

claim is moot because the other Owners of Fractional Interests in the Syndicate expressly ratified

Lane's End's conduct in relation to KNC in the Amended Agreement.    Therefore, KNC no

longer has a viable claim for damages.

III.

Accordingly, we **AFFIRM** the judgment of the district court.

- 8 -

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

**HELENE N. WHITE, Circuit Judge**, dissenting.  The majority opinion concludes that KNC's claims against Lane's End are moot because the Amended Agreement "now expressly ratifies Lane's End's past conduct."  Maj. Op. at 4.  I respectfully dissent.

**I.**

KNC brought four claims:  (I) for a declaratory judgment that Lane's End should be required to make all contracts related to the Syndicate "in the name of the LDK Syndicate" and that all monies received by Lane's End for the Syndicate should be deposited into a segregated, interest-bearing account; (II) for an injunction prohibiting Lane's End from commingling Syndicate funds with other funds and from making contracts related to the Syndicate in Lane's End's name; (III) for a declaration that Lane's End must allocate excess Nominations to Syndicate members and give Syndicate members priority consideration in the purchase of Nominations; and (IV) for damages based on Lane's End alleged breach of fiduciary duties in engaging in the conduct described in Counts I – III.  The district court dismissed the claims and KNC appealed.  During the pendency of the direct appeal, thirty-nine of the forty members of the Syndicate voted to amend the Syndicate Agreement and to ratify Lane's End's challenged conduct.  The Amended Agreement makes its changes effective retroactive to the date of the adoption of the Original Agreement and purports to supersede that Agreement entirely.  Lane's End filed a Notice of Suggestion of Mootness based on the Amended Agreement.  Without reaching the merits of KNC's appeal, we remanded the case to the district court for a determination whether the Amended Agreement rendered KNC's claims moot.

On remand, the district court found that KNC's complaints regarding the sale of bonus nominations were moot because "thirty-nine of the forty Syndicate Owners ratified Lane's End's decisions."  Op. at 2 (citing Section 6.16(f) of the Amended Agreement).  The district court did

- 9 -

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

not specifically address Counts I and II.  The district court rejected KNC's argument that its claims for monetary relief in Count IV are still alive, relying on its own prior dismissal of the claim.  *Id.* at 3 ("[T]he breach of fiduciary duty claims were expressly dismissed and therefore, there can be no 'surviving' claim for damages stemming from those dismissed claims.").  The district court also denied KNC's request for discovery.

In this appeal, KNC argues, first, that the district court failed to follow the mandate in the remand order, "which KNC construes to contain a requirement that the district court decide disputed issues of material fact via the discovery process."  Maj. Op. 10.  I agree with the majority that the remand order did not require the district court to permit discovery into the validity of the amendment and ratification process.  I note, however, that to the extent the district court relied on its own prior dismissal of KNC's claim for damages to find the damages claim moot, it failed to comply with the mandate.  Second, KNC argues that the amendment of the Original Agreement cannot moot its claim for damages regarding Lane's End's alleged breach of fiduciary duties.

## II.

As KNC acknowledges, its claims for declaratory and injunctive relief under the Original Agreement are moot because the Original Agreement no longer exists to enforce.  But the Owners' adoption of the Amended Agreement does not necessarily moot KNC's claims for *damages* because this court can still redress a past violation of the Original Agreement by awarding damages.  *See Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 348 (6th Cir. 2010) ("'The test for mootness is whether the relief sought would, if granted, make a difference to the legal interest of the parties.'") (citation omitted); *see also* 13C Fed. Prac. & Proc. Juris. § 3533.3 (3d ed.) ("Untold numbers of cases illustrate the rule that a claim for money damages is

- 10 -

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

not moot, no matter how clear it is that the claim arises from events that have completely concluded without any prospect of recurrence.").

Lane's End asserts, essentially, two reasons that the Amended Agreement nonetheless renders KNC's damages claims moot: (1) in the Amended Agreement, the Owners ratified, i.e., retroactively sanctioned, all the conduct of Lane's End that KNC claims was in violation of the Agreement and Lane's End's fiduciary duties; and (2) the Amended Agreement purports to supersede the Original Agreement entirely, as though it never existed.

