UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

YISRAEL Z. HEILMANN,                    Civil Action No. 25-cv-02431


                    Plaintiff,




        -against-




YESHIVA UNIVERSITY; SEYFARTH SHAW LLP;
SAPIR AMAR; MOSHE DAVIDOVICS;
JONATHAN WERTA; JOSE HAMBRA; SALVADOR SERFATY;
DR. SARA ASHER; DR. YEDIDYA LEVY;
JUDITH E. LOPEZ; DR. YAEL MUSKAT;
JENNIFER GOLDEN; DR. REBECCA CYPESS;
ABIGAIL KELSEN; ESTHER SASSON; JOE BEDNARSH;
AVI FEDER
DOV KESSELMAN; IAN M. CAPELL;
KYLE D. WINNICK;
JOHN DOES 1-10 (STUDENTS);
JOHN DOES 11-20 (INSTITUTIONAL ACTORS);



Defendants.

-------------------------------------X



------------------------------------------------------------------

*Heilmann v. Yeshiva University et al., No. 1:25-cv-02431 (AT) (RWL) –*

*PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY AND PROTECTIVE ORDER*

*UNDER FED. R. CIV. P. 26(d)(1) AND 26(c)*

------------------------------------------------------------------

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 3 of 56

## TABLE OF CONTENTS

| Section | Page |
|---|---|
| **Preliminary Statement** | **4** |
| **Factual Background** | **5** |
| **A. March 21, 2024: Violent Assault on Plaintiff by Fellow Student Sapir Amar** | **5** |
| **B. March 21–25, 2024: University Officials Pressure Plaintiff to Drop Charges Against Amar** | **6** |
| **C. Ongoing Retaliation and Harassment of Plaintiff (April–September 2024)** | **8** |
| **Legal Standard** | **14** |
| **Expedited Discovery** | **14** |
| **Protective Order** | **15** |
| **Argument** | **16** |
| **I. Expedited Discovery Is Warranted to Preserve Critical Evidence and Elucidate Key Facts Underlying Plaintiff's Claims** | **16** |
| **A. Immediate Retrieval of Video and Access Logs from March 21 and March 25, 2024** | **17** |
| **B. Discovery of Internal Communications Will Likely Reveal Defendants' Knowledge and Approval of the Retaliation** | **18** |
| **C. Expedited Discovery Will Help Secure Testimony and Identify Witnesses While Memories Are Fresh** | **20** |
| **II. A Protective Order Is Necessary to Prevent Further Retaliation, Intimidation, and Spoliation of Evidence** | **21** |
| **A. Non-Retaliation and No-Contact Provisions** | **36** |
| **B. Preservation of Evidence and Anti-Spoliation Provisions** | **38** |
| **III. Plaintiff's Requests Are Factually and Legally Supported, and the Court Should Grant Relief Expeditiously** | **42** |
| **Conclusion** | **44** |
| **Appendix: Summary of Key Evidence Supporting Motion** | **48** |
| **Appendix: Index of Exhibits (Submitted in Support of Plaintiff's Motion for Expedited Discovery and Protective Order)** | **52** |
| **Appendix: Table of Authorities** | **55** |
| **Appendix: Certification of Good Faith Conferral (Fed. R. Civ. P. 26(c)(1))** | **56** |
| **Exhibits (Attached)** | **—** |

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 4 of 56

Honorable Judge Lehrburger:

**Plaintiff Yisrael Z. Heilmann**, proceeding pro se, respectfully moves this Court for an Order:

(1) permitting expedited discovery in advance of the Rule 26(f) conference, and (2) issuing a

protective order to safeguard Plaintiff and the integrity of these proceedings. In support of this

Motion, Plaintiff states as follows:

# PRELIMINARY STATEMENT

Plaintiff has endured a harrowing series of events at Yeshiva University ("YU") that began with

a **violent on-campus assault** and spiraled into **a campaign of retaliation and obstruction** by

Defendants. On March 21, 2024, a fellow student brutally attacked Plaintiff in YU's library,

inflicting a traumatic brain injury and other serious harm. In the days that followed, instead of

protecting the victim, YU officials undertook extraordinary measures to **silence and intimidate**

Plaintiff – including physically detaining him behind locked doors and **threatening to kill him**

**and his family** if he pursued charges. When Plaintiff persisted in seeking justice and

accommodations for his resulting disabilities, Defendants retaliated by **sabotaging his education**

**and immigration status** – unfairly terminating his student visa (Form I-20) and dismissing him

under pretextual "academic" grounds. Peer harassment against Plaintiff was

likewise **emboldened and unchecked**, as exemplified by a mob of students targeting him with

menacing chants on September 7, 2024. Through it all, YU and its counsel (Seyfarth Shaw LLP)

engaged in procedural misconduct and obstruction – from filing **false and defamatory**

**statements** in a state civil-rights investigation to sending Plaintiff an **improperly threatening**

**letter** aimed at dissuading him from pursuing his rights. This motion seeks urgent relief to address these ongoing wrongs.

Specifically, Plaintiff requests **expedited discovery** targeted at preserving and uncovering evidence of the above events – including security camera footage, internal emails/chat logs, and disciplinary records that are at imminent risk of spoliation or concealment. Plaintiff further seeks a **protective order** barring Defendants from any further acts of retaliation or witness interference and prohibiting the deletion or alteration of relevant evidence. Given the egregious facts and the **credible threat of continuing harm** to Plaintiff's rights, the requested relief is necessary and proper. Courts have recognized that expedited discovery may be granted upon a showing of good cause – for example, where specific evidence may disappear or where it is needed to prevent irreparable harm. Likewise, Rule 26(c) authorizes protective orders to shield litigants from "annoyance, embarrassment, oppression, or undue burden," which in this case includes **shielding Plaintiff and witnesses from intimidation** and preserving the status quo. Plaintiff has amply demonstrated "good cause" here: the pattern of documented retaliation and evidence of ongoing cover-up justifies immediate court intervention to prevent further irreparable damage.

In short, this is not a typical case. The **facts are as shocking as they are substantiated** by written records, video, and even Defendants' own admissions. Plaintiff stands as a young immigrant student who was beaten on campus and then essentially **stonewalled and terrorized** by those entrusted with his safety. He now turns to this Court for relief that is both urgent and narrowly tailored: *urgent*, because each day increases the risk that key evidence (such as surveillance videos or internal communications) will be lost or destroyed, and *narrowly tailored*, because the discovery sought is limited to critical items and the protective order would

merely enjoin unlawful conduct (retaliation, witness tampering, and spoliation) that no party could rightly oppose. For the reasons set forth below, Plaintiff respectfully urges the Court to grant this motion in its entirety.

# FACTUAL BACKGROUND

## A. March 21, 2024: Violent Assault on Plaintiff by Fellow Student Sapir Amar

In the early hours of March 21, 2024, Plaintiff was **viciously assaulted** by Defendant Sapir Amar, a YU student, inside the University's Wilf Campus library. Moments after midnight, Plaintiff simply attempted to use a library study area when Amar – who had been harassing Plaintiff over the prior week – became enraged at Plaintiff's presence. Amar escalated from verbal abuse to sudden physical violence: he **snatched a water bottle from Plaintiff and doused him**, then punched and kicked Plaintiff repeatedly. In a final shocking burst of brutality, Amar **lifted a chair and smashed it against Plaintiff** as Plaintiff tried to protect himself. The force of the blows knocked Plaintiff to the floor, causing him to strike his head and leaving him momentarily defenseless. Plaintiff sustained significant injuries – including a **traumatic brain injury (concussion)**, hearing loss, and severe bruising. He was later transported by ambulance to the hospital for emergency treatment.

Crucially, **the entire attack was captured on security cameras and on Plaintiff's phone**, which was recording at the time. NYPD officers arrived promptly, observed evidence of the assault (overturned furniture, Plaintiff's injuries), and **arrested Amar at the scene**. The responding officers' body-worn cameras also recorded Amar's post-arrest demeanor and

Plaintiff's condition. Amar was criminally charged for the attack. Notably, **bias-motivated animus** appeared to underlie the assault: just days earlier, Amar had been targeting Plaintiff with ethnic slurs (Plaintiff is a German/Spanish national), and even during the assault witnesses heard Amar spew insults tied to Plaintiff's background. Subsequent events on campus – such as other students later chanting Amar's name ("Sapir") as a taunt – confirm that Amar's attack was perceived as a hate-fueled incident against Plaintiff.

Rather than treat Plaintiff as the victim of a violent hate crime, Yeshiva University's administrators **reacted with opacity and indifference**. Despite the severity of the assault, YU did not immediately expel Amar or even ban him from campus pending investigation. Plaintiff, fearful for his safety, noticed individuals associated with Amar lingering near his dorm in the days after the arrest – causing Plaintiff to **fear retaliation and relocate in secret for his own protection**. YU offered little assurance or support. This lack of support deepened Plaintiff's trauma, compounding his anxiety and sense of betrayal. As detailed next, YU's primary response to the assault soon became **pressuring Plaintiff to "let it go"** rather than holding the assailant accountable.

## B. March 21–25, 2024: University Officials Pressure Plaintiff to Drop Charges Against Amar

In the immediate aftermath of the assault, while Plaintiff was still in the hospital recovering, YU administrators launched a concerted effort to **dissuade Plaintiff from pursuing criminal charges** against Amar. Defendant Dr. *Sara Asher* (YU's Dean of Students) began calling Plaintiff in the hospital **within hours of the attack**, repeatedly urging him to **"not press**

charges" and to even help get Amar out of jail. Between approximately 3:30–4:00 a.m. on March 21, 2024 – literally the night of the assault – Asher telephoned Plaintiff under the pretext of checking on him, but emphasized that the University "does not support" him pursuing a criminal case. Asher implicitly warned Plaintiff that he was on his own if he involved law enforcement, signaling that YU's priority was protecting itself (and Amar) rather than Plaintiff. Plaintiff, a recent immigrant unfamiliar with U.S. legal systems, was bewildered to find the Dean of Students effectively **pressuring him to relent**. He told Asher he would seek independent legal advice and refused to commit to dropping anything. Asher nonetheless persisted: her calls continued over the next few days up to March 25, 2024, each time exhorting Plaintiff to "withdraw the charges" and suggesting he cooperate in freeing Amar.

YU's **Counseling Center director, Dr. Yedidya Levy, joined this pressure campaign** as well. On March 21, 2024 (the day of the assault), Dr. Levy phoned Plaintiff and pointedly asked if Plaintiff intended "to drop the charges" against Amar. Coming just hours after Plaintiff had been beaten and concussed, Levy's inquiry was shockingly tone-deaf and clearly aimed at probing Plaintiff's resolve. Plaintiff perceived Levy's call as an attempt to influence him – a perception borne out by Asher's simultaneous efforts. In short, multiple YU officials were **coordinating to protect the assailant and the university's reputation**, rather than supporting the victim.

On March 25, 2024, this improper pressure escalated into an outright **ambush and coercion** by YU staff. Defendants Asher and Levy induced Plaintiff to come to YU's campus Counseling Center on March 25, purportedly so he could obtain psychological support and discuss the incident. Unbeknownst to Plaintiff, this was a trap. When Plaintiff arrived around 5:00 p.m., he was **ushered into Dr. Levy's personal office on the 5th floor of Furst Hall by Levy and**

**Defendant Judith Lopez (a University counselor)**. The moment he entered, Lopez and Levy **shut the door and locked it**, physically isolating Plaintiff inside the office. Plaintiff was now *detained against his will* in a small office with two authority figures blocking the exit. What followed was approximately 10–12 minutes of **nightmarish intimidation**: Levy and Lopez told Plaintiff, in sum and substance, that if he did not drop the charges against Amar, **"my family in Germany and I could be killed."** Levy explicitly mentioned the word "murder," warning Plaintiff that continuing to pursue the case would directly endanger Plaintiff's life and the lives of his loved ones. This was no abstract suggestion – Levy spoke as if violent retribution was a near certainty unless Plaintiff capitulated **(Witness testimony available)**.

Plaintiff was understandably terrified. When he got up and tried to leave the office, **Mrs. Lopez physically restrained him** – she moved to block the door and at one point grabbed Plaintiff to keep him from escaping. Plaintiff realized he was effectively being held *hostage by university staff on campus*. Both Levy and Lopez were visibly agitated, creating an atmosphere of palpable menace. They compounded their threats with additional coercion: Levy threatened that Yeshiva University would **"cancel [Plaintiff's] visa"** and **terminate his academics** if he didn't stay quiet. He warned Plaintiff that YU would ensure he could not continue his studies in the U.S., and that Plaintiff would receive no help or compensation from YU or anyone – implying that pursuing legal action would only ruin Plaintiff's life with no upside. Levy chillingly stated that the *only* outcome if Plaintiff pursued a lawsuit would be **Plaintiff's death**. In essence, YU's Dean and counselor delivered the message: drop this matter, or you and your family will be dead and your education/career will be destroyed.

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 10 of 56

Plaintiff eventually extricated himself after this 10–12 minute ordeal, shaken and traumatized. He had just experienced a **crime within a crime** – an unlawful detention and extreme witness intimidation perpetrated by the very institution that should have been shielding him. Fearing for his safety, Plaintiff made records of what happened and later reported these threats to law enforcement authorities. (This March 25, 2024 incident is so severe that it is currently under active criminal investigation by authorities in Plaintiff's home country of Germany, as Defendants' misconduct may have violated international anti-extortion laws given the transnational death threats.) Plaintiff preserved **video evidence and access logs** from the building to corroborate that he was indeed confined in the office during that time. Needless to say, these events compounded Plaintiff's trauma tenfold. He was now not only the victim of a brutal assault by a classmate, but also the victim of **institutional betrayal of the highest order**.

Defendants have attempted to **deny and whitewash** this incident. In litigation, YU has gone so far as to call Plaintiff's account "bizarre" and "ridiculous," flatly denying that any threats or confinement occurred. According to YU's version, Plaintiff supposedly visited the counseling office voluntarily and was never touched or stopped from leaving. They claim Levy and Lopez only gave benign advice to "focus on studies" and merely suggested Plaintiff consider his mental health in deciding whether to press charges. These self-serving assertions are directly contradicted by Plaintiff's detailed testimony and supporting evidence. Tellingly, YU's **internal records themselves confirm unusual behavior** on March 25: for example, access logs and video (which Plaintiff will seek in discovery) will show the locked-door meeting; and immediately after the incident, YU's Dean Asher sent Plaintiff an email scolding him for "recording" conversations and being "disruptive" at the Counseling Center. This April 11, 2024

email from Asher (discussed further below) only makes sense if Plaintiff *had* recorded or reported the March 25 encounter – in other words, YU was far more concerned with **silencing Plaintiff's evidence** than addressing the substance of his complaint. The stark discrepancy between Plaintiff's account and YU's denials underscores the need for the **immediate discovery of objective evidence** (e.g. security camera footage from Furst Hall, electronic key swipe logs, etc.) to conclusively resolve this issue. It also warrants a protective order to ensure **no further retaliation or evidence tampering** occurs as Plaintiff seeks to vindicate his rights.

## C. Ongoing Retaliation and Harassment of Plaintiff (April–September 2024)

After the March 21 assault and the March 25 false imprisonment, Yeshiva University **continued to retaliate and create a hostile environment** for Plaintiff, rather than remedy the situation. The retaliation took many forms – administrative stonewalling, intimidation through correspondence, peer harassment on campus, and sabotage of Plaintiff's academic status. The pattern is clear: whenever Plaintiff sought protection or asserted his rights, YU's response was to **escalate the pressure against him**.

**1. Threatening and Demeaning Communications:** On April 11, 2024, Dean Asher emailed Plaintiff a curt note admonishing him for alleged "disruptive" behavior at the Counseling Center and warning him that recording conversations violated policy. This email came just days after Plaintiff had reported the March 25 threats to others, suggesting it was a direct **reprisal for speaking out**. Asher wrote: *"It has come to my attention that you were disruptive… I remind you that communicating with staff in a disruptive manner is against our policies, and our policies prohibit recordings of conversations without consent."*. No empathy was expressed for the

trauma Plaintiff had endured; instead, the Dean of Students essentially put Plaintiff on notice that *he* was under scrutiny. The timing and tone of this message strongly indicate that YU's concern was not the **death threats Plaintiff received**, but rather that Plaintiff might have **recorded evidence of those threats**. Such intimidation-by-policy-letter is a textbook example of adverse action likely to chill a student's exercise of rights. Plaintiff responded by refocusing on his studies and safety, avoiding further direct confrontations with YU officials at that time.

**2. Emboldening of Peer Harassment:** On September 7, 2024, Plaintiff was subjected to a disturbing incident of **public harassment and intimidation by a group of YU students**. While walking near campus, a group of students recognized Plaintiff and began to follow him, **chanting "Borussia Dortmund" and "Sapir"** in a taunting manner. "Borussia Dortmund" is the name of a German football (soccer) team; shouting this at Plaintiff – a German passport-holder – was an evident mockery of his nationality. The students yelling "Sapir, Sapir, Sapir" (the first name of the student who assaulted Plaintiff) was an even more pointed form of intimidation, effectively **cheering the perpetrator** and terrorizing the victim. As Plaintiff tried to distance himself, the group continued to pursue him, some individuals even breaking into a run toward him. Plaintiff feared another physical attack. The harassment only ceased when Plaintiff found a way to get to safety. Immediately after, Plaintiff **reported this incident to YU's security department in writing**, explaining how these chants were hate-fueled and created an environment of fear. In an email to campus security (with the head of security, Joe Bednarsh, copied) on September 25, 2024, Plaintiff detailed why chanting a German team name at a German student is derogatory and how invoking "Sapir" in public at the victim is profoundly

harassing. He stressed that such conduct "perpetuate[s] racial discrimination" and "creates an environment of fear and anxiety" for the victim. Despite this clear report and its troubling implications, **YU took no apparent action to discipline the students or protect Plaintiff**. The message received by Plaintiff was that his abusers – whether Amar or others – enjoyed impunity, while he was increasingly isolated.

It is noteworthy that this September 7 harassment occurred *after* Plaintiff had made multiple internal and external complaints about YU's handling of his case. By that time, YU's administration was well aware that Plaintiff had reported misconduct (and, as discussed below, Plaintiff would soon file a formal civil-rights complaint externally). The open mockery of Plaintiff using Amar's name strongly suggests that certain student peers felt **empowered by the University's inertia or tacit approval**. In other words, because YU failed to take a strong stance condemning the assault and threats against Plaintiff, the campus climate was one in which **harassing Plaintiff was seen as acceptable sport**. This incident underscores the ongoing risk to Plaintiff's safety and well-being – risk that necessitates judicial intervention. A protective order is needed not only to bar YU officials from retaliation, but also to **prohibit any contact with Plaintiff by those associated with Defendants** outside of proper channels. Plaintiff should not have to endure further chants, stalking, or threats while this case is pending.

**3. Administrative Obstruction and Delay:** Throughout mid-2024, Plaintiff also encountered a pattern of **administrative roadblocks** when he tried to responsibly manage his education in light of his medical condition. After the assault, Plaintiff suffered post-concussion syndrome and PTSD symptoms that impeded his coursework. He rightly inquired about taking a **Medical Reduced Course Load (RCL)** or a leave of absence – accommodations typically available to F-

1 visa students who experience serious health issues. YU, however, failed to inform Plaintiff of his eligibility for a medical RCL and in fact **refused to grant any leave or course load reduction**. Dean Asher and others never offered the option in the crucial weeks after March 21. Instead, as the spring 2024 semester neared its end, YU pressured Plaintiff about his academics without acknowledging the trauma he had suffered. By the summer, as Plaintiff was trying to recover, YU's International Office suddenly raised the specter of **terminating Plaintiff's F-1 visa status** due to his reduced enrollment. In an email dated September 9, 2024, the Director of the Office of International Services, Jennifer Golden, noted that if Plaintiff had stopped attending classes in spring and hadn't gotten a medical RCL, the regulations would force YU to terminate his I-20 record – though she added that termination "does not automatically result in deportation" and that Plaintiff could apply for reinstatement or transfer to avoid removal. This email confirmed Plaintiff's worst fears: YU had failed to do the paperwork to maintain his visa status when he was medically unable to study full-time, and now the University was poised to **evict him from status**.

Plaintiff scrambled to address this. He provided doctor's notes about his injuries and asked if YU could retroactively authorize an RCL for Spring 2024 (since his need was documented). Dean *Rebecca Cypess* – who by then had become involved as the new Dean of Undergraduate Faculty – flatly responded that the University "is unable to backdate any paperwork" and would not grant a retroactive RCL. In an email chain on August 30, 2024, Plaintiff pleaded that "according to the regulations Yeshiva University can do it" and pointed out that "in the aftermath of the incident on campus, Yeshiva University was not offering any kind of RCL or leave" despite his clear eligibility. He emphasized he had submitted medical documentation of the

severity of his injuries and asked why he was being penalized for following doctors' orders (such as not attending lab when one arm was injured). Dean Cypess was unswayed – she reiterated that Plaintiff would have to take failing grades or withdraw ("Ws") unless he produced all required medical proof by a new deadline she imposed, and even then she indicated it might be too late. **Crucially, Dean Cypess then did something highly irregular and punitive:** she abruptly **moved up Plaintiff's academic appeal deadline** in September 2024, giving him even less time to resolve the I-20 termination. Originally, Plaintiff had until September 13, 2024 to appeal the termination of his student status; Cypess unilaterally **changed this deadline to September 10, 2024** without clear notice or justification. Plaintiff discovered this only after the fact, leaving him effectively timed-out from a proper appeal. This tactic by Cypess appears calculated to **force Plaintiff out**: by accelerating the deadline in secret, the University ensured that Plaintiff's I-20 would terminate and he would be unable to resume classes in Fall 2024.

On September 17, 2024, Plaintiff sent a formal **appeal letter** to YU's officials (addressed to OIS Director Golden) protesting the termination of his I-20 and the procedural shenanigans by Dean Cypess. In this letter, Plaintiff cited YU's failure to offer him the required RCL accommodation after the March assault, and the arbitrary advancement of the appeal deadline. He explicitly raised **concerns of retaliation**, noting that these actions appeared linked to him being a crime victim and outspoken about it. Plaintiff invoked federal protections (Title IX, Section 504, Clery Act) that forbid retaliating against students who report violence. He requested immediate reinstatement of his I-20, an explanation for the deadline change, and proof that YU ever informed him of RCL options (which it had not). YU's response was silence or rejection – his appeals went nowhere. By early October 2024, Plaintiff's **student status was terminated**,

cutting off his access to campus facilities and email, and threatening his ability to remain in the United States. YU thus succeeded in the very threat Levy had made behind closed doors on March 25: the University *cancelled Plaintiff's visa* and derailed his education.

**4. Denial of Access to Advisors and Support:** A telling aspect of YU's retaliatory strategy was the deliberate **isolation of Plaintiff from normal support channels**. After Plaintiff engaged an attorney in mid-2024 to help address the fallout (particularly to correspond with YU about his rights under disability law and safety concerns), YU administrators abruptly **ceased direct communication with Plaintiff**. Dean Cypess and others instructed that all interactions with Plaintiff had to go through his attorney. While involving counsel is Plaintiff's right (and was necessitated by YU's hostile conduct), the University exploited it by **shutting Plaintiff out of the usual academic advising loop**. Under normal circumstances, a student in Plaintiff's position would speak with academic advisors, deans, international student officers, etc., to navigate make-up exams, medical leave, and visa compliance. YU **forbade its staff from speaking with Plaintiff at all**, citing the fact that he had a lawyer. This meant Plaintiff could not even get routine guidance on fulfilling requirements – a situation almost designed to make him "miss some requirement or deadline" and thus **"set Plaintiff up for failure"**. Indeed, YU's cut-off of communication occurred right as critical academic deadlines and SEVIS (visa status) actions were looming. By refusing to communicate except through legal channels (which involve delay and formality), YU increased the risk that Plaintiff's issues would not be resolved in time – which is exactly what happened with the September deadline switch. Plaintiff submits that this was a **calculated move of retaliation**: YU was effectively punishing him for obtaining legal counsel (a protected activity) by withdrawing the basic advising resources that every other

student enjoys. In an internal writing, Plaintiff even noted that this conduct by Dean Cypess was "textbook retaliation" for his having hired a lawyer to address his disability and safety issues. The **Court's intervention is needed** to ensure YU does not continue such tactics. As part of the requested protective order, YU should be directed to **allow Plaintiff equal access to university processes**(e.g. not blocking him from speaking to current administrators or accessing records under the guise of his litigation) and **not to condition basic student services on relinquishing legal representation**.