## A. Ratification

The Original Agreement provides that "the relationship of the Owners to the Syndicate Manager [is] that of principal and agent." Under Kentucky law, a principal may ratify or affirm its agent's otherwise unauthorized conduct. *See Stewart v. Mitchell's Adm'x*, 190 S.W.2d 660, 662 (Ky. 1945) ("As applied to the law of agency, ratification is the affirmance of an act by one for or in behalf of another at a time when he had no authority to do the act for the one in whose name it was done."). "An otherwise-effective ratification eliminates claims that the principal has against the agent, including claims for breach of fiduciary duty." Restatement (Third) of Agency § 4.02(b). Accordingly, if KNC ratified Lane's End's conduct, all KNC's claims against Lane's End would be extinguished, and therefore moot, even claims for damages.

The Original Agreement provides that a vote of 34 out of 40 Owners may alter, amend, or modify the Agreement, and a simple majority of Owners may resolve "all questions properly submitted." The Owners' express statement in the Amended Agreement that they ratified Lane's End's conduct is undoubtedly effective to ratify the conduct on behalf of the Owners who participated in the vote to amend, but the question is whether it is effective with respect to KNC.

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

The majority opinion concludes that Kentucky law permits a simple majority of syndicate owners to ratify an agent's conduct on behalf of the remaining owners.   Maj. Op. at 6 ("Kentucky law permits such ratification, even with the consent of a simple majority of the owners.")  (citing *Weisbord/Etkin/Goldberg v. Gainesway Mgmt. Corp.*, No. 2007-CA-000280-MR, 2008 WL 820950, at *5–6 (Ky. Ct. App. Mar. 28, 2008), for its observation that "[t]he appellants provide no convincing authority in law or in the express language of the Agreement to support the view that such a post facto approval of the transfer of one share must be approved by all the members of the syndicate.").  But the quoted sentence in *Weisbord* was not a holding; it was dicta.  In *Weisbord*, the plaintiffs challenged the sale of one member's Fractional Interest, arguing that in coordinating the sale, the Syndicate Manager had deviated from the terms of the Syndicate Agreement governing such sales.  *Id.* at *2.  The court affirmed the dismissal of the plaintiffs' claims for declaratory and injunctive relief.  It found, first, that the plaintiffs were estopped from challenging the sale because they themselves had sought a waiver from the terms of the Agreement.  *Id.* at *4.  Second, it addressed the plaintiffs' argument "that the ratification was invalid because it was not approved by all the members of the syndicate, but was approved only by a majority."  *Id.* at *6.  The court made the observation quoted above that the plaintiffs had provided "no convincing authority in law or in the express language of the Agreement to support the view that such a post facto approval of the transfer of one share must be approved by all the members of the syndicate."  *Id.*   And then in a footnote immediately following that observation, the court stated: "*Regardless of whether the appellants have a valid argument in this regard*, they are without remedy due to estoppel as we have explained above."  *Id.* at *6 n.3 (emphasis added).   Thus, the observation the majority relies on would not bind subsequent Kentucky courts because it is dicta, *see Bd. of Claims of Kentucky v. Banks*, 31 S.W.3d 436, 439

- 12 -

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

n.3 (Ky. Ct. App. 2000), and because it appears in an unpublished decision, *see* Ky. St. RCP 76.28(4)(c). For a federal court sitting in diversity, like this one, the observation is a relevant data point, but is not controlling on its own. *See Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) ("When deciding a diversity case under state law," where the state's highest court has not decided the question, "a federal court must . . . ascertain the state law from 'all relevant data'" including "the state's appellate court decisions, . . . the state's supreme court dicta, restatements of law, law review commentaries, and the majority rule among other states") (citations omitted).