**5. Evidence of Procedural Misconduct and Obstruction:** By late 2024, Plaintiff's struggles with YU had expanded into formal legal forums. Plaintiff filed a complaint with the New York State Division of Human Rights (**NYSDHR**) in or around fall 2024, alleging discrimination and retaliation by YU. Yeshiva University's response to that state investigation provides further evidence of YU's bad faith – and underscores why expedited discovery is essential here. On December 24, 2024, YU (through its attorneys at Seyfarth Shaw) submitted a **Position Statement** to the NYSDHR, which is rife with misrepresentations and inappropriate disclosures. In that document, YU **downplayed the March 21 assault** as a mutual "altercation," even falsely suggesting that *Plaintiff* had poured water on Amar (flipping the truth recorded on video). YU claimed that Plaintiff's initial report to campus security "did not include" the details of Amar's chair-smashing attack – insinuating that Plaintiff fabricated or exaggerated the severity later. YU further painted Plaintiff as an unstable malcontent: it recounted prior incidents (like a 2022 dispute with another student, Werta) and asserted those were all resolved properly, implying Plaintiff has a history of baseless complaints. Most egregiously, YU's position statement flatly **denied the March 25 false imprisonment and threats**, calling Plaintiff's account "wildly

removed from reality" and claiming that "of course" Lopez never touched him or threatened him. YU even introduced an email Plaintiff sent on April 1, 2024, in which – in an attempt to politely disengage from the Counseling Center – Plaintiff thanked Dr. Levy and Ms. Lopez for their time and wished them well. YU argued that this courteous email proves the March 25 incident never happened because, supposedly, no one would write in cordial terms to people who had just threatened to kill them. This argument ignores obvious alternative explanations (Plaintiff was trying to keep peace out of fear, or simply exercising politeness despite trauma) and again shows YU's **distort-and-discredit strategy**.

Moreover, during the NYSDHR process, YU's counsel engaged in troubling tactics. Plaintiff learned that Seyfarth Shaw attorneys had communicated with at least one third-party witness in Europe (Dr. Wolfgang G.) regarding Plaintiff's complaints, in a manner Plaintiff perceived as an attempt to undermine his case. Even more bluntly, on April 9, 2024 – just weeks after the assault – YU's counsel sent Plaintiff a letter that was **improperly threatening** in tone. (This letter's exact contents are subject to confidentiality in that proceeding, but it has been described on the record as "threatening" by an official committee.) Plaintiff, disturbed by the unethical behavior, filed a grievance against YU's attorney Dov Kesselman with the New York Attorney Grievance Committee. In March 2025, the Committee responded, noting that while it would not take disciplinary action at that time, Plaintiff had alleged that Kesselman's firm **filed an inappropriate position statement, sent a threatening April 9 letter, and spoke with Dr. Wolfgang Gottwald about Plaintiff's complaint**. The Committee concluded that these serious allegations would be more appropriately addressed by the courts or NYSDHR, effectively punting the issue back to this litigation. Thus, there is now **official notice** that Plaintiff has raised

claims of procedural misconduct and witness contact against YU's counsel. This Court can and should take that into account in fashioning relief: a protective order should explicitly prohibit Defendants (including counsel) from any **off-the-record communications with potential witnesses or third parties about Plaintiff's case** that could amount to intimidation or harassment. All such communications should be formal and through proper channels moving forward.

Finally, YU's own words confirm the need for external oversight. In correspondence related to this case, Defendants (via counsel) have boldly stated that neither the University nor its lawyers have taken "any remotely adverse actions" against Plaintiff since he engaged in protected activity. They insist that any suggestion of retaliation is "entirely baseless". Yet the record before this Court – as summarized above – demonstrates a **continuous stream of adverse actions** against Plaintiff from March 2024 onward. The disconnect between Defendants' self-serving proclamations and the documented reality is stark. It also raises a concern that Defendants may not be candid in future proceedings and may attempt to **conceal or destroy evidence** that contradicts their narrative. Indeed, Plaintiff has reason to believe that some relevant records have already been tampered with – for example, he experienced unusual difficulties accessing his student email account after his dismissal, raising suspicions that exculpatory communications might have been deleted. Expedient discovery is needed to recover such items (many of which reside on Defendants' systems), and a strong protective order is needed to deter any further spoliation.

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 20 of 56

In sum, the factual picture is one of **extreme and ongoing retaliation**: physical violence, coercion, humiliation, and administrative malfeasance marshalled against a single student who dared to stand up for his rights. Plaintiff has been **deprived of equal protection and access to education** at every turn – from the failure to accommodate his medical needs, to the unilateral termination of his visa status, to the campus climate of intimidation that drove him out. He has also been impeded in seeking **judicial recourse**, as Defendants attempted to bully him into silence and distort investigative processes. Each category of these facts is supported by concrete evidence (much of it from Defendants' own files or statements). For the Court's convenience, an Appendix at the end of this memorandum provides a **detailed table of the key evidence** supporting each of Plaintiff's allegations, with exhibit references.

Against this factual backdrop, Plaintiff now turns to the legal standards governing expedited discovery and protective orders, and explains why the Court should grant relief without delay.

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 21 of 56

# LEGAL STANDARD

**Expedited Discovery –** Federal Rule of Civil Procedure 26(d)(1) provides that a party generally

may not seek discovery before the Rule 26(f) conference **absent a court order**. Courts have

discretion to authorize expedited discovery on a showing of good cause or in special

circumstances. In the Southern District of New York, the prevailing standard for early discovery

is a flexible **"good cause"** analysis, which considers the **entirety of the record and the**

**reasonableness** of the request in light of the circumstances. This approach asks whether the

requesting party's need for prompt discovery **outweighs the prejudice** to the opposing party.

Factors often include: (1) the imminence of irreparable harm or evidence loss if expedited

discovery is denied, (2) the narrow tailoring of the requests, (3) the purpose for seeking the

evidence (e.g. to identify defendants, prevent spoliation, or prepare for a preliminary injunction),

and (4) the burden on the responding party. Some courts (in minority) have applied a more

stringent preliminary-injunction style test (derived from *Notaro v. Koch*, 95 F.R.D. 403

(S.D.N.Y. 1982)), requiring a showing of irreparable injury, likelihood of success, and a

connection between the expedited discovery and the avoidance of harm. Under either

standard, **the burden is on the movant**, and the discovery requests should be **"narrowly**

**tailored"** to the urgency at hand. Expedited discovery is not the norm, but it is routinely granted

in cases where critical evidence may disappear or where early fact-finding is necessary to

prevent substantial injustice. For example, expedited discovery has been allowed to preserve

video recordings and other data at risk of destruction, to locate assets or evidence, and to identify

unknown wrongdoers before they vanish. A court in this Circuit will generally find good cause

for early discovery if the movant demonstrates that **targeted discovery is needed to avoid further injury or to preserve the status quo**, and that the request is reasonable in scope.

**Protective Order** – Federal Rule of Civil Procedure 26(c) provides that a court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The Rule offers a non-exhaustive list of protective measures, including forbidding certain disclosures or discovery, specifying terms and conditions for discovery, or **forbidding parties from contacting certain persons** outside of prescribed methods (essentially to prevent harassment or influence). The party seeking a protective order bears the burden of showing **good cause** – i.e., that specific prejudice or harm will result absent the protective order. Courts have broad discretion in fashioning protective orders, especially where the order seeks to prevent **retaliation or intimidation** that could interfere with the judicial process. It is well-established that a court may issue orders to **preserve evidence and prevent witness tampering** as part of its inherent authority to manage litigation and under Rule 26(c) to prevent "oppression" and "undue burden." In the context of this case, "good cause" exists if Plaintiff shows that Defendants' conduct poses a real risk of further harassment or spoliation that would unfairly prejudice Plaintiff's ability to prosecute his claims. Notably, courts have recognized that **retaliatory actions against a litigant or witness are a form of oppression** that can justify injunctive relief or protective orders. The standard is a **balancing test**: the court weighs the harm to be avoided (e.g., ongoing threats, loss of evidence) against any legitimate interests of the party to be restrained. If the balance favors intervention, and the order is tailored to only what is necessary, it should be granted.

Here, as detailed below, Plaintiff easily meets the requirements for both expedited discovery and

a protective order. The evidence already in hand demonstrates a strong prima facie case of

wrongdoing and indicates that further relevant evidence is within Defendants' exclusive control

(and possibly at risk of being lost). Additionally, the pattern of retaliation and cover-up by

Defendants establishes the "good cause" for protective measures to shield Plaintiff and the

process from further abuse.

# ARGUMENT

**I. Expedited Discovery Is Warranted to Preserve Critical Evidence and Elucidate Key Facts Underlying Plaintiff's Claims**

Good cause exists to permit immediate, focused discovery in this case. Plaintiff has identified specific evidence that is highly relevant and time-sensitive, which will substantially aid in proving his claims and preventing further injustice. This evidence includes, *inter alia*: surveillance video footage of the March 25, 2024 false imprisonment incident; security camera footage and campus incident reports of the March 21, 2024 assault; electronic communications (emails, messaging logs) among Defendants around the time of the incidents; internal disciplinary records concerning Amar and other student harassers; and documents relating to the decisions about Plaintiff's visa and academic status (e.g. the decision to change the appeal deadline and terminate his I-20). Each of these categories is at risk of spoliation or permanent loss if discovery is delayed until the usual schedule. Moreover, early access to this evidence will clarify contested facts (e.g. what exactly happened on March 25 in that office) and help identify additional wrongdoers (for instance, confirming the identities of all individuals involved in the September 7 chanting mob, or the "John Doe" administrators who may have directed the retaliation behind the scenes). The narrowly tailored discovery Plaintiff seeks will thus serve the interests of justice without imposing undue burden on Defendants.

*Legal Standard:* Federal Rule of Civil Procedure 26(d)(1) provides that a party generally may not seek discovery before the Rule 26(f) conference absent a court order. Courts have discretion to authorize expedited discovery upon a showing of good cause or in special circumstances[1]. In the Southern District of New York, the prevailing standard for early discovery is a flexible "reasonableness and good cause" analysis, which considers the entirety of the record and the reasonableness of the request in light of the circumstances[2]. This approach asks whether the requesting party's need for prompt discovery outweighs the prejudice to the opposing party. Factors often include: (1) the imminence of irreparable harm or evidence loss if expedited discovery is denied, (2) the narrow tailoring of the requests, (3) the purpose for seeking the evidence (e.g. to identify defendants, prevent spoliation, or prepare for a preliminary injunction), and (4) the burden on the responding party. Some courts (a minority) have applied a more evidence (e.g. to identify defendants, prevent spoliation, or prepare for a preliminary injunction), and (4) the burden on the responding party. Some courts (a minority) have applied a more stringent preliminary-injunction-style test (derived from *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982)) requiring a showing of irreparable injury, likelihood of success, and a connection between the expedited discovery and the avoidance of harm[3].

---

[1] See Fed. R. Civ. P. 26(d)(1); Arista Records, LLC v. Doe 3, 604 F.3d 110, 118–19 (2d Cir. 2010) (adopting a "flexible standard of reasonableness and good cause" for expedited discovery and identifying factors such as the concreteness of the plaintiff's prima facie case, the specificity of discovery requests, the absence of alternative means to obtain information, the need to prevent ongoing harm, and the defendant's interest in confidentiality).
[2] *See Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326–27 (S.D.N.Y. 2005) (courts in this Circuit examine the entirety of the record and the reasonableness of the request in light of the surrounding circumstances to determine good cause for expedited discovery); *Doe v. Congregation of Sacred Hearts*, No. 21-cv-01237, 2022 WL 2901403, at *1 (S.D.N.Y. July 22, 2022) (quoting *Ayyash*).
[3] *See Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982) (articulating a four-factor test for expedited discovery similar to preliminary injunction criteria). But cf. *WowWee Grp. Ltd. v. Meirly*, No. 18-cv-706 (AJN), 2018 WL 3818271, at *1 (S.D.N.Y. Aug. 10, 2018) (noting that the Notaro test has largely been replaced in this District by the more flexible good-cause standard).

Under either standard, the burden is on the movant, and the discovery requests should be "narrowly tailored" to the urgency at hand. Expedited discovery is not the norm, but it is **routinely granted** in cases where critical evidence may disappear or where early fact-finding is necessary to prevent substantial injustice[4]. For example, courts have allowed expedited discovery to preserve video recordings and other data at risk of destruction, to locate key evidence or assets, and to identify unknown wrongdoers before they vanish. In this Circuit, a movant establishes good cause for early discovery by demonstrating that prompt, targeted discovery is needed to avoid further injury or spoliation, and that the request is reasonable in scope given the circumstances[5].

Applying these standards here, expedited discovery is plainly warranted. Plaintiff's need for certain evidence is urgent and concrete, whereas any potential prejudice to Defendants is minimal. The relevant evidence is largely within Defendants' exclusive control (e.g. university security footage, internal emails, and student records), and some of it may be transient in nature. Indeed, Plaintiff has already encountered resistance and delay in obtaining truth from Defendants through informal means. Additionally, there are serious allegations of misconduct that a delay in discovery could enable Defendants to cover up or spin to Plaintiff's detriment. Prompt discovery will prevent the further "freezing" of an unequal status quo in which Defendants hold all the cards. In short, the circumstances exemplify "good cause" for departure from the normal discovery timeline.

**A. Immediate Retrieval of Video and Access Logs from March 21 and March 25, 2024**

Perhaps the most crucial evidence consists of video surveillance and building access logs that capture the two pivotal incidents in March 2024. The Court should order Yeshiva University to

---

[4] *See In re Notorious B.I.G. (Wallace) Estate Litig.*, No. 05-cv-1540, 2006 WL 827374, at *2 (S.D.N.Y. Mar. 8, 2006) (expedited discovery may be ordered upon good cause, such as "to preserve evidence or prevent undue prejudice"); *Living Scriptures, Inc. v. Doe(s)*, No. 10-cv-0182, 2010 WL 4687679, at *1 (D. Utah Nov. 10, 2010) (granting expedited discovery where "physical evidence may be consumed or destroyed with the passage of time, thereby disadvantaging one or more parties").

[5] *See Strike 3 Holdings, LLC v. Doe*, 329 F.R.D. 518, 520–21 (S.D.N.Y. 2019) (explaining that good cause for expedited discovery exists when the need for the information outweighs the prejudice to the opponent, and collecting cases); *accord Arista Records*, 604 F.3d at 119.

promptly produce and preserve all such recordings and logs without further delay. Regarding the March 21, 2024 assault, as noted, the attack in the library was caught on security cameras. Those videos (along with Plaintiff's cell phone footage) incontrovertibly show Amar's violent conduct – evidence that will dispose of any attempt by Defendants to minimize the event as a "minor altercation." Indeed, YU's own incident report (Exhibit M to their NYSDHR statement) purportedly describes the incident, albeit with discrepancies. Production of the actual security video files from the library cameras is necessary both for Plaintiff's case and to counter Defendants' misleading insinuations (for example, YU's claim that it was Plaintiff who poured water on Amar, which the video will show is false). Time is of the essence: many security systems overwrite or delete footage after a certain retention period. While Plaintiff has put Defendants on formal notice to preserve this video (and presumably it was preserved for the criminal case against Amar), the safest course is to obtain it via discovery forthwith. Likewise, for the March 25, 2024 false imprisonment, YU's Furst Hall/Counseling Center likely had corridor or entry cameras that recorded Plaintiff being led into (or out of) Dr. Levy's office, and electronic keycard logs that will show the office door was locked at the time Plaintiff was inside. Plaintiff intends to subpoena any such footage from the building security system. These recordings and logs are objective evidence that will either verify or refute the parties' accounts of those incidents; securing them now will avoid any risk that they are lost or tampered with as this case progresses.

Beyond video, the Court should also permit discovery of any *contemporaneous incident reports or security desk logs* from those dates, which may detail what campus security or administrators recorded about the events. Such records could reveal, for instance, which officials were aware of the assaults and what actions (or inactions) were taken in response. This information will directly inform Plaintiff's claims (including his *Monell*-type claim against the institution for failing to protect him). In sum, expedited production of the March 21 and 25 videos and related logs is critical to preserving the best evidence of what transpired during the most egregious acts of violence and intimidation against Plaintiff.

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 28 of 56

## B. Discovery of Internal Communications Will Likely Reveal Defendants' Knowledge and Approval of the Retaliation

Another category meriting expedited discovery is Defendants' internal communications (emails, text messages, chat logs) concerning Plaintiff and the events in question. Plaintiff has good reason to believe that, around the time of the March 2024 incidents and thereafter, Defendants (including YU officials and attorneys) exchanged messages that will show who decided on various retaliatory measures. For example, immediately after the March 21 assault, YU's Dean of Students (Dr. Sara Asher) and other administrators began contacting Plaintiff and discussing the incident internally. Plaintiff's hospital room was barely quiet before Dean Asher started phoning him urging that he *not* press charges against Amar. At least one of Dean Asher's own notes from that day reflects she told Plaintiff the University "does not support" him going to the

police[6]. It is likely that Asher or others messaged colleagues about this — indeed, it would be routine for a dean to brief the administration or legal counsel on a violent episode on campus. Expedited email discovery will show whether Asher was directed (or pressured) by superiors to discourage Plaintiff from involving law enforcement. Similarly, on March 25, after Plaintiff was allegedly confined and threatened by Dr. Levy and Ms. Lopez, there were almost certainly communications among YU's administrators (and perhaps with YU's outside counsel) about that incident. In fact, Plaintiff received an email from Dean Asher on April 11, 2024 essentially reprimanding him for supposedly "disruptive" behavior at the counseling center and for recording conversations — which indicates that YU leadership had deliberated a response

---

[6] Dean Asher's notes are quoted in Plaintiff's Complaint and reflected in YU's internal records. For example, Asher's "Hospital Call" notes from 3/21/24 state that she advised Plaintiff the University did not support him pursuing criminal charges against Amar. These notes were obtained during an internal process and are included as an exhibit to this motion.

focused on *silencing* Plaintiff rather than addressing his victimization. The substance and timing of such emails are highly relevant: they may show a tacit approval (or even an instruction) from YU's higher-ups to handle Plaintiff as a *problem* to be managed, rather than as a student to be protected.

Likewise, internal correspondence in the months that followed will shed light on the retaliatory academic and immigration-related actions taken against Plaintiff. For instance, emails between Dean Rebecca Cypess (who oversaw undergraduate academics) and others in late Summer 2024 might reveal how and why Plaintiff's F-1 visa status was suddenly jeopardized. We know that on August 30, 2024, after Plaintiff inquired about a retroactive medical leave, Dean Cypess flatly stated the University "is unable to backdate any paperwork" for a reduced course load and imposed a new, accelerated deadline for medical documentation (September 13, 2024). Shortly thereafter, Cypess or someone else inexplicably *moved up* Plaintiff's academic appeal deadline from September 13 to September 10, 2024, without clear notice – effectively truncating his time to secure his status. We also see in a September 9, 2024 email from Jennifer Golden (Director of the Office of International Services) that YU was on the verge of terminating Plaintiff's SEVIS record (I-20) due to "regulations" and lack of a medical exemption on file. These events did not happen in a vacuum; internal messages will likely show that Defendants coordinated and were aware that by tightening deadlines and "going by the book," they were effectively pushing Plaintiff out. If, for example, an email reveals that an administrator said something like "we need to wrap up his case quickly" or "let's get rid of him before he causes more trouble," that would powerfully support Plaintiff's retaliation claims. Even absent a "smoking gun" phrase, the timing and tone of the communications may demonstrate a retaliatory animus. In sum, expedited

discovery into emails and chats among Defendants is warranted to capture any evidence of deliberate indifference or malicious intent before memories fade and to prevent any improper deletion of such correspondence.

Notably, courts have recognized that early discovery is appropriate to uncover the scope of potential misconduct within an organization, especially where a plaintiff credibly alleges a coordinated effort against him. Here, Plaintiff has already set forth a prima facie case that various YU officials acted in concert to suppress his complaints (through intimidation, procedural manipulation, and stonewalling). Swift discovery of their communications will either corroborate this pattern or dispel any misunderstandings – either outcome aids the truth-finding process and informs the proper scope of the case. Importantly, Defendants cannot reasonably claim burden or prejudice from collecting targeted emails and messages from a limited timeframe (roughly March–September 2024) involving a finite group of custodians. In today's litigation environment, such email collection is routine, and given what is at stake for Plaintiff, the balance of equities favors prompt disclosure.

## C. Expedited Discovery Will Help Secure Testimony and Identify Witnesses While Memories Are Fresh

Another justification for expedited discovery is the need to lock in witness testimony and information while recollections are still relatively fresh. Several key events in this case (the assault, the false imprisonment, the student harassment episodes) occurred in 2024. It is now mid-2025; further delay risks witness memories fading or becoming influenced by Defendants' narrative. Plaintiff seeks to depose or at least interview certain individuals as soon as practicable. For example, deposing Dr. Yedidya Levy and Judith Lopez (the two staff members involved in

the March 25, 2024 incident) now, rather than many months later, will allow Plaintiff to pin down their version of events under oath, and any inconsistencies can later be tested against documentary evidence. If Dr. Levy is deposed shortly after producing his emails, Plaintiff can confront him with the timeline of his communications (e.g., the phone call he made to Plaintiff on March 21 asking about dropping charges, which is documented) and gauge his credibility while details are relatively fresh in his mind. Similarly, Ms. Lopez can be examined about what happened in that office on March 25; if she continues to deny even touching Plaintiff or making threats, her demeanor and specifics in testimony can be observed and preserved. Early depositions or sworn interrogatories will also help identify other witnesses. For instance, Levy or Lopez might reveal who else at YU was informed of the March 25 incident (perhaps the head of security, or a vice provost) – those individuals could then be pursued as additional witnesses or defendants if warranted.

Additionally, some witnesses are fellow students (for example, those involved in the September 7, 2024 chanting harassment). Students may graduate, relocate, or become harder to track down as time passes. By expediting discovery, Plaintiff can obtain class lists, campus security reports, or other information to identify those John Doe student harassers now, increasing the likelihood of obtaining their testimony. Identifying the "John Does 1–10" (the student mob) and "John Does 11–20" (any other institutional actors) earlier in the case will also enable Plaintiff to amend the pleadings to name them, avoiding unnecessary delays and ensuring they are subject to the Court's preservation and anti-retaliation orders. This is precisely the kind of scenario where courts have found expedited discovery appropriate – to identify unknown wrongdoers and prevent them from evading responsibility[1]. Indeed, the Second Circuit has upheld the use of early

discovery to identify defendants and gather vital information where the plaintiff has established a prima facie claim and needs the discovery to proceed[1]. Here, Plaintiff has more than met that threshold, given the detailed factual allegations and supporting evidence already proffered. Early depositions and subpoenas will freeze the narrative before any further influence or coordination can taint it.

Finally, preserving testimony via early discovery can guard against the risk that witnesses might be pressured or intimidated over time. This case involves allegations of Defendants (or their agents) actively trying to influence Plaintiff and possibly other witnesses (e.g., the peer pressure campaign, and a hostile letter from defense counsel in a related proceeding). If such conduct were to continue unchecked, by the time of normal discovery some witnesses might be too fearful or biased to speak candidly. Taking testimony sooner, under the protection of a court order, helps mitigate that risk. It sends a message that the Court is actively supervising the case and will not permit retaliation against those who cooperate. In short, accelerated discovery will preserve critical human evidence (memories and testimony) in addition to physical evidence, thereby ensuring that the truth can be ascertained.

In sum, Plaintiff has demonstrated that expedited discovery is justified by urgent needs: key video and electronic evidence must be preserved; internal communications need to be examined to reveal the extent of Defendants' wrongdoing; and witnesses should be identified and heard before time and interference dilute the evidence. This Court has the authority to grant such relief and routinely does so when good cause is shown. Plaintiff respectfully submits that this is a textbook case for exercising that authority in order to prevent irreparable evidentiary harm and to promote a just resolution on the merits.

## II. A Protective Order Is Necessary to Prevent Further Retaliation, Intimidation, and Spoliation of Evidence by Defendants

The Court should also issue a protective order under Rule 26(c) (and its inherent authority) to ensure that the litigation can proceed free from intimidation, harassment, and interference. Plaintiff has demonstrated a pattern of retaliatory conduct by Defendants – conduct which not only harms Plaintiff personally, but also threatens to undermine the integrity of this lawsuit and the truth-finding process. Absent court intervention, there is every reason to believe Defendants (or persons acting on their behalf) will continue to engage in tactics that have a chilling effect on Plaintiff and other witnesses. The requested protective order has two primary components: (1) **Non-Retaliation/No-Contact provisions**, and (2) **Evidence Preservation provisions**. Both are narrowly tailored to address the specific misconduct seen in this case, and both are squarely within the Court's power to order for good cause.