The Kentucky Supreme Court has applied the Restatement (Third) of Agency (2006) to questions of agency law, *see Pannell v. Shannon*, 425 S.W.3d 58, 84 (Ky. 2014) (citing §§ 4.01, 4.02 in a discussion of ratification), as well as American Jurisprudence, Second Edition, on Agency, *see Kindred Nursing Ctrs. Ltd. P'ship v. Leffew*, 398 S.W.3d 463, 467 (Ky. Ct. App. 2013) (stating that "Kentucky has adopted th[e] understanding of ratification" expressed in 2 Am. Jur. 2d *Agency* § 209 (2013)) (citing *Capurso v. Johnson*, 248 S.W.2d 908, 910 (Ky. 1952)). Under the Restatement, the Owners are "coprincipals," and lack the power to ratify their agent's conduct on each other's behalf. *See* Restatement (Third) of Agency § 3.14 ("[A]n agent for coprincipals acts for more than one principal in the same transaction or other matter. Coprincipals are not hierarchically stratified."); *see also id.* § 4.01 ("When there are two or more coprincipals, *each must ratify to be bound*.") (emphasis added). American Jurisprudence is in accord. *See* 3 Am. Jur. 2d *Agency* § 176 (2013) ("If a ratification would bind multiple principals, each must affirm with knowledge of the acts to be ratified.") (citing Restatement (Third) Agency § 4.06 cmt. b.); *see also Kindred Nursing Ctrs. Ltd. P'ship*, 398 S.W.3d at 467 (citing § 176 of Am. Jur. as authoritative on a question of agency law).

- 13 -

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

KNC did not vote to ratify Lane's End's conduct.  To resolve the question whether the Owners' ratification is effective as to KNC, I would look to the authorities the Kentucky Supreme Court and Court of Appeals have relied on in published decisions rather than an unsupported, non-binding observation in an unpublished decision.  According to those authorities, the Owners lacked authority to ratify Lane's End's conduct on KNC's behalf, and therefore, the Owners' ratification could not and did not extinguish KNC's claims for damages.

### B.  Contract

I would also reject Lane's End's contention that the Owners' purported retroactive amendment of the contract moots KNC's claims for damages.  Lane's End cites Kentucky decisions holding generally that a contract provision allowing for amendment of the contract is enforceable and binding, *see, e.g.*, *Kentucky Home Mut. Life Ins. Co. v. Leitner*, 196 S.W.2d 421, 423 (Ky. 1946); *Supreme Lodge K.P. v. Hunziker*, 87 S.W. 1134, 1135 (Ky. 1905), but neither party cites cases addressing whether a contract provision granting one-sided authority to amend can be reasonably construed to include authority to amend the contract *retroactively*.

Kentucky follows the general rule of enforcing contracts as written.  *See Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 685 (Ky. 2012) ("'[A] written instrument will be enforced strictly according to its terms,' and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.") (quoting *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003).  No term in the Original Agreement confers on the Owners the power to *retroactively* change its terms.  The Original Agreement provides that it may be "altered, amended, or modified" by thirty-four out of forty Owners, but says nothing about retroactivity, and the contract does not purport to govern the parties' *past* conduct.  Under those circumstances, I see no basis to conclude that the Owners'

No. 13-5951
*KNC Invs., LLC v. Lane's End Stallions, Inc.*

authority to amend the Original Agreement includes the additional extraordinary power to retroactively amend it to eliminate an Owner's accrued claim for damages. *Cf., e.g.*, *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 373 (6th Cir. 1999) (declining to give a merger clause retroactive effect "as no other provision of the later agreement even 'remotely intimate[d] that the parties ever contemplated so radical a retroactive renegotiation of their earlier agreements'") (quoting *Choice Security Sys., Inc. v. AT&T Corp.*, No. 97–1774, 1998 WL 153254, at *1 (1st Cir. 1998) (unpublished)). To the extent that Lane's End argues that the Amended Agreement is probative of the Owners' understanding of the terms of the Original Agreement, that is not a contention that renders KNC's claims moot; it is an argument on one side of a live controversy.

I would VACATE the district court's mootness determination and reach the merits of KNC's appeal regarding Count III. In that regard, I would reverse the grant of the motion to dismiss as to the claim regarding nominations. The Syndicate Agreement is ambiguous on this issue, and further proceedings are appropriate.