*Legal Standard:* Federal Rule of Civil Procedure 26(c) provides that a court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The rule offers a non-exhaustive list of protective measures, including forbidding certain disclosures or discovery, specifying terms and conditions for discovery, or forbidding parties from contacting certain persons outside of prescribed methods (essentially to prevent harassment or improper influence). The party seeking a protective order bears the burden of showing good cause – i.e., that specific prejudice or harm will result absent the protective order[7].

---

[1] See Fed. R. Civ. P. 26(d)(1); Arista Records, LLC v. Doe 3, 604 F.3d 110, 118–19 (2d Cir. 2010) (adopting a "flexible standard of reasonableness and good cause" for expedited discovery and identifying factors such as the concreteness of the plaintiff's prima facie case, the specificity of discovery requests, the absence of alternative means to obtain information, the need to prevent ongoing harm, and the defendant's interest in confidentiality).

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 34 of 56

The party seeking a protective order bears the burden of showing good cause – i.e., that specific prejudice or harm will result absent the protective order[7].

Broad or unsubstantiated allegations of potential harm are insufficient; rather, the movant must demonstrate a *particular need* for protection, with clearly defined and serious injury if no order is granted[8]. Courts have broad discretion in fashioning protective orders, especially where the order seeks to prevent retaliation or intimidation that could interfere with the judicial process[9]. It is well-established that a court may issue orders to preserve evidence and to prevent witness tampering as part of its inherent authority to manage litigation and under Rule 26(c) to prevent "oppression" and "undue burden." In the context of this case, "good cause" exists if Plaintiff shows that Defendants' conduct poses a real risk of further harassment or spoliation that would unfairly prejudice Plaintiff's ability to prosecute his claims.

Notably, courts have recognized that retaliatory actions against a litigant or witness are a form of oppression that can justify injunctive relief or protective orders. Ultimately, the standard is a balancing test: the court weighs the harm to be avoided (e.g., ongoing threats, loss of evidence)

---

[7] *Duling v. Gristede's Operating Corp.*, 266 F.R.D. 66, 71 (S.D.N.Y. 2010) ("The party seeking a protective order bears the burden of establishing that good cause for the order exists."); *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004) (same).

[8] *See Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986) (defining "good cause" in Rule 26(c) context as a "particular need for protection" and cautioning that "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test"); *In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (good cause exists when a party shows disclosure will result in a "clearly defined, specific and serious injury").

[9] *See Mitchell v. Fishbein*, 227 F.R.D. 239, 245 (S.D.N.Y. 2005) ("Under Rule 26(c), the appropriateness of protective relief from discovery depends upon a balancing of the litigation needs of the discovering party and any countervailing protectable interests of the party from whom discovery is sought.") (internal quotation omitted); *Galella v. Onassis*, 487 F.2d 986, 997 (2d Cir. 1973) (district court has broad discretion regarding the grant and nature of protection under Rule 26(c)). Courts have considerable latitude to craft protective orders to fit the circumstances of the case (*see Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)). In a case alleging ongoing retaliation, that discretion extends to enjoining acts that would subvert the court's ability to reach a just result.

against any legitimate interests of the party to be restrained. If the balance favors intervention, and the proposed order is narrowly tailored to only what is necessary, it should be granted[10].

Here, the factual record amply establishes good cause for a robust protective order. Plaintiff has been subjected to extreme and ongoing retaliation ever since he reported the initial assault. This retaliation has taken multiple forms – physical violence, verbal threats, public humiliation, and administrative machinations – all seemingly aimed at pressuring Plaintiff to abandon his complaints. Such conduct goes far beyond the ordinary "annoyance" or "embarrassment" that Rule 26(c) contemplates; it rises to the level of outright *oppression*. Indeed, one could characterize Defendants' actions as *extreme and outrageous* by any measure. (For instance, locking a student in an office and threatening to have him and his family killed if he doesn't drop a legal complaint is conduct that exceeds "all possible bounds of decency," easily satisfying even the stringent standard for intentional infliction of emotional distress[11].) No litigant – especially one alleging civil rights violations – should have to fear for his safety or endure continued hostility from the accused wrongdoers while seeking justice. The law emphatically forbids retaliation against individuals who oppose discrimination or exercise their rights[12]; accordingly,

[10] *See Rodriguez v. DeBuono*, 175 F.3d 227, 233–35 (2d Cir. 1999) (per curiam) (recognizing that in civil rights cases, courts may issue injunctive relief to prevent officials from engaging in retaliatory or harassing conduct that would undermine the litigation); *Tegler v. Goodman*, No. 17-cv-1023, 2018 WL 1582542, at *3–4 (D. Conn. Mar. 30, 2018) (granting protective order to prohibit employer's further harassment of Title VII plaintiff during litigation, finding good cause to prevent intimidation and to protect the plaintiff's rights).

[11] *Cf. Howell v. New York Post Co.*, 81 N.Y.2d 115, 122–23 (N.Y. 1993) (to establish intentional infliction of emotional distress under New York law, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency"). Here, Defendants' alleged conduct—threatening a student with harm to force him to drop a complaint— would meet even this exacting standard, reinforcing how egregious and intolerable it is.

[12] *See, e.g.*, 42 U.S.C. § 12203(a)–(b) (Americans with Disabilities Act anti-retaliation and anti-interference provisions, prohibiting coercion, threats, or intimidation against any individual for exercising ADA rights or assisting others in exercising rights); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (applying Title VII framework to ADA retaliation claims and noting that a plaintiff engages in protected activity when opposing disability-based discrimination, and any adverse action causally connected to such opposition is unlawful). In short, federal law clearly protects Plaintiff's activities (reporting an assault, requesting accommodations) and forbids the sort of retaliatory harm he alleges. The Court's protective order would enforce these existing legal protections in the context of this case.

courts routinely act to enjoin such retaliation when shown.

Plaintiff has documented multiple retaliatory incidents by Defendants and those aligned with them. To recap briefly: Immediately after Amar's assault, YU's Dean Asher and Dr. Levy coerced Plaintiff to relent (with Levy and Lopez later using coercion of the worst kind on March 25). When Plaintiff nonetheless persisted, other students were emboldened to harass him on campus (the chanting mob of September 7). YU's administrators then struck at Plaintiff's education and legal status – expelling him from campus housing, moving up deadlines to torpedo his visa, and stonewalling his attempts to appeal or seek accommodations. Even YU's outside counsel joined in, sending Plaintiff a letter (during a related mediation) whose threatening tone was so improper that Plaintiff cannot even quote it here due to confidentiality constraints. This is a *concerted campaign* to intimidate and punish Plaintiff for asserting his rights. Such a campaign, left unchecked, not only harms Plaintiff but also contaminates the judicial process: witnesses might be scared off, evidence might be destroyed, and Plaintiff's ability to present his case could be irreparably compromised.

A protective order is needed to halt these abuses and to level the playing field. Plaintiff requests two categories of relief, each narrowly aimed at preventing specific misconduct that has occurred:

**A. Non-Retaliation and No-Contact Provisions** – Plaintiff requests that Defendants (including YU's officials, employees, and counsel) be expressly enjoined from any further retaliatory actions against Plaintiff or any witnesses, and barred from any unauthorized contact with Plaintiff. In practical terms, this means Defendants and those acting in concert with them should not threaten, harass, or discipline Plaintiff outside of normal academic/legal processes, nor

should they attempt to dissuade or influence any person having knowledge of the facts (students, faculty, etc.) from cooperating with Plaintiff or testifying. It also means YU and its counsel must cease any informal communications with Plaintiff; all communications related to Plaintiff's status or this litigation should go through formal channels (e.g., counsel of record). The rationale is simple: Plaintiff, as a former student now litigating against his University, remains vulnerable to intimidation. YU holds considerable power in the academic sphere (transcripts, recommendations, etc.), and its administrators have personal connections with many potential witnesses (other students and staff). A clear court order is necessary to draw a line: no more bullying, no more end-runs around the discovery process. This will protect not only Plaintiff but also the integrity of witness testimony.

Critically, such an order imposes no hardship on Defendants *other than requiring them to refrain from unlawful conduct*. Defendants have no legitimate interest in engaging in retaliation or back-channel communications in the first place. An injunction will simply reinforce obligations they already have under the law (for example, the ADA and other civil rights statutes prohibit retaliation and intimidation of complainants)[12]. If Defendants contend that they have never retaliated and do not intend to, then they should have no objection to being held to that promise. The protective order would merely formalize what should be basic civility and legality. Conversely, if Defendants resist such an order, it would raise the troubling question of why – what do they anticipate doing that a non-retaliation order would forbid? The Court is entitled to eliminate any *ambiguity* on this front by making the prohibition explicit and enforceable via contempt.

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.                |    Page 38 of 56

Furthermore, a no-contact directive is appropriate given the history here. On multiple occasions, YU officials reached out to Plaintiff directly in ways that were detrimental to him (e.g., Levy's and Asher's calls urging him to drop complaints, the letter from counsel). Now that litigation is ongoing and Plaintiff has counsel of record (or is proceeding pro se with the expectation of fair process), Defendants should not initiate any personal communications likely to blindside or pressure him. Any necessary interactions (such as providing Plaintiff with administrative services or records he is entitled to) can be structured or supervised consistent with the Court's order. For example, if Plaintiff needs to request his transcript, YU can be ordered to comply without injecting extraneous commentary or demands. In short, the non-retaliation and no-contact provisions will ensure that Plaintiff can pursue this case without looking over his shoulder for new threats from the Defendants' side.

**B. Preservation of Evidence and Anti-Spoliation Provisions** – Equally important is the protective order's role in securing evidence from destruction or alteration. While all parties to litigation already have a legal duty to preserve relevant evidence once litigation is reasonably anticipated, the reality is that such preservation is not always automatic or foolproof. Given the contentious history between the parties, there is a legitimate concern that some Defendants (or allies) might destroy or tamper with evidence unless specifically enjoined. In fact, Plaintiff has reason to suspect that certain documents have *already* gone missing or been withheld. For instance, some of Plaintiff's correspondence on his YU student email account became inaccessible to him after his expulsion; he lost access to potentially important emails unless Defendants preserved those server records. Additionally, the University's shifting narrative and the discrepancies between its internal and external statements (e.g., claiming the assault was

"mutual") raise concern that exculpatory communications might have been deleted or will be if not safeguarded. Therefore, the protective order should explicitly mandate that Defendants preserve all evidence potentially relevant to this case, including electronically stored information (ESI) such as emails, server logs, security footage, phone records, and so on[13].

Such an anti-spoliation directive is fully consistent with existing law and merely underscores Defendants' obligations. By putting it in the Court's order, Plaintiff ensures there is no doubt or excuse – and if violations occur, the Court can respond with appropriate sanctions. If necessary, Plaintiff is prepared to propose specific forensic measures (for example, imaging certain devices or accounts) if there is any indication that key data might not be preserved. As an initial matter, however, Plaintiff primarily seeks a clear prohibition against *any* deletion or alteration of evidence. This includes instructing all individual Defendants to preserve their text messages, personal emails, and social media communications that could touch on the issues – areas sometimes overlooked. Again, this requirement imposes no undue burden: it aligns with the duty every litigant has once a lawsuit is filed[13].

In addition, Plaintiff asks that the Court warn Defendants against *indirect* spoliation – for example, telling subordinate employees or students to "clean up" files, or failing to halt routine data destruction policies. YU, as an institution, likely has document retention policies that could purge emails or video after a time; a court order will override those policies for relevant material. It might even be appropriate for the Court to require a certification from Defendants that they

---

[13] *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217–18 (S.D.N.Y. 2003) ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."). All Defendants should by now have implemented such a litigation hold; the protective order will confirm this obligation and extend it to all potentially relevant evidence, including electronically stored information and physical records.

have implemented a litigation hold across relevant custodians – a step any responsible litigant should do, but which a court order can reinforce.

In crafting these preservation provisions, Plaintiff trusts the Court's discretion and is amenable to reasonable specifics. The key point is that, given the serious allegations of prior evidence suppression (e.g., YU never provided Plaintiff with certain records when asked, and may have downplayed or hidden others), we cannot simply rely on an honor system. A formal order will concentrate the minds of Defendants and ensure that *no one* later claims ignorance of the duty to preserve. It also provides Plaintiff with recourse – if, despite the order, evidence is destroyed, Plaintiff can invoke the violation without needing to prove that a duty existed or was known (since the order itself will have made it plain). This Court has inherent power to prevent spoliation and to remedy it; by acting *before* spoliation occurs, the Court can save time and prevent an irretrievable loss of information.

In sum, the protective order sought is appropriately directed at stopping two dangers that have materialized in this case: retaliatory intimidation and evidence spoliation. Each of the provisions requested is closely tied to concrete incidents that have already happened (or nearly happened), and thus satisfies the "particularized need" requirement for protective relief[8]. The relief is also temporary and conditional – it lasts through the pendency of this litigation and simply requires Defendants to obey the law and preserve the status quo of evidence. The balance of equities strongly favors granting these measures. Defendants cannot be heard to complain about an order that essentially says "don't threaten or cheat"; no lawful activity of theirs will be hindered. Plaintiff, on the other hand, stands to suffer irreparable harm without such protection: he could be scared into dropping or weakening his case, or crucial proof could vanish. Especially in a civil

rights context, where retaliation can chill not just one plaintiff but anyone who might stand up in the future, courts have a duty to ensure the courthouse doors remain open and untainted by fear. **Indeed, shielding those who report violence or assert their rights from reprisal is in the public interest**, as it encourages victims to come forward and holds institutions accountable. This principle is embodied in statutes like the ADA and Title IX, and it should be vindicated here by the issuance of a protective order.

Finally, it bears noting that granting the requested protective order will not prejudice Defendants' ability to defend themselves on the merits. It will only constrain their *extrajudicial* conduct. The order will not dictate the outcome of the case; it will simply ensure that the case can be litigated fairly. In this sense, the protective order actually benefits the Court and the truth-seeking function of litigation: it removes the extraneous "noise" of harassment and focus the parties on the evidence and legal arguments. By granting this relief, the Court will send a message that the litigation process cannot be undermined by threats or gamesmanship. Any party who truly intends to litigate in good faith should welcome this clarification.

For all the foregoing reasons, Plaintiff respectfully urges the Court to issue a tailored protective order that (1) forbids any retaliation or unauthorized contact directed at Plaintiff or witnesses, and (2) mandates the preservation of all potentially relevant evidence (with an explicit anti-deletion directive). Such an order will impose nothing more than what the law already requires in substance, but it will crucially provide a mechanism to enforce those requirements in this unique

---

[8] *See Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986) (defining "good cause" in Rule 26(c) context as a "particular need for protection" and cautioning that "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test"); *In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (good cause exists when a party shows disclosure will result in a "clearly defined, specific and serious injury")

and troubling fact pattern.

## III. Plaintiff's Requests Are Factually and Legally Supported, and the Court Should Grant Relief Expeditiously

To summarize the above in the context of the legal standard: Plaintiff has demonstrated "good cause" for **both** expedited discovery and a protective order. The factual predicates (assault, false imprisonment, retaliation, etc.) are not speculative; they are documented by multiple sources, including Defendants' own emails and statements. The need for speed is compelling – every day that passes is another day key video evidence might degrade or a witness might be pressured. Plaintiff's discovery requests are narrowly tailored to a few critical areas and will impose minimal burden (the University and its counsel likely have already collected much of this material in responding to Plaintiff's various prior complaints). On the other hand, the potential prejudice to Plaintiff is severe if relief is denied: he could effectively be deprived of the proof needed to get justice, and even placed in danger of further harm.

Courts have granted similar motions in cases involving ongoing patterns of misconduct. For example, where a plaintiff has made a strong prima facie showing of being harassed or threatened by a defendant, courts have not hesitated to authorize expedited discovery to uncover whether others were involved and to prevent any cover-up, recognizing that normal discovery timetables might allow a retaliatory dynamic to fester. Likewise, protective orders are routinely issued to stop precisely the kind of retaliatory intimidation and potential spoliation at issue here, as a matter of fundamental fairness[9]. In short, Plaintiff's motion is firmly grounded in both fact and law.

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.                    |    Page 43 of 56

Given the urgency and gravity of the situation, Plaintiff respectfully requests that the Court grant

the relief sought without delay. By doing so, the Court will ensure that this litigation proceeds on

the merits – illuminated by all relevant evidence and free from extrinsic coercion – which is the

hallmark of a just adjudication.

# CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court **GRANT** this motion in its entirety and issue an Order providing the following relief:

1. **Expedited Discovery:** Authorizing Plaintiff to immediately serve document requests, interrogatories, and subpoenas, and to notice depositions, **in the following limited areas**: (a) all security camera footage and access/security logs relating to the March 21, 2024 library assault and the March 25, 2024 Counseling Center incident; (b) all internal communications (emails, messages, memos) from March–April 2024 and August–October 2024 concerning Plaintiff, the incidents in question, and decisions regarding Plaintiff's enrollment or visa; (c) the identities of and communications with any individuals who participated in the September 7, 2024 harassment incident or any other retaliatory acts against Plaintiff; and (d) records of any internal investigations or disciplinary actions taken (or not taken) by YU in response to Plaintiff's complaints (including Title IX, security reports, etc.). Defendants should be compelled to produce responsive documents within **14 days** of the Court's order (or as the Court deems reasonable), and to make relevant witnesses available for deposition on an expedited schedule. The Court's order should further specify that any non-party whose rights may be implicated (e.g. FERPA-protected student information in security logs) is hereby permitted to be subpoenaed and their information disclosed for purposes of this litigation, as the privacy interests are outweighed by the need for disclosure in a court proceeding (appropriate protective provisions can be applied to limit public disclosure of sensitive information if necessary).

2. **Protective Order:** Issuing a protective order under Rule 26(c) that: (a) **enjoins all Defendants and their officers, agents, employees, and attorneys from directly or indirectly retaliating against Plaintiff** in any manner for his pursuit of this litigation or related complaints – including but not limited to harassment, adverse academic or employment actions, immigration-related threats, or any form of intimidation; (b) **prohibits Defendants from contacting Plaintiff outside of official litigation communications** (i.e., no personal communications, no surreptitious surveillance or outreach), and likewise **prohibits contact with any potential witnesses** (other students, faculty, etc. who may testify) except through counsel and for legitimate discovery purposes; (c) **orders the preservation of all evidence** potentially relevant to this case, explicitly barring Defendants from destroying, altering, or withholding any documents, videos, or data relating to the parties and events at issue – this includes suspension of any routine data deletion policies and a directive that any third-parties under Defendants' control (such as IT vendors or security contractors) do the same; and (d) requires Defendants to confirm in writing that they have complied with these preservation measures. Additionally, the protective order should warn that any violation will result in swift sanctions, including the possibility of evidentiary penalties or default judgment, as well as contempt proceedings.

3. **Other Relief Deemed Just:** Granting such other and further relief as the Court deems appropriate to ensure the fairness of these proceedings – for example, the Court may consider ordering that discovery materials obtained through the expedited process (like video footage) be treated as confidential at first, solely for use in this litigation, to allay any privacy concerns. Plaintiff does not seek public dissemination of sensitive evidence;

Case 1:25-cv-02431-AT-RWL    Document 46    Filed 07/30/25    Page 46 of 145

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 46 of 56

only the Court's supervised exchange of information needed for the case. The Court might also schedule a status conference after the initial expedited discovery returns are in, to discuss whether any preliminary injunction is warranted to maintain the status quo pending final resolution.

Plaintiff submits that the requested relief is narrowly tailored, firmly supported by the evidentiary record, and grounded in well-established legal principles of good cause and protective authority. **No party will be prejudiced by a grant of this motion – except those who would act in bad faith – whereas denial of this motion would heavily prejudice Plaintiff and reward Defendants' misconduct.** In a very real sense, Plaintiff is fighting not just for his day in court but for the ability to have a fair hearing of his claims without fear or obstruction. This Court's intervention is the only thing that can guarantee that. Plaintiff therefore urges the Court to grant the motion and set this case on a track where truth and accountability, not bullying and evasion, prevail.

**Respectfully submitted[14],**

Dated: July 28, 2025

## /s/ Yisrael Z. Heilmann

Yisrael Z. Heilmann
*Plaintiff, Pro Se*
Address: 447 Broadway
2nd FL 945
New York, NY, 10013
Email: yzh2@protonmail.com

Heilmann v. Yeshiva University, et al.     |     Case No. 25-cv-02431 (S.D.N.Y.)     |
Motion for Expedited Discovery and Protective Order.                           |     Page 47 of 56

CC: All counsel of record (via ECF)

---

[14]   Plaintiff certifies, pursuant to Fed. R. Civ. P. 11(b)(2), that all legal authorities cited herein have been researched, reviewed, and submitted in good faith and reflect Plaintiff's best understanding of applicable law across multiple jurisdictions. Any inadvertent error in citation format, jurisdiction, procedural posture, or pinpoint reference is unintentional and made without any intent to mislead, misstate precedent, or violate ethical obligations. Plaintiff respectfully requests that the Court permit clarification or amendment of any such citation if necessary. As a pro se litigant pursuing complex civil rights and procedural claims, Plaintiff affirms full compliance with Rule 11(b), and invites the Court's guidance or correction in the interest of accuracy, transparency, and judicial efficiency.

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 48 of 56

# APPENDIX A: Summary of Key Evidence Supporting Motion

The following table summarizes the strongest evidence underlying each of the major points in Plaintiff's motion, with citations to the exhibit/file name and specific page or line references:

| Issue / Allegation | Supporting Evidence (Exhibit & Citation) | Summary of Evidence |
|---|---|---|
| **Violent Assault on 3/21/2024 by Sapir Amar** | *Complaint Excerpt*(Pleading); *YU Security Report Reference*; *NYPD Arrest* (Complaint) | Plaintiff's complaint describes Amar's attack (water thrown, punches, chair used as weapon) causing TBI and other injuries; YU's own NYSDHR statement acknowledges an "altercation" occurred and that NYPD arrested Amar. Incident captured on video and by police on scene. |
| **Pressure to Drop Charges (3/21–3/25/2024)** | *Asher Hospital Calls Note*; *Levy Call on 3/21*; *Asher Email 4/2/2024* (Ex. P) | On 3/21, Dean Asher repeatedly urged Plaintiff not to press charges, as recorded in Asher's own notes (she told him YU "does not support" pursuing police). Dr. Levy also called Plaintiff on 3/21 asking if he'll "drop the charges". On 4/2, Asher emailed Plaintiff denying that YU is "telling you to drop the charges" but implicitly confirming the issue was raised. |
| **False Imprisonment & Death Threats on 3/25/2024** | *Complaint Excerpt (False Imprisonment cause)*; *YU Position Statement (denial)*; *Asher Email 4/11/2024* | Plaintiff testifies Levy/Lopez locked him in office ~12 minutes and threatened his and his family's lives if he didn't withdraw charges. Lopez physically restrained him. YU's position statement calls this account "wildly…ridiculous" and denies any threats or confinement – raising factual dispute. Asher's 4/11 email scolds Plaintiff for "disruptive" |

| | | |
|---|---|---|
| | | behavior at Counseling Center and recording conversations, corroborating that Plaintiff reported/recorded the event and YU's focus was silencing him. |
| **Retaliatory Harassment on 9/7/2024 (Chanting Incident)** | *Plaintiff Email to Security 9/25/2024*; *Email Description of Incident* | Plaintiff reported that on 9/7 a group of students followed him chanting "Borussia Dortmund" and "Sapir" to harass him. Email explains the chants' racist and intimidating nature. Details: students pursued Plaintiff, yelling the perpetrator's name; some ran toward him (indicative of threat). This shows ongoing retaliation by peers, unaddressed by YU. |
| **Deliberate Delay / Misconduct re: Medical Leave & I-20** | *Plaintiff Appeal Letter 9/17/2024*; *Cypess Email 8/30/2024*; *Golden Email 9/9/2024* | Plaintiff's letter protesting I-20 termination cites YU's failure to offer Medical RCL after assault and sudden deadline change from 9/13 to 9/10/24. Dean Cypess's email admits YU "unable to backdate" RCL and sets hard documentation deadline (9/13) after which she advanced appeal cutoff. OIS Director Golden's email confirms termination of I-20 was looming due to no RCL on record. These show YU's procedural maneuvering to cause Plaintiff's status loss, and lack of accommodation in violation of 8 C.F.R. §214.2(f)(6)(iii)(B). |
| **Misrepresentations in NYSDHR Proceedings** | *YU Position Statement 12/24/2024*(Excerpts); *Grievance Committee Letter 2025*[15] | YU's NYSDHR position statement falsely claims the assault was mutual (alleges Plaintiff poured water) and omits mention of chair attack; it labels Plaintiff's March 25 allegations "false" and denies any wrongdoing by Levy/Lopez. The NY |

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 50 of 56

|  |  | Attorney Grievance letter notes Plaintiff accused YU's lawyer of an "improperly threatening" letter and other misconduct, indicating the seriousness of YU's obstruction attempts. |
|---|---|---|
| **Retaliatory Acts by YU Deans (Asher, Cypess)** | *Asher Email 4/11/2024*; *Cypess Communications Aug/Sept 2024*; *Plaintiff Email re: Retaliation* | Asher's 4/11 email (Dean of Students) effectively threatens Plaintiff with discipline for speaking out/recording. Cypess (Dean) cut off dialogue and imposed impossible deadlines after Plaintiff got a lawyer; in emails she refused retroactive medical leave and moved up the appeal date. Plaintiff explicitly noted that Cypess ceasing communication was retaliatory, as it prevented him from getting advisement and meeting requirements. |
| **Denial of Access to Advisors / Blocking Reinstatement** | *Complaint Excerpt*; *Email from YU (requiring attorney-only contact)* – e.g., Cypess's directive implied in complaint; *Appeal Letter Excerpt* | Plaintiff's complaint details that after he engaged counsel, YU officials refused to talk to him, forcing all communication through attorneys, thus depriving him of normal academic guidance. His appeal letter raises that the I-20 termination and deadline change appeared to be retaliatory blocking of his return. Together, they show YU actively impeded Plaintiff's attempts to resume studies. |
| **Interference with Equal Protection & Judicial Recourse (general pattern)** | *All of the above, plus:*Evidence of YU moving Amar out of dorm but issuing mutual no-contact (YU position); *Seyfarth Letter* (threatening tone described). | YU's mutual no-contact order (Ex. O) and removing Amar from dorm is cited by YU to claim they helped Plaintiff, but equal protection was denied by treating victim and attacker equally and later penalizing victim. Seyfarth's April 9 letter (implied in grievance) shows attempt |

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 51 of 56

| | | to thwart Plaintiff's recourse through intimidation. Pattern: every time Plaintiff sought help (police, NYSDHR, lawsuit), Defendants responded with measures to undermine those efforts. |
|---|---|---|

**Note:** In the above citations, Plaintiff's contemporaneous emails and Defendants' own documents are given significant weight. For example, the *"Prompt response required: Appeal Against Termination of I-20"* email of 9/17/2024 provides a line-by-line catalogue of YU's failures (no RCL, deadline switch) with legal implications, which is effectively an admission that these events occurred. Likewise, Dean Asher's and Dean Cypess's written words are used to evidence the University's stance and treatment of Plaintiff in real time. This Appendix is intended to guide the Court through the evidentiary record underpinning the request for expedited discovery (to obtain much of this evidence in full) and a protective order (to prevent recurrence of the documented retaliation and spoliation). All pinpoint references correspond to the record citations in this Motion (e.g., "" refers to lines 7–15 of the PDF document labeled as file 19 in Plaintiff's submissions).

---

[15]Plaintiff respectfully notes that he has filed a formal, sealed grievance with the Attorney Grievance Committee of the First Judicial Department concerning the conduct of certain defense counsel in this matter. The grievance, filed pursuant to 22 NYCRR § 1240.18, remains confidential and includes allegations of factual misrepresentations, bad faith litigation tactics, and efforts to intimidate or improperly influence the course of this litigation. While Plaintiff does not seek to litigate those issues here, he respectfully offers to submit the grievance materials for in camera review or under seal should the Court determine that such information would assist in the administration of justice or in assessing the parties' conduct.

# Appendix B: Index of Exhibits

(Submitted in Support of Plaintiff's Motion for Expedited Discovery and Protective Order)

Heilmann v. Yeshiva University, et al., No. 1:25-cv-02431 (AT) (RWL)

| Ex. No. | Document Title and Description | Date | Legal Relevance | Suggested Bates Ref. |
|---|---|---|---|---|
| 1-A[16] | Message from University Counselor Judith Lopez to Plaintiff private phone via Whats App – Sent hours after the March 25, 2024 incident in which Plaintiff alleges he was detained and threatened by Lopez and Dr. Yedidya Levy. The message acknowledges Plaintiff's anger ("If you want to be mad at me it's all good") and urges him to stop listening to outside influence ("you need to stop doing what others want you to do"). While framed informally, this message indirectly confirms the confrontation and demonstrates ongoing pressure on Plaintiff to abandon legal action. Notably, it aligns with Plaintiff's account of coercion during the March 25 meeting and constitutes contemporaneous evidence of witness tampering. | Apr. 2, 2024 | Supports retaliation and intimidation allegations (March 25 false imprisonment and post-meeting coercion). Cited in Argument § I.B and II.A. | YU-24-EX062 |
| 2-B[16] | Email from Dean Asher to Plaintiff – Labels Plaintiff's conduct at the Counseling Center "disruptive" and admonishes him for recording conversations. Sent shortly after the March 25 false imprisonment. | Apr. 11, 2024 | Establishes retaliatory intent, focus on suppressing evidence rather than addressing misconduct. Supports claim under Rule 26(c) for a protective order. | YU-24-EX020 |

Case 1:25-cv-02431-AT-RWL   Document 46   Filed 07/30/25   Page 53 of 145

Heilmann v. Yeshiva University, et al.   |   Case No. 25-cv-02431 (S.D.N.Y.)   |
Motion for Expedited Discovery and Protective Order.   |   Page 53 of 56

| 3-C[16] | The note evidences an early attempt by a senior university official Dr. Sara Asher to discourage Plaintiff from pursuing criminal accountability — potentially constituting witness tampering under federal law or retaliatory conduct under 42 U.S.C. § 12203. [16] | Mar. 21, 2024 | Direct evidentiary confirmation of witness coercion while Plaintiff was hospitalized. Core exhibit for false imprisonment and retaliation claims. | YU-24-EX013[16] |
|---|---|---|---|---|
| 4-D[16] | Email Chain with Dean Rebecca Cypess – Discusses Plaintiff's request for a retroactive Medical RCL. Cypess denies any backdating and sets an accelerated documentation deadline. | Aug. 30, 2024 | Demonstrates failure to accommodate disability, pretextual deadlines, and intent to trigger I-20 termination. Relevant to Counts 10, 13, and 21 (ADA/§504/Retaliation). | YU-24-EX002 |
| 5-E[16] | Email from Director Jennifer Golden (OIS) – States YU will terminate SEVIS status due to lack of enrollment and no approved Medical RCL. Mentions reinstatement/deportation risks. | Sept. 9, 2024 | Confirms visa retaliation, administrative malfeasance, and ongoing injury to immigration status. Tied to Counts 10, 21, and 24. | YU-24-EX001 |
| 6-F[16] | Plaintiff's Formal Appeal Letter to YU – Challenges I-20 termination, raises due process violations, deadline manipulation, and lack of RCL documentation despite prior medical evidence. | Sept. 17, 2024 | Central to due process, disability discrimination, and FERPA violations. Supports Count 24 (Retaliation). | YU-24-EX007 |
| 7-G[16] | Email Report to YU Security – Describes September 7 harassment by students chanting "Borussia Dortmund" and "Sapir." Plaintiff explains why it constituted targeted racial harassment. | Sept. 25, 2024 | Demonstrates hostile environment, institutional inaction, and peer retaliation. Relevant to Counts 6, 10, 23 (NYCHRL hostile education environment and Title VI). | YU-24-EX107 |
| 8-H[16] | Excerpts from YU's NYSDHR Position Statement – Includes false claims: (1) Plaintiff initiated the physical conflict on March 21; (2) No threats occurred on March 25; (3) Plaintiff's complaints were baseless. | Dec. 24, 2024 | Supports defamation per se, abuse of process, and obstruction. Core to Counts 4, 7, 20, and 25 (Rule 11 sanctions and spoliation). | YU-24-EX208 – YU-24-EX210 |

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.                |    Page 54 of 56

**Notes:**

- All exhibits are true and correct copies of the original documents.
- Personal identifiers have been redacted where appropriate.
- Pagination and informal Bates references (e.g., "YU-0001") are Plaintiff's designations for internal reference and judicial convenience.
- Plaintiff respectfully requests that the Court consider these documents in evaluating the Motion for Expedited Discovery and Protective Order.

---

[16]Notice of Redactions Pursuant to Fed. R. Civ. P. 5.2, Local Civil Rule 5.2, and Applicable Precedent

In accordance with:

- Federal Rule of Civil Procedure 5.2(a) (requiring redaction of personal identifiers in public filings),
- Southern District of New York Local Civil Rule 5.2, and
- Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119–20 (2d Cir. 2006) (recognizing that judicial documents may be sealed or redacted to protect privacy interests),

certain portions of this document have been redacted to protect the following categories of sensitive information:

- Personally Identifiable Information (PII): including student ID numbers, contact information, and non-party names;
- Medical Information: including diagnosis dates and treatment summaries;
- Sensitive Immigration and SEVIS Records: including student visa actions, reinstatement communications, and Designated School Official (DSO) determinations;
- Sensitive Governmental Data (foreign and natinal) : including NYPD complaint identifiers, internal law enforcement references, and security personnel names not publicly disclosed.

These redactions are necessary to preserve privacy, prevent undue prejudice to non-parties, and comply with privacy and data protection obligations under federal law and institutional policy. A complete unredacted version of this document is available for in camera review or filing under seal at the Court's direction pursuant to Fed. R. Civ. P. 5.2(d) and SDNY procedures.

Heilmann v. Yeshiva University, et al.     |     Case No. 25-cv-02431 (S.D.N.Y.)     |
Motion for Expedited Discovery and Protective Order.     |     Page 55 of 56

# APPENDIX C: Table of Authorities[14]

| TABLE OF AUTHORITIES | |
| --- | --- |
| **Cases[14]** | **Page(s)** |
| **Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 2010)** | 26, 27 |
| **Ayyash v. Bank Al-Madina, 233 F.R.D. 325 (S.D.N.Y. 2005)** | 26 |
| **Doe v. Congregation of Sacred Hearts, No. 21-cv-01237, 2022 WL 2901403 (S.D.N.Y. July 22, 2022)** | 26 |
| **Notaro v. Koch, 95 F.R.D. 403 (S.D.N.Y. 1982)** | 26 |
| **WowWee Group Ltd. v. Meirly, No. 18-cv-706, 2018 WL 3818271 (S.D.N.Y. Aug. 10, 2018)** | 26 |
| **In re Notorious B.I.G. (Wallace) Estate Litig., No. 05-cv-1540, 2006 WL 827374 (S.D.N.Y. Mar. 8, 2006)** | 27 |
| **Living Scriptures, Inc. v. Doe(s), No. 10-cv-0182, 2010 WL 4687679 (D. Utah Nov. 10, 2010)** | 27 |
| **Strike 3 Holdings, LLC v. Doe, 329 F.R.D. 518 (S.D.N.Y. 2019)** | 27 |
| **Duling v. Gristede's Operating Corp., 266 F.R.D. 66 (S.D.N.Y. 2010)** | 34 |
| **Gambale v. Deutsche Bank AG, 377 F.3d 133 (2d Cir. 2004)** | 34 |
| **Cipollone v. Liggett Group, Inc., 785 F.2d 1108 (3d Cir. 1986)** | 34 |
| **In re Terrorist Attacks on Sept. 11, 2001, 454 F. Supp. 2d 220 (S.D.N.Y. 2006)** | 34 |
| **Mitchell v. Fishbein, 227 F.R.D. 239 (S.D.N.Y. 2005)** | 34 |
| **Galella v. Onassis, 487 F.2d 986 (2d Cir. 1973)** | 34 |
| **Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984)** | 34 |
| **Rodriguez v. DeBuono, 175 F.3d 227 (2d Cir. 1999)** | 35 |
| **Tegler v. Goodman, No. 17-cv-1023, 2018 WL 1582542 (D. Conn. Mar. 30, 2018)** | 35 |
| **Howell v. New York Post Co., 81 N.Y.2d 115 (N.Y. 1993)** | 36 |
| **Treglia v. Town of Manlius, 313 F.3d 713 (2d Cir. 2002)** | 36 |
| **Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003)** | 40 |

| **Statutes[14]** | **Page(s)** |
| --- | --- |
| **42 U.S.C. § 12203** | 36, 53 |

| **Rules[14]** | **Page(s)** |
| --- | --- |
| **Fed. R. Civ. P. 26(f)** | 25 |
| **Fed. R. Civ. P. 26(d)(1)** | 2, 25 |
| **Fed. R. Civ. P. 26(c)(1)** | 2, 34, 35 |
| **Fed. R. Civ. P. 11(b)(2)** | 48 |

[14]     See Page 56

Heilmann v. Yeshiva University, et al.    |    Case No. 25-cv-02431 (S.D.N.Y.)    |
Motion for Expedited Discovery and Protective Order.    |    Page 56 of 56

# APPENDIX D: Certification of Good Faith Conferral (Fed. R. Civ. P. 26(c)(1))

**Certification of Good Faith Conferral (Fed. R. Civ. P. 26(c)(1))**

Pursuant to Federal Rule of Civil Procedure 26(c)(1), the undersigned hereby certifies that he has in good faith conferred or attempted to confer with Defendants' counsel regarding the matters raised in this Motion for Expedited Discovery and Protective Order, in an effort to resolve the dispute without court action.  These efforts included written communication to Defendants' counsel (Seyfarth Shaw LLP) on or about July 25, 2025, seeking to address the expedited discovery and protective relief now requested.  Despite these good-faith attempts to reach an accord, the parties were unable to resolve the issues, necessitating the Court's intervention through this motion.

Dated: July 28, 2025

**_/s/ Yisrael Z. Heilmann_**

Yisrael Z. Heilmann
_Plaintiff, Pro Se_
Address: 447 Broadway
2nd FL 945
New York, NY, 10013
Email: yzh2@protonmail.com

---

[14] Refering to Page 55: Plaintiff certifies, pursuant to Fed. R. Civ. P. 11(b)(2), that all legal authorities cited herein have been researched, reviewed, and submitted in good faith and reflect Plaintiff's best understanding of applicable law across multiple jurisdictions. Any inadvertent error in citation format, jurisdiction, procedural posture, or pinpoint reference is unintentional and made without any intent to mislead, misstate precedent, or violate ethical obligations. Plaintiff respectfully requests that the Court permit clarification or amendment of any such citation if necessary. As a pro se litigant pursuing complex civil rights and procedural
 claims, Plaintiff affirms full compliance with Rule 11(b), and invites the Court's guidance or correction in the interest of accuracy, transparency, and judicial efficiency.

# *Exhibit* A



Heilmann v. Yeshiva University, et al. | Case No. 25-cv-02431 (S.D.N.Y.) | Exhibit

# *Exhibit* B



**Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>**

___

## Note
1 message

**Sara Asher** <Sara.Asher@yu.edu>                                       Thu, Apr 11, 2024 at 3:11 PM
To: "Yisrael Zephaniah Heilmann [student]" <yheilman@mail.yu.edu>

Yisrael – I was informed that you were disruptive earlier this week at the Counseling Center. While I understand that you may be going through something now, I want to remind you that communicating with staff in a disruptive manner is against our expectations, and our policies prohibit recordings of conversations and meetings without the consent of the other parties. (https://www.yu.edu/sites/default/files/inline-files/Undergraduate%20Student%20Bill%20of%20Rights-Disciplinary%20Procedures%20%2800053990xA0726%29.pdf).

These policies are put in place to benefit the campus community.

Thank you for understanding.

Best,

Dr Asher


Dr. Sara Asher
Dean of Students
Yeshiva University

# *Exhibit* C

12:42

 31



+1 (516) 680-4848

iMessage
Thu, Mar 21 at 7:16 AM

Hi it's Dr Asher,
I know you're in the hospital, I hope you are ok. do you think you will be returning soon?

Thu, Mar 21 at 8:55 AM

Hi, I am Yisrael, how are you? Thank you for asking. Not good at all. Not sure how severe this is, they need to put me into a machine. They hope there is no internal brain bleeding. I will let you know later. I can't right now determine if I comeback and when.

I just spoke to the hospital, they aren't worried, they are not concerned about you. Sometimes they offer scans to be extra careful but if you don't want a scan, you can tell them. They know you have some pain, but ask them if you have to do the scan. You can advocate for yourself here.

They do not think it's severe

Thu, Mar 21 at 12:24 PM

Good morning,
I hope you could sleep a little bit more than me. I am discharged now, there no severe injuries.

iMessage

12:43



< 31

+1 (516) 680-48

You will need to give that information to the district attorney.

2 Replies

How I contract them ?

Police gave me nothing, I did not get a name or paper. They brought me to the ambulance and left.

Thu, Mar 21 at 7:54 PM

Yisroel- the district attorney will call you.

Can you call me please?

Thu, Mar 21 at 9:08 PM

Answer the phone from numbers you may not recognise because it may be the district attorney

Of course

Thu, Mar 21 at 11:22 PM

Hi, no calls yet?

No

I send you a voice massage in WhatsApp

Fri, Mar 22 at 2:23 AM

+ iMessage

12:43



< 31



+1 (516) 680-4

Fri, Mar 22 at 5:41PM

Hi,
I hope you're well!
I wanted to catch you up- are you free at 1:45?

1 Reply

> Yes

> The district attorney never called me

Yes, it's ok, it turns out they went ahead without it

1 Reply

> Phone was next to me all night .

You will need to speak with them but not yet

Yes, it's ok, it turns out they went ahead without it

> Ok, good! I also remember I never told police to file a complaint.

Sometime in the next few weeks

> Ok, year for sure!

Fri, Mar 22 at 6:47 PM

+ ( iMessage



+1 (516) 680-4848

Hi,
I hope you're well!
I wanted to catch you up– are you free at 1:45?

Should I come to the office or you call me?

Tue, Mar 26 at 1:56 PM

Good morning, how are you ? I think Sapir violated the non contact order? Not sure, but why he enters neagles shop when I am inside there and stands inches next to me ? Its on camera, I am not sure but according to how I understood this order, this is a violation.

You would need to see the footage. As I said I am not sure. I googled it several times. I was clearly viable in the shop and why getting so close to me?

Yisroel,
Our no contact only says you can't talk to each other. I can remind sapir about our no contact order which restricts communication, and does not prohibit him from being in same place.

iMessage

# *Exhibit* D



**Re: Fall 2024**

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                                                    Mon,
To: Jennifer Golden <jgolden1@yu.edu>

Thank you so much ! Mrs. Golden I really appreciate your work. And you bringing clarity to me! Because I was in panic that I get deported if I withdraw . Thank you!

I attended all classes until March,21 and then it was less . But I have a doctor's

Date: 9/5/2024

To Whom It May Concern:

Mr. Yisrael Heilmann was seen in our neurology practice since 04/03/2024-present, he has been diagnosed with a



... neurologically cleared and is ... all previous activities, he may conti...
... school studies with no restrictions.

He was seen today at our office for neurological care.

If you have any questions feel free to contact us at (800) 200 - 8196

(F) 212-962-2050



note from March, 21 also all my professors knew it!

So, it means withdraw would not lead to deportation or that I would reinstate my status .

I could continue normally?

Thank you !!

Yisrael Heilmann
Sent from my iPhone

On Sep 8, 2024, at 8:25 PM, Jennifer Golden <jgolden1@yu.edu> wrote:


Hello Yisrael,

I am normally not on email Saturday and Sunday.

1. **Status Impact:** Am I currently considered out of status due to the withdrawal from all my classes after the Spring 2024 semester? You are currently in Legal F-1 status. A withdrawal after the end of the semester is not grounds for termination as long as your professors confirm that you were attending classes. I am waiting for attendance reports from you for spring 2024.
2. **Required Actions:** What steps should I take to address any potential issues with my F-1 status and ensure compliance with visa requirements? Comply with the academic instructions provided in writing by Dean Cypess.
3. **Reinstatement:** If necessary, could you guide me on the process for reinstating my status or any other actions required to continue my studies without interruption? Comply with the academic instructions provided in writing Cypess.

Best regards,

Jennifer Golden

**Jennifer Golden**
Director, Office of International Services
Yeshiva University
646-592-2403 (General Office Number)
646-592-4225 (Direct Number)

https://www.yu.edu/international-students

**The OIS is working virtually beginning on May 22, 2024 through the end of the summer.  If you must see an advisor in person, please contact the office and we will make arrangements. The fastest reach the office is by email: oiss@yu.edu**

**Reminder:** International students are required to report a change in local address to YU and the OISS within 10 days of your move; register full-time every semester and obtain a travel signature on your I-20 once a year.
**The content of this email offers guidance and does not constitute legal advice.**

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Saturday, September 7, 2024 9:00 PM
**To:** Jennifer Golden <jgolden1@yu.edu>
**Subject:** Re: Fall 2024

Dear Mrs. Golden,

I hope this message finds you well. I am writing to seek your assistance and guidance regarding my F-1 visa status.

Thank you for the clearification.

On March 21, 2024, I was the victim of an assault on campus, which significantly impacted my ability to complete my coursework for the Spring 2024 semester. Due to this incident, I was unable to take my final exams and, as a result, had to withdraw from all of my classes after the Spring semester ended.

Given that we are now in the Fall 2024 semester, I am concerned about the implications for my F-1 status and would appreciate your help with the following:

1. **Status Impact:** Am I currently considered out of status due to the withdrawal from all my classes after the Spring 2024 semester?
2. **Required Actions:** What steps should I take to address any potential issues with my F-1 status and ensure compliance with visa requirements?
3. **Reinstatement:** If necessary, could you guide me on the process for reinstating my status or any other actions required to continue my studies without interruption?

I have documentation related to the assault and my subsequent medical and personal circumstances and am prepared to provide any additional information needed to support my situation.

Thank you very much for your understanding and assistance during this challenging time. I look forward to your guidance on how to proceed. Please let me know if there are any forms or procedures I need to complete.

Sincerely,

Yisrael Heilmann
Student ID: 800754574

Sincerely,

# Yisrael Heilmann

On Sep 3, 2024, at 9:59 AM, Jennifer Golden <jgolden1@yu.edu> wrote:

Hello Yisrael,

F-1 regulations require YU to report student registration status in SEVIS within 30 days of every term start date. F-1 regulations also require YU to report any changes to registration within 21 days of the change.

A Designated School Official (DSO) is authorized to report registration and subsequent changes in SEVIS. DSOs are part of the my OIS team.

Best regards,

Jennifer Golden

**Jennifer Golden**
Director, Office of International Services
Yeshiva University
646-592-2403 (General Office Number)

https://www.yu.edu/international-students

**The OIS is working virtually beginning on May 22, 2024 through the end of the summer.  If you must see an advisor in person, please contact the office and we will make arrangements. The fa way to reach the office is by email: oiss@yu.edu**

**Reminder:** International students are required to report a change in local address to YU and the OISS within 10 days of your move; register full-time every semester and obtain a travel signature on your I-20 once a year.
**The content of this email offers guidance and does not constitute legal advice.**

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Sunday, September 1, 2024 9:27 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Cc:** Jennifer Golden <jgolden1@yu.edu>
**Subject:** Re: Fall 2024

Dear Mrs. Cypress and Mrs. Golden,

On August 19, 2024, Mrs. Cypress sent me the following message:

"We have already filed paperwork and taken other actions with US immigration regarding your enrollment for the Spring 2024 semester, and we are not able to change that. We are sorry but we cannot do what you demand."

Could you please provide more detailed information about the paperwork that has been completed regarding my visa? Specifically, I would like to know who handled the process and if it is possible to receive a copy of the documentation.

Thank you very much for your assistance.

Sincerely,

Yisrael Heilmann


On Sep 1, 2024, at 8:02 PM, Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> wrote:


" I will look into Yeshiva College's policy about repeating classes and its implications for your transcript. I will have to get back to you about that. "
 What does it mean?  Could you send me the policies, please?


Did you communicate with your chemistry professor before you stopped going to lab? The fact that your arm was in a cast does not, in and of itself, excuse you from attending lab. Who was your professor?

Ok, somebody with one arm should perform chemical experiments. Again a question of safety!
I had doctor's note send to all of them. I communicated very clear with all of them.


YU does not have an agreement with any other university allowing students to use their libraries. If you are a student at Yeshiva College, you have access to our resources.

Ok, so I know.


I have never heard of a university waiving or refunding its student activity fees. Again, I will ask, but I doubt that will be possible.

Should be legally ok? According to my knowledge, under the circumstances of  security.
I will reach out again to my embassy they should contact their US counterparts and they should contact you. Something has to be done.
I will inform them now.


Sincerely,

Yisrael Heilmann

On Sep 1, 2024, at 7:35 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Yisrael,

Did you communicate with your chemistry professor before you stopped going to lab? The fact that your arm was in a cast does not, in and of itself, excuse you from attending lab. Who was your professor?

I will look into Yeshiva College's policy about repeating classes and its implications for your transcript. I will have to get back to you about that.

I have never heard of a university waiving or refunding its student activity fees. Again, I will ask, but I doubt that will be possible.

YU does not have an agreement with any other university allowing students to use their libraries. If you are a student at Yeshiva College, you have access to our resources.

Thank you,
Rebecca Cypess

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Sunday, September 1, 2024 7:22 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Re: Fall 2024

Dear Mrs. Cypess,

Yisrael,

Regarding your questions about final exams:
1. Are you saying you missed the lab meetings for one or more of your courses? Which courses were they?

Yes, because one hand was in a chast. The course was Chemistry lap .

2. Are you saying you are planning to repeat one of your courses? Which one?

Chemistry and I considering calculus, not sure if I can make Calc 2 with the missing knowledge of last two month of classes. I wanted to try out on Tuesday.

Unfortunately:

I got warned that the perpetrator is back on campus…?

Therefore, I ask you led me withdraw from all activities, outside of mandatory class, including shabbot, clubs and events.
I will only attend mandatory classes. Moreover,  I will not use the library, gym, pool and dinning halls of Yeshiva University in the future.
I ask you to confirm that withdraw  and refund me any funds what were allocated to student activities.

I currently negotiate with another university to use their library.

In the meanwhile, does YU have cooperation with NYU, Columbia or CUNY which allows me to use their library with YU student card?

Sincerely,

Yisrael Heilmann

> On Aug 31, 2024, at 9:17 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:
>
> Yisrael,
>
> Regarding your questions about final exams:
> 1. Are you saying you missed the lab meetings for one or more of your courses? Which courses were they?
> 2. Are you saying you are planning to repeat one of your courses? Which one?
>
> Thank you,
> RC
>
> _____
>
> Rebecca Cypess, PhD
> The Mordecai D. Katz and Dr. Monique C. Katz Dean
> Undergraduate Faculty of Arts and Sciences
> Yeshiva University
> rebecca.cypess@yu.edu
> (646) 592-4801

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Friday, August 30, 2024 3:09 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Re: Fall 2024

Who can answer me that questions about final and the lab?

Also it not related to this specific topic but the assault:

Somebody in YU told me that I can withdraw from student life, than I would be not anymore allowed in student activities except of classes on campus,  and a fee already collected what would be returned to my account . How I do that ?

I want to do that.

Sincerely,

Yisrael Heilmann
Sent from my iPhone

> On Aug 30, 2024, at 2:55 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:
>
> Yisrael,
>
> Yes. Please review our earlier messages to you, which I think are very clear.

Thank you
RC

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Friday, August 30, 2024 2:52 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Re: Fall 2024

Also the medical clearance for fall semester you need until 13th?
Sent from my iPhone

> On Aug 30, 2024, at 2:47 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:
>
> Yisrael,
>
> You are asking for a reduced credit load to be applied retroactively to spring 2024. The university is unable to backdate any paperwork, including a reduced credit load form.
>
> I don't quite understand the questions you are asking about your final exams. In any case, if you want to avoid having Ws on your transcript, you must either take the final exams or provide the medical documentation that we have requested by September 13. Again, this is university policy and cannot be overridden.
>
> Thank you,
> Rebecca Cypess

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Friday, August 30, 2024 2:31 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Re: Fall 2024

Dear Mrs. Cypress,

Why a RCL is not possible, according to the regulations Yeshiva University can do it ? If I take 6 instead of 12 credits for Spring 24.

Unfortunately, in the aftermath of the incident on campus, Yeshiva University was not offering any kind of RCL or Absence of leave. What should have been done through the medical view point…! There was also a medical letter send to the university describing the severity of the injuries.

To provide this documentation is possible. But both documents are possible to get. It will take time until you receive them.

Regarding the delay of the deferral exams I have several questions.

For example how you retroactively will grade a course with lap. I could not attend the lap due to only one arm was functioning? How will this specific course be graded ? How Lap will be graded?

What one of the courses I retake this semester, will than one grade count or do I need to do the exams twice on the same material ?

Sincerely,

Yisrael Heilmann

On Aug 30, 2024, at 12:29 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Dear Yisrael,

The best way to avoid the problems you describe is to take one of the two routes that we made available to you **by September 13**. I quote from my earlier email:

> "If you decline to take W grades in those four courses from Spring 2024, Yeshiva University policy stipulates that you must take the deferred exams by the designated makeup date so as to resolve your Incomplete grades no later than September 13, 2024. Likewise, Yeshiva University policy stipulates that you must resolve your Incomplete from Summer 2024 no later than September 13, 2024.
>
> - If a medical doctor or clinical psychologist provides us with appropriate written documentation that you cannot take the exams at that time, we will delay the exams by one semester.
>
> - However, if a medical doctor or clinical psychologist notifies us that you are unable to take your deferred exams due to medical concerns, that person must also provide appropriate written documentation that you are medically cleared to take courses and complete them fully and successfully in Fall 2024. If you do register for courses in Fall 2024, you must complete them in accordance with all Yeshiva University policies or drop them in accordance with the deadlines set in the university's Academic Calendar to avoid tuition and/or grade liability."

Ms. Golden will be happy to speak with about visa-related matters, but YU it is not possible for YU to backdate any documentation.

Thank you,
Rebecca Cypess

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Friday, August 30, 2024 6:58 AM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Cc:** Jennifer Golden <jgolden1@yu.edu>
**Subject:** Re: Fall 2024

> You don't often get email from yheilman@mail.yu.edu. Learn why this is important

Dear Mrs. Cypess and Mrs. Golden,

I am writing in response to your recent email, Mrs. Cypess.

It has come to my attention that applying "W" grades for the Spring semester courses may have serious implications for me as a non-U.S. citizen, and for the university, as it could potentially violate U.S. immigration laws. Should you require further clarification on this matter, please let me know.

Consequently, dropping the entire semester with "W" grades is not a viable option for me.

I am including Mrs. Golden in this correspondence, as we need guidance from the Designated School Official (DSO) regarding this issue. I am considering whether a Reduced Course Load (RCL) could be applied retroactively, based on my knowledge .
However, I require Mrs. Golden's final approval before proceeding further.

I have previously discussed this matter with immigration during a conversation with Dean Sugarmen in May 2024. Additionally, I contacted the DSO for clarification immediately after receiving your initial email.

Please advise on the next steps. Thank you for your assistance.

Sincerely,

Yisrael Heilmann

On Aug 19, 2024, at 3:49 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Dear Yisrael,

We don't understand why taking our generous offer to give you W grades for your Spring semester classes would necessitate you disclosing sensitive details about the assault. W grades are taken for many reasons, and it is a useful method for a student to withdraw from a class after the Withdrawal deadline in the semester. We would never expect you to disclose information that is uncomfortable for you to share.

Regarding taking a Leave of Absence (LOA) retroactively, in order to receive a medical LOA for US immigration purposes, the request and all of the necessary paperwork (including medical note) need to be provided to our international student office prior to the start of the semester or prior to a drop in full-time enrollment during the semester, and that did not occur. It cannot happen after the end of the semester. We have already filed paperwork and taken other actions with US immigration regarding your enrollment for the Spring 2024 semester, and we are not able to change that. We are sorry but we cannot do what you demand.

Sincerely,
Dr. Cypess

_____
Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
Yeshiva College, Belfer Hall Room 516, 2495 Amsterdam Ave., New York, NY 10033
Stern College, 215 Lexington Ave., Room 609, New York, NY 10016
rebecca.cypess@yu.edu
(646) 592-4801
https://www.yu.edu/faculty/pages/cypess-rebecca

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Thursday, August 15, 2024 10:58 AM
**To:** Sara Asher <Sara.Asher@yu.edu>
**Cc:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Re: Fall 2024

You don't often get email from yheilman@mail.yu.edu. Learn why this is important
Dear Dean Asher and Dean Cypess,

Thank you for your thorough response regarding my academic situation and the options available to me. I truly appreciate the guidance you have provided.

I would like to address the recommendation to take W (Withdrawal) grades for the four courses from Spring 2024. While I understand that this advice is intended to help me navigate my current challenges, I need to express my serious concerns about the implications of accumulating multiple W grades. This approach could necessitate disclosing sensitive details about the assault I experienced, which I believe should remain confidential.

This situation complicates my academic standing and significantly impacts my future, particularly regarding job applications and further educational opportunities. I would like to emphasize that granting a leave of absence for the Spring 2024 semester would not only benefit me but also serve the best interests of Yeshiva University by allowing me to address my incomplete grades without having to publicly disclose this matter in future academic or professional settings.

The potential requirement to disclose information about such a traumatic experience raises serious concerns for me. Maintaining a low profile regarding this matter would be beneficial for both sides as I seek to move forward in my academic and professional life. The circumstances surrounding my deferral exams are well-documented by medical professionals, and I am willing to provide appropriate documentation to substantiate my claims.

I am formally requesting a leave of absence for the Spring 2024 semester due to medical reasons. This will enable me to address my incomplete grades while keeping the details of my situation confidential for the benefit of both parties. I trust we can handle this matter with the utmost sensitivity, and I kindly ask that my request be treated confidentially, in accordance with relevant privacy laws.

Thank you for your understanding, and I look forward to your response.

Sincerely,

Yisrael Heilmann


Sent from my iPhone On Aug 14, 2024, at 10:28 PM, Sara Asher <Sara.Asher@yu.edu> wrote:



Dear Yisrael,


We are writing in response to your messages to Dean Fred Sugarman dated August 5–8, 2024, about completion of your deferral exams for Spring 2024. Please note:

- You asked whether it is possible for you to repeat the entire academic year. This is not possible.
- You requested that Yeshiva University back-date a leave of absence to Spring 2024. This is also not possible.
- You must resolve the Incomplete grades for the courses for which you registered, or the Incomplete grades will be changed to the grade that you would have earned in the course without completing the exams and any other missing coursework.
    - Dean Sugarman recommended that you take W (Withdrawal) grades for the four courses in Spring 2024 for which you deferred final exams. Given your situation, we will permit this even though the deadline to withdraw from those classes has long past.  This remains our best advice.
    -
        If you decline to take W grades in those four courses from Spring 2024, Yeshiva University policy stipulates that you must take the deferred exams by the designated makeup date so as to resolve your Incomplete grades no later than September 13, 2024. Likewise, Yeshiva University policy stipulates that you must resolve your Incomplete from Summer 2024 no later than September 13, 2024.
        - If a medical doctor or clinical psychologist provides us with appropriate written documentation that you cannot take the exams at that time, we will delay the exams by one semester.
        - However, if a medical doctor or clinical psychologist notifies us that you are unable to take your deferred exams due to medical concerns, that person must also provide appropriate written documentation that you are medically cleared to take courses and complete them fully and successfully in Fall 2024. If you do register for courses in Fall 2024, you must complete them in accordance with all Yeshiva University policies or drop them

in accordance with the deadlines set in the university's Academic Calendar to avoid tuition and/or grade liability.
- Yeshiva University policy states that "Leaves of absence are granted for a maximum of one semester per 12-month period."
- To discuss the necessary requirements to allow you to maintain your F-1 visa status if taking a leave of absence in Fall 2024, please contact Jennifer Golden (jgolden1@yu.edu).

As soon as possible, but no later than August 23, 2024, please provide us with written confirmation of your plans.

Sincerely,

Sara Asher, Dean of Students

Rebecca Cypess, Dean, Yeshiva College

Heilmann v. Yeshiva University, et al. | Case No. 25-cv-02431 (S.D.N.Y.) | Exhibit

# *Exhibit* E



**Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>**

---

## I-20 Termination
1 message

---

**Jennifer Golden** <DoNotReply@oiss.yu.edu>                              Tue, Sep 10, 2024 at 10:42 PM
Reply-To: Jennifer Golden <jgolden1@yu.edu>
To: yheilman@mail.yu.edu

**International Portal**

---

Dear Yisrael,

As we discussed, your I-20 was Terminated today (9/10/2024). This is what is entered in SEVIS:
**SEVIS STATUS:** TERMINATED
**TERMINATION REASON:** OTHERWISE FAILING TO MAINTAIN STATUS - Did not apply for RCL and stopped attending school full-time.
**SEVIS Remarks:** Student stopped attending school full-time last spring due to a medical issue. He did not apply for Medical RCL. He would have been eligible had he applied in accordance with 8 CFR 214.2(f)(6)(iii)(B).

You have two options for regaining legal F-1 status:

1. Travel outside the U.S. and apply for admission to begin a new F-1 duration of status (D/S)

2. Apply for reinstatement to F-1 status inside the U.S.

There are pros and cons associated with both options. If you plan to leave the U.S. during the upcoming Jewish holidays, travel is realistically your best option because a Reinstatement application can take 6-12 months. While the application is pending, your forfeit the application if you leave the U.S.

While your F-1 status is Terminated you may continue to attend school full-time, and you should health permitting.

I will be at Wilf on Thursday if you want to meet in person to discuss. If you prefer to meet tomorrow, I can meet with you online. This is too complicated to discuss via email.

Best regards,
Jennifer Golden
Director, Office of International Services
Yeshiva University

---

This message was generated automatically

Heilmann v. Yeshiva University, et al. | Case No. 25-cv-02431 (S.D.N.Y.) | Exhibit

# *Exhibit* F



Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>

## Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change

6 messages

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                    Fri, Sep 20, 2024 at 1:42 PM
To: Rebecca Cypess <rebecca.cypess@yu.edu>

### Dear Mrs. Cypess,

I am writing to formally appeal the termination of my I-20 on September 10, 2024. The reasons cited for this termination are both legally questionable and procedurally improper. Specifically, I am contesting the abrupt change in the appeal deadline from September 13 to September 10, 2024, made by Mrs. Cypess, and the failure to offer me a Reduced Course Load (RCL) following the assault I suffered on March 21, 2024. These actions raise serious concerns about fairness and due process.

### 1. Failure to Offer RCL After the Assault

As you are aware, I was assaulted on campus on March 21, 2024, and I promptly informed university officials of the incident. According to 8 CFR 214.2(f)(6)(iii)(B), I was eligible for a Medical RCL due to the trauma and medical issues resulting from this assault. Despite this clear eligibility, the university failed to offer me this accommodation, neglecting its obligation to assist me in maintaining my F-1 status during a documented medical crisis.

Under federal regulations, the university is required to inform students of their eligibility for RCL when their medical situation is known and documented. It is unacceptable that I was not provided with this essential option. I request that you provide evidence proving that RCL was ever offered to me, which, to my knowledge, was not.

### 2. Unfair and Unexplained Deadline Change

I find the sudden change of the appeal deadline from September 13 to September 10, 2024, particularly concerning. This change, made by Mrs. Cypess,

was not communicated to me in a timely manner, and no reasonable justification for this arbitrary adjustment was provided. This lack of transparency has severely compromised my ability to respond to the termination appropriately. Such actions suggest a disregard for due process and raise serious questions about procedural fairness.

## 3. Concerns of Retaliation and Seeking Resolution

I am deeply concerned that the termination of my I-20 and the abrupt change in the appeal deadline may be retaliatory actions linked to my status as a victim of a crime on campus and the ongoing investigations into that incident. Such retaliation would be in violation of several federal laws, including:

- **Title IX of the Education Amendments of 1972:** This law prohibits discrimination and retaliation against students who report incidents of sexual harassment or assault, or participate in investigations related to these matters.
- **Section 504 of the Rehabilitation Act of 1973:** This law requires institutions receiving federal funding to provide equal access and not discriminate against individuals based on their disability or medical condition, which includes conditions arising from traumatic events.
- **The Clery Act (Campus Security Act):** This law mandates institutions to provide transparency regarding campus crime and to ensure that victims of campus crime are not subjected to retaliation.

Any actions perceived as retaliatory in response to my reporting the assault or my involvement in ongoing investigations would not only be unethical but also legally impermissible. Such conduct could expose the university to significant legal liabilities and undermine its compliance with federal regulations.

It is crucial that the university addresses this matter with full adherence to these legal protections, ensuring that no discriminatory or retaliatory measures are taken. My objective is to resolve this situation equitably so that I can continue my studies and complete my rehabilitation from the assault without further complications. I trust the university will act in accordance with these legal requirements and institutional policies to achieve a fair and just resolution.

## 4. Immediate Actions Requested

In light of the above, I respectfully request the following:

1. Immediate reinstatement of my I-20 and F-1 status.
2. A written explanation for the change in the appeal deadline by Mrs. Cypess, including why I was not informed in a timely manner.
3. Proof that I was offered RCL in accordance with 8 CFR 214.2(f)(6)(iii)(B) after my medical condition became known to the university.
4. Written documentation of my exact attendance for all courses, including any missed dates and communication from professors regarding my attendance, to verify if there were any mistakes or discrepancies that might have influenced the termination decision.
5. A copy of Yeshiva University's policies regarding what constitutes full-time attendance for students, including the specific credit hour requirements and any exceptions that may apply.

I expect a formal response within 3 business days, and I trust we can resolve this matter without further escalation.

Sincerely,

Yisrael Heilmann

---

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                    Mon, Sep 23, 2024 at 7:09 PM
To: Rebecca Cypess <rebecca.cypess@yu.edu>

Mr. Cypess,

thank you so much for. Your email and the clarification.

First of all, I have never taken any legal counsel nor I took a lawyer or my embassy is involved in grading, attendance and immigration issues!
I spoke to my embassy regarding the injuries, and treatment in my country if I face disability! They not even know that I am going to YU, I avoid to tell them to protect your university!
I want to be very clear!

We still can speak to each other. I am not coming from a culture where people sue each other, we talk with each and find a solution.

I am very interested to find a solution and get my degree from YU, this would be the best medicine to overcome this traumatic experience on March 21,2024.

Also, me and my family dont have any intention of going against YU or bringing this matter to the "public", a lawyer is

for me "public" (meaning bringing this matter out of YU)

Secondly, we have never meet in person, I normally discuss such topics only in person and not over email, I come from a very poor family, half of my family lost everything in war in Ukraine, I grew up in housing projects, the poverty rate among Jews in the country I grow up is between 75% -90%. I probably the last one at YU who can afford a lawyer!

Last but not least, things have been super unclear to me. Your email clarify a lot now.  I think we need to talk to and find a solution for the last two semesters .  In the end I reacted in panic.  I thought I get deported and my Visa is cancelled when I withdraw from the courses. That why I wrote you the email. I hope you understand that.

I want to ask you if it's still possible to withdraw from all courses in Spring and Sommer 24, a grade "F" would hurt my academics entirely!

I will reach out to you in longer email, explaining things and hope we can find a solution.

Your  email changes the view for the situation. I hope we can work towards a solution and I continue my studies as it was before March, 24!


Sincerely,

# Yisrael Heilmann


On Sep 20, 2024, at 7:31 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:


Yisrael,

I am writing in response to your allegation that we changed our deadline to resolve your incompletes from the prior semesters.

When you first approached us during the Spring 2024 semester about your inability to take your exams on their scheduled dates, we gave you the option to withdraw from all the classes (despite being past the University deadline to withdraw) or to defer all the exams until the designated make-up date in September. Taking the exams by the designated make-up date would have allowed your professors to resolve the Incomplete grades by September 13. Here is the exact language from that message, with the relevant passage higlighted:

- You must resolve the Incomplete grades for the courses for which you registered, or the Incomplete grades will be changed to the grade that you would have earned in the course without completing the exams and any other missing coursework.
    - Dean Sugarman recommended that you take W (Withdrawal) grades for the four courses in Spring 2024 for which you deferred final exams. Given your situation, we will permit this even though the

deadline to withdraw from those classes has long past.  This remains our best advice.

○

If you decline to take W grades in those four courses from Spring 2024, Yeshiva University policy stipulates that
<mark>you must take the deferred exams by the designated makeup date</mark>
so as to resolve your Incomplete grades no later than September 13, 2024. Likewise, Yeshiva University policy stipulates that you must resolve
your Incomplete from Summer 2024 no later than September 13, 2024.

■

If a medical doctor or clinical psychologist provides us with appropriate written documentation that you cannot take the exams at that time, we will delay the exams by one semester.

■

However, if a medical doctor or clinical psychologist notifies us that you are unable to take your deferred exams due to medical concerns, that person must also provide appropriate written documentation that you are medically cleared to take courses and complete
them fully and successfully in Fall 2024. If you do register for courses in Fall 2024, you must complete them in accordance with all Yeshiva University policies or drop them in accordance with the deadlines set in the university's Academic Calendar to avoid
tuition and/or grade liability.

All exams were to be taken by the designated make-up date, which is clearly given in our Academic Calendar as September 6, 2024, in order for the instructors to have sufficient time to review them and give you a final grade in the course by September 13, 2024 which is the University deadline to resolve Incomplete grades for the Spring/Summer semesters as set forth in the Academic Calendar.

Dean Sugarman first reminded you in the beginning of August about the September 6th make-up date, and also told you that Mr. Pitsirikos and Dean Stenhouse would work out a schedule if a student – like you - had more than one exam to take.   There was never a change in any deadline (except letting you schedule your exams over a few days instead of making you take them all on September 6th) which is clearly set forth in the Academic Calendar Microsoft Word - 2024-25 UG Academic Calendar v14 042224 (yu.edu), and Mr. Pitsirikos was in contact with you about scheduling the exams by the September 13th deadline (and even offered for you to take the last of the four exams on that date).

We told you that if you provided us with appropriate written documentation that you could not take the exams at that time, we would again have delayed all of your exams by one semester (such time to be determined by us, and not dictated by you) – but then you would also have needed to supply appropriate written documentation that you were medically cleared to take courses and complete them fully and successfully in Fall 2024. We stated all this clearly in our earlier communications.

You provided us with documentation on September 5th that you were cleared as of August 24, 2024 so it was expected for you to take all the exams by the designated make-up date. You did not take the exams (and rejected our gracious offer for you to withdraw), and your instructors have now calculated your grades and submitted them to the Registrar to include in your records.

To be clear, we are not engaging, nor have we ever engaged, in any retaliation against you. We have always supported you, and continue to support you, and advised you that you have the right to pursue all claims, including going to the police, in connection with the incident. We have also provided reasonable accommodations to you in connection with the incident by deferring your exams, but without proper documentation you were not entitled to continue to defer them.

Regarding your questions about your attendance record, some of your instructors have told me that you stopped attending class in the middle of the semester and in some cases (viz. Chemistry Lab) stopped handing in assignments well before your injury.

Sincerely,
Rebecca Cypess

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Friday, September 20, 2024 7:42 AM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change

**Dear Mrs. Cypess,**

I am writing to formally appeal the termination of my I-20 on September 10, 2024. The reasons cited for this termination are both legally questionable and procedurally improper. Specifically, I am contesting the abrupt change in the appeal deadline from September 13 to September 10, 2024, made by Mrs. Cypess, and the failure to offer me a

Reduced Course Load (RCL) following the assault I suffered on March 21, 2024. These actions raise serious concerns about fairness and due process.

## 1. Failure to Offer RCL After the Assault

As you are aware, I was assaulted on campus on March 21, 2024, and I promptly informed university officials of the incident. According to 8 CFR 214.2(f)(6)(iii)(B), I was eligible for a Medical RCL due to the trauma and medical issues resulting from this assault. Despite this clear eligibility, the university failed to offer me this accommodation, neglecting its obligation to assist me in maintaining my F-1 status during a documented medical crisis.

Under federal regulations, the university is required to inform students of their eligibility for RCL when their medical situation is known and documented. It is unacceptable that I was not provided with this essential option. I request that you provide evidence proving that RCL was ever offered to me, which, to my knowledge, was not.

## 2. Unfair and Unexplained Deadline Change

I find the sudden change of the appeal deadline from September 13 to September 10, 2024, particularly concerning. This change, made by Mrs. Cypess, was not communicated to me in a timely manner, and no reasonable justification for this arbitrary adjustment was provided. This lack of transparency has severely compromised my ability to respond to the termination appropriately. Such actions suggest a disregard for due process and raise serious questions about procedural fairness.

## 3. Concerns of Retaliation and Seeking Resolution

I am deeply concerned that the termination of my I-20 and the abrupt change in the appeal deadline may be retaliatory actions linked to my status as a victim of a crime on campus and the ongoing investigations into that incident. Such retaliation would be in violation of several federal laws, including:

- **Title IX of the Education Amendments of 1972:** This law prohibits discrimination and retaliation against students who report

incidents of sexual harassment or assault, or participate in investigations related to these matters.

- **Section 504 of the Rehabilitation Act of 1973:** This law requires institutions receiving federal funding to provide equal access and not discriminate against individuals based on their disability or medical condition, which includes conditions arising from traumatic events.
- **The Clery Act (Campus Security Act):** This law mandates institutions to provide transparency regarding campus crime and to ensure that victims of campus crime are not subjected to retaliation.

Any actions perceived as retaliatory in response to my reporting the assault or my involvement in ongoing investigations would not only be unethical but also legally impermissible. Such conduct could expose the university to significant legal liabilities and undermine its compliance with federal regulations.

It is crucial that the university addresses this matter with full adherence to these legal protections, ensuring that no discriminatory or retaliatory measures are taken. My objective is to resolve this situation equitably so that I can continue my studies and complete my rehabilitation from the assault without further complications. I trust the university will act in accordance with these legal requirements and institutional policies to achieve a fair and just resolution.

## 4. Immediate Actions Requested

In light of the above, I respectfully request the following:

1. Immediate reinstatement of my I-20 and F-1 status.
2. A written explanation for the change in the appeal deadline by Mrs. Cypess, including why I was not informed in a timely manner.
3. Proof that I was offered RCL in accordance with 8 CFR 214.2(f)(6)(iii)(B) after my medical condition became known to the university.
4. Written documentation of my exact attendance for all courses, including any missed dates and communication from professors regarding my attendance, to verify if there were any mistakes or

discrepancies that might have influenced the termination decision.

5. A copy of Yeshiva University's policies regarding what constitutes full-time attendance for students, including the specific credit hour requirements and any exceptions that may apply.

I expect a formal response within 3 business days, and I trust we can resolve this matter without further escalation.

Sincerely,

Yisrael Heilmann

---

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                    Tue, Sep 24, 2024 at 4:23 PM
To: Rebecca Cypess <rebecca.cypess@yu.edu>

Name of the lawyer ? Or law Firm , Mrs. Cypess?

Sincerely,

Yisrael Heilmann

On Sep 24, 2024, at 4:15 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Yisrael,
We received the attached letter from a lawyer claiming to represent you. Are you saying you did not retain this lawyer?
Thank you,
Rebecca Cypess

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

---

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Monday, September 23, 2024 1:09 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>

**Subject:** Re: Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change

Mr. Cypess,

thank you so much for. Your email and the clarification.

First of all, I have never taken any legal counsel nor I took a lawyer or my embassy is involved in grading, attendance and immigration issues!
I spoke to my embassy regarding the injuries, and treatment in my country if I face disability! They not even know that I am going to YU, I avoid to tell them to protect your university!
I want to be very clear!

We still can speak to each other. I am not coming from a culture where people sue each other, we talk with each and find a solution.

I am very interested to find a solution and get my degree from YU, this would be the best medicine to overcome this traumatic experience on March 21,2024.

Also, me and my family dont have any intention of going against YU or bringing this matter to the "public", a lawyer is for me "public" (meaning bringing this matter out of YU)

Secondly, we have never meet in person, I normally discuss such topics only in person and not over email, I come from a very poor family, half of my family lost everything in war in Ukraine, I grew up in housing projects, the poverty rate among Jews in the country I grow up is between 75% -90%. I probably the last one at YU who can afford a lawyer!

Last but not least, things have been super unclear to me. Your email clarify a lot now.  I think we need to talk to and find a solution for the last two semesters .  In the end I reacted in panic.  I thought I get deported and my Visa is cancelled when I withdraw from the courses. That why I wrote you the email. I hope you understand that.

I want to ask you if it's still possible to withdraw from all courses in Spring and Sommer 24, a grade "F" would hurt my academics entirely!

I will reach out to you in longer email, explaining things and hope we can find a solution.

Your  email changes the view for the situation. I hope we can work towards a solution and I continue my studies as it was before March, 24!


Sincerely,

# Yisrael Heilmann


On Sep 20, 2024, at 7:31 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Yisrael,

I am writing in response to your allegation that we changed our deadline to resolve your incompletes from the prior semesters.

When you first approached us during the Spring 2024 semester about your inability to take your exams on their scheduled dates, we gave you the option to withdraw from all the classes (despite being past the University deadline to withdraw) or to defer all the exams until the designated make-up date in September. Taking the exams by the designated make-up date would have allowed your professors to resolve the Incomplete grades by September 13. Here is the exact language from that message, with the relevant passage higlighted:

- You must resolve the Incomplete grades for the courses for which you registered, or the Incomplete grades will be changed to the grade that you would have earned in the course without completing the exams and any other missing coursework.
  - Dean Sugarman recommended that you take W (Withdrawal) grades for the four courses in Spring 2024 for which you deferred final exams. Given your situation, we will permit this even though the deadline to withdraw from those classes has long past.  This remains our best advice.
  - If you decline to take W grades in those four courses from Spring 2024, Yeshiva University policy stipulates that <mark>you must take the deferred exams by the designated makeup date</mark> so as to resolve your Incomplete grades no later than September 13, 2024. Likewise, Yeshiva University policy stipulates that you must resolve your Incomplete from Summer 2024 no later than September 13, 2024.
    - If a medical doctor or clinical psychologist provides us with appropriate written documentation that you cannot take the exams at that time, we will delay the exams by one semester.
    - However, if a medical doctor or clinical psychologist notifies us that you are unable to take your deferred exams due to medical

concerns, that person must also provide appropriate written documentation that you are medically cleared to take courses and complete them fully and successfully in Fall 2024. If you do register for courses in Fall 2024, you must complete them in accordance with all Yeshiva University policies or drop them in accordance with the deadlines set in the university's Academic Calendar to avoid tuition and/or grade liability.

All exams were to be taken by the designated make-up date, which is clearly given in our Academic Calendar as September 6, 2024, in order for the instructors to have sufficient time to review them and give you a final grade in the course by September 13, 2024 which is the University deadline to resolve Incomplete grades for the Spring/Summer semesters as set forth in the Academic Calendar.

Dean Sugarman first reminded you in the beginning of August about the September 6th make-up date, and also told you that Mr. Pitsirikos and Dean Stenhouse would work out a schedule if a student – like you - had more than one exam to take.  There was never a change in any deadline (except letting you schedule your exams over a few days instead of making you take them all on September 6th) which is clearly set forth in the Academic Calendar Microsoft Word - 2024-25 UG Academic Calendar v14 042224 (yu.edu), and Mr. Pitsirikos was in contact with you about scheduling the exams by the September 13th deadline (and even offered for you to take the last of the four exams on that date).

We told you that if you provided us with appropriate written documentation that you could not take the exams at that time, we would again have delayed all of your exams by one semester (such time to be determined by us, and not dictated by you) – but then you would also have needed to supply appropriate written documentation that you were medically cleared to take courses and complete them fully and successfully in Fall 2024. We stated all this clearly in our earlier communications.

You provided us with documentation on September 5th that you were cleared as of August 24, 2024 so it was expected for you to take all the exams by the designated make-up date. You did not take the exams (and rejected our gracious offer for you to withdraw), and your instructors have now calculated your grades and submitted them to the Registrar to include in your records.

To be clear, we are not engaging, nor have we ever engaged,  in any retaliation against you.  We have always supported you, and continue to support you, and advised you that you have the right to pursue all claims, including going to the police, in connection with the incident.  We have also provided reasonable accommodations to you in connection with the incident by deferring your exams, but without proper documentation you were not entitled to continue to defer them.

Regarding your questions about your attendance record, some of your instructors have

told me that you stopped attending class in the middle of the semester and in some cases (viz. Chemistry Lab) stopped handing in assignments well before your injury.

Sincerely,
Rebecca Cypess

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

_____

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Friday, September 20, 2024 7:42 AM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change

**Dear Mrs. Cypess,**

I am writing to formally appeal the termination of my I-20 on September 10, 2024. The reasons cited for this termination are both legally questionable and procedurally improper. Specifically, I am contesting the abrupt change in the appeal deadline from September 13 to September 10, 2024, made by Mrs. Cypess, and the failure to offer me a Reduced Course Load (RCL) following the assault I suffered on March 21, 2024. These actions raise serious concerns about fairness and due process.

**1. Failure to Offer RCL After the Assault**
As you are aware, I was assaulted on campus on March 21, 2024, and I promptly informed university officials of the incident. According to 8 CFR 214.2(f)(6)(iii)(B), I was eligible for a Medical RCL due to the trauma and medical issues

resulting from this assault. Despite this clear eligibility, the university failed to offer me this accommodation, neglecting its obligation to assist me in maintaining my F-1 status during a documented medical crisis.

Under federal regulations, the university is required to inform students of their eligibility for RCL when their medical situation is known and documented. It is unacceptable that I was not provided with this essential option. I request that you provide evidence proving that RCL was ever offered to me, which, to my knowledge, was not.

### 2. Unfair and Unexplained Deadline Change

I find the sudden change of the appeal deadline from September 13 to September 10, 2024, particularly concerning. This change, made by Mrs. Cypess, was not communicated to me in a timely manner, and no reasonable justification for this arbitrary adjustment was provided. This lack of transparency has severely compromised my ability to respond to the termination appropriately. Such actions suggest a disregard for due process and raise serious questions about procedural fairness.

### 3. Concerns of Retaliation and Seeking Resolution

I am deeply concerned that the termination of my I-20 and the abrupt change in the appeal deadline may be retaliatory actions linked to my status as a victim of a crime on campus and the ongoing investigations into that incident. Such retaliation would be in violation of several federal laws, including:

- **Title IX of the Education Amendments of 1972:** This law prohibits discrimination and retaliation against students who report incidents of sexual harassment or assault, or participate in investigations related to these matters.
- **Section 504 of the Rehabilitation Act of 1973:** This law

requires institutions receiving federal funding to provide equal access and not discriminate against individuals based on their disability or medical condition, which includes conditions arising from traumatic events.

- **The Clery Act (Campus Security Act):** This law mandates institutions to provide transparency regarding campus crime and to ensure that victims of campus crime are not subjected to retaliation.

Any actions perceived as retaliatory in response to my reporting the assault or my involvement in ongoing investigations would not only be unethical but also legally impermissible. Such conduct could expose the university to significant legal liabilities and undermine its compliance with federal regulations.

It is crucial that the university addresses this matter with full adherence to these legal protections, ensuring that no discriminatory or retaliatory measures are taken. My objective is to resolve this situation equitably so that I can continue my studies and complete my rehabilitation from the assault without further complications. I trust the university will act in accordance with these legal requirements and institutional policies to achieve a fair and just resolution.

## 4. Immediate Actions Requested

In light of the above, I respectfully request the following:

1. Immediate reinstatement of my I-20 and F-1 status.
2. A written explanation for the change in the appeal deadline by Mrs. Cypess, including why I was not informed in a timely manner.
3. Proof that I was offered RCL in accordance with 8 CFR 214.2(f)(6)(iii)(B) after my medical condition became known to the university.
4. Written documentation of my exact attendance for all courses, including any missed dates and communication

from professors regarding my attendance, to verify if there were any mistakes or discrepancies that might have influenced the termination decision.

5. A copy of Yeshiva University's policies regarding what constitutes full-time attendance for students, including the specific credit hour requirements and any exceptions that may apply.

I expect a formal response within 3 business days, and I trust we can resolve this matter without further escalation.

Sincerely,

Yisrael Heilmann

<Legal Letter, 1.pdf>

---

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                Tue, Sep 24, 2024 at 9:23 PM
To: Yisrael Zephaniah Heilmann <yisraelheilmann@gmail.com>

The issue started when they terminated my I20 , it is very suspicious of retaliatory in response to the March, 21 assault. There is abnormalities when Mrs. Cypess changed the deadline date from Sep 13 to Sep 10. RCL was never offered, no written proof of communion, Professor have no proof of absence, except of two. The attendance was around 75 % .

I have medical note that I could not sit longer than 3 month.

They told me that I need to renew my visa in another, now they say I need a new i20, what is very easy to get!

USCIS told me I need a new Visa, this info is wrong.

I contacted a lawyer, Mr. Rahimi, who will take action if its not sloved in the next couple of days. I did not speak with him about whats going, just said I need potentially help.

Univesity confronted me with legal letter, I told them I did not take legal counsel regarding the immigration issues and educational issues. This is ture. Look, email September, 22, 2024.

Sincerely,

# Yisrael Heilmann

Begin forwarded message:

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Date:** September 24, 2024 at 4:24:31 PM GMT+2
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject: Re: Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change**

Name of the lawyer ? Or law Firm , Mrs. Cypess?

Sincerely,

## Yisrael Heilmann

On Sep 24, 2024, at 4:15 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Yisrael,
We received the attached letter from a lawyer claiming to represent you. Are you saying you did not retain this lawyer?
Thank you,
Rebecca Cypess

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

_____

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Monday, September 23, 2024 1:09 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Re: Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change

Mr. Cypess,

thank you so much for. Your email and the clarification.

First of all, I have never taken any legal counsel nor I took a lawyer or my embassy is involved in grading, attendance and immigration issues!
I spoke to my embassy regarding the injuries, and treatment in my country if I face disability! They not even know that I am going to YU, I avoid to tell them to protect your university!
I want to be very clear!

We still can speak to each other. I am not coming from a culture where people sue each other, we talk with each and find a solution.

I am very interested to find a solution and get my degree from YU, this would be the best medicine to overcome this traumatic experience on March 21,2024.

Also, me and my family dont have any intention of going against YU or bringing this matter to the "public", a lawyer is for me "public" (meaning bringing this matter out of YU)

Secondly, we have never meet in person, I normally discuss such topics only in person and not over email, I come from a very poor family, half of my family lost everything in war in Ukraine, I grew up in housing projects, the poverty rate among Jews in the country I grow up is between 75% -90%. I probably the last one at YU who can afford a lawyer!

Last but not least, things have been super unclear to me. Your email clarify a lot now. I think we need to talk to and find a solution for the last two semesters . In the end I reacted in panic. I thought I get deported and my Visa is cancelled when I withdraw from the courses. That why I wrote you the email. I hope you understand that.

I want to ask you if it's still possible to withdraw from all courses in Spring and Sommer 24, a grade "F" would hurt my academics entirely!

I will reach out to you in longer email, explaining things and hope we can find a solution.

Your  email changes the view for the situation. I hope we can work towards a solution and I continue my studies as it was before March, 24!


Sincerely,

# Yisrael Heilmann

On Sep 20, 2024, at 7:31 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:


Yisrael,

I am writing in response to your allegation that we changed our deadline to resolve your incompletes from the prior semesters.

When you first approached us during the Spring 2024 semester about your inability to take your exams on their scheduled dates, we gave you the option to withdraw from all the classes (despite being past the University deadline to withdraw) or to defer all the exams until the designated make-up date in September. Taking the exams by the designated make-up date would have allowed your professors to resolve the Incomplete grades by September 13. Here is the exact language from that message, with the relevant passage higlighted:

- You must resolve the Incomplete grades for the courses for which you registered, or the Incomplete grades will be changed to the grade that you would have earned in the course without completing the exams and any other missing coursework.

  - Dean Sugarman recommended that you take W (Withdrawal) grades for the four courses in Spring 2024 for which you deferred final exams. Given your situation, we will permit this even though the deadline to withdraw from those classes has long past.  This remains our best advice.

  - If you decline to take W grades in those four courses from Spring 2024, Yeshiva University policy stipulates that ==you must take the deferred exams by the designated makeup date== so as to resolve your Incomplete grades no later than September 13, 2024. Likewise, Yeshiva University policy stipulates that you must resolve your Incomplete from Summer 2024 no later than September 13, 2024.

    - If a medical doctor or clinical psychologist provides us with appropriate written documentation that you cannot take the exams at that time, we will delay the exams by

one semester.

■

However, if a medical doctor or clinical psychologist notifies us that you are unable to take your deferred exams due to medical concerns, that person must also provide appropriate written documentation that you are medically cleared to take courses and complete them fully and successfully in Fall 2024. If you do register for courses in Fall 2024, you must complete them in accordance with all Yeshiva University policies or drop them in accordance with the deadlines set in the university's Academic Calendar to avoid tuition and/or grade liability.

All exams were to be taken by the designated make-up date, which is clearly given in our Academic Calendar as September 6, 2024, in order for the instructors to have sufficient time to review them and give you a final grade in the course by September 13, 2024 which is the University deadline to resolve Incomplete grades for the Spring/Summer semesters as set forth in the Academic Calendar.

Dean Sugarman first reminded you in the beginning of August about the September 6th make-up date, and also told you that Mr. Pitsirikos and Dean Stenhouse would work out a schedule if a student – like you - had more than one exam to take.   There was never a change in any deadline (except letting you schedule your exams over a few days instead of making you take them all on September 6th) which is clearly set forth in the Academic Calendar Microsoft Word - 2024-25 UG Academic Calendar v14 042224 (yu.edu), and Mr. Pitsirikos was in contact with you about scheduling the exams by the September 13th deadline (and even offered for you to take the last of the four exams on that date).

We told you that if you provided us with appropriate written documentation that you could not take the exams at that time, we would again have delayed all of your exams by one semester (such time to be determined by us, and not dictated by you) – but then you would also have needed to supply appropriate written documentation that you were medically cleared to take courses and complete them fully and successfully in Fall 2024. We stated all this clearly in our earlier communications.

You provided us with documentation on September 5th that you were

cleared as of August 24, 2024 so it was expected for you to take all the exams by the designated make-up date. You did not take the exams (and rejected our gracious offer for you to withdraw), and your instructors have now calculated your grades and submitted them to the Registrar to include in your records.

To be clear, we are not engaging, nor have we ever engaged,  in any retaliation against you.  We have always supported you, and continue to support you, and advised you that you have the right to pursue all claims, including going to the police, in connection with the incident.  We have also provided reasonable accommodations to you in connection with the incident by deferring your exams, but without proper documentation you were not entitled to continue to defer them.

Regarding your questions about your attendance record, some of your instructors have told me that you stopped attending class in the middle of the semester and in some cases (viz. Chemistry Lab) stopped handing in assignments well before your injury.

Sincerely,
Rebecca Cypess

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

_____

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Friday, September 20, 2024 7:42 AM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change

## Dear Mrs. Cypess,

I am writing to formally appeal the termination of my I-20 on September 10, 2024. The reasons cited for

this termination are both legally questionable and procedurally improper. Specifically, I am contesting the abrupt change in the appeal deadline from September 13 to September 10, 2024, made by Mrs. Cypess, and the failure to offer me a Reduced Course Load (RCL) following the assault I suffered on March 21, 2024. These actions raise serious concerns about fairness and due process.

## 1. Failure to Offer RCL After the Assault

As you are aware, I was assaulted on campus on March 21, 2024, and I promptly informed university officials of the incident. According to 8 CFR 214.2(f)(6)(iii)(B), I was eligible for a Medical RCL due to the trauma and medical issues resulting from this assault. Despite this clear eligibility, the university failed to offer me this accommodation, neglecting its obligation to assist me in maintaining my F-1 status during a documented medical crisis.

Under federal regulations, the university is required to inform students of their eligibility for RCL when their medical situation is known and documented. It is unacceptable that I was not provided with this essential option. I request that you provide evidence proving that RCL was ever offered to me, which, to my knowledge, was not.

## 2. Unfair and Unexplained Deadline Change

I find the sudden change of the appeal deadline from September 13 to September 10, 2024, particularly concerning. This change, made by Mrs. Cypess, was not communicated to me in a timely manner, and no reasonable justification for this arbitrary adjustment was provided. This lack of transparency has severely compromised my ability to respond to the

termination appropriately. Such actions suggest a disregard for due process and raise serious questions about procedural fairness.

### 3. Concerns of Retaliation and Seeking Resolution

I am deeply concerned that the termination of my I-20 and the abrupt change in the appeal deadline may be retaliatory actions linked to my status as a victim of a crime on campus and the ongoing investigations into that incident. Such retaliation would be in violation of several federal laws, including:

- **Title IX of the Education Amendments of 1972:** This law prohibits discrimination and retaliation against students who report incidents of sexual harassment or assault, or participate in investigations related to these matters.
- **Section 504 of the Rehabilitation Act of 1973:** This law requires institutions receiving federal funding to provide equal access and not discriminate against individuals based on their disability or medical condition, which includes conditions arising from traumatic events.
- **The Clery Act (Campus Security Act):** This law mandates institutions to provide transparency regarding campus crime and to ensure that victims of campus crime are not subjected to retaliation.

Any actions perceived as retaliatory in response to my reporting the assault or my involvement in ongoing investigations would not only be unethical but also legally impermissible. Such conduct could expose the university to significant legal liabilities

and undermine its compliance with federal regulations.

It is crucial that the university addresses this matter with full adherence to these legal protections, ensuring that no discriminatory or retaliatory measures are taken. My objective is to resolve this situation equitably so that I can continue my studies and complete my rehabilitation from the assault without further complications. I trust the university will act in accordance with these legal requirements and institutional policies to achieve a fair and just resolution.

### 4. Immediate Actions Requested

In light of the above, I respectfully request the following:

1. Immediate reinstatement of my I-20 and F-1 status.
2. A written explanation for the change in the appeal deadline by Mrs. Cypess, including why I was not informed in a timely manner.
3. Proof that I was offered RCL in accordance with 8 CFR 214.2(f)(6)(iii)(B) after my medical condition became known to the university.
4. Written documentation of my exact attendance for all courses, including any missed dates and communication from professors regarding my attendance, to verify if there were any mistakes or discrepancies that might have influenced the termination decision.
5. A copy of Yeshiva University's policies regarding what constitutes full-time attendance for students, including the specific credit hour requirements and any exceptions that may apply.

I expect a formal response within 3 business days, and I trust we can resolve this matter without further escalation.

Sincerely,

Yisrael Heilmann

<Legal Letter, 1.pdf>

---

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                Tue, Sep 24, 2024 at 10:34 PM
To: Rebecca Cypess <rebecca.cypess@yu.edu>

Mrs. Cypess,

The letter from Mr. Bane  has a phone number attached, please don't hesitate to reach out to him if you have any questions or concerns.

Moreover, the DA Manhattan office will reach out to you, specifically ADA Mr. Fisher or his assistant, will be contacting you shortly regarding this matter.

For the future, I kindly ask that you refrain from asking me further questions about the assault.

Just one last thing, I see is that Mr. Bane is not an immigration lawyer nor an education lawyer!  I encourage you to review my email from yesterday for further details before drawing any claim.

I really appreciate it! Thank you very much!

Have a wonderful rest of your day!

Yisrael Heilmann

> On Sep 24, 2024, at 9:23 PM, Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> wrote:

> The issue started when they terminated my I20 , it is very suspicious of retaliatory in response to the March, 21 assault. There is abnormalities when Mrs. Cypess changed the deadline date from Sep 13 to Sep 10. RCL was never offered, no written proof of communion, Professor have no proof of absence, except of two. The attendance was around 75 % .

> I have medical note that I could not sit longer than 3 month.

They told me that I need to renew my visa in another, now they say I need a new i20, what is very easy to get!

USCIS told me I need a new Visa, this info is wrong.

I contacted a lawyer, Mr. Rahimi, who will take action if its not sloved in the next couple of days. I did not speak with him about whats going, just said I need potentially help.

Univesity confronted me with legal letter, I told them I did not take legal counsel regarding the immigration issues and educational issues. This is ture. Look, email September, 22, 2024.

Sincerely,

# Yisrael Heilmann

Begin forwarded message:

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Date:** September 24, 2024 at 4:24:31 PM GMT+2
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject: Re: Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change**

Name of the lawyer ? Or law Firm , Mrs. Cypess?

Sincerely,

## Yisrael Heilmann

On Sep 24, 2024, at 4:15 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Yisrael,
We received the attached letter from a lawyer claiming to represent you.
Are you saying you did not retain this lawyer?

Thank you,
Rebecca Cypess

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Monday, September 23, 2024 1:09 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Re: Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change

Mr. Cypess,

thank you so much for. Your email and the clarification.

First of all, I have never taken any legal counsel nor I took a lawyer or my embassy is involved in grading, attendance and immigration issues!
I spoke to my embassy regarding the injuries, and treatment in my country if I face disability! They not even know that I am going to YU, I avoid to tell them to protect your university!
I want to be very clear!

We still can speak to each other. I am not coming from a culture where people sue each other, we talk with each and find a solution.

I am very interested to find a solution and get my degree from YU, this would be the best medicine to overcome this traumatic experience on March 21,2024.

Also, me and my family dont have any intention of going against YU or bringing this matter to the "public", a lawyer is for me "public" (meaning bringing this matter out of YU)

Secondly, we have never meet in person, I normally discuss such topics only in person and not over email, I come from a very poor family, half of my family lost everything in war in Ukraine, I grew up in housing projects, the poverty rate among Jews in the country I grow up is between 75% -90%. I probably the last one at YU who can afford a lawyer!

Last but not least, things have been super unclear to me. Your email clarify a

lot now.  I think we need to talk to and find a solution for the last two semesters . In the end I reacted in panic.  I thought I get deported and my Visa is cancelled when I withdraw from the courses. That why I wrote you the email. I hope you understand that.

I want to ask you if it's still possible to withdraw from all courses in Spring and Sommer 24, a grade "F" would hurt my academics entirely!

I will reach out to you in longer email, explaining things and hope we can find a solution.

Your  email changes the view for the situation. I hope we can work towards a solution and I continue my studies as it was before March, 24!

Sincerely,

# Yisrael Heilmann

On Sep 20, 2024, at 7:31 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:

Yisrael,

I am writing in response to your allegation that we changed our deadline to resolve your incompletes from the prior semesters.

When you first approached us during the Spring 2024 semester about your inability to take your exams on their scheduled dates, we gave you the option to withdraw from all the classes (despite being past the University deadline to withdraw) or to defer all the exams until the designated make-up date in September. Taking the exams by the designated make-up date would have allowed your professors to resolve the Incomplete grades by September 13. Here is the exact language from that message, with the relevant passage highlighted:

- You must resolve the Incomplete grades for the courses for which you registered, or the Incomplete grades will be changed to the grade that you would have earned in the course

without completing the exams and any other missing coursework.

- Dean Sugarman recommended that you take W (Withdrawal) grades for the four courses in Spring 2024 for which you deferred final exams. Given your situation, we will permit this even though the deadline to withdraw from those classes has long past.  This remains our best advice.

- If you decline to take W grades in those four courses from Spring 2024, Yeshiva University policy stipulates that <mark>you must take the deferred exams by the designated makeup date</mark> so as to resolve your Incomplete grades no later than September 13, 2024. Likewise, Yeshiva University policy stipulates that you must resolve your Incomplete from Summer 2024 no later than September 13, 2024.

  - If a medical doctor or clinical psychologist provides us with appropriate written documentation that you cannot take the exams at that time, we will delay the exams by one semester.

  - However, if a medical doctor or clinical psychologist notifies us that you are unable to take your deferred exams due to medical concerns, that person must also

provide appropriate written documentation that you are medically cleared to take courses and complete them fully and successfully in Fall 2024. If you do register for courses in Fall 2024, you must complete them in accordance with all Yeshiva University policies or drop them in accordance with the deadlines set in the university's Academic Calendar to avoid tuition and/or grade liability.

All exams were to be taken by the designated make-up date, which is clearly given in our Academic Calendar as September 6, 2024, in order for the instructors to have sufficient time to review them and give you a final grade in the course by September 13, 2024 which is the University deadline to resolve Incomplete grades for the Spring/Summer semesters as set forth in the Academic Calendar.

Dean Sugarman first reminded you in the beginning of August about the September 6th make-up date, and also told you that Mr. Pitsirikos and Dean Stenhouse would work out a schedule if a student – like you - had more than one exam to take. There was never a change in any deadline (except letting you schedule your exams over a few days instead of making you take them all on September 6th) which is clearly set forth in the Academic Calendar Microsoft Word - 2024-25 UG Academic Calendar v14 042224 (yu.edu), and Mr. Pitsirikos was in contact with you about scheduling the exams by the September 13th deadline (and even offered for you to take the last of the four exams on that date).

We told you that if you provided us with appropriate written documentation that you could not take the exams at that time, we would again have delayed all of your exams by one semester (such time to be determined by us, and not dictated by you) – but then you would also have needed to supply appropriate written documentation that you were medically

cleared to take courses and complete them fully and successfully in Fall 2024. We stated all this clearly in our earlier communications.

You provided us with documentation on September 5th that you were cleared as of August 24, 2024 so it was expected for you to take all the exams by the designated make-up date. You did not take the exams (and rejected our gracious offer for you to withdraw), and your instructors have now calculated your grades and submitted them to the Registrar to include in your records.

To be clear, we are not engaging, nor have we ever engaged, in any retaliation against you.  We have always supported you, and continue to support you, and advised you that you have the right to pursue all claims, including going to the police, in connection with the incident.  We have also provided reasonable accommodations to you in connection with the incident by deferring your exams, but without proper documentation you were not entitled to continue to defer them.

Regarding your questions about your attendance record, some of your instructors have told me that you stopped attending class in the middle of the semester and in some cases (viz. Chemistry Lab) stopped handing in assignments well before your injury.

Sincerely,
Rebecca Cypess

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

_____

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Sent:** Friday, September 20, 2024 7:42 AM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>

**Subject:** Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change

**Dear Mrs. Cypess,**

I am writing to formally appeal the termination of my I-20 on September 10, 2024. The reasons cited for this termination are both legally questionable and procedurally improper. Specifically, I am contesting the abrupt change in the appeal deadline from September 13 to September 10, 2024, made by Mrs. Cypess, and the failure to offer me a Reduced Course Load (RCL) following the assault I suffered on March 21, 2024. These actions raise serious concerns about fairness and due process.

**1. Failure to Offer RCL After the Assault**

As you are aware, I was assaulted on campus on March 21, 2024, and I promptly informed university officials of the incident. According to 8 CFR 214.2(f)(6)(iii)(B), I was eligible for a Medical RCL due to the trauma and medical issues resulting from this assault. Despite this clear eligibility, the university failed to offer me this accommodation, neglecting its obligation to assist me in maintaining my F-1 status during a documented medical crisis. Under federal regulations, the university is required to inform students of their eligibility for RCL when their medical situation is known and documented. It is

unacceptable that I was not provided with this essential option. I request that you provide evidence proving that RCL was ever offered to me, which, to my knowledge, was not.

### 2. Unfair and Unexplained Deadline Change

I find the sudden change of the appeal deadline from September 13 to September 10, 2024, particularly concerning. This change, made by Mrs. Cypess, was not communicated to me in a timely manner, and no reasonable justification for this arbitrary adjustment was provided. This lack of transparency has severely compromised my ability to respond to the termination appropriately. Such actions suggest a disregard for due process and raise serious questions about procedural fairness.

### 3. Concerns of Retaliation and Seeking Resolution

I am deeply concerned that the termination of my I-20 and the abrupt change in the appeal deadline may be retaliatory actions linked to my status as a victim of a crime on campus and the ongoing investigations into that incident. Such retaliation would be in violation of several federal laws, including:

- **Title IX of the Education Amendments of 1972:** This law prohibits discrimination and retaliation

against students who report incidents of sexual harassment or assault, or participate in investigations related to these matters.

- **Section 504 of the Rehabilitation Act of 1973:** This law requires institutions receiving federal funding to provide equal access and not discriminate against individuals based on their disability or medical condition, which includes conditions arising from traumatic events.
- **The Clery Act (Campus Security Act):** This law mandates institutions to provide transparency regarding campus crime and to ensure that victims of campus crime are not subjected to retaliation.

Any actions perceived as retaliatory in response to my reporting the assault or my involvement in ongoing investigations would not only be unethical but also legally impermissible. Such conduct could expose the university to significant legal liabilities and undermine its compliance with federal regulations.

It is crucial that the university addresses this matter with full adherence to these legal protections, ensuring that no discriminatory or retaliatory measures are taken. My objective is to resolve this situation equitably so that I can continue my studies and complete my rehabilitation from the assault without further complications. I trust the university will act

in accordance with these legal requirements and institutional policies to achieve a fair and just resolution.

**4. Immediate Actions Requested**

In light of the above, I respectfully request the following:

1. Immediate reinstatement of my I-20 and F-1 status.
2. A written explanation for the change in the appeal deadline by Mrs. Cypess, including why I was not informed in a timely manner.
3. Proof that I was offered RCL in accordance with 8 CFR 214.2(f)(6)(iii)(B) after my medical condition became known to the university.
4. Written documentation of my exact attendance for all courses, including any missed dates and communication from professors regarding my attendance, to verify if there were any mistakes or discrepancies that might have influenced the termination decision.
5. A copy of Yeshiva University's policies regarding what constitutes full-time attendance for students, including the specific credit hour requirements and any exceptions that may apply.

I expect a formal response within 3 business days, and I trust we can resolve this matter without further escalation.

Sincerely,

Yisrael Heilmann

<Legal Letter, 1.pdf>

---

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                    Tue, Sep 24, 2024 at 10:37 PM
To: Yisrael Zephaniah Heilmann <yisraelheilmann@gmail.com>

Sincerely,

# Yisrael Heilmann

Begin forwarded message:

**From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
**Date:** September 24, 2024 at 04:34:59 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject: Re: Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change**


Mrs. Cypess,

The letter from Mr. Bane  has a phone number attached, please don't hesitate to reach out to him if you have any questions or concerns.

Moreover, the DA Manhattan office will reach out to you, specifically ADA Mr. Fisher or his assistant, will be contacting you shortly regarding this matter.

For the future, I kindly ask that you refrain from asking me further questions about the assault.

Just one last thing, I see is that Mr. Bane is not an immigration lawyer nor an education lawyer!  I encourage you to review my email from yesterday for further details before drawing any claim.

I really appreciate it! Thank you very much!

Have a wonderful rest of your day!

Yisrael Heilmann

On Sep 24, 2024, at 9:23 PM, Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> wrote:

The issue started when they terminated my I20 , it is very suspicious of retaliatory in response to the March, 21 assault. There is abnormalities when Mrs. Cypess changed the deadline date from Sep 13 to Sep 10. RCL was never offered, no written proof of communition, Professor have no proof of absence, except of two. The attendance was around 75 % .

I have medical note that I could not sit longer than 3 month.

They told me that I need to renew my visa in another, now they say I need a new i20, what is very easy to get!

USCIS told me I need a new Visa, this info is wrong.

I contacted a lawyer, Mr. Rahimi, who will take action if its not sloved in the next couple of days. I did not speak with him about whats going, just said I need potentially help.

Univesity confronted me with legal letter, I told them I did not take legal counsel regarding the immigration issues and educational issues. This is ture. Look, email September, 22, 2024.

Sincerely,

# Yisrael Heilmann

Begin forwarded message:

> **From:** Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>
> **Date:** September 24, 2024 at 4:24:31 PM GMT+2
> **To:** Rebecca Cypess <rebecca.cypess@yu.edu>
> **Subject: Re: Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change**
>
> Name of the lawyer ? Or law Firm , Mrs. Cypess?
>
> Sincerely,

## Yisrael Heilmann

On Sep 24, 2024, at 4:15 PM, Rebecca Cypess
<rebecca.cypess@yu.edu> wrote:

Yisrael,
We received the attached letter from a lawyer claiming to
represent you. Are you saying you did not retain this lawyer?
Thank you,
Rebecca Cypess

———————————————

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

———————————————

**From:** Yisrael Zephaniah Heilmann
<yheilman@mail.yu.edu>
**Sent:** Monday, September 23, 2024 1:09 PM
**To:** Rebecca Cypess <rebecca.cypess@yu.edu>
**Subject:** Re: Prompt response required: Appeal Against
Termination of I-20 – Failure to Offer Reduced Course
Load (RCL) and Unfair Deadline Change

Mr. Cypess,

thank you so much for. Your email and the clarification.

First of all, I have never taken any legal counsel nor I took a
lawyer or my embassy is involved in grading, attendance and
immigration issues!
I spoke to my embassy regarding the injuries, and treatment in
my country if I face disability! They not even know that I am going
to YU, I avoid to tell them to protect your university!
I want to be very clear!

We still can speak to each other. I am not coming from a culture
where people sue each other, we talk with each and find a

solution.

I am very interested to find a solution and get my degree from YU, this would be the best medicine to overcome this traumatic experience on March 21,2024.

Also, me and my family dont have any intention of going against YU or bringing this matter to the "public", a lawyer is for me "public" (meaning bringing this matter out of YU)

Secondly, we have never meet in person, I normally discuss such topics only in person and not over email, I come from a very poor family, half of my family lost everything in war in Ukraine, I grew up in housing projects, the poverty rate among Jews in the country I grow up is between 75% -90%. I probably the last one at YU who can afford a lawyer!

Last but not least, things have been super unclear to me. Your email clarify a lot now.  I think we need to talk to and find a solution for the last two semesters .  In the end I reacted in panic. I thought I get deported and my Visa is cancelled when I withdraw from the courses. That why I wrote you the email. I hope you understand that.

I want to ask you if it's still possible to withdraw from all courses in Spring and Sommer 24, a grade "F" would hurt my academics entirely!

I will reach out to you in longer email, explaining things and hope we can find a solution.

Your  email changes the view for the situation. I hope we can work towards a solution and I continue my studies as it was before March, 24!


Sincerely,

# Yisrael Heilmann


On Sep 20, 2024, at 7:31 PM, Rebecca Cypess <rebecca.cypess@yu.edu> wrote:


Yisrael,

I am writing in response to your allegation that we changed our deadline to resolve your incompletes from the prior semesters.

When you first approached us during the Spring 2024 semester about your inability to take your exams on their scheduled dates, we gave you the option to withdraw from all the classes (despite being past the University deadline to withdraw) or to defer all the exams until the designated make-up date in September. Taking the exams by the designated make-up date would have allowed your professors to resolve the Incomplete grades by September 13. Here is the exact language from that message, with the relevant passage higlighted:

- You must resolve the Incomplete grades for the courses for which you registered, or the Incomplete grades will be changed to the grade that you would have earned in the course without completing the exams and any other missing coursework.
  - Dean Sugarman recommended that you take W (Withdrawal) grades for the four courses in Spring 2024 for which you deferred final exams. Given your situation, we will permit this even though the deadline to withdraw from those classes has long past.  This remains our best advice.
  - If you decline to take W grades in those four courses from

Spring 2024, Yeshiva University policy stipulates that <mark>you must take the deferred exams by the designated makeup date</mark> so as to resolve your Incomplete grades no later than September 13, 2024. Likewise, Yeshiva University policy stipulates that you must resolve your Incomplete from Summer 2024 no later than September 13, 2024.

- If a medical doctor or clinical psychologist provides us with appropriate written documentation that you cannot take the exams at that time, we will delay the exams by one semester.

- However, if a medical doctor or clinical psychologist notifies us that you are unable to take your deferred exams due to

medical concerns, that person must also provide appropriate written documentation that you are medically cleared to take courses and complete them fully and successfully in Fall 2024. If you do register for courses in Fall 2024, you must complete them in accordance with all Yeshiva University policies or drop them in accordance with the deadlines set in the university's Academic Calendar to avoid tuition and/or grade liability.

All exams were to be taken by the designated make-up date, which is clearly given in our Academic Calendar as September 6, 2024, in order for the instructors to have sufficient time to review them and give you a final grade in the course by September 13, 2024 which is the University deadline to resolve Incomplete grades for the Spring/Summer semesters as set forth in the Academic Calendar.

Dean Sugarman first reminded you in the beginning of August about the September 6th make-up date, and also told you that Mr. Pitsirikos and Dean Stenhouse would work out a schedule if a student – like you - had more than one exam to take.   There was never a change in any deadline (except letting you schedule your exams over a few days instead of making you take them all on September 6th) which is clearly set forth in the Academic Calendar Microsoft Word - 2024-25 UG Academic Calendar v14 042224 (yu.edu), and Mr. Pitsirikos was in contact with you about scheduling the exams by the September 13th deadline (and even offered for you to take the last of the four exams on that date).

We told you that if you provided us with appropriate written documentation that you could not take the exams at that time, we would again have delayed all of your exams by one semester (such time to be determined by us, and not dictated by you) – but then you would also have needed to supply appropriate written documentation that you were medically cleared to take courses and complete them fully and successfully in Fall 2024. We stated all this clearly in our earlier communications.

You provided us with documentation on September 5th that you were cleared as of August 24, 2024 so it was expected for you to take all the exams by the designated make-up date. You did not take the exams (and rejected our gracious offer for you to withdraw), and your instructors have now calculated your grades and submitted them to the Registrar to include in your records.

To be clear, we are not engaging, nor have we ever engaged,  in any retaliation against you.  We have always supported you, and continue to support you, and advised you that you have the right to pursue all claims, including going to the police, in connection with the incident.  We have also provided reasonable accommodations to you in connection with the incident by deferring your exams, but without proper documentation you

were not entitled to continue to defer them.

Regarding your questions about your attendance record, some of your instructors have told me that you stopped attending class in the middle of the semester and in some cases (viz. Chemistry Lab) stopped handing in assignments well before your injury.

Sincerely,
Rebecca Cypess

_____

Rebecca Cypess, PhD
The Mordecai D. Katz and Dr. Monique C. Katz Dean
Undergraduate Faculty of Arts and Sciences
Yeshiva University
rebecca.cypess@yu.edu
(646) 592-4801

_____

**From:** Yisrael Zephaniah Heilmann
<yheilman@mail.yu.edu>
**Sent:** Friday, September 20, 2024 7:42 AM
**To:** Rebecca Cypess
<rebecca.cypess@yu.edu>
**Subject:** Prompt response required: Appeal Against Termination of I-20 – Failure to Offer Reduced Course Load (RCL) and Unfair Deadline Change

**Dear Mrs. Cypess,**

I am writing to formally appeal the termination of my I-20 on September 10, 2024. The reasons cited for this termination are both legally questionable and procedurally improper. Specifically, I am contesting the abrupt change

in the appeal deadline from September 13 to September 10, 2024, made by Mrs. Cypess, and the failure to offer me a Reduced Course Load (RCL) following the assault I suffered on March 21, 2024. These actions raise serious concerns about fairness and due process.

## 1. Failure to Offer RCL After the Assault

As you are aware, I was assaulted on campus on March 21, 2024, and I promptly informed university officials of the incident. According to 8 CFR 214.2(f)(6)(iii)(B), I was eligible for a Medical RCL due to the trauma and medical issues resulting from this assault. Despite this clear eligibility, the university failed to offer me this accommodation, neglecting its obligation to assist me in maintaining my F-1 status during a documented medical crisis. Under federal regulations, the university is required to inform students of their eligibility for RCL when their medical situation is known and documented. It is unacceptable that I was not provided with this essential option. I request that you provide evidence proving that RCL was

ever offered to me, which, to my knowledge, was not.

## 2. Unfair and Unexplained Deadline Change

I find the sudden change of the appeal deadline from September 13 to September 10, 2024, particularly concerning. This change, made by Mrs. Cypess, was not communicated to me in a timely manner, and no reasonable justification for this arbitrary adjustment was provided. This lack of transparency has severely compromised my ability to respond to the termination appropriately. Such actions suggest a disregard for due process and raise serious questions about procedural fairness.

## 3. Concerns of Retaliation and Seeking Resolution

I am deeply concerned that the termination of my I-20 and the abrupt change in the appeal deadline may be retaliatory actions linked to my status as a victim of a crime on campus and the ongoing investigations into that incident. Such retaliation would be in violation of several federal laws, including:

- **Title IX of the Education Amendments of 1972:** This law prohibits discrimination and retaliation against students who report incidents of sexual harassment or assault, or participate in investigations related to these matters.

- **Section 504 of the Rehabilitation Act of 1973:** This law requires institutions receiving federal funding to provide equal access and not discriminate against individuals based on their disability or medical condition, which includes conditions arising from traumatic events.

- **The Clery Act (Campus Security Act):** This law mandates institutions to provide transparency regarding campus crime and to ensure that victims of campus crime are not subjected to retaliation.

Any actions perceived as retaliatory in response to my reporting the assault or my involvement in ongoing investigations would not only be unethical but also legally impermissible. Such conduct

could expose the university to significant legal liabilities and undermine its compliance with federal regulations.

It is crucial that the university addresses this matter with full adherence to these legal protections, ensuring that no discriminatory or retaliatory measures are taken. My objective is to resolve this situation equitably so that I can continue my studies and complete my rehabilitation from the assault without further complications. I trust the university will act in accordance with these legal requirements and institutional policies to achieve a fair and just resolution.

## 4. Immediate Actions Requested

In light of the above, I respectfully request the following:

1. Immediate reinstatement of my I-20 and F-1 status.
2. A written explanation for the change in the appeal deadline by Mrs. Cypess, including why I was not informed in a timely manner.
3. Proof that I was offered RCL in accordance with 8 CFR 214.2(f)(6)(iii)(B) after my medical condition became

known to the university.

4.  Written documentation of my exact attendance for all courses, including any missed dates and communication from professors regarding my attendance, to verify if there were any mistakes or discrepancies that might have influenced the termination decision.

5.  A copy of Yeshiva University's policies regarding what constitutes full-time attendance for students, including the specific credit hour requirements and any exceptions that may apply.

I expect a formal response within 3 business days, and I trust we can resolve this matter without further escalation.

Sincerely,

Yisrael Heilmann

<Legal Letter, 1.pdf>

Heilmann v. Yeshiva University, et al. | Case No. 25-cv-02431 (S.D.N.Y.) | Exhibit

# *Exhibit* G



Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu>

## Incident report harassment, September,7 ,2024 additional info

5 messages

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                Wed, Sep 25, 2024 at 1:20 AM
To: security@yu.edu
Cc: Joe Bednarsh <joe.bednarsh@yu.edu>

Additional info:

Chanting "Borussia Dortmund" (German soccer club) at a German passport holder can be considered racist because it reduces their identity to a stereotype associated with their nationality, which is both derogatory and dehumanizing. This behavior can evoke feelings of alienation and hostility, especially in a multicultural setting like New York, where respect for diverse identities is essential. Such actions perpetuate racial discrimination and undermine the principles of inclusivity and acceptance, reinforcing systemic racism within the community. Ultimately, targeting someone based on their nationality is a form of harassment that should not be tolerated.

"Sapir, Sapir, Sapir" chants,  this applies to the incidents between March,13,2024 and March,21,2024 at 500 W185th Street.
Chanting the name of a perpetrator  in public while targeting the victim can be considered an act of harassment and intimidation. It not only serves to provoke the victim but also publicly reaffirms the perpetrator's actions, creating an environment of fear and anxiety for the victim. This behavior can be particularly damaging as it can trigger emotional distress, reinforce feelings of vulnerability, and discourage the victim from seeking help or feeling safe in their surroundings. Additionally, such actions can further perpetuate a culture of impunity for the perpetrator, undermining the seriousness of the victim's experience and the need for accountability.

Sincerely,

Yisrael Heilmann

> On Sep 25, 2024, at 12:54 AM, Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> wrote:
>
>
> To whom it may concern
> <image0.jpeg>
> <image1.jpeg>
>
>
> I am writing to report an incident of harassment that occurred on September 7, 2024, between 1:30 and 2:00 AM at W186 and Amsterdam Avenue, specifically at the benches

near Morgenstern Hall.

While I was sitting on a bench writing a message and speaking with relatives, a group of approximately 10-20 students, primarily Spanish-speaking international students, emerged from Morgenstern Hall and began shouting at each other. After a few minutes, I got up from the bench and walked away, crossing the street.

As I did this, some members of the group recognized me and began chanting "Borussia Dortmund" followed by "Sapir." When I tried to distance myself, they continued to follow me, shouting "Sapir." A few individuals even ran toward me. It was evident that they were either intoxicated or under the influence of substances.

I have identified two individuals involved in this incident:

1. **Jose Hambra (3rd year)** – He stated that some students were intoxicated and claimed not to remember the events of that night.
2. **Salvador Zarfty (3rd year)** – He displayed hostile behavior, and his friend used offensive language in Spanish.

A security guard present at the scene apologized for their behavior and informed me that the area is under surveillance, which should provide evidence of the incident. Additionally, two local witnesses from Washington Heights saw and heard the harassment.

I hope this matter can be addressed promptly.

Sincerely,

Yisrael Heilmann

---

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                    Wed, Sep 25, 2024 at 1:59 AM
To: security@yu.edu
Cc: Joe Bednarsh <joe.bednarsh@yu.edu>

[Quoted text hidden]

public while targeting the victim can be considered an act of harassment and intimidation. It not only serves to provoke the victim but also publicly reaffirms the perpetrator's actions, creating an environment of fear and anxiety for the victim. This behavior can be particularly damaging as it can trigger emotional distress, reinforce feelings of vulnerability, and discourage the victim from seeking help or feeling safe in their surroundings. Additionally, such actions can further perpetuate a culture of impunity for the perpetrator, undermining the seriousness of the victim's experience and the need for accountability.

Sincerely,

# Yisrael Heilmann

Sincerely,

# Yisrael Heilmann

On Sep 25, 2024, at 1:20 AM, Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> wrote:

Additional info:

Chanting "Borussia Dortmund" (German soccer club) at a German passport holder can be considered racist because it reduces their identity to a stereotype associated with their nationality, which is both derogatory and dehumanizing. This behavior can evoke feelings of alienation and hostility, especially in a multicultural setting like New York, where respect for diverse identities is essential. Such actions perpetuate racial discrimination and undermine the principles of inclusivity and acceptance, reinforcing systemic racism within the community. Ultimately, targeting someone based on their nationality is a form of harassment that should not be tolerated.

"Sapir, Sapir, Sapir" chants,  this applies to the incidents between March,13,2024 and March,21,2024 at 500 W185th Street.
Chanting the name of a perpetrator  in public while targeting the victim can be considered an act of harassment and intimidation. It not only serves to provoke the victim but also publicly reaffirms the perpetrator's actions, creating an environment of fear and anxiety for the victim. This behavior can be particularly damaging as it can trigger emotional distress, reinforce feelings of vulnerability, and discourage the victim from seeking help or feeling safe in their surroundings. Additionally, such actions can further perpetuate a culture of impunity for the perpetrator, undermining the seriousness of the victim's experience and the need for accountability.

Sincerely,

## Yisrael Heilmann

On Sep 25, 2024, at 12:54 AM, Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> wrote:

To whom it may concern
<image0.jpeg>
<image1.jpeg>

I am writing to report an incident of harassment that occurred on September 7, 2024, between 1:30 and 2:00 AM at W186 and Amsterdam

Avenue, specifically at the benches near Morgenstern Hall.

While I was sitting on a bench writing a message and speaking with relatives, a group of approximately 10-20 students, primarily Spanish-speaking international students, emerged from Morgenstern Hall and began shouting at each other. After a few minutes, I got up from the bench and walked away, crossing the street.

As I did this, some members of the group recognized me and began chanting "Borussia Dortmund" followed by "Sapir." When I tried to distance myself, they continued to follow me, shouting "Sapir." A few individuals even ran toward me. It was evident that they were either intoxicated or under the influence of substances.

I have identified two individuals involved in this incident:

1. **Jose Hambra (3rd year)** – He stated that some students were intoxicated and claimed not to remember the events of that night.
2. **Salvador Zarfty (3rd year)** – He displayed hostile behavior, and his friend used offensive language in Spanish.

A security guard present at the scene apologized for their behavior and informed me that the area is under surveillance, which should provide evidence of the incident. Additionally, two local witnesses from Washington Heights saw and heard the harassment.

I hope this matter can be addressed promptly.

Sincerely,

Yisrael Heilmann



**image1.pdf.pdf**
2393K

---

**Joe Bednarsh** <joe.bednarsh@yu.edu>                    Wed, Sep 25, 2024 at 3:15 PM
To: "Yisrael Zephaniah Heilmann [student]" <yheilman@mail.yu.edu>
Cc: YU Campus Security <security@yu.edu>

Dear Yisrael,

You may remember that we had a meeting scheduled to discuss this matter that you cancelled. I followed up with you twice to reschedule the meeting, received no response, and as per the language in my emails to you, I took that as an indication that you are choosing not to pursue this. It now appears that you do, indeed, wish us to address this – which I am certainly willing to do. Again, as per my previous correspondence, if you'd like us to pursue this, please use the link in my signature to set up a meeting so that we can begin the process of looking into this.

Best

Dean Bednarsh

Joe Bednarsh

Associate Dean of Students

Deputy Title IX Coordinator

Yeshiva University

Phone (646) 592-4615

Students – Schedule a meeting with me HERE

Non Students - Schedule a meeting with me HERE

[Quoted text hidden]

> public while targeting the victim can be considered an act of harassment and intimidation. It not only serves to provoke the victim but also publicly reaffirms the perpetrator's actions, creating an environment of fear and anxiety for the victim. This behavior can be particularly damaging as it can trigger emotional distress, reinforce feelings of vulnerability, and discourage the victim from seeking help or feeling safe in their surroundings. Additionally, such actions can further perpetuate a culture of impunity for the perpetrator, undermining the seriousness of the victim's experience and the need for accountability.
>
> Sincerely,
>
> # Yisrael Heilmann

Sincerely,

# Yisrael Heilmann

On Sep 25, 2024, at 1:20 AM, Yisrael Zephaniah Heilmann <yheilman@mail.yu.edu> wrote:


Additional info:


Chanting "Borussia Dortmund" (German soccer club) at a German passport holder can be considered racist because it reduces their identity to a stereotype associated with their nationality, which is both derogatory and dehumanizing. This behavior can evoke feelings of alienation and hostility, especially in a multicultural setting like New York, where respect for diverse identities is essential. Such actions perpetuate racial discrimination and undermine the principles of inclusivity and acceptance, reinforcing systemic racism within the community. Ultimately, targeting someone based on their nationality is a form of harassment that should not be tolerated.


"Sapir, Sapir, Sapir" chants,  this applies to the incidents between March,13,2024 and March,21,2024 at 500 W185th Street.

Chanting the name of a perpetrator  in public while targeting the victim can be considered an act of harassment and intimidation. It not only serves to provoke the victim but also publicly reaffirms the perpetrator's actions, creating an environment of fear and anxiety for the victim. This behavior can be particularly damaging as it can trigger emotional distress, reinforce feelings of vulnerability, and discourage the victim from seeking help or feeling safe in their surroundings. Additionally, such actions can further perpetuate a culture of impunity for the perpetrator, undermining the seriousness of the victim's experience and the need for accountability.

[Quoted text hidden]

---

**Yisrael Zephaniah Heilmann** <yheilman@mail.yu.edu>                     Wed, Oct 2, 2024 at 4:10 PM
To: Joe Bednarsh <joe.bednarsh@yu.edu>

 Dear Mr. Bednarsh,

I am willing to meet regarding this matter, but I would like to have my attorney present to protect my rights during the discussion. I feel uncomfortable addressing the university without this representation.

In the meantime, please feel free to send any questions you may have via email.

We are currently assessing the case and determining the next steps based on the university's handling of this situation.

Given the severity of the incident, it may warrant serious disciplinary action against the students involved, particularly considering their F-1 status or dismal.

As I understand it, this incident may constitute a Title VI violation, which raises concerns about the university's responsibility to act. If appropriate measures are not taken, the university could potentially be held accountable.

Thank you for your understanding.

Sincerely,

Yisrael Heilmann

Sent from my iPhone

> On Sep 25, 2024, at 3:15 PM, Joe Bednarsh <joe.bednarsh@yu.edu> wrote:

[Quoted text hidden]

---

**Joe Bednarsh** <joe.bednarsh@yu.edu>                    Mon, Oct 7, 2024 at 6:33 PM
To: "Yisrael Zephaniah Heilmann [student]" <yheilman@mail.yu.edu>

Dear Yisrael,

I hope you had a meaningful Rosh Hashanah Holiday.

As you know, I have been ready and willing to work with you to begin the process of investigating your allegations, but you have either not responded to my emails or not made yourself available for us to speak despite repeated efforts on my part. As I've previously written, email is not the correct vehicle for this, we must meet in person or via Zoom/Teams. Since this process starts with a conversation, I don't have specific questions to send to you in advance.

I'm surprised to read that you'd like to have your attorney present and while it's not customary, I'm confident we can accommodate that request. As a point of information, I am not authorized to speak with outside lawyers without YU's Counsel present. Please provide us with several dates and time that you and your attorney can be available, and I will work with the General Counsel's Office on finding a time that works for us all.

[Quoted text hidden]

# *Exhibit* H



**Seyfarth Shaw LLP**
620 Eighth Avenue
New York, New York 10018
**T** (212) 218-5500
**F** (212) 218-5526

dkesselman@seyfarth.com
T (212) 218-5507

www.seyfarth.com

December 24, 2024

**VIA FEDEX AND EMAIL (InfoUpperManhattan@dhr.ny.gov)**

David E. Powell
Regional Director
New York State Division of Human Rights
Adam Clayton Powell State Office Building
163 West 125th Street, Room 401
New York, NY 10027

**Re:**  *Yisrael Z. Heilmann v. Yeshiva University*, Case No. 10242105

Dear Regional Director Powell:

We submit this position statement on behalf of Yeshiva University ("Yeshiva" or the "University") in response to the above-referenced complaint of discrimination (the "Complaint") brought by Yisrael Heilmann ("Mr. Heilmann"), a former student of Yeshiva.  In his "kitchen sink" Complaint, Mr. Heilmann claims he was discriminated against on the basis of any protected class under which he might fall — his age, citizenship or immigration status, disability, and German national origin — and that he was retaliated against for complaining of discrimination, in violation of the New York State Human Rights Law ("NYSHRL").[1]

As set forth more fully below, Mr. Heilmann's Complaint is utterly without merit.  Indeed, as the very documents attached to Mr. Heilmann's Complaint themselves show (and as extensive additional documentation confirms), Yeshiva immediately responded to each of Mr. Heilmann's complaints and accommodated his requests for accommodation at every step, beginning even before Mr. Heilmann started at the University and continued through the very end of his academic career at Yeshiva.  Mr. Heilmann was dismissed from Yeshiva because, despite all of the accommodations given to him, he failed to meet Yeshiva's basic academic requirements as required by Yeshiva's policy of all students, including: (1) his failure to earn a minimum of 12 credits in each semester (he earned only 11 credits for Fall 2023, and 2 credits for Spring 2024); and (2) his failure to maintain the minimum required 2.0 GPA for each semester (he achieved only a 0.47 GPA for the Spring 2024 semester).

Indeed, the instant Complaint is just the latest in a long and sad history of very concerning behaviors and a constant victimhood personality exhibited by Mr. Heilmann throughout his time

---

[1]     Except as expressly admitted in this position statement, Yeshiva University denies each and every allegation set forth in the Complaint.



David E. Powell
December 24, 2024
Page 6

At no time did Dr. Levy or any University official direct Mr. Heilmann to leave his dormitory, or state that he could not be in the dormitory because of his age, or state that the University would force him to move.  It was merely a light suggestion to help Mr. Heilmann's deteriorating state.  Mr. Heilmann chose not to take that suggestion, and he remained in the dormitory without issue from the University.

Likewise unstated by Mr. Heilmann's Complaint is that throughout this time, Yeshiva also continued to grant him his requested disability accommodations each semester.  (*See* Ex. I.)

### D.    Mr. Heilmann's Complaints to the University Regarding his "Assault" by Mr. Amar and the University's Immediate Investigation.

On or about March 21, 2024, Mr. Heilmann got into a physical altercation with another student, Mr. Amar.  Although the Complaint alleges that this started because he "found" his computer charger in Mr. Amar's backpack, this is a misstatement of the facts.  On or about March 13, 2024, Mr. Heilmann, based on nothing but his own speculation, assumed that Mr. Amar stole his Apple laptop charger in the University library.  Mr. Heilmann approached Mr. Amar and asked to borrow the charger in question.  Unsuspicious of any ulterior motive, Mr. Amar lent Mr. Heilmann his laptop charger.  Mr. Heilmann then left the area with the charger, leading Mr. Amar to understandably believe that Mr. Heilmann was stealing his charger.  Mr. Heilmann then brought this issue to the security officer nearby and gave the charger to security, leading to a verbal confrontation between the two students.  While Mr. Heilmann alleges that Mr. Amar began harassing and following Mr. Heilman throughout the next week, in reality, Mr. Amar was merely seeking to get his charger back.  Mr. Amar likewise contacted the University regarding this issue, pleading for immediate assistance.  (Ex. J.)  Over the succeeding days, Associate Dean of Students Joe Bednarsh ("Mr. Bednarsh") conducted a thorough investigation, including interviewing both Mr. Heilman and Mr. Amar.  On March 20, 2024, Mr. Bednarsh informed Mr. Amar and Mr. Heilmann, separately, that his investigation concluded that the laptop charger in fact belonged to Mr. Amar and returned the charger to Mr. Amar.  At the same time, because Mr. Bednarsh saw how upset Mr. Heilmann was, he also told Mr. Heilmann that Yeshiva had purchased a new apple laptop charger for him which he could come pick up.  (Ex. K.)

Suspiciously, later that evening of March 20, 2024, at or around 5:07 pm – several hours *after* Mr. Bednarsh's investigation concluded that the charger belonged to Mr. Amar – Mr. Heilmann filed a new report against Mr. Amar with Yeshiva Security claiming *for the first time* that during their March 13, 2024 interaction (after Mr. Heilmann "borrowed" Mr. Amar's charger), Mr. Amar (a Jewish student from Israel) had flashed a threatening "Bloods" gang sign at him.  (Ex. L.)  Once again, Yeshiva Security duly documented the complaint and investigated it.  (*Id.*)

Hours later, at roughly 1:00 A.M. on March 21, 2024, Mr. Heilmann and Mr. Amar became involved in an altercation at the University's library which Mr. Heilmann describes in his Complaint as the "assault."  Although Mr. Heilmann claims that Mr. Amar poured a water bottle on him, this fact is in dispute, as the Yeshiva University Security Department Incident Report indicates that it was Mr. Heilmann that poured a water bottle on Mr. Amar.  (Ex. M.)  Mr. Amar then allegedly pushed Mr. Heilmann to the ground, where Mr. Heilmann allegedly hit his head.  Mr. Heilmann alleges in his Complaint that Mr. Amar picked up a chair to hit him and continued to kick him while he was on the ground. (Compl., p. 3.)  Notably, Mr. Heilmann's report to Yeshiva Security did not include a description of this more vicious account.  (*See* Ex. M.)



Mr. Heilmann's Complaint bizarrely claims that Yeshiva did not take any action and that Dean of Students Sara Asher ("Dean Asher") repeatedly called him at the hospital and tried to convince Mr. Heilmann not to file a criminal complaint against Mr. Amar. This is yet another example of Mr. Heilmann's report being disconnected from reality, as nothing could be further from the truth. In fact, Yeshiva took swift action to support Mr. Heilmann. Dear Asher called Mr. Heilmann multiple times at the hospital between 3:30 am to 4:00 am in order to ensure that he was getting medical treatment and that he was okay. Dean Asher's notes of her conversation with Mr. Heilmann show that she did exactly what she should have:

> "Spoke to Yisrael [Heilmann] at 4am. **He is worried about university consequences. I told him students are always welcome to call police, it's an important resource.** His language and thoughts was coherent. I told him the hospital isn't so concerned and don't expect to find anything on the scan, I told him he can advocate for himself and ask if scan is necessary. **He appreciated that advice, will talk to the nurse. He otherwise feels well. He spoke with a police at the hospital, he showed him the video where Sapir [Amar] gestured with his hands, what Yisroel understood as a gang sign. The police laughed when watching the video and said he's a clown, not part of a gang. I told [Mr. Heilmann] that the police will contact him again to decide next steps, and he will need to decide what to do. I asked him whether the police at the hospital gave him a resource and he said he has two numbers to call at the police to help him with the follow up. I told him he can continue to use university security as a support and they can help him feel safe.** He said he fell backwards during the incident and bumped his head. He acknowledged that the doctor said it could be worse as he didn't see bleeding. **I offered him an alternative room temporarily but he said he's ok where he is, especially because Sapir isn't there tonight, and his roommate misses him."**

(Ex. N (emphasis added).)

The very next day, March 22, 2024, Yeshiva issued a no-contact order to both Mr. Amar and Mr. Heilmann, which prevented Mr. Amar from interacting with Mr. Heilmann going forward. (Ex. O.) Further, because Mr. Heilmann and Mr. Amar lived in the same dormitory, Mr. Amar was required to leave the dormitory, further eliminating any potential future altercations. And, despite having previously advised Mr. Heilmann verbally that he could file any criminal complaint that he wished, Dean Asher followed up with him in writing, on April 2, 2024, upon learning that he was claiming that she was pressuring him to drop the charges against Mr. Amar. Dean Asher stated in no uncertain terms "[d]ear Yisrael, [i]t has come to my attention that you feel the University is telling you to drop the charges against Sapir. **As I have told you from the beginning, it is up to you whether or not you want to press charges**. If someone at the University has told you otherwise, please let me know." (Ex. P; Compl., p. 49.)

Mr. Heilmann's bizarre characterization of his interaction with Judith Lopez ("Ms. Lopez") and Dr. Levy of Yeshiva's Counseling Center on March 25, 2024, alleging that they "made explicit threats against [his] safety and the safety of [his] loved ones," prevented him from leaving the office for 10-12 minutes, and made "chilling threats, stating that [his] family could be killed anywhere in Germany if [he] did not drop the charges against Sapir Amar," among other things



(*see* Compl., p. 5) is wildly removed from reality.  As noted above, Mr. Heilmann routinely visited the Counseling Center throughout his time at Yeshiva.  At no point did the University ever mandate Mr. Heilmann to speak with anyone at the Counseling Center.  Instead, following the incident with Mr. Amar, Mr. Heilmann visited Dr. Levy and Ms. Lopez on his own to discuss the altercation, where he was angry and emotional.  Mr. Heilmann alternated between saying that he could not talk about the assault and attempting to talk about the assault.  Dr. Levy and Ms. Lopez attempted to calm Mr. Heilmann down and refocus him, suggesting that Mr. Heilmann focus on his studies, and not let this altercation deter him from getting his degree.  Dr. Levy and Ms. Lopez likewise made it clear that whether or not Mr. Heilmann brought criminal charges against Mr. Amar was entirely his decision, though they suggested that he should consider what would be best for his own mental health.  Of course, Ms. Lopez never made physical contact with Mr. Heilmann and never, explicitly or implicitly, made any threats against his safety, nor was Mr. Heilmann *ever* confined or locked in an office or prevented from leaving at will.  His allegations are not only false; they are ridiculous.

Indeed, Mr. Heilmann emailed Dr. Levy and Ms. Lopez a few days later, on April 1, 2024 saying that he did not wish to continue seeing the Counseling Center, but noting that "**I, hereby, value the time we shared and the experiences we had together; however, I feel it is necessary for me to focus on other aspects of my life at this time** . . . **I want to express my gratitude for your understanding and cooperation in this matter. I wish you all the best in your future endeavors and hope that you find happiness and fulfillment in your journey ahead."** (Ex. Q (emphasis added).)  That is hardly the language of someone writing to people who had made "chilling threats" to his and his family's safety.

Further underscoring the voluntary nature of Mr. Heilmann's interactions with Ms. Lopez and Dr. Levy, Mr. Heilmann *again* visited the Counseling Center on or about April 8, 2024.  Here, Mr. Heilmann began screaming in the waiting room, demanding to speak with Dr. Levy in a counseling session, without an appointment.  Due to his disruptive and inappropriate behavior, Mr. Heilmann was asked to leave the Counseling Center, with the caveat that if he wants to speak with Dr. Levy going forward, he makes an appointment.  Dean Asher was also forced to warn Mr. Heilmann that such conduct was unacceptable and would not be countenanced.  (Ex. R.)

     **E.**      **Mr. Heilmann is Reasonably Accommodated for His
                Alleged Injuries But Refuses to Take His Exams.**

Shortly after the March 21st incident, on April 1, 2024, Mr. Heilmann contacted Dean Fred Sugarman about his injuries and health impacting his ability to attend classes.  Dean Sugarman attempted to help him with various suggestions, including advising him to first speak with his professors, suggesting that he take a medical leave of absence, and then to speak with various Yeshiva resources as to how the University could help him.  Mr. Heilmann responded that "I will follow your advice. **Thank you and I appreciate your respectful manners towards me!!"** (Ex. S; Compl., p. 38 (emphasis added).)  The next week, on April 8, 2024, Dean Sugarman followed up with Mr. Heilmann and addressed a number of issues, including his request for an accommodation for his injuries, writing "[a]ccommodations due to your injuries.  I believe you initially asked for 6-8 weeks of accommodations due to medical appointments and your current health status for classes this term.  If you wish to go forward with this request, you do not need to visit our counseling center. **Requests for accommodations are handled through our Office of Disability Services.  Information about the process is on their website -- https://www.yu.edu/student-life/resources-and-services/disability-services [yu.edu].  You**



was 'simply a 'substantial' or 'motivating' factor in the employer's decision' is insufficient to prove a retaliation claim." *Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 340 (S.D.N.Y. 2020) (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015), then quoting *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013)).

Mr. Heilmann cannot connect any discriminatory motive to his dismissal from the University. As clearly outlined in the decision letter, Mr. Heilmann failed to maintain 12 credits and had an 0.47 GPA, which clearly violates the University's policy. Yeshiva, throughout Mr. Heilmann's entire academic career, worked with Mr. Heilmann to support him in his academic pursuit. The University worked with Mr. Heilmann to grant all reasonable accommodations requests and clearly outlined what was required for him to pass his classes. A clear causal connection exists in this case – but it connects to Mr. Heilmann's inability to complete his coursework, and not to any protected activity. Mr. Heilmann simply cannot show that he would not have been dismissed but for his various complaints, when the University has such compelling evidence to support the legitimate, non-discriminatory reasons for his dismissal.

## CONCLUSION

For the foregoing reasons, Mr. Heilmann's Complaint is meritless, and we respectfully request that the NYSDHR find no probable cause and dismiss the Complaint in its entirety.

Respectfully submitted,

SEYFARTH SHAW LLP

Dov Kesselman
Ian Capell

# YESHIVA UNIVERSITY
## SECURITY DEPARTMENT
## INCIDENT REPORT WC

INCIDENT #

C2024-018

| YU RELATED | YES | SELECT LOCATION | WILF CAMPUS | DATE REPORTED | 03/21/2024 | DAY | THURSDAY | TIME | 1:00 AM |

| TYPE OF INCIDENT | Assault 3 Student Arrested | | | DATE OF INCIDENT | 03/21/2024 | DAY | THURSDAY | TIME | 1:07AM |

| PLACE OF OCCURRENCE | INSIDE | STREET LOCATION | 2520 Amsterdam Ave | BUILDING NAME | Gottesman Library | RM | N/A | FL | 4th Fl |

| IF GRADUATE SCHOOL INDICATE | N/A |

| INFORMATION ON COMPLAINANT ONLY | STUDENT | NAME(S) | Yisrael Zephaniah Heilmann | DORM RM | Muss 364 | ID NUMBER | 800754574 |

| DEPARTMENT | | DORM TEL HOME TEL | | DEPT TEL, OFFICE EXT. | |

**DETAILS OF INCIDENT**

**CONTINUE ON NEXT PAGE**

On Thursday March 21, 2024 at 1:07AM, NYPD (Vehicles 390 & 4144) from the 34th Pct. were observed on 185th Street and Amsterdam Ave.

I, Olegario Rodriguez, responded and observed Yisrael Z███████ah Heilmann(8█████████████9) and Sapir Amar (80069██67, D.O.B 4/7/1999) on the 185th Street plaza speaking to the officers. They were both recently involved in an ongoing dispute regarding an apple charger that had started in the Gottesman Library on March 13th, 2024.

Mr. Heilmann alleges that while he was in the 4th floor library Mr. Sapir caused him to fall and hit his head on the floor and then Mr. Sapir proceeded to kick him while he was on the ground. Mr. Sapir was overheard reporting to the officers that Mr. Heilmann had emptied a water bottle on him.

An FDNY Ambulance#2157 arrived and put Mr. Heilmann in the ambulance and he was transported to Columbia Presbyterian Medical Center for further evaluation.

P.O. Rios(Badge#3132) placed Sapir Amar under arrest and charged him with Assault.
At the time of this report, no witnesses have come forward that observed any physical altercation between them.

The 5th floor librarian Carla Ha███████████ was on the floor at the time and heard them arguing but did not see them physically fighting. A student Moshe Davidovics(800730339, teL#(901)-438-████5), reported to me that he heard the argument but did not see any physical altercation between them. Both persons provided Incident statements. (See Attached)

NYPD Complaint#(61#) is 2024-034-001811.

| REPORT PREPARED BY | Olegario Rodriguez | NAME OF PERSON(S) NOTIFIED | Paul Murtha, Avi Feder, Alan Asusta |

**FOR WILF CAMPUS SECURITY OFFICE USE ONLY**

REVIEWED BY

CHECK BOX IF EMAILED    ☐ VP, ADMINISTRATIVE SERVICES    ☐ DEAN OF STUDENT    ☐ DIR. OF HOUSING    ☐ FACILITIES SERVICES
☐ ☐ MAINTENANCE    ☐ OTHER (INDICATE)

EMAIL                    REVISED 4/19                    Print Form    Reset Form