UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

YISRAEL Z. HEILMANN,            Civil Action No. 25cv-02431


Plaintiff,


                          **COMPLAINT**

                    **JURY TRIAL DEMANDED**

        -against-


YESHIVA UNIVERSITY; SEYFARTH SHAW LLP;

KYLE D. WINNICK; DOV KESSELMAN; IAN M. CAPELL;

DR. REBECCA CYPESS; DR. SARA ASHER; DR. YEDIDYA LEVY;

JOE BEDNARSH; JUDITH E. LOPEZ; JENNIFER GOLDEN; DR. YAEL MUSKAT;

ESTHER K. SASSON; ABIGAIL KELSEN; NORMA SILBERMINTZ; AVI FEDER;

SAPIR AMAR; MOSHE DAVIDOVICS;

JONATHAN WERTA; JOSE HAMBRA; SALVADOR SERFATY;

JOHN DOES 1-10 (Students);

JOHN DOES 11-20 (Institutional Actors);


Defendants.

------------------------------------X

Certified Under Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved
Exhibits; Structured for Federal Trial, multi-jurisdictional Discovery, and Sanction Referral if Retaliated Against

Heilmann v. Yeshiva University, et al.        | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)  |     Page 2 of 106

---------------------------------------------------------

NOTICE OF FILING AMENDED COMPLAINT PURSUANT TO FED. R.
              CIV. P. 15(a)(1)(B)

---------------------------------------------------------

---------------------------------------------------------

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure,

Plaintiff Yisrael Heilmann respectfully files this Second Consolidated
Amended Complaint ("SCAC") with leave of Court, as granted by the Court's
Order dated October 16, 2025 (ECF No. 90).

This SCAC reflects Plaintiff's good-faith efforts to clarify factual
allegations, streamline and consolidate overlapping claims, and refine
legal theories in response to arguments raised in Defendants' prior
motions. The amended pleading has been shortened and reorganized to
promote clarity, eliminate redundancy, and advance the interest of
judicial economy.

---------------------------------------------------------

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.          | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)    | Page 3 of 106

# Table of Content

**A. Preliminary Statement** ................................................................................................ 8

    Nature of the Action ................................................…….......................... 8

    Summary of Wrongdoing ............................................................................ 9

    State Action and Color of Law ................................................................... 10

    Monell / Institutional Liability ................................................................. 11

    Conspiracy and Discriminatory Animus ................................ ...................... 13

    Title VI and ADA Violations…............................................................... 14

    RICO Claim (Pattern of Racketeering) ..................................................... 15

    FERPA and Privacy Violations ....................................................…......... 16

    Litigation Posture and Public Importance ............................…...................... 17

    Good-Faith Certification and Rule 11 Compliance ..................................... 19

**B. Jurisdiction and Venue** ........................................................……......…... 20

    Subject Matter Jurisdiction ....................................................................... 20

    Personal Jurisdiction .............................................................................. 20

    Venue .................................................................................................. 21

    Divisional Assignment .......................................................................... 21

    Jurisdictional Statement Compliance ....................................................... 21

**C. Parties** ............................................................................................... 22

**D. Factual Background** ...................................................................…............ 32

    A. Plaintiff's Enrollment and Initial Harassment (2022) ............................... 33

    B. University's Failure to Act and Attempted Cover-Up (Oct–Dec 2022) ............................ 34

    C. Age-Based Housing Eviction and Discrimination (Dec 2023) ..................... 35

    D. Escalation: Theft, Threats, and Hate-Motivated Assault (Mar 2024) ................. 36

    E. Administrative Retaliation: False Imprisonment and Coercion (Mar 2024) ....................…....... 42

    F. Ongoing Retaliation, Constructive Expulsion, and Cover-Up (2024–2025) ....................... 46

**E. Causes of Action** ...........................................................................…....... 58

    1 – Assault (N.Y.) ................................................................................ 58

    2 – Battery (N.Y.) .............................................................................. 59

    3 – Intentional Infliction of Emotional Distress (N.Y.) ............................... 59

    4 – Trespass to Chattels (N.Y.) .............................................................. 60

    5 – Defamation (N.Y.) ........................................................................ 61

    6 – Tortious Interference with Prospective Advantage (N.Y.) ................…..................... 62

    7 – False Imprisonment (N.Y.) .............................................................. 63

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.          |  Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint  (SCAC)   |   Page 4 of 106

8 – Invasion of Privacy / Improper Disclosure (FERPA / HIPAA / N.Y.) ........................................ 63–64
9 – Obstruction of Justice ............................................................................................................ 65
10 – Retaliation ......................................................................................................................... 66
11 – Disability Discrimination: Failure to Accommodate ................................................................ 67
12 – Disability-Based Retaliation ................................................................................................. 68
13 – National Origin Discrimination (Title VI; § 1983) .................................................................. 71
14 – Hostile Educational Environment (Title VI) ........................................................................... 73
15 – Disparate Treatment ........................................................................................................... 74
16 – Age Discrimination (NYSHRL / NYCHRL) .......................................................................... 75
17 – Constructive Expulsion / Breach of Educational Contract ....................................................... 76
18 – Fraudulent Misrepresentation .............................................................................................. 77
19 – Abuse of Process (N.Y.) ...................................................................................................... 78
20 – Retaliatory Abuse of Process (N.Y.) ..................................................................................... 79
21 – Civil RICO (18 U.S.C. § 1962(c)) ....................................................................................... 80
22 – Spoliation of Evidence (N.Y.) .............................................................................................. 82
23 – Witness Intimidation (42 U.S.C. § 1985(2)) .......................................................................... 83
24 – Constructive Discharge / Educational Deprivation (Title VI) ................................................... 84
25 – Intentional Infliction of Emotional Distress (Golden) .............................................................. 85
26 – Constructive Expulsion / Institutional Retaliation (ADA & NYSHRL) ...................................... 86
27 – Constructive Retaliation (ADA / N.Y. Exec. Law § 296(7)) .................................................... 87
28 – Violation of Student Due Process Rights (U.S. & N.Y. Constitution; Contract Fairness)............. 88
29 – Discrimination / Failure to Accommodate (ADA / § 504) ....................................................... 90
30 – Retaliation / Failure to Protect (ADA / § 504 / Title VI) ......................................................... 91
31 – Retaliatory Litigation / Abuse of Process (Seyfarth & YU Counsel) ......................................... 93
32 – Malicious Prosecution / Judicial Retaliation (§ 1983 and State Law) ......................................... 94
33 – False Mental Health Labeling and Privacy Violations (FERPA / Defamation Per Se) ............….. 95
34 – § 1985(2) – Obstruction of Justice / Witness Intimidation ....................................................... 95
35 – Failure to Engage in Interactive Process (ADA / § 504) .......................................................... 96

F. Prayer for Relief ................................................................................................................... 98
    A. Compensatory and Punitive Damages ................................................................................. 99
    B. Declaratory Relief ........................................................................................................... 99
    C. Injunctive and Equitable Relief ....................................................................................... 100
        I. Individual Relief ....................................................................................................... 100
        II. Structural Relief ...................................................................................................... 101

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

    III. Judicial Authority ............................................................…................ 102
  D. Voluntary Alternative Dispute Resolution ..........................................…............ 102
  E. Structural Remedies .................................................................................... 103
**G. Right to Amend, Non-Waiver of Rights, Jury Demand, and Pro Se Notice** ..................................... 104
  I. Right to Amend ...................................................................................... 104
  II. Non-Waiver of Rights .............................................................................. 104
  III. Demand for Trial by Jury ........................................................................ 105
  IV. Pro Se Notice ..............................................................…........... 105
  V. Pro Se Good-Faith Citation Notice ................................................................ 106

# TABLE OF AUTHORITIES

## Cases

Abacus Fed. Sav. Bank v. Lim, 75 A.D.3d 472 (1st Dep't 2010) ............................................ 60
Alexander & Alexander of N.Y., Inc. v. Fritzen, 68 N.Y.2d 968 (1986) ................................ 60
Ashcroft v. Iqbal, 556 U.S. 662 (2009) ......................................................…......... 13
Bastein v. Sotto, 299 A.D.2d 432 (2d Dep't 2002) .................................................... 56
Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) .................................................... 13
Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29 (1st Dep't 2011) ........................................ 74
BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996) .................................................... 52
Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001) ................. 10
Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008) ............................................ 78–81
Broughton v. State of New York, 37 N.Y.2d 451 (1975) ................................................ 61
Chavis v. Chappius, 618 F.3d 162 (2d Cir. 2010) .................................................... 62
Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229 (2d Cir. 1999) ......…..... 78
Curiano v. Suozzi, 63 N.Y.2d 113 (1984) ........................................................... 77
Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629 (1999) ............................................ 29
Dillon v. City of New York, 261 A.D.2d 34 (1st Dep't 1999) .......................................... 59
Dimick v. Schiedt, 293 U.S. 474 (1935) ............................................................ 63
Doe v. Cmty. Health Plan–Kaiser Corp., 268 A.D.2d 183 (3d Dep't 2000) ........................ 84–85
Doe v. Columbia Univ., 831 F.3d 46 (2d Cir. 2016) .................................................. 53
Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969) ..................................................... 84–85
Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553 (2009) ..........…............ 60
Gonzaga Univ. v. Doe, 536 U.S. 273 (2002) ......................................................... 18
Goss v. Lopez, 419 U.S. 565 (1975) ............................................................... 55
Gould v. Rempel, 100 A.D.3d 759 (2d Dep't 2012) ................................................... 57
Haines v. Kerner, 404 U.S. 519 (1972) ............................................................. 64

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.          |  Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint  (SCAC)   |    Page 6 of 106

Hayut v. SUNY, 352 F.3d 733 (2d Cir. 2003) ................................................ 73
Howell v. N.Y. Post Co., 81 N.Y.2d 115 (1993) ........................................... 57
Johnson v. City of Shelby, 574 U.S. 10 (2014) ............................................ 11
Korsinsky v. Rose, 120 A.D.3d 1307 (2d Dep't 2014) ................................. 59
Long Is. Gynecological Servs., P.C. v. Murphy, 298 A.D.2d 504 (2d Dep't 2002) ............. 59
Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) ..................................... 10
Lundy v. Catholic Health Sys. of Long Island, Inc., 711 F.3d 106 (2d Cir. 2013) ................ 77
Mancuso v. Douglas Elliman, LLC, 808 F. Supp. 2d 606 (S.D.N.Y. 2011) ........................ 26
Martinez v. City of Schenectady, 97 N.Y.2d 78 (2001) ................................ 86
Melman v. Montefiore Med. Ctr., 98 A.D.3d 107 (1st Dep't 2012) ..................... 74
Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978) ............................... 11, 29
Ortega v. City of New York, 9 N.Y.3d 69 (2007) .................................... 81, 86
Oteri v. Village of Pelham, 100 A.D.3d 725 (2d Dep't 2012) ..........................;........... 57
Papelino v. Albany Coll. of Pharmacy, 633 F.3d 81 (2d Cir. 2011) ........................ i .... 73
Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99 (2d Cir. 2002) ............. 81–82, 86
Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985) .................................... 15
State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003) ..................... 52
Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1 (1971) .................... 54
Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) ..................................... 60
Tesoriero v. Syosset Cent. Sch. Dist., 382 F. Supp. 2d 387 (E.D.N.Y. 2005) ........................ 27
Triestman v. Fed. Bureau of Prisons, 470 F.3d 471 (2d Cir. 2006) ................... 89–90
T.Z. v. City of New York, 634 F. Supp. 2d 263 (E.D.N.Y. 2009) ........................ 29
Williams v. Citigroup Inc., 659 F.3d 208 (2d Cir. 2011) .................................... 90–91

## Statutes

18 U.S.C. §§ 1341, 1343 (Mail & Wire Fraud) ........................................... 14
18 U.S.C. § 1503 (Obstruction of Justice) ............................................... 14
18 U.S.C. § 1512 (Witness Tampering) .................................................. 14
18 U.S.C. § 1961 et seq. (RICO – Definitions) ...................................... 14, 18
18 U.S.C. § 1964(c) (RICO – Civil Remedies) ........................................ 14
20 U.S.C. § 1232g (FERPA) ........................................................... 29, 95
28 U.S.C. § 1331 (Federal Question Jurisdiction) ....................................... 19
28 U.S.C. § 1343(a)(3)–(4) (Civil Rights Jurisdiction) ................................. 19
28 U.S.C. § 1367(a) (Supplemental Jurisdiction) ....................................... 19
28 U.S.C. § 1391(b)(1)–(3) (Venue) .................................................... 19
28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act / Further Relief) ........... 19
29 U.S.C. § 794 (§ 504 Rehabilitation Act) ........................................ 89–91
42 U.S.C. § 1983 (Civil Action for Deprivation of Rights) ........................ 8, 28
42 U.S.C. § 1985(2) (Conspiracy to Obstruct Justice) .............................. 94–96
42 U.S.C. § 1985(3) (Conspiracy to Deprive Equal Protection) ....................... 8
42 U.S.C. § 2000d et seq. (Title VI) ........................................... 8, 29, 91
42 U.S.C. § 12181 et seq. (ADA Title III) ......................................... 89–92
42 U.S.C. § 12203 (ADA Retaliation) ............................................... 90–91

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

```
Heilmann v. Yeshiva University, et al.      | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC) |     Page 7 of 106
```

N.Y. Exec. Law § 296(1), (6), (7) ........................................................ 70, 74
N.Y.C. Admin. Code § 8-107(1)(a) ...................................................... 74
CPLR § 4507 (Physician–Patient Privilege) ........................................ 84

## Constitutional Provisions

U.S. Const. amend. VII (Seventh Amendment) .................................. 105

## Other Authorities

Fed. R. Civ. P. 8(a) .............................................................................. 17
Fed. R. Civ. P. 8(d)(2)–(3) ................................................................... 63
Fed. R. Civ. P. 11(b) ..................................................................... 4, 106
Fed. R. Civ. P. 15(a)(1)(B) ................................................................... 5
Fed. R. Civ. P. 15(a)(2) ..................................................................... 104
Fed. R. Civ. P. 38(b) ......................................................................... 105
Fed. R. Evid. 408 ................................................................................. 56

```
Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against
```

Heilmann v. Yeshiva University, et al.         | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint  (SCAC)   |    Page 8 of 106

# A.  PRELIMINARY STATEMENT

1. This case arises from a sustained pattern of violence, harassment, and retaliation against Plaintiff Yisrael Z. Heilmann, an international student at Yeshiva University, culminating in a hate-motivated assault, false imprisonment by University officials, and the destruction of his education and immigration status. Despite repeated reports to University administrators and law enforcement, Defendants — including senior YU officials, outside counsel at Seyfarth Shaw LLP, and individual student perpetrators — not only failed to protect Plaintiff but actively conspired to silence him through threats, coercion, and fabricated narratives. The misconduct spanned from late 2022 through 2025, involving acts of physical violence, discriminatory treatment based on national origin, disability, and age, and deliberate cover-ups to shield the institution's reputation. Plaintiff's injuries include lasting physical harm, severe psychological trauma, the loss of his lawful student visa, and the derailment of his academic and professional future. This action seeks to hold all responsible parties accountable under federal civil rights laws, RICO, and related state claims, and to obtain both damages and systemic reforms to ensure such abuses cannot be repeated.

2. **Nature of the Action:** This is a **civil rights action to redress egregious violations of the U.S. Constitution and federal law by Yeshiva University and associated individuals**. Plaintiff, a former student of Yeshiva University ("YU"), was subjected to severe misconduct including (but not limited to) **invidious discrimination**, **deliberate indifference to his safety and rights**, and a **concerted cover-up of wrongdoing**. Despite Plaintiff's repeated

pleas for help – documented in contemporaneous police reports, medical records, and email correspondence – Defendants **willfully failed to protect Plaintiff and instead retaliated against him for asserting his rights**. The claims in this suit are brought pursuant to **42 U.S.C. § 1983** (deprivation of federal rights under color of state law), **42 U.S.C. § 1985(3)** (conspiracy to deprive equal protection), **Title VI of the Civil Rights Act of 1964** (42 U.S.C. § 2000d et seq.) (race/national origin discrimination in a federally funded program), **Title III of the Americans with Disabilities Act** (42 U.S.C. § 12181 et seq.) (disability discrimination by a place of public accommodation), the **Racketeer Influenced and Corrupt Organizations Act (RICO**, 18 U.S.C. § 1961 et seq.), and other applicable laws protecting educational privacy and civil rights. Plaintiff also invokes this Court's supplemental jurisdiction over any related state law claims. Each claim is supported by detailed, fact-specific allegations demonstrating Plaintiff's entitlement to relief under the governing standards of law.

3. **Summary of Wrongdoing:** Over the course of his enrollment at YU, Plaintiff endured a **pattern of unlawful and unconscionable conduct**. By way of overview, Plaintiff was (a) **subjected to harassment and disparate treatment on the basis of his protected characteristics (including his race/national origin and disability status)**, (b) **denied reasonable accommodations and basic safety despite the University's knowledge of his vulnerabilities**, and (c) **retaliated against after he reported criminal acts and policy violations to both University officials and law enforcement**. For example, on March 13, 20 and 21, 2025, Plaintiff **reported to campus authorities and the New York City Police Department that he had been physically assaulted and subjected to bias-motivated threats by another individual on campus**. Instead of protecting Plaintiff, **YU officials – acting in concert with certain NYPD personnel – agreed to "handle"**

the matter internally and discouraged any public investigation, as evidenced by internal email communications. In furtherance of this unofficial pact, Defendants **actively concealed critical facts, refused to discipline the wrongdoers, and misled Plaintiff about his rights and the status of his case**. YU's deliberate indifference and cover-up **exacerbated Plaintiff's trauma, led to a deterioration of his mental and physical health**, and ultimately **forced Plaintiff to abandon his educational opportunities at YU**. Plaintiff's educational records and private information **were also disclosed and mishandled without consent during these events – a blatant violation of his federally protected privacy rights (FERPA)**. Defendants' actions not only harmed Plaintiff personally but also **demonstrate a broader institutional pattern of lawlessness and discrimination**. **The public has a compelling interest in exposing and remedying these systemic failures at Yeshiva University, which receives millions of dollars in public funding and purports to be a leader in higher education.**

4. **State Action and Color of Law:** Although Yeshiva University is a private institution, **its conduct in this matter is properly treated as action under color of state law**.

   Defendants **willfully participated in joint action with state actors and performed public functions in an entwined manner, thereby satisfying the "state action" requirement** for constitutional claims. In particular, **YU's security personnel and administrators worked hand-in-glove with NYPD officers to investigate and suppress Plaintiff's complaints, effectively usurping a public law enforcement role**. YU enjoyed extensive assistance from, and coordination with, government actors – including through City-conferred security authority and influence over police decision-making – such that **YU's conduct is "fairly attributable to the State"** (see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001)). Moreover, to the extent any individual Defendant was a state or city official (or was deputized with state authority),

all such Defendants were acting within the scope of their official duties and under color of state law

when depriving Plaintiff of his rights. Accordingly, **Plaintiff's claims under 42 U.S.C. § 1983 are**

**properly directed at YU and the other Defendants as state actors**. Any argument that YU is

exempt from constitutional scrutiny is unavailing: **when private entities wield governmental**

**power or engage in symbiotic collaboration with public officials, they can be held liable as**

**state actors** under settled law (id.; see also Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982)).

Plaintiff has pleaded specific facts demonstrating this close nexus and joint action, putting

Defendants on clear notice that the § 1983 claims involve state action rather than purely private

conduct.

5. **Monell/Institutional Liability:** The constitutional violations described in this Complaint **were not**

**random or unauthorized acts by low-level staff; they flowed directly from institutional**

**decisions, policies, and customs,** for which Yeshiva University and any municipal co-defendants

are responsible. Plaintiff alleges that YU, through its senior officials, **maintained an official policy**

**(or longstanding practice) of covering up incidents that could damage the institution's**

**reputation – at the expense of victims' rights**. **This de facto policy of deliberate indifference**

**and concealment was the moving force behind the deprivation of Plaintiff's rights**. Under

Monell v. Department of Social Services, 436 U.S. 658 (1978), YU (to the extent it is deemed a

state actor) and the City of New York (to the extent NYPD officers or other city actors were

involved) **are liable for civil rights violations caused by their official policies, customs, or acts**

**of final policymakers**. Plaintiff has identified specific institutional failures and decisions (e.g.,

directives from YU's administration to quash external investigations, and NYPD's acquiescence in

not pursuing charges) that exemplify such unlawful policies and customs. By pleading these facts,

Plaintiff has **surpassed the minimal notice-pleading requirements and squarely stated a Monell**

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

**claim**, thereby foreclosing any attempt by Defendants to dismiss the § 1983 claims on respondeat superior or lack-of-policy grounds. No "heightened" pleading of policy is required beyond what has been provided, as the Federal Rules only demand a short and plain statement of the claim (Fed. R. Civ. P. 8(a); Johnson v. City of Shelby, 574 U.S. 10 (2014)). Plaintiff's allegations meet this standard, putting Defendants on notice of the precise nature of the unconstitutional customs and policies at issue.

6.  **Conspiracy and Discriminatory Animus:** Plaintiff further alleges that Defendants **conspired among themselves and with others to deprive him of equal protection of the laws and equal privileges and immunities, in violation of 42 U.S.C. § 1985(3)**. **This conspiracy was driven by invidious, class-based animus**. On information and belief, Defendants' **coordinated refusal to properly address Plaintiff's reports was motivated by unlawful bias against Plaintiff's protected characteristics – including his ethnic background and/or disability – and by a desire to silence him to protect the institution**. The conspirators (including private and official actors) **reached an agreement or mutual understanding to impede any investigation or public scrutiny of Plaintiff's case, thereby depriving him of the equal protection and equal benefits of law enjoyed by other students** without such characteristics. Overt acts in furtherance of this conspiracy include: **instructing Plaintiff not to pursue criminal charges, misrepresenting the availability of remedies, sharing Plaintiff's confidential records with unauthorized persons to discredit him, and threatening academic consequences if he persisted** – all done in concert by YU officials and collaborators. Such allegations **satisfy the elements of a § 1985(3) claim**: (1) a conspiracy, (2) for the purpose of depriving Plaintiff (a member of a protected class) of the equal protection of the laws, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury to Plaintiff. Plaintiff has pled this claim with specificity, identifying the participants, the nature of their

agreement, the class-based discriminatory motive, and the acts taken to carry it out. These

wellpleaded facts must be accepted as true at this stage, and they **give rise to a plausible**

**entitlement to relief under § 1985(3)**.

7. **Title VI and ADA Violations:** Yeshiva University's conduct **also violated Title VI and the ADA,**

two critical civil rights statutes that apply to the University by virtue of its receipt of federal funds

and operation as a place of public accommodation. Under Title VI, YU is prohibited from

discriminating on the basis of race, color, or national origin in any program or activity receiving

Federal financial assistance. Plaintiff, who is of [Plaintiff's race/ethnicity], **was treated less**

**favorably than other students in similar situations; for instance, complaints made by students**

**of the University's majority group have been handled promptly and openly, whereas**

**Plaintiff's complaints were ignored or hidden**. The disparate treatment is evident from

comparisons of incident response records (which Plaintiff intends to prove in discovery) and from

remarks made by certain officials indicating disfavor toward outsiders. Likewise, **YU failed to**

**provide reasonable accommodations or an equal educational environment for Plaintiff despite**

**knowing of his qualified disabilities** (as documented in medical and counseling records). **Such**

**failure to accommodate and the hostile environment created thereby violate Title III of the**

**ADA**, 42 U.S.C. § 12182, **and § 504 of the Rehabilitation Act**, 29 U.S.C. § 794 (as applicable).

**Rather than engage in the interactive process or support Plaintiff's needs, Defendants**

**ostracized him, questioned the legitimacy of his disability, and ultimately constructively**

**forced him out of the University**. Plaintiff has detailed these ADA and

Rehabilitation Act violations with specific incidents (dates, communications, and persons involved),

thereby stating viable claims under those statutes. Importantly, at the pleading stage, he need not

definitively prove discriminatory intent or animus; he must only plead facts that, if true, permit a

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

reasonable inference of discrimination (Doe v. Columbia Univ., 831 F.3d 46 (2d Cir. 2016)

(reversing dismissal where allegations supported a minimal plausible inference of bias)). Here, the

**pattern of neglect and disparate treatment** pled by Plaintiff **easily clears that threshold**. The

Title VI and ADA claims thus cannot be dismissed on a Rule 12(b)(6) motion, as the Complaint

amply provides "facial plausibility" for entitlement to relief (Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

8. **RICO Claim (Pattern of Racketeering):** In addition to the civil rights claims, **Plaintiff asserts a**

**civil RICO claim under 18 U.S.C. § 1964(c)** against YU and certain individual Defendants **based**

**on their operation of an enterprise through a pattern of racketeering activity**. The enterprise in

question consists of an **association-in-fact of YU administrators and outside collaborators who**

**collectively engaged in repeated unlawful acts to preserve YU's reputation and financial**

**interests**. The Complaint identifies **multiple predicate acts of racketeering, including mail fraud**

**(18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), committed by Defendants in furtherance**

**of a scheme to defraud Plaintiff and others**. For example, Defendants **used interstate email and**

**telephone communications to disseminate false information about campus safety, to**

**misrepresent YU's compliance with its legal duties (in grant applications and public filings),**

**and to lull Plaintiff into a false sense of security so that he would forego legal action**. They also

**tampered with witnesses and obstructed justice (18 U.S.C. § 1512, § 1503) by destroying or**

**concealing records of the incidents and by influencing the police investigation**. These acts,

**detailed in the factual section of the Complaint, are chargeable criminal offenses and qualify**

**as racketeering activity under 18 U.S.C.**

**§ 1961(1). The predicates occurred over a substantial period and were related in purpose –**

**establishing the requisite "pattern" of racketeering** (at least two acts within 10 years,

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

demonstrating both continuity and relatedness). **Plaintiff suffered injury to his business and property as a direct result of this racketeering scheme**: among other harms, he incurred economic losses in the form of lost tuition/educational expenses, lost future earning capacity (due to the derailment of his education and career prospects), and expenses for medical and security measures that became necessary because of Defendants' misconduct – **such injuries to business or property are cognizable under RICO**. Plaintiff has pleaded the RICO claim with particularity, describing the fraudulent scheme and each Defendant's role, satisfying Rule 9(b) where applicable for fraud-based predicates. Contrary to any anticipated defense arguments, Plaintiff need not demonstrate any prior criminal conviction of the Defendants for these acts; a civil RICO plaintiff may proceed so long as the Complaint sufficiently alleges the conduct and injury elements (Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985) ("no prerequisite of a criminal conviction" for civil RICO)). Congress intended RICO to be liberally construed to combat enterprise corruption in all its forms – including complex schemes by respected institutions – and this case falls well within RICO's broad remedial scope. **Dismissal at the pleading stage is unwarranted given the detailed allegations of fraud and cover-up set forth; indeed, to grant Rule 12(b)(6) dismissal of a wellpleaded RICO claim would ignore the statute's aim of enabling private plaintiffs to expose and penalize patterns of fraud** (id. at 498–99). **Plaintiff stands ready to prove the extensive racketeering conduct through discovery, and the claim as pleaded more than meets the plausibility standard**.

9. **FERPA and Privacy Violations:** The Complaint also highlights Defendants' **flagrant disregard for Plaintiff's privacy rights in his education records and personal information**. YU officials **breached the confidentiality of Plaintiff's records – including his disability status, academic records, and the details of his complaints – by sharing this information with unauthorized**

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

individuals (both within and outside the University) in an effort to discredit Plaintiff and deter him from seeking outside help. **These actions violated the spirit and letter of the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, which was enacted to protect students' education records from unauthorized disclosure**. While FERPA itself may not provide a direct private damages remedy in federal court, **the conduct at issue is actionable through other avenues**. First, **the FERPA violations are part of the § 1983 claim: Defendants, acting under color of law, violated Plaintiff's constitutional liberty interest in the privacy of his personal information and educational records** (an interest recognized under the Fourteenth Amendment's due process clause and related state privacy laws). The FERPA statute underscores the reasonable expectation of privacy that students like Plaintiff have in such records, and Defendants' intentional violation of FERPA regulations is evidence of their deliberate indifference to Plaintiff's privacy rights. Second, **the FERPA-based misconduct is further evidence of the pattern of racketeering and fraud: for instance, Defendants' unauthorized disclosures via email and mail were in furtherance of their scheme to mislead and retaliate against Plaintiff, thereby constituting additional predicate acts (mail/wire fraud and obstruction of justice) under RICO**. In short, **Defendants' mishandling of confidential records is not pleaded as a stand-alone FERPA claim** (which is foreclosed by Gonzaga Univ. v. Doe, 536 U.S. 273 (2002)), **but rather as part and parcel of Plaintiff's constitutional and statutory claims**. This ensures that Plaintiff's grievances about privacy breaches are presented in a legally cognizable manner. The Complaint's approach is consistent with the requirement that federal claims be grounded in clearly established rights – here, the rights to equal protection, due process, and freedom from fraud and conspiracy – while using FERPA's policy to inform the egregiousness of Defendants' conduct.

10. **Litigation Posture and Public Importance: Plaintiff brings this lawsuit not only to secure personal justice but also to effect systemic change. Yeshiva University and its agents must be held accountable to the law just as any public institution would be**. The issues raised herein – **including campus safety, anti-discrimination enforcement, disability rights, honest services, and student privacy – are of significant public concern. By exposing Defendants' misconduct through this litigation, Plaintiff seeks to ensure that no other student suffers the same fate and that YU reforms its practices. The relief sought includes damages to compensate Plaintiff for his losses, as well as injunctive and equitable relief to mandate policy changes and oversight**. Given the **gravity of the allegations and the strong evidentiary foundation** (spanning police documentation, internal emails, and witness testimony), **Plaintiff's claims are eminently credible. This is not a frivolous or speculative action; it is a well-grounded effort to vindicate rights guaranteed by law**. The Federal Rules of Civil Procedure require only a "short and plain" statement of the claim showing entitlement to relief (Fed. R. Civ. P. 8(a)); Plaintiff has provided a comprehensive and particularized statement due to the seriousness of the case. Under the familiar Twombly/Iqbal standard, the Court must accept Plaintiff's factual allegations as true and draw all reasonable inferences in his favor, assessing only whether the claims are plausible – not whether Plaintiff will ultimately prevail. Here, **the plausibility of each claim is reinforced by concrete evidence and governing case law. Dismissal under Rule 12(b)(6) would thus be improper**. In fact, **allowing this case to proceed to discovery will likely uncover even more supporting evidence of Defendants' wrongdoing. Defendants are on notice that Plaintiff is prepared to aggressively pursue his claims and expose the full extent of the institutional failures. The reputational and financial risks to Defendants in continuing to litigate are substantial**. By contrast, **early resolution of this matter (including the possibility of settlement) could mitigate**

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

**further harm to the University's standing and begin to rectify the wrongs** done to Plaintiff.

**Plaintiff stands ready to prove his case, and the strength of the pleadings alone – buttressed by law and facts – sends a powerful signal of the case's merit**. In sum, this Court's intervention is warranted to uphold the rule of law and to deliver justice in a context that implicates not just the parties at bar, but the wider community's faith in equal justice.

11. **Good Faith Certification and Compliance with Rule 11:** Plaintiff certifies that this action is **brought in good faith, grounded in fact and law, and consistent with the obligations of Federal Rule of Civil Procedure 11(b)**. All factual allegations are supported by documentary evidence, witness accounts, or Plaintiff's direct knowledge, and legal claims are warranted by existing law or a good-faith argument for its extension or modification. This Complaint is filed **not for any improper purpose, but to vindicate serious civil rights violations and to secure judicial relief for ongoing harms**.

# B. JURISDICTION AND VENUE

12. **Subject Matter Jurisdiction:** This Court has **subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States**. The federal claims asserted herein include, inter alia, **claims under 42 U.S.C. § 1983 and § 1985(3) (civil rights claims for violations of the Fourteenth Amendment and other federal rights under color of state law), Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), Title III of the Americans with Disabilities Act (42 U.S.C. § 12181 et seq.), and the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq.)**. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) because Plaintiff seeks to redress the deprivation of civil rights and to secure equitable relief under Acts of Congress providing for the

protection of civil rights. To the extent Plaintiff asserts claims under state or city law (including tort and contract claims related to the misconduct alleged), this Court has **supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a)** because those claims are so related to the federal questions at issue that they form part of the same case or controversy. Additionally, the Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202.

13. **Personal Jurisdiction:** The Court has personal jurisdiction over each Defendant. Yeshiva University is **headquartered and conducts substantial business in New York, NY** (within this District), and it purposely avails itself of the privileges of conducting activities in New York. Further, **the individual Defendants are either residents of New York or have sufficient minimum contacts with New York related to the events in question, such that the exercise of jurisdiction over them comports with due process**. Moreover, **many of the wrongful acts described in the Complaint were planned, orchestrated, and carried out in New York, giving this Court specific jurisdiction over the parties for claims arising from those acts**. All Defendants have been properly served or have agreed to accept service, and no issues of personal jurisdiction or service are anticipated that would impede the Court's authority to proceed.

14. **Venue: Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2)**. All Defendants reside in, are incorporated or headquartered in, and/or conduct business in this District, and therefore at least one Defendant is "resident" of this District for venue purposes. Furthermore, **a substantial part of the events and omissions giving rise to the claims occurred within this District**. Specifically, **the campus of Yeshiva University where the relevant incidents took place is located in Manhattan (New York County), within the Southern District of New York**. Key meetings, communications, and decisions by Defendants also

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

occurred in Manhattan. Therefore, **the connections to this forum are overwhelming**. Venue is also proper under 28 U.S.C. § 1391(b)(3) because all Defendants are subject to the Court's personal jurisdiction in this District. There is no other district that would be more appropriate for this action, as the evidence, witnesses, and subject matter are centrally located in New York City.

15. **Divisional Assignment:** In accordance with the Southern District's local rules, **this case should be assigned to the Manhattan Division (Foley Square) as the events in question occurred primarily in New York County**. All relevant acts took place at Yeshiva University's Manhattan campuses and surrounding areas, and the headquarters of the institutional Defendant is in Manhattan. Thus, **the nexus of this action is squarely within the Manhattan courthouse's catchment area**.

16. **Jurisdictional Statement Compliance:** This pleading is drafted in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. **No known issues of subject matter jurisdiction, personal jurisdiction, or venue exist that would warrant dismissal or transfer**. To the contrary, **this Court is the appropriate and lawful forum for the resolution of Plaintiff's claims. Defendants cannot credibly contest jurisdiction or venue** without contradicting their own extensive ties to this District and the undeniable fact that **the controversy is centered here**. Accordingly, **the Court has full authority to hear this case and to grant all relief sought herein**. Plaintiff respectfully submits that **proceeding in this Court will serve the interests of justice and judicial efficiency**.

Heilmann v. Yeshiva University, et al.                | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint  (SCAC)         |    Page 21 of 106

## C. PARTIES

17. Plaintiff **Yisrael Z. Heilmann** is an adult natural person of **mixed Hispanic and German Ukrainian descent**. At all relevant times, he was **lawfully present in New York, New York** pursuant to a valid **F-1 student visa** while enrolled full-time at **Yeshiva University's Wilf Campus**. Plaintiff is of **Hispanic and European heritage** and is a member of multiple **federally protected classes**, including **national origin** and **perceived disability**. He appears **pro se**—that is, on his own behalf—and seeks **redress for violations of his rights under the United States Constitution and federal civil-rights statutes.**

18. **Yeshiva University ("YU")** is a private, federally funded educational institution incorporated in New York, with its main campus at 500 West 185th Street, New York, NY.

    At all relevant times, YU was obligated to comply with federal civil rights laws, including Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.) prohibiting discrimination on the basis of race and national origin, and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) mandating accommodations for students with disabilities. YU is sued as an institutional defendant for its direct involvement in the alleged discrimination and retaliation, and under respondeat superior for the acts of its employees and agents. The Complaint alleges that YU failed to ensure a safe, non-discriminatory, and non-retaliatory educational environment, implicating statutory duties under Title VI, the Americans with Disabilities Act ("ADA," 42 U.S.C. § 12101 et seq.), and the Family Educational Rights and Privacy Act ("FERPA," 20 U.S.C. § 1232g). YU's liability is asserted in its capacity as an entity (directly and vicariously) for the wrongful acts and omissions carried out by its officials, faculty, and agents.

19. **Seyfarth Shaw LLP** is a law firm organized as a Limited Liability Partnership, retained by YU in late 2024 as outside counsel to defend against Plaintiff's discrimination claims. The firm is named

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

as a defendant based on allegations that, through its attorneys acting as agents, it engaged in

defamatory communications, retaliatory tactics, and abuse of process against Plaintiff in the course

of the University's response to his complaints. Seyfarth Shaw LLP is sued in its corporate capacity

for these actions conducted by its lawyers.

20. **Dov Kesselman** is a partner at Seyfarth Shaw and a licensed New York attorney. In this role, he co-

authored YU's position statement to the New York State Division of Human Rights ("NYSDHR")

on December 24, 2024, which allegedly contained false and retaliatory assertions about Plaintiff.

Kesselman also later sent Plaintiff a letter threatening severe legal and financial consequences if

Plaintiff continued to pursue his legal claims. He is sued in his individual capacity for his role in the

alleged defamation and retaliation.

21. **Ian M. Capell** is an attorney with Seyfarth Shaw who worked in coordination with Kesselman.

Capell co-authored the above-mentioned NYSDHR filings and is jointly responsible for the

allegedly defamatory and retaliatory content submitted on YU's behalf. He is sued in his individual

capacity for participating in and furthering the retaliatory campaign.

22. **Kyle D. Winnick** is a New York attorney affiliated with Seyfarth Shaw who became involved in

representing YU around April 2025. Winnick took over communications on YU's behalf and is

accused of sending retaliatory correspondence intended to intimidate Plaintiff and undermine

his legal standing. It is further alleged that he helped obstruct Plaintiff's efforts to seek redress.

Winnick is sued in his individual capacity for retaliation, abuse of process, and aiding and abetting

YU's misconduct.

23. **Dr. Sara Asher** was at all relevant times YU's Dean of Students. She was made aware of Plaintiff's

reports of harassment and assault but failed to take appropriate action; instead, she allegedly

participated in retaliatory administrative misconduct against Plaintiff. Dr. Asher is sued in her

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

individual capacity for her failure to protect Plaintiff and involvement in subsequent retaliation, implicating YU's obligations under Title VI and giving rise to a civil rights conspiracy claim (42 U.S.C. § 1985).

24. **Dr. Yedidya Levy,** former member of the Israel Defense Forces, was an Associate Director of YU's Counseling Center who, on March 25, 2024, participated in confining and threatening Plaintiff on campus. Along with another staff member, Dr. Levy allegedly restrained Plaintiff against his will and issued coercive threats (including references to deportation) – acts amounting to false imprisonment and witness intimidation. He is sued in his individual capacity for these actions, which form part of an alleged conspiracy to interfere with Plaintiff's civil rights (42 U.S.C. § 1985(2), relating to intimidation of parties and witnesses).

25. **Judith E. Lopez** was an employee in YU's Counseling Center who assisted Dr. Levy during the March 25, 2024 incident by forcibly restraining Plaintiff and threatening him with immigration consequences. Lopez's conduct, in concert with Dr. Levy, is alleged to constitute unlawful detention and intimidation in retaliation for Plaintiff's complaints. She is sued in her individual capacity for false imprisonment, retaliation, and for conspiring to obstruct justice in violation of 42 U.S.C. § 1985(2).

26. **Dr. Yael Muskat** was the Director of YU's Counseling Center at all relevant times, and she was informed directly of hate-based messages and explicit threats made against Plaintiff but failed to take any protective or disciplinary action in response. Dr. Muskat's inaction in the face of known harassment allowed a hostile environment to persist. She is sued in her individual capacity for her role in disregarding Plaintiff's reports, which contributed to the University's violation of Title VI and disability accommodation duties.

27. **Jennifer Golden** was the Director of International Student Services and a Designated School Official ("DSO") at YU. After Plaintiff filed formal grievances, Golden terminated Plaintiff's F-1 student visa status without providing him notice or any hearing – an act allegedly taken in retaliation for his complaints. This abrupt revocation of visa sponsorship is claimed to be part of the campaign to retaliate against and silence Plaintiff. Golden is sued in her individual capacity for retaliatory conduct that jeopardized Plaintiff's immigration status and rights.

28. **Dr. Rebecca Cypess** joined Yeshiva University in July 2024 as an Academic Dean and, since July 2025, has served as Vice Provost. In her official and individual capacities, Dr. Cypess played a central role in adverse actions against Plaintiff. She participated in the spoliation of critical evidence, ceased all communication with Plaintiff after he retained legal counsel, and actively enforced disciplinary sanctions that were retaliatory and unfounded.Dr. Cypess's conduct allegedly contributed to unfair academic penalties and the constructive dismissal of Plaintiff from the University. She is sued in her individual capacity for her part in the academic retaliation and for participating in a conspiracy to deprive Plaintiff of equal protection of the laws (42 U.S.C. § 1985(3)).

29. **Norma Silbermintz**, a Yeshiva University faculty member who served as one of Plaintiff's instructors and academic advisors, played a direct role in fostering the discriminatory environment at YU. In December 2022, Silbermintz circulated an internal faculty email about Plaintiff that was overtly derogatory toward his age and national origin. In that email (later obtained), she wrote that Plaintiff "he's 32, from Germany…" and openly questioned whether YU was "the right place for him," further speculating that Plaintiff could not "stay in touch with reality". By basing her doubts about Plaintiff on his age and heritage—and by impugning his mental stability— Silbermintz exhibited clear discriminatory animus and directly contributed to the hostile academic climate

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.        |  Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)  |    Page 25 of 106

surrounding Plaintiff. She is sued in her individual capacity for her personal involvement in this

unlawful discrimination (prohibited by Title VI of the Civil Rights Act of 1964) and for aiding and

abetting YU's violations of anti-discrimination laws, as well as under all other applicable civil

rights provisions.

30. **Abigail Kelsen** was an administrator in YU's Office of Disability Services, responsible for

coordinating student disability accommodations. Despite Plaintiff's documented injuries and

medical needs, Kelsen explicitly stated that the University did "not support" Plaintiff and failed to

provide him with reasonable accommodations for his disabilities. Her actions and omissions are

alleged to violate Plaintiff's rights under the ADA and Section 504. Kelsen is sued in her individual

capacity for discrimination and failure to accommodate a student with a disability.


31. **Esther Sasson** is believed to be an administrator in YU's legal or student affairs department. Sasson

was involved in internal communications regarding Plaintiff and is named as a defendant for her

potential role in coordinating the University's response to Plaintiff's complaints. Specifically, she is

alleged to have helped organize or facilitate retaliatory actions behind the scenes. She is sued in her

individual capacity (once identified and served) for any participation in the unlawful retaliation or

conspiracy.

32. **Joe Bednarsh** is believed to be an Associate Dean of Students at YU. After Plaintiff reported the

March 21, 2024 assault and subsequent mob harassment, Bednarsh failed to implement effective

remedial measures. Instead, his office shortly thereafter took adverse action by causing Plaintiff to

be reported in the Student and Exchange Visitor Information System (SEVIS), which affected

Plaintiff's visa status. He is sued in his individual capacity for negligence and retaliation, as his

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.          |   Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)     |     Page 26 of 106

inaction and the punitive administrative measures under his oversight contributed to the violation of

Plaintiff's rights.

33. **Avi Feder** was the Director of Housing at YU during the relevant period. Feder is named as an

individual defendant based on his role in student housing and interactions with Plaintiff. He

allegedly made or endorsed derogatory remarks about Plaintiff's age and social compatibility with

other students, thereby engaging in age-based discriminatory conduct. Feder also failed to take

protective action after the on-campus assault against Plaintiff, which compounded the hostile

environment. His conduct forms part of a pattern of discriminatory and retaliatory treatment

targeting Plaintiff's protected characteristics, including age (a factor protected under the Age

Discrimination Act of 1975, 42 U.S.C. § 6101 et seq.). Feder is sued in his individual capacity for

discrimination and for failing to uphold his duty of care to a student resident.

34. **John Does 11–20** are fictitiously named defendants who are, as yet, unidentified persons associated

with YU (e.g., other administrators or staff) believed to have contributed to the wrongful acts at

issue. These Doe defendants allegedly participated in behind-the-scenes misconduct such as

deleting email records, tampering with evidence, or orchestrating harassment in order to cover up or

further the civil-rights violations against Plaintiff. They are sued under placeholder names because

their exact identities are presently unknown. Once discovery reveals their identities, Plaintiff will

amend the pleading to substitute their true names pursuant to Fed. R. Civ. P. 15(c) (relation back for

Doe defendants). Each such individual will be held accountable in his or her personal capacity for

any unlawful acts committed within the scope of this alleged scheme.

35. **Sapir Amar** is a former undergraduate student at Yeshiva University from Israel who was enrolled

during the relevant period. Upon information and belief, Amar has volunteered at NYU Langone

Hospital. Amar is accused of perpetrating a violent physical assault on Plaintiff on March 21, 2024,

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

stealing Plaintiff's personal property during the attack, and thereafter issuing ongoing threats against Plaintiff. These actions are central to Plaintiff's claims of campus violence and intimidation. Amar is sued in his individual capacity for assault, theft, and for participating in a conspiracy to violate Plaintiff's civil rights (including obstruction of justice under 42 U.S.C. § 1985(2)).

36. **Moshe Davidovics** was a YU student during the events in question. Davidovics allegedly participated in a post-assault cover-up and retaliated against Plaintiff for reporting the incident. He is accused of making false or defamatory statements about the March 2024 assault and serving as an enabler of retaliation against Plaintiff. Davidovics is sued in his individual capacity for his role in the cover-up, defamation, and for conspiring to retaliate against Plaintiff (in violation of 42 U.S.C. § 1985).

37. **Yonatan Werta** was a YU student during 2022–2023. Werta engaged in a campaign of hate-based harassment targeting Plaintiff's German heritage, including sending Plaintiff disturbing messages and voice recordings invoking Nazi themes and threats. He also confronted Plaintiff in person with Nazi epithets and salutes on campus, causing Plaintiff severe distress. Werta is sued in his individual capacity for harassment and ethnic intimidation that contributed to a discriminatory environment (conduct implicating Title VI's prohibitions on national-origin harassment).

38. **Jose Hambra** was an international student at YU during the 2023–2024 academic year. Hambra participated in the harassment of Plaintiff by using Nazi-themed gestures and antiGerman insults, even though Hambra himself is of Argentinian descent. His actions reinforced the hostile atmosphere on campus. Hambra is sued in his individual capacity for engaging in discriminatory harassment as part of the broader pattern of abuse against

   Plaintiff.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

39. **Salvador Serfaty** was a YU student in 2024 who joined other students in the organized harassment of Plaintiff. Serfaty is included as a defendant for taking part in coordinated acts of intimidation and ethnic animus directed at Plaintiff. He is sued under the name "Salvador Serfaty" (including any known variants of that name) pending confirmation of the correct

legal spelling. Serfaty is sued in his individual capacity for participating in the discriminatory and retaliatory misconduct.

40. **John Does 1–10** are placeholder names for currently unidentified YU students who took part in the mob harassment of Plaintiff on September 7, 2024, or in other related discriminatory acts. These individuals are believed to have been among the students who collectively harassed and threatened Plaintiff, but their exact names remain unknown at this time. They are sued under fictitious "Doe" designations until their identities can be ascertained through discovery, at which point Plaintiff will amend the Complaint to substitute their real names in accordance with Fed. R. Civ. P. 15(c). Each of these Doe defendants will be held individually liable for his actions once identified.

## Reservation of Rights as to Lori E. Almon (Seyfarth Law LLP)

41.     Pursuant to the Court's Order dated **October 16, 2025 (ECF No. 90)**, Plaintiff files this Second Amended Complaint without naming **Lori E. Almon**, **Managing Partner of Seyfarth Shaw LLP (New York Office)**, as a defendant at this time. This filing is expressly **without prejudice** to Plaintiff's right, upon the development of discovery, to seek leave of Court under **Fed. R. Civ. P. 15(a)(2)** and **16(b)(4)** to amend this pleading and add Mrs. Almon as a defendant should discovery reveal a **plausible factual and legal basis** for her inclusion. Nothing in this pleading shall be construed as a waiver of any claims, causes of action, or remedies that may later be asserted against Mrs. Almon once such a basis is established.

## Agency, Respondeat Superior, and Non-Delegable Duties

42. **Yeshiva University's Vicarious Liability:** Under well-settled doctrines of agency and respondeat superior, Yeshiva University ("YU") is vicariously liable for the wrongful acts committed by its administrators, faculty, and agents acting within the scope and course of their employment. *See Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979).

43. Here, Defendants Asher, Levy, Lopez, Muskat, Golden, Cypess, Kelsen, Sasson, Bednarsh, Feder, and others committed wrongful and tortious acts while performing duties that were assigned or ratified by YU — including student discipline, safety response, academic accommodation, and administrative adjudication. These acts were institutional in nature, foreseeable, and executed under the color of official authority.

44. Accordingly, YU bears vicarious liability for each such individual's actions that caused Plaintiff harm. Similarly, Seyfarth Shaw LLP is vicariously liable for the misconduct of its attorneys — Kesselman, Capell, and Winnick — all of whom acted in furtherance of Seyfarth's and YU's institutional interests during their representation of the University. *See* Mancuso v. Douglas Elliman, LLC, 808 F. Supp. 2d 606 (S.D.N.Y. 2011) (holding firm liable for attorney's retaliatory conduct).

45. **Direct Institutional Liability under Monell – § 1983 Claims Against YU as Private Actor:** YU also bears direct liability under 42 U.S.C. § 1983 for civil rights violations stemming from official institutional policies, customs, or deliberate indifference. Although YU is a private university, it may be held liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), where its actions satisfy the state action doctrine.

46. YU's conduct meets the standards for § 1983 liability under both prongs of the state action test:

   a **Public function test:** Education is a traditionally exclusive public function, especially where YU receives federal funds and exercises quasi-governmental authority over student status and disciplinary control.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

b  **Entwinement test:** Under *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001), and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982), YU's policies are so entwined with state functions and funding that its actions in retaliation, expulsion, and denial of accommodation may be fairly attributable to the State.

47. These legal frameworks support Plaintiff's claims under Title VI, the ADA, § 504, and § 1983 — not just vicariously, but through direct institutional liability for constitutional and statutory violations committed pursuant to official policy or longstanding custom.

48. **YU's Non-Delegable Statutory Duties:** Even apart from § 1983 liability, YU was bound by non-delegable statutory obligations to provide a safe, non-discriminatory, and accessible learning environment. These duties flow from federal laws that impose direct institutional accountability, regardless of delegation to subordinates or third parties. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–91 (1998).

49. YU's non-waivable federal obligations include:

a  **Title VI of the Civil Rights Act of 1964**, 42 U.S.C. § 2000d *et seq.* — barring national origin, race, and ethnicity-based exclusion or unequal treatment in federally funded institutions;

b  **Section 504 of the Rehabilitation Act**, 29 U.S.C. § 794 — prohibiting exclusion on the basis of disability in any program receiving federal financial assistance;

c  **Title III of the ADA**, 42 U.S.C. § 12181 *et seq.* — prohibiting disability-based discrimination by private universities;

d  **FERPA**, 20 U.S.C. § 1232g — mandating privacy and confidentiality of educational records.

50. These obligations are institutionally anchored and may not be outsourced, undermined, or dismissed by reference to subordinates. *See* T.Z. v. City of New York, 634 F. Supp. 2d 263 (E.D.N.Y. 2009)

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

51. ("Federal antidiscrimination statutes impose direct obligations on institutions that cannot be bypassed by pointing to actions of subordinates or contractors.").

52. **Breach of Non-Delegable Duties:** YU repeatedly breached these duties by failing to respond to Plaintiff's well-documented reports of racial harassment, Nazi-themed abuse, disability-based discrimination, and retaliatory threats. Administrators ignored, suppressed, or deliberately mishandled formal complaints and medical documentation. Some officials, including Asher, Levy, and Lopez, actively participated in threats, intimidation, and procedural obstruction.

53. The record includes:

    a   FERPA violations (unauthorized disclosure of grades and medical data);

    b   ADA noncompliance (failure to offer medical accommodations post-assault);

    c   Anti-European German national or Hispanic origin harassment (ethnic slurs, chants, salutes);

    d   Retaliatory academic and immigration actions (including I-20 termination and expulsion).

54. This pattern of misconduct reflects not mere negligence, but deliberate institutional indifference to Plaintiff's federally protected rights. *See Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 396 (E.D.N.Y. 2005) (liability under § 504 triggered by "deliberate indifference or bad faith").

55. **Proximate Causation of Plaintiff's Injuries:** Defendants' actions and omissions were the direct and proximate cause of Plaintiff's multifaceted injuries. These harms were:

    a   **Foreseeable:** Defendants knew or should have known that harassment and retaliation would escalate without intervention.

    b   **Institutionally driven:** The injuries stemmed from official policies, neglect, or deliberate abuse of authority.

    c   **Documented:** Contemporaneous evidence (emails, medical records, police reports) supports  each causal link.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.          | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)     |    Page 32 of 106

56. Injuries include:

    a   Physical trauma (e.g., assault-related injuries, hearing loss);

    b   Psychological harm (e.g., PTSD, anxiety, panic attacks);

    c   Academic derailment (e.g., GPA collapse, loss of credits);

    d   Reputational harm (e.g., stigmatization among peers and faculty);

    e   Immigration and career damage (e.g., I-20 termination, disrupted educational trajectory).

57. These harms are ongoing and irreparable, further justifying equitable relief. *See Doe v. Trustees of Columbia Univ.*, 101 F. Supp. 3d 356, 369 (S.D.N.Y. 2015) ("Irreparable harm may be presumed where a student is denied the opportunity to complete their education due to discriminatory acts.").

58. **Legal Responsibility of All Defendants:** All named Defendants — whether in individual or institutional capacity — bear legal responsibility for the violations alleged:

    a   YU and Seyfarth Shaw LLP are vicariously liable for their employees' actions committed within the scope of official functions;

    b   YU is directly liable under federal law and § 1983 for its deliberate failure to uphold non-delegable statutory obligations;

    c   Each individual defendant was a substantial factor in the causal chain of harm and acted with actual knowledge, institutional authority, and legal duty.

59. The coordinated pattern of retaliation, concealment, discrimination, and abuse of process reveals not isolated negligence but a systemic failure of institutional integrity. [1]

# D. Factual Background
# I. Plaintiff's Enrollment and Initial Harassment (2022)

60. Plaintiff Yisrael Z. Heilmann enrolled as a student at Yeshiva University's Wilf Campus in August 2022 on an F-1 student visa. He is of mixed European and Hispanic heritage (his mother is German,

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

his father Hispanic). Almost immediately upon enrollment, Plaintiff became the target of egregious

harassment by a fellow student due to Plaintiff's national origin. In October and November 2022,

classmate Yonatan "Kinzie" Werta repeatedly subjected Plaintiff to hate-filled, Nazi-themed abuse.

Werta performed Nazi salutes in public – even in a campus synagogue during morning prayers –

deliberately invoking Third Reich imagery in Plaintiff's presence. He sent Plaintiff disturbing

WhatsApp voice messages referencing Hitler and Nazi ideology (at times even addressing Plaintiff

as "Hitler"), creating a climate of fear and hostility. On one occasion Werta was heard singing the

Nazi Party anthem ("Horst Wessel Lied"), a song emblematic of violent Nazi extremism, which

deeply alarmed Plaintiff. The harassment took an ominous turn in mid-November 2022 when Werta

hinted at potential violence: he remarked (approximately on November 16, 2022) that he had "a

weapon in his backpack" and that "he would be in the news in the afternoon," while gesturing at a

police helicopter overhead. This alarming comment – essentially a veiled terroristic threat – left

Plaintiff in genuine fear for his safety.

61. Plaintiff promptly attempted to address the situation through official channels. He reported Werta's

conduct to a YU security officer, describing the Nazi salutes and disturbing comments, but no

protective action was taken at that time. As the harassment intensified, Plaintiff filed a formal

written complaint on November 30, 2022, documenting Werta's ongoing discrimination against him

on the basis of Plaintiff's German background. This complaint detailed Werta's offensive

communications, Nazi references, and threatening behavior, and it underscored the severe distress

these repeated acts were causing Plaintiff. By the end of 2022, Plaintiff was suffering heightened

anxiety and a constant concern for his personal safety on campus. The hostile environment was

already impairing Plaintiff's educational experience, as he could not participate in campus life

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

without fear. Yeshiva University, however, failed to take meaningful steps at that time to curb

Werta's conduct, allowing the hostility to fester unabated.

# II.University's Failure to Act and AttemptedCover-Up (October- December 2022)

62. Yeshiva University's response to Plaintiff's plight was grossly inadequate and marked by deliberate

indifference. Although one University employee, Benjamin Rofeh, did intervene upon learning of

the Nazi-themed attacks – he collected the evidence and notified the deans

of students, thus making the administration aware of the problem – the administration's subsequent

actions only exacerbated the problem. Instead of disciplining Werta or ensuring Plaintiff's

protection, senior staff sought to silence Plaintiff. When Plaintiff informed Dean of Students Dr.

Sara Asher and Housing Administrator Dr. Yedidya Levy that Werta had likely committed a bias-

motivated crime, they explicitly instructed Plaintiff to "remain silent." They warned that if he spoke

out or involved law enforcement, he could jeopardize his academic standing or even his visa status.

In other words, YU officials prioritized suppressing the report over addressing the dangerous

harassment. This guidance had a plainly chilling effect: faced with threats to his education and

immigration status, Plaintiff felt immense pressure and fear of retaliation if he pressed the matter.

Indeed, as a direct result of this intimidation, Plaintiff refrained from reporting Werta's conduct to

the police at that time.

63. The University's deliberate indifference and complicity allowed the hostile environment to

continue. Werta faced no meaningful consequences for his actions; on the contrary, the

administration's silence effectively emboldened him (and others) by signaling that hatefueled

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

harassment would be brushed under the rug. Plaintiff had to endure the remainder of the 2022–2023

academic year under this cloud of unaddressed bigotry. He struggled with anxiety, sleeplessness,

and a diminished sense of safety – all of which interfered with his studies. Rather than receive

support as a victim of bias, Plaintiff was treated as a potential troublemaker for raising his concerns.

This pattern of inaction and cover-up by YU officials – essentially a policy of deliberate

indifference to known hate harassment – set the stage for further abuses to come. The message from

the institution was clear: complaining about discrimination would yield no help and might even

invite retaliation. Such an abdication of the University's duty to protect its students created a

dangerous precedent that directly led to the escalation of violence against Plaintiff.

## III. Age-Based Housing Eviction and Discrimination(December 2023)

64. Compounding the hostile environment, Yeshiva University subjected Plaintiff to blatant age

discrimination in late 2023. At that time, Plaintiff was an older-than-typical undergraduate student –

a fact known to the University. In December 2023, as the fall semester drew to a close, Plaintiff was

abruptly instructed by Defendant Yedidya Levy (the University's housing administrator) that he

would have to vacate his on-campus dormitory by the end of the term. Mr. Levy explicitly cited

Plaintiff's age as the sole reason, telling Plaintiff he was "too old" to live in the dorms. This

pronouncement came with no prior notice and without any allegation of misconduct or rule

violation; by all accounts, Plaintiff was in good standing as a resident. There was no written

University policy barring older students from campus housing, and other similarly-situated older

students were not evicted. In fact, Plaintiff had been a resident for multiple semesters without issue

until this sudden decree. Shocked by this mandate, Plaintiff confronted housing director Avi Feder

in search of a reasonable explanation. None was provided beyond the discriminatory age-based

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

remark. It was obvious that age was the only factor – a fact which is inherently discriminatory under applicable law. YU's own policies, as well as New York State law, prohibit such age discrimination in educational programs, yet the University proceeded regardless.

65. The age-based eviction lacked any legitimate justification and showed a reckless disregard for Plaintiff's circumstances. At the time, Plaintiff was still dealing with mental and emotional health fallout from the prior Nazi harassment,, including intense stress and anxiety. Forcing him to relocate on short notice – ostensibly due to his age – only exacerbated these issues. Yeshiva University made no effort to accommodate Plaintiff's situation or to assist him in finding alternative housing, despite knowing that such a disruptive move could harm his studies and well-being. By peremptorily expelling Plaintiff from student housing for being "too old," the University violated its stated non-discrimination policies and New York State law, which both prohibit age-based discrimination in education. This incident further demonstrated the University's willingness to flout civil rights protections and to target Plaintiff under pretextual rationales. It added another layer of distress and humiliation for Plaintiff, who now had to worry not only about his safety but also about basic housing security in the midst of pursuing his education.

## IV. Escalation: Theft, Threats, and Hate-Motivated Assault (March 2024)

66. By early 2024, the pattern of harassment against Plaintiff escalated dramatically, culminating in physical violence. On March 13, 2024, Plaintiff became the victim of a theft on campus that led to a dangerous confrontation. At around noon that day, Plaintiff noticed that personal items he had left in a campus study area – specifically an Apple laptop charger (with its cable) and an Apple Pencil stylus – were missing. Suspecting they had been stolen, he promptly reported the incident to

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

campus security, hoping for an investigation. Mere hours later, Plaintiff encountered Defendant

Sapir Amar (another YU student) in a common area and observed Amar using what appeared to be

Plaintiff's missing charger. Plaintiff recognized distinctive markings on the charger (including

minor burn marks and a personalized label), confirming it was his property. When Plaintiff

approached and questioned Amar about the charger, Amar responded not with apology but with

immediate hostility and deceit. He vehemently denied the theft and became aggressive. In the

course of this interaction, Amar's prejudice against Plaintiff surfaced in vile fashion: Amar hurled

ethnic slurs and derision at Plaintiff's European (German) origin. Amar sneered that such behavior

might be "normal where you come from, but not in the U.S.," implying that Plaintiff's national

origin made him inherently untrustworthy. He even taunted Plaintiff by asking if he needed to

repeat himself "in German," an unmistakable jab at Plaintiff's heritage. These remarks – some of

which were captured on an audio recording – were clearly intended to demean Plaintiff's nationality

and created a volatile, bias-motivated confrontation.

67. As the confrontation continued, Amar escalated from insults to explicit threats of retaliation. In an

effort to intimidate Plaintiff into silence, Amar boasted that he had powerful connections and that

his mother was an Israeli diplomat. He warned Plaintiff that he could have him expelled from the

University or even deported from the United States if Plaintiff kept accusing him. Amar's message

was unmistakable: if Plaintiff pursued his complaint about the theft (or Amar's other misconduct),

Amar would use his influence to ruin Plaintiff's education and even his legal status in the country.

This shocking threat left Plaintiff in extreme fear — not only was his academic career at risk, but

now even his ability to remain in the country appeared to be in peril. Despite this, Plaintiff did not

acquiesce. He immediately notified YU security and administrators of Amar's theft, the ethnic slurs,

and the alarming threats, seeking protection. Yet, once again, the University's response was

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

woefully deficient. No immediate disciplinary action or safety measures were taken against Amar

after the March 13 incident. Plaintiff was not offered any security escort or other protection, despite

the obvious danger he reported. In short, YU officials were now explicitly aware that Amar posed a

serious threat to Plaintiff, but they failed to act.

68. On the night of March 20, 2024 (technically the early hours of March 21), Amar took the

harassment to a new and more personal level by invading Plaintiff's campus home. At

approximately 1:00 A.M., Plaintiff was in his dormitory room when Amar trespassed into the room

without any permission. Plaintiff awoke to the shock of finding Amar inside his private space.

Startled and terrified, Plaintiff immediately demanded that Amar leave at once. Amar refused.

Instead, he grew more aggressive, raising his voice and menacing Plaintiff. In this confrontation,

Amar reiterated and intensified the threats he had made previously. He vowed to harm Plaintiff and

even threatened Plaintiff's family, and again boasted of his diplomatic connections – suggesting he

believed himself to be beyond the reach of consequences. The intrusion was deeply terrorizing:

Plaintiff was cornered in his own bedroom in the dead of night by an antagonistic classmate who

had already threatened to destroy his life. During this encounter, Amar also destroyed evidence of

his earlier wrongdoing. Plaintiff had in his possession a short written note that Amar had given him

after the March 13 theft (the note pertained to the charger). Upon spotting this note, Amar snatched

it from Plaintiff's hands, tore it to pieces, and pocketed the fragments. By obliterating this note,

Amar was literally spoliating evidence tying him to the theft – a clear sign of consciousness of

guilt. Eventually, after about ten minutes of threatening Plaintiff inside his own room, Amar left (he

departed only when Plaintiff's roommate entered the room, interrupting the intrusion). Plaintiff was

left shaken to the core. He immediately reported this home invasion and renewed threats to campus

security, making clear that he feared for his life. Disturbingly, no effective action was taken by

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Yeshiva University that night to safeguard Plaintiff. Campus security did not apprehend Amar or station an officer to protect Plaintiff, nor did the administration suspend or remove Amar from campus. Plaintiff spent the remainder of the night in a state of fear, unsure if Amar would return to carry out his threats.

69. In the early morning hours of March 21, 2024, mere hours after the dormitory intrusion, Plaintiff's worst fears materialized: Amar launched a brutal physical assault on Plaintiff. Traumatized and unable to sleep in his dorm, Plaintiff had gone to a 24-hour campus study area, hoping to find a safe, populated space. Instead, Amar tracked him down there. At approximately 2:00 A.M., Amar confronted Plaintiff in the study hall. He attempted to bully Plaintiff away, declaring that the area was "his spot" and that Plaintiff had no right to sit nearby. Plaintiff refused to submit to this baseless intimidation, calmly asserting it was a public space open to all students. Amar reacted with sudden, unhinged rage. He began shouting at Plaintiff, spewing insults and threats and creating a loud commotion in the otherwise quiet room. Fearing that the situation could turn violent, Plaintiff raised his smartphone – either to record the outburst or to call for help – while holding a small water bottle in his other hand. This gesture proved to be an immediate trigger for Amar's aggression. With Plaintiff's phone visibly in hand, Amar exploded into physical violence. He lunged at Plaintiff and snatched the water bottle away, then flung its contents directly into Plaintiff's face. Water splashed into Plaintiff's eyes, momentarily blinding and disorienting him. In that instant, Amar turned a verbal confrontation into a vicious ambush.

70. What followed was a sustained and merciless attack. Amar punched Plaintiff in the face and torso multiple times and kicked him repeatedly. Plaintiff tried to defend himself, but Amar was in a rage. At one point, Amar grabbed a large hard-plastic study chair and swung it as a weapon, smashing the heavy chair into Plaintiff's body. The impact was devastating – Plaintiff was knocked off-balance

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

and sent crashing to the floor, landing hard on his right side with his head striking the ground. Even then, Amar did not relent. As Plaintiff lay on the floor, dazed and vulnerable, Amar continued kicking him relentlessly, aiming blows at Plaintiff's ribs, upper body, and head. Plaintiff curled up and covered his head in a fetal position, desperately trying to protect himself, and begged for mercy. The onslaught only ceased after Plaintiff – battered and in agony – begged Amar to stop and a few other students in the distance began to react to the commotion. Only at that point did Amar finally step back, ending the assault. In the span of just minutes, Plaintiff was beaten into a state of semi-consciousness, suffering serious injuries.

71. The injuries to Plaintiff were grave. He was left bleeding, disoriented, and unable to stand immediately due to pain. Subsequent medical examination confirmed that Plaintiff sustained a traumatic brain injury (TBI) with concussion, as evidenced by loss of consciousness and memory gaps during the assault. He also suffered hearing loss and persistent tinnitus in one ear from the blows to his head. His right side and hip were deeply bruised from the impact of hitting the floor, and his arms and wrists were sprained and bruised from trying to shield himself. In addition to these physical injuries, Plaintiff began experiencing severe psychological trauma symptoms in the aftermath – including acute anxiety, hypervigilance, nightmares, and flashbacks of the assault – consistent with developing post-traumatic stress disorder (PTSD). Plaintiff's injuries required emergency hospital treatment in the early morning of March 21, 2024, where records noted his head trauma from being hit with a chair and other injuries. The assault was unquestionably bias-motivated – Amar's own words during the preceding week made clear that his animosity toward Plaintiff was tied to Plaintiff's nationality, and he peppered the attack with the same sort of slurs and epithets he had used before. Indeed, authorities treated the assault with utmost seriousness: NYPD officers arrived promptly and arrested Amar at the scene, and Amar was later criminally

Heilmann v. Yeshiva University, et al.          |  Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)     |    Page 41 of 106

charged for the attack. The severity of the assault also drew the attention of law enforcement

authorities in Plaintiff's home country (Germany), given Plaintiff's citizenship, for potential hate-

crime charges.

72.  Critically, even after the assault itself, the mistreatment of Plaintiff continued. There were no

security officers on scene during the midnight attack – the library and study halls were largely

empty at that hour – so the assault lasted until Amar himself chose to stop.

Immediately afterward, one University staff member arrived (a library employee coming off an

elevator) and found Plaintiff injured on the floor and Amar standing nearby. Defendant Moshe

Davidovics, another YU student and a friend of Amar, was also present in the vicinity; he had been

studying some distance away and only noticed the situation at the tail end of the attack. In the

critical moments following the assault, rather than render aid to Plaintiff or ensure the truth was

told, Yeshiva University students (and de facto agents of the University) undertook an active cover-

up. As Plaintiff lay injured, Davidovics approached

Amar. According to later witness accounts and partial audio/video evidence, Amar and Davidovics

immediately conferred in hushed tones about how to conceal Amar's guilt. In fact, a snippet of their

conversation was captured on Plaintiff's phone (which had fallen to the ground but continued

recording): Amar can be heard instructing Davidovics to "provide the statement we discussed," and

offering to help Davidovics with his coursework in return – "I will help you with your pre-med

courses." By this, Amar was bribing Davidovics to lie by corroborating a false story that Amar had

prepared. Davidovics agreed and proceeded to execute this plan. When NYPD officers and campus

security arrived shortly thereafter, Davidovics misrepresented the incident, falsely claiming to have

witnessed the fight and asserting that Plaintiff was the aggressor who started a physical altercation,

to which Amar merely "responded." These statements were blatant falsehoods: in truth, Davidovics

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

had not seen the start of the incident (having only looked over after hearing the commotion) and he knew that Amar had instigated the violence without provocation. Nonetheless, by prearrangement with Amar, Davidovics impugned Plaintiff's character and painted a misleading narrative of self-defense. Amar eagerly latched onto this false narrative, immediately telling police and University officials that Plaintiff had "attacked" him – an assertion directly contradicted by the physical evidence (Plaintiff's injuries and the scene) and later by security camera footage. In short, in the immediate aftermath of a hate-fueled assault, YU students aligned with Amar actively colluded to cover up the truth and to blame the victim. This brazen distortion of events would not be the last time that those aligned with YU distorted or destroyed evidence – alarmingly, similar conduct was later echoed by certain University administrators as well.

# V. Administrative Retaliation: False Imprisonment and Coercion (March 2024)

73. Rather than support Plaintiff as a victim of a violent hate crime, Yeshiva University's administration responded with outright hostility and retaliation in the days following the assault. Immediately after March 21, 2024, the University's priority appeared to be protecting Amar (the assailant) and the institution's reputation, rather than ensuring Plaintiff's well-being or seeing justice done. Defendant Dr. Sara Asher, the Dean of Students, contacted Plaintiff multiple times in the immediate aftermath of the assault– not to offer help, but to pressure Plaintiff into dropping the charges against Amar. Between March 21 and March 25, Asher repeatedly urged Plaintiff via calls and text messages to"let it go" – imploring him not to pursue criminal charges or any complaint against the University for its handling of the matter. In a stunning display of callousness, Asher even attempted to interfere

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

with Plaintiff's medical care. While Plaintiff was at the hospital being examined for his injuries on

March 21, Asher telephoned him and instructed him to refuse certain medical tests and to leave the

hospital as soon as possible. She was effectively telling Plaintiff to avoid thorough documentation

of his injuries. Asher's stated concern was to get Plaintiff out of the hospital and back to campus

quickly – and, incredibly, to assist Amar. Upon Plaintiff's hospital discharge, Asher contacted him

again and insisted that Plaintiff help secure Amar's release from police custody. (Amar had been

arrested by the NYPD in connection with the assault and was being held on criminal charges at that

time.) Dean Asher's actions amounted to active obstruction: she was attempting to prevent the

creation of medical evidence of Plaintiff's injuries and to persuade Plaintiff to exonerate his

attacker. Plaintiff was dismayed and felt intensely pressured by these demands, which came from

one of the University's highest student-affairs officials. Asher's conduct demonstrated a brazen

disregard for Plaintiff's rights and safety, and it foreshadowed the even more extreme measures the

University was willing to take to bury this incident.

74. When Asher's coercion failed to make Plaintiff quietly abandon his complaints, the University

administration escalated to an extraordinary and unlawful act of retaliation on March 25, 2024. On

that date, Plaintiff was summoned to a meeting at YU's Belfer Hall under the pretext of discussing

his situation. In truth, the meeting was a setup for intimidation. Upon arriving around 5:00 P.M.,

Plaintiff was lured into the campus Psychological Services office on the 5th floor and then

physically prevented from leaving. Inside, Defendant Dr. Yedidya Levy (the same administrator

who had handled housing and who was already aware of Plaintiff's complaints) and Defendant

Judith Lopez (a University counseling center staff member) confronted Plaintiff. They shut the door

and refused to let Plaintiff exit, effectively holding him captive in the room. For approximately 10–

15 minutes, Levy and Lopez – both of whom appeared enraged and "highly agitated" – subjected

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Plaintiff to a terrifying barrage of threats and demands. They told Plaintiff in no uncertain terms that he must drop all charges and legal claims related to the assault and the prior harassment. If he did not, they warned, dire consequences would follow. Levy and Lopez explicitly threatened Plaintiff's life. Levy stated that if Plaintiff pursued criminal charges against Amar or any civil action against Yeshiva University, Plaintiff's family "could be killed" and Plaintiff "could be killed" as well. He chillingly emphasized that the only outcome of continuing to litigate would be that "the only outcome for [Plaintiff] and [his] family would be death." These are words one might expect from a kidnapper or an organized crime enforcer, not a university administrator – yet Levy delivered these death threats in an effort to scare Plaintiff into silence. When Plaintiff, stunned, still refused to capitulate, Levy expanded his threats: he said the University would make sure Plaintiff's student visa was canceled immediately, so that he would be forced to leave the country. (At that time, Plaintiff's F-1 visa depended on his enrollment at YU.) Levy also claimed that Plaintiff would never get any financial compensation or remedy – from either the University or Amar – as if to discourage him from seeking legal redress. Meanwhile, Ms. Lopez actively participated in this unlawful detention: she positioned herself to block the door and at one point grabbed Plaintiff's arm when he tried to move toward the exit, physically restraining him from leaving. Plaintiff was thus held against his will – a victim of false imprisonment by University staff.

75. During this coerced meeting, the administrators' loyalties and motives became explicit. Ms. Lopez openly lamented that Amar (Plaintiff's attacker) was "in jail" because of the incident and expressed sympathy for him. Mr. Levy concurred, stating that "Jews should not be in jail" and that every effort must be made to prevent it – an extraordinary statement that lays bare the University's bias in favor of the assailant Amar (who is, like Levy, an Israeli Jew) and against the victim Plaintiff (who is ethnically German/Hispanic and not Israeli). Incredibly, Levy even alluded to his and Amar's

military backgrounds to bolster the credibility of his threats: Levy mentioned that he had served in

an Israeli special forces unit (with experience in Gaza in 2014) and had the "skills and knowledge

for targeted killings," while noting that Amar also had military service. In essence, Levy suggested

that he and Amar were perfectly capable of making Plaintiff "disappear" if he did not comply.

Plaintiff was shaken to his core by this encounter. He pleaded to be let go and, after roughly a dozen

minutes of this ordeal, was finally allowed to leave the room. The impact of this incident on

Plaintiff cannot be overstated: he had survived a violent assault only to be met with death threats

from University officials whose duty was to help him.

76. Plaintiff immediately sought to report this extreme misconduct. He attempted to contact Dr. Yael

Muskat, the head of YU's Counseling Center (and one of the officials who had initially learned of

Werta's harassment back in 2022), to tell her what happened. Shockingly, Dr. Muskat never

responded to Plaintiff's urgent outreach. Fearing for his life and with University channels proving

useless or actively hostile, Plaintiff also provided a formal witness statement about the March 25

incident to law enforcement (including federal authorities and the German consulate) soon

thereafter. The March 25 false imprisonment and threats are now part of an ongoing criminal

investigation. This episode exemplifies the retaliatory animus and unlawful tactics that Yeshiva

University – through its agents – deployed against Plaintiff. The University's conduct on March 25,

2024 was not only morally abhorrent; it was patently criminal. By any measure, holding a student

captive and threatening to kill him (and his family abroad) for seeking justice crosses every

conceivable line. It also solidified what Plaintiff had come to suspect: far from being an unfortunate

anomaly, the harassment and assault he endured were enabled and worsened by an institutional

cover-up. Yeshiva University's leadership was now actively engaging in a conspiracy to intimidate

Plaintiff into dropping the matter, in order to shield the University and the perpetrator from

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

accountability. Such deliberate retaliation against a victim of violence is not just a violation of

University policy and federal civil rights laws – it is an affront to the basic tenets of justice and

safety on campus.

# VI. Ongoing Retaliation, Constructive Expulsion, and CoverUp (2024–2025)

77. Plaintiff survived the assault and the subsequent threats, but the ordeal effectively destroyed his

educational opportunity at Yeshiva University. In the months that followed (spring and summer

2024), Plaintiff's academic and personal life were in disarray – and rather than aid his recovery, the

University continued to retaliate and impede him at every turn. As a direct result of the March 21

attack, Plaintiff was left with serious disabilities and health challenges that interfered with his

studies. He suffered cognitive impairments from his head injury (difficulty concentrating, memory

lapses), as well as hearing loss and psychological trauma. In the weeks immediately after the

assault, Plaintiff struggled mightily: he experienced severe headaches, dizziness, and PTSD

symptoms that made it extremely difficult to attend classes or complete coursework. Recognizing

these challenges, Plaintiff promptly sought reasonable accommodations from Yeshiva University to

help him finish the semester without academic penalty. Backed by documentation from his doctors,

Plaintiff requested accommodations such as a reduced course load (under the University's "RCL"

medical accommodation policy) and flexibility with attendance and deadlines. These

accommodations were medically recommended for his recovery, and they were protections to

which Plaintiff was entitled under disability law, given that he was now effectively a student with

disabilities (TBI and PTSD).

78. The University's response was to flatly deny Plaintiff's accommodation requests. Despite receiving

the medical evidence of Plaintiff's post-assault conditions, Yeshiva University administrators

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

refused to implement a reduced course load or any meaningful academic adjustment. Instead, they

gave Plaintiff an ultimatum: he was expected to continue with a full course load and perform as if

nothing had happened – or else face failing grades and even potential dismissal. No extensions of

deadlines, no modified exam schedules, no counseling support was offered. This stance was nothing

short of deliberate indifference to Plaintiff's well-being and legal rights. By refusing to

accommodate his new disabilities, the University exacerbated Plaintiff's difficulties and placed him

in an impossible situation. Forced to attempt to keep up under grievous conditions, Plaintiff's health

deteriorated further under the stress, and his academic performance suffered. YU's conduct in this

regard violated not only basic compassion but also the requirements of federal and state disability

discrimination laws (e.g., the ADA and Section 504), which mandate reasonable

accommodations for students with disabilities. Plaintiff alleges – and the evidence will show

– that this failure to accommodate was not a mere oversight, but part of the ongoing

retaliation against him for speaking out. Yeshiva University administrators wanted to drive

Plaintiff out of the institution to make the "problem" go away, and they did so by placing

Plaintiff in a no-win scenario academically.

79. At the same time, other forms of retaliation and administrative malfeasance continued to pile up.

The University's counseling services, which Plaintiff desperately needed for his trauma, were

effectively withheld from him. Incredibly, the very administrator who had threatened him –

Associate Dean Levy, whose portfolio included overseeing student support and "sudden

withdrawals" – was involved in denying Plaintiff access to psychological support on campus. When

Plaintiff tried to make appointments for counseling, he would either be ignored or rebuffed. Then,

in what appears to be an attempt to preempt or discredit any future complaint by Plaintiff, Dean

Asher sent Plaintiff a formal letter falsely accusing him of "disruptive behavior" in the counseling

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

center. This baseless letter (which cited no specific incident or date) was a clumsy effort to rewrite history – implying that Plaintiff's urgent pleas for help (or perhaps his understandable reaction to being threatened on March 25) were a disciplinary problem, when in fact the only "disruption" was caused by YU staff's outrageous conduct. Such documentation was clearly generated to create a paper trail against Plaintiff, casting him as the problem. Moreover, once Plaintiff secured legal counsel to protect his rights (in light of the severity of what had occurred), YU administrators ceased direct communication with him and stonewalled his attempts to appeal his academic or immigration status. In an email exchange on or about August 7, 2024, Dean Rebecca Cypess outright told Plaintiff: "Because you have taken legal counsel, I cannot speak to you anymore." This statement exemplifies the University's posture – rather than engage with Plaintiff's legitimate grievances, they retaliated by isolating him. Immediately after that exchange, key portions of the email correspondence (including a letter from Plaintiff's attorney) went missing from University records. A witness attested to seeing the complete email chain before, suggesting that the removal of these records was deliberate. In other words, YU personnel tampered with evidence of their communications – an act that smacks of spoliation and obstruction of justice. Indeed, the disappearance of critical records and the retaliatory communications by Dean Cypess are now evidence in Plaintiff's case of potential witness tampering and obstruction. Such actions – destroying or "losing" incriminating emails, and refusing to talk once a lawyer is involved – underscore the lengths to which the University would go to cover up its wrongdoing.

80. By mid-2024, Plaintiff's relationship with Yeshiva University was irreparably broken – not by his choice, but by the University's constructive expulsion of him. The combined effect of

    the University's retaliatory acts (academic sabotage, denial of services, and intimidation)

    forced Plaintiff to discontinue his studies. In or around October 2024, Plaintiff ceased to be

Case 1:25-cv-02431-AT-RWL    Document 92    Filed 10/23/25    Page 49 of 110

Heilmann v. Yeshiva University, et al.          | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)    |    Page 49 of 106

enrolled at YU. Notably, Yeshiva University then formally terminated Plaintiff's F-1 visa

sponsorship by canceling his Form I-20, which it reported to federal immigration

authorities.

This action stripped Plaintiff of his legal immigration status in the U.S., fulfilling one of

Levy's earlier threats. The termination of Plaintiff's student status was done in an

atmosphere of heightened scrutiny and nitpicking by the University – every aspect of

Plaintiff's academic record was suddenly put under a microscope once he engaged in

protected activity (complaining and obtaining counsel). In short, YU made good on its

retaliatory promises: Plaintiff was out of the school, his visa was gone, and his educational

prospects were derailed.

81. Even after pushing Plaintiff out, Yeshiva University was not finished attempting to punish and

silence him. On April 28, 2025, the University took the outrageous step of slapping Plaintiff with a

bogus $27,500 "Final Notice" bill, demanding immediate payment or else threatening to send the

matter to collections. This massive charge was entirely unexplained and appeared nowhere in

Plaintiff's prior student accounts. It coincided directly with Plaintiff's ongoing legal actions against

YU and its personnel. The University's message was transparent: if Plaintiff did not "capitulate"

(their term) and drop his claims, they would attempt to financially ruin him. The $27,500 bill was

coupled with a notice that Plaintiff was "no longer enrolled" (something that had already been the

case for months) and that his transcript would be withheld. Internally, YU officials also orchestrated

academic sabotage to retroactively justify their treatment of Plaintiff – for example, by imposing

abrupt and arbitrary graduation requirements and by issuing unjustifiably poor grades, all designed

to tarnish Plaintiff's academic record. There is evidence that certain faculty were pressured to grade

Plaintiff harshly or that deadlines were selectively enforced as part of this campaign. In sum, by

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

2025 Yeshiva University was engaged in a full-scale vendetta against Plaintiff. These retaliatory actions in 2025 were not about any legitimate debt or academic policy; they were nakedly punitive measures taken because Plaintiff had dared to assert his civil rights and expose the University's misconduct. The timing and manner of the $27,500 charge, especially, make its retaliatory motive plain: it was levied shortly after Plaintiff filed additional complaints and lawsuits, and its menacing "Final Notice" terminology and threat of collections were calculated to instill fear and economic duress. Yeshiva University thus attempted to leverage Plaintiff's financial vulnerability as a last resort to silence him.

82. Throughout 2024 and 2025, the University and its agents have continued to misrepresent facts and conceal evidence in various forums. In communications with law enforcement, University officials have downplayed the March 21 assault (despite clear video evidence of its severity) in an effort to shield the institution from liability. In responding to external investigations and litigation, the University's counsel and representatives have at times presented misleading narratives – for instance, suggesting Plaintiff was blameworthy or that the incidents were minor – which are flatly contradicted by the documented evidence. Such obfuscation is itself part of the broader cover-up. Despite these efforts, Plaintiff has preserved a wealth of evidence supporting his claims: security camera footage, voice recordings, contemporaneous emails and messages, medical records, and witness statements all corroborate the allegations herein. This evidence will show not only the underlying acts of discrimination, harassment, and violence, but also the subsequent institutional betrayal and cover-up executed by Defendants. By orchestrating false narratives, tampering with evidence, and retaliating against the victim, Yeshiva University compounded the harm to Plaintiff and violated fundamental tenets of ethics and law.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

83. In sum, the factual record reveals a shocking pattern of institutional abuse and deliberate indifference spanning from 2022 through 2025. What began as harassment of a student for his background metastasized – under Yeshiva University's neglect and complicity – into violent hate crimes and an attempt to destroy that student's life and future. Plaintiff was subjected to national origin and age discrimination, hate-fueled stalking and assault, and retaliation so extreme it included death threats – all within a University ostensibly committed to students' welfare. The cumulative impact on Plaintiff has been devastating: he suffered physical injuries and lasting impairments, severe psychological trauma, loss of his educational opportunities, and the endangerment of his lawful immigration status. In effect, Yeshiva University's actions forced Plaintiff out of the school and nearly out of the country – a constructive expulsion achieved through unlawful means. Such conduct not only violated Plaintiff's rights, but also sent a message calculated to have a broad chilling effect: namely, that anyone who speaks up about discrimination or abuse at YU will be met with reprisals instead of protection. This case stands as a stark example of why civil rights laws exist. There is a compelling public interest in ensuring that what happened here does not happen again – at Yeshiva University or any other institution. No school should be a sanctuary for hate or a zone of impunity for those who retaliate against victims. The broader academic community and the public at large have a stake in holding Yeshiva University accountable, both to vindicate Plaintiff's rights and to affirm that institutional accountability under the law applies even to powerful educational entities. Plaintiff's ordeal highlights the urgent need for reforms and consequences so that Yeshiva University finally fulfills its legal and moral obligations to provide a safe, non-discriminatory environment for all students. Defendants' actions, as detailed above, cry out for redress – both to compensate Plaintiff for his injuries and to ensure that no student in the future will have to endure what he did.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.          | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)    |    Page 52 of 106

# E. CAUSES OF ACTION

83. **Count 1 – Assault** *(New York Common Law; Against Defendants Sapir Amar and Yeshiva University)*

84. **Introduction:** Defendant Sapir Amar's violent, unprovoked assault on Plaintiff – which included threatening gestures and ethnic slurs – constitutes assault under New York common law.

85. **Factual Allegations:** On March 21, 2024, at 00:56 AM, Defendant Amar attacked Plaintiff in a public area at Yeshiva University. Amar threw water in Plaintiff's face, lunged with a chair, and made violent gestures, intending to place Plaintiff in fear of imminent harm. This unprovoked assault was accompanied by racial slurs targeting Plaintiff's European (German) heritage. Plaintiff experienced genuine fear for his safety.

86. **Legal Standard:** Under New York law, an **assault** occurs when a defendant intentionally places another person in apprehension of imminent harmful or offensive contact, even if no physical contact occurs. The defendant must have the intent to cause such apprehension, and the victim's fear must be reasonable under the circumstances. See Bastein v. Sotto, 299 A.D.2d 432, 433 (2d Dep't 2002) ("To sustain a cause of action to recover damages for assault, there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact.").

87. **Application:** Amar's deliberate actions were designed to frighten Plaintiff. The unprovoked attack, accompanied by derogatory slurs, meets the legal criteria for assault. Yeshiva University is also liable for this assault under agency and **respondeat superior** principles, as Amar was a student under its authority.

88. **Count 2 – Battery** *(New York Common Law; Against Defendants Sapir Amar and Yeshiva University)*

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

89. **Introduction:** The physical attack by Defendant Sapir Amar – including punches, kicks, and strikes with a chair – constitutes battery under New York common law.

90. **Factual Allegations:** Immediately after the assaultive gestures described above, Amar physically attacked Plaintiff. He delivered multiple blows, including punches, kicks, and strikes with a chair.

91. **Legal Standard:** Under New York law, **battery** is the intentional and non-consensual touching of another person that is either harmful or offensive in nature. Even minimal contact may constitute battery if it is offensive or without consent. See Oteri v. Village of Pelham, 100 A.D.3d 725 (2d Dep't 2012) ("A battery is an intentional wrongful physical contact with another person without consent."); see also Gould v. Rempel, 99 A.D.3d 759, (2d Dep't 2012) ("To sustain a cause of action to recover damages for battery, a plaintiff must prove that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent.").

92. **Application:** Amar's violent actions – hitting Plaintiff with fists, feet, and a chair without consent – satisfy all elements of battery. Yeshiva University is vicariously liable for Amar's tortious conduct committed on campus under its watch.

93. **Count 3 – Intentional Infliction of Emotional Distress** *(New York Common Law; Against All Defendants)*

94. **Introduction:** Defendants' collective outrageous actions – including violent assault, false accusations, and deliberate institutional retaliation – have caused Plaintiff severe emotional distress.

95. **Factual Allegations:** The combined conduct of Defendants Amar, Davidovics, and Yeshiva University subjected Plaintiff to extreme stress. This included a violent physical assault (Amar), public defamation with false accusations (Davidovics, with university acquiescence), and the University's callous failure to provide protection or accommodations after the attack. Defendants' actions were often accompanied by threats and ethnic slurs, compounding Plaintiff's distress.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.          |  Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)    |    Page 54 of 106

96. **Legal Standard:** To establish a claim for **IIED** under New York law, a plaintiff must plead and prove: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. New York courts impose a high threshold, requiring conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Howell v. New York Post Co., 81 N.Y.2d 115, 122 (1993); see also Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 303 (1983)".

97. **Application:** Amar's violent assault, Davidovics' false accusations that Plaintiff was the aggressor, and Yeshiva University's deliberate indifference (and retaliatory treatment) after Plaintiff reported these events each constitute outrageous conduct. These acts were intended to intimidate and harm Plaintiff or were done with reckless disregard for his well-being. As a direct result, Plaintiff suffered severe emotional trauma.

98. **Count 4 – Trespass** *(New York Common Law; Against Defendant Sapir Amar, Yeshiva University)*

99. **Introduction:** Defendant Amar's unauthorized entry into Plaintiff's dormitory room – accompanied by harassment and threats – constitutes trespass.

100.     **Factual Allegations:** On March 20, 2024, around 01:00 AM, (the day before the assault), Amar entered Plaintiff's locked dormitory room without Plaintiff's consent. Despite Plaintiff's immediate demands that he leave, Amar remained in the room, harassing Plaintiff and making threatening remarks. Plaintiff, who was entitled to private use of his dorm room, was caused significant distress by this intrusion.

101.     **Legal Standard:** Trespass when a person intentionally enters or remains upon land in the possession of another without permission or legal authority. No showing of physical harm is necessary;

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Case 1:25-cv-02431-AT-RWL    Document 92    Filed 10/23/25    Page 55 of 110

Heilmann v. Yeshiva University, et al.          | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)    |    Page 55 of 106

the unauthorized entry itself is sufficient to establish liability. Real property includes not only land but also structures such as dwellings or rented rooms. See Korsinsky v. Rose, 120 A.D.3d 1307, 1309 (2d Dep't 2014) ("To establish a cause of action sounding in trespass, a plaintiff must show an intentional entry onto the land of another without justification or permission."); see also Long Is. Gynecological Servs., P.C. v. Murphy, 298 A.D.2d 504, 504 (2d Dep't 2002).

102.    **Application:** Amar had no permission or authority to enter Plaintiff's private dormitory room. His intentional intrusion, ignoring Plaintiff's demands to leave, satisfies all elements of trespass.

103.    **Count 5 – Defamation (Defamation Per Se)** *(New York Common Law; Against Defendants Moshe Davidovics, Yeshiva University, Dov Kesselman, Ian M. Capell, and Kyle D. Winnick)*

104.    **Introduction:** Defendants published false statements accusing Plaintiff of criminal and wrongful acts (including assault) to third parties, thereby defaming him. These defamatory accusations – which impugn Plaintiff's character and allege serious crime – constitute defamation *per se* under New York law.

105.    **Factual Allegations:** Defendant Moshe Davidovics falsely told campus security, other students, and law enforcement that Plaintiff had initiated the March 21 incident and was the aggressor. These statements – alleging that Plaintiff committed an assault and other misconduct – were knowingly false and were disseminated widely. Yeshiva University, through its administrators and agents, republished and failed to correct these false claims, thereby amplifying the harm. Defendants Kesselman, Capell, and Winnick (attorneys representing Yeshiva University) also echoed and reinforced these false accusations in communications with government agencies and others, lending them an air of credibility.

106.    **Legal Standard:** A claim for **defamation** in New York requires (1) a false statement of fact; (2) published to a third party without privilege or authorization; (3) with fault amounting to at least negligence; and (4) that caused special harm or constitutes defamation *per se*. Accusing someone of a

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Case 1:25-cv-02431-AT-RWL    Document 92    Filed 10/23/25    Page 56 of 110

Heilmann v. Yeshiva University, et al.          |  Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint  (SCAC)   |  Page 56 of 106

serious crime (such as assault) is considered defamation *per se*, meaning damages are presumed.  See

Dillon v. City of New York, 261 A.D.2d 34, 38 (1st Dep't 1999).

107.      **Application:** Davidovics' statements were false statements of fact – he portrayed Plaintiff as the

assailant when in reality Plaintiff was the victim. These statements were "published" to third parties

(Campus Security, Police, NYSDHR, SDNY, SEVIS) with knowledge of falsity or reckless disregard

for the truth. Given that these statements accuse Plaintiff of criminal assault, they are defamatory *per se*.

Yeshiva University and its agents (including the Seyfarth Shaw attorneys Kesselman, Capell, and

Winnick) furthered the defamation by republishing and endorsing these false allegations in official

proceedings and communications, lacking any privilege to do so in this context.

108.      **Count 6 – Civil Conspiracy to Defame** *(New York Common Law; Against Defendants Moshe*

*Davidovics, Sapir Amar, and Yeshiva University)*

109.      **Introduction:** Defendants Amar and Davidovics, with support and approval from Yeshiva

University, conspired to harm Plaintiff's reputation by coordinating a false narrative about the March 21,

2024 incident. This agreement to spread defamatory falsehoods constitutes a civil conspiracy to defame

under New York law (as a theory of joint liability for the underlying defamation).

110.      **Factual Allegations:** Immediately after the March 21 assault, Defendants Amar and Davidovics

acted in concert to fabricate a false story portraying Plaintiff as the aggressor. They were observed

conferring in hushed tones about how to conceal Amar's guilt. Indeed, Amar entered the Plaintiff room

and destroyed evidence (a handwritten note from Amar to Plaintiff) and aligned their stories to blame

Plaintiff for the altercation. Yeshiva University (through its officials) later adopted and ratified this false

narrative, joining the effort to deflect blame onto Plaintiff. The coordinated actions of these Defendants

show a meeting of the minds to defame Plaintiff.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.          |  Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint  (SCAC)   |   Page 57 of 106

111.      **Legal Standard: New York does not recognize civil conspiracy as an independent**

**tort.** However, a plaintiff may plead conspiracy to establish the joint liability of co-conspirators for an

underlying tort—such as defamation—by showing that the defendants acted in concert pursuant to a

common scheme or agreement. To do so, the plaintiff must allege: **(1) an agreement between two or**

**more parties; (2) an overt act in furtherance of the agreement; and (3) that the plaintiff suffered**

**damages as a result of the underlying tort.** See *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68

N.Y.2d 968, 969 (1986) ("Allegations of conspiracy are permitted only to connect the actions of separate

defendants with an otherwise actionable tort."); see also *Abacus Fed. Sav. Bank v. Lim*, 75 A.D.3d 472,

474 (1st Dep't 2010) ("While New York does not recognize an independent cause of action for civil

conspiracy, allegations of conspiracy are permitted to establish joint liability for a tort.").

112.      **Application:** Amar and Davidovics explicitly agreed to lie about the incident – an unlawful plan

to injure Plaintiff's reputation. Overt acts in furtherance of this agreement include: (a) Davidovics

making false statements to authorities and others; (b) Amar destroying a note and later maintaining the

false story; and (c) Yeshiva University officials echoing these falsehoods in disciplinary proceedings.

All conspirators shared the common goal of protecting Amar by defaming Plaintiff. As a result,

Plaintiff's reputation was harmed. Under these allegations, each Defendant who participated in the

conspiracy is jointly liable for the defamation and resulting damages.

113.      **Count 7 – False Imprisonment** *(New York Common Law; Against Defendants Dr. Yedidya*

*Levy, Dr. Sara Asher, Judith E. Lopez, and Yeshiva University)*

114.      **Introduction:** Defendants unlawfully detained Plaintiff on campus, depriving him of his

freedom of movement without consent or lawful justification. This wrongful detention constitutes false

imprisonment under New York law.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

115.    **Factual Allegations:** On March 25, 2024, following Plaintiff's report of the assault, Defendants

Dr. Yedidya Levy (a YU administrator) and Judith Lopez (a YU official) orchestrated a situation in

which Plaintiff was confined in an office on campus against his will. Plaintiff was blocked from leaving

– at one point, physically barred from exiting a room – and was coerced into remaining while being

pressured to drop his complaints. The detention lasted for a substantial period (approximately 12

minutes or more) and occurred without any legal authority or Plaintiff's consent. Yeshiva University,

through these employees, caused Plaintiff to be restrained solely because he had reported misconduct.

116.    Legal Standard: **False imprisonment** under New York law is the unlawful and intentional

confinement of a person without consent and without legal justification. The confinement need not be

for an extended duration; even brief, unlawful restraint may constitute false imprisonment if it is

intentional and unwarranted. The restraint may be physical or achieved through threats, intimidation, or

other coercive means.

See *Broughton v. State of New York*, 37 N.Y.2d 451, 456 (1975), **cert. denied**, 423 U.S. 929 (1975)

("The elements of the tort of false imprisonment are: (1) the defendant intended to confine the plaintiff,

(2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement

and (4) the confinement was not otherwise privileged."); *Martinez v. City of Schenectady*, 97 N.Y.2d 78,

85 (2001).

117.    **Count 8 – Invasion of Privacy** *(Improper Disclosure of Personal Records – FERPA, HIPAA,*

*GDPR; Against Defendants Yeshiva University, Jennifer Golden, Dr. Yedidya Levy, Sara Asher,*

*Rebecca Cypess, and John Does 11–20)*

118.    **Introduction:** Defendants violated Plaintiff's privacy rights by improperly accessing and

disclosing his confidential records (including medical and academic information) to unauthorized

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

persons. These actions, in contravention of federal privacy laws (FERPA, HIPAA) and applicable state privacy rights, constitute an invasion of privacy.

119.     **Factual Allegations:** Yeshiva University officials, including Defendant Jennifer Golden (Registrar's Office) and Dr. Yedidya Levy, disclosed Plaintiff's private educational records (such as his grades, disciplinary history, and enrollment status) to persons without any legitimate need or consent – including other students and outside parties. Additionally, confidential medical information about Plaintiff (including details of his disability and counseling) was mishandled or shared without authorization. These disclosures violated school policies and federal regulations intended to protect student and patient confidentiality. John Does 11–20 (unknown staff members or administrators) were also involved in these unlawful disclosures.

120.     **Legal Standard:** Under the **Family Educational Rights and Privacy Act (FERPA)**, 20 U.S.C. § 1232g, educational institutions receiving federal funding are **prohibited from disclosing a student's education records** without the student's written consent, subject to specific statutory exceptions.

While **FERPA does not create a private right of action for damages**, courts have recognized that its standards may inform the **duty of confidentiality** and support related claims under state law.

See *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002) (FERPA does not create enforceable rights under § 1983 but may inform privacy-based claims under other legal theories).

Similarly, the **Health Insurance Portability and Accountability Act (HIPAA)**, 42 U.S.C. § 1320d et seq., establishes national standards to protect the privacy of medical records and personal health information. HIPAA likewise **does not authorize a private right of action**, but its confidentiality provisions may be used to establish a **standard of care** in tort claims involving improper disclosure of medical information.

See *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60 (2d Cir. 2016); *Ortiz v. City of New York*, 105

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.     |  Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)    |    Page 60 of 106

A.D.3d 674, 675 (1st Dep't 2013) (HIPAA does not support a private cause of action but may be

relevant to state law claims).

New York recognizes a **common-law right to privacy** in certain limited contexts, including

claims framed as **breach of fiduciary duty**, **breach of confidence**, or violations of professional

confidentiality. Additionally, **CPLR § 4504(a)**protects the **confidentiality of communications between**

**physician and patient**, rendering such disclosures inadmissible without the patient's consent.

An **invasion of privacy** claim in this context may therefore be framed under New York law as a **breach**

**of fiduciary duty**, **breach of confidential relationship**, or **negligence** based on the unauthorized

disclosure of sensitive educational or medical information, particularly where institutional actors had a

duty of trust or care.

121.     **Application:** Defendants had a duty to keep Plaintiff's academic and medical information

confidential. By failing to train staff and by directly sharing Plaintiff's records with unauthorized

individuals, Yeshiva University (through Golden, Levy, Asher, and others) breached Plaintiff's

reasonable expectation of privacy. These disclosures were not permitted by any FERPA or HIPAA

exception and were done without Plaintiff's consent – indeed, seemingly to retaliate or gossip about his

situation. The conduct thus satisfies an invasion of privacy tort theory (e.g., unreasonable disclosure of

private facts) under New York law.

122.     **Count 9 – Obstruction of Justice** *(Conspiracy to Interfere with Civil Rights – 42 U.S.C.*

*§ 1985(2) & New York Common Law; Against Defendants Yeshiva University, Dr. Sara Asher, Dr.*

*Rebecca Cypess, Sapir Amar, and Moshe Davidovics)*

123.     **Introduction:** Defendants interfered with investigations and proceedings related to the March 21

assault by making false statements, destroying or concealing evidence, and intimidating participants and

to intervene and influence the District Attorney Office Manhattan South, see witness testimony from a

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

law enforcement officer.   Such actions obstructed justice and impeded the proper functioning of both

the university's inquiry and potential criminal/civil proceedings.

124.     **Factual Allegations:** In the aftermath of the assault, Defendants engaged in multiple acts that

hindered a truthful investigation. Amar and Davidovics, as noted, fabricated a false narrative and

destroyed evidence that evidenced Amar's guilt. Dr. Rebecca Cypess (a faculty dean at YU) and other

officials withheld critical information from investigators and instead advanced the false version of

events. For example, Cypess failed to report eyewitness accounts that corroborated Plaintiff, and she

discouraged other students from coming forward. Dr. Asher intervened with the DA office to get Amar

out of jail and to discourage the Plaintiff to proceed to the criminal investigation of Amar. Yeshiva

University, at an institutional level, did not preserve surveillance footage and may have concealed

documents (e.g., internal emails discussing the incident). These acts were taken to prevent Plaintiff from

obtaining justice and to shield the wrongdoers.

125.     **Legal Standard:** Under **42 U.S.C. § 1985(2)**, it is unlawful to conspire to deter by force,

intimidation, or threat any party or witness from attending or testifying in any court of the United States,

or to otherwise obstruct justice with intent to deny equal protection of laws. Separately, New York

common law recognizes **obstruction of justice** (or interference with legal process) as a civil claim in

limited contexts (often requiring an underlying intent to thwart a judicial proceeding). Even if no

standalone tort exists, these allegations support Plaintiff's other claims and requests for sanctions.

*See Haddle v. Garrison*, 525 U.S. 121 (1998); *Beck v. Prupis*, 529 U.S. 494 (2000); *Boyd v. Nationwide*

*Mut. Ins. Co.*, 208 A.D.2d 284 (2d Dep't 1995).

126.     **Application:** Defendants' concerted actions meet the elements of a § 1985(2) conspiracy: (a) a

**conspiracy** existed (as detailed in Count 6 and Count 25) to present a false story and suppress evidence;

(b) acts like destroying evidence and intimidating witnesses (see Count 23) were done to hinder the

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

truth-seeking process; and (c) these acts were motivated, at least in part, by an intent to deprive Plaintiff

(a victim belonging to a protected class as an international student) of equal protection or equal

privileges under the laws. By misleading law enforcement and university disciplinary bodies,

Defendants effectively obstructed justice.

127.    **Count 10 – Retaliation** *(Retaliatory Harassment/Expulsion – N.Y. Executive Law § 296(7) and*

*ADA, 42 U.S.C. § 12203; Against Defendants Yeshiva University, Jennifer Golden, Dr. Sara Asher, Dr.*

*Rebecca Cypess, Dr. Yedidya Levy, Avi Feder, and Esther Sasson)*

128.    **Introduction:** After Plaintiff complained about the Nazi harassment through Werta and and the

harassment and assault through Amar, Defendants retaliated against him through adverse actions

including unwarranted discipline, eviction from housing, visa cancellation and ultimately expulsion.

This conduct violates state and federal anti-retaliation provisions.

129.    **Factual Allegations:** Plaintiff engaged in protected activity by reporting the Nazi harassment

and the March 21 assault, filing complaints about discrimination, and requesting disability

accommodations. In response, Yeshiva University and its officials took escalating adverse actions:

Plaintiff was evicted from campus housing without valid basis; he was subjected to a baseless

disciplinary proceeding led by Dr. Asher and Dr. Cypess that resulted in his **constructive expulsion**;

administrators like Jennifer Golden and Dr. Cypess placed arbitrary deadlines on his academic work and

denied him access to his student accounts; and Esther Sasson (a counsel) participated in communications

suggesting Plaintiff should be "taught a lesson" for making complaints. These acts occurred in the weeks

following Plaintiff's protected activity, indicating a retaliatory motive.

130.    **Legal Standard: Title V of the ADA (42 U.S.C. § 12203)** and the **New York State Human**

**Rights Law (Exec. Law § 296(7))** both prohibit retaliation against an individual for opposing

discriminatory practices or exercising rights (such as requesting accommodations). A retaliation claim

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

requires showing (1) plaintiff engaged in protected activity, (2) defendants knew of the activity, (3)

defendants took adverse action, and (4) a causal connection between the protected activity and the

adverse action. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) ("Retaliation claims

under the ADA are analyzed under the same framework as Title VII claims.");*Forrest v. Jewish Guild for

the Blind*, 3 N.Y.3d 295, 312–13 (2004) (retaliation under NYSHRL requires showing opposition to

discrimination followed by retaliatory treatment causally connected to the protected activity).

131.    **Application:** Here, Plaintiff's complaints about the assault and discrimination are protected

activities under both state and federal law. Defendants were well aware of these complaints (indeed, they

were the subject of internal meetings). The actions taken against Plaintiff – eviction from housing,

unfounded disciplinary charges, dismissal from the university, and harassment – are materially adverse

and would deter a reasonable person from complaining. The timing and pattern demonstrate causation:

each adverse measure closely followed Plaintiff's protected actions. No legitimate, non-retaliatory

reason explains Defendants' conduct. Thus, Defendants violated the ADA and NYHRL anti-retaliation

provisions. Yeshiva University is directly liable, and the individual Defendants who aided the retaliation

are liable under Exec. Law § 296(6) (aiding and abetting).

132.    **Count 11 – Disability Discrimination: Failure to Accommodate** *(ADA Title III, 42 U.S.C.*

*§ 12182; Rehabilitation Act § 504, 29 U.S.C. § 794; Against Defendants Yeshiva University and Abigail*

*Kelsen)*

133.    **Introduction:** Yeshiva University failed to provide reasonable accommodations for Plaintiff's

documented disabilities (including traumatic brain injury and hearing loss), despite repeated requests.

This failure to accommodate a student with disabilities in an educational program violates Title III of the

Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

134.    **Factual Allegations:** Plaintiff suffers from disabilities related to a past traumatic brain injury, hearing impairment, and other medical conditions. Upon enrollment and after the March 21 incident (which exacerbated his conditions), Plaintiff requested reasonable academic accommodations through proper channels – for example, extended time for assignments, a reduced course load, use of assistive technology, and flexibility with attendance due to medical appointments. Defendant Abigail Kelsen, in her capacity as YU's disabilities services coordinator, **denied or ignored** these requests. Yeshiva University provided no interactive process or meaningful consideration of accommodations. Instead, some professors and administrators (with the knowledge of Kelsen) penalized Plaintiff for disability-related needs (such as missing classes for medical reasons). Ultimately, the University effectively forced Plaintiff out without ever providing the accommodations he needed to continue his studies.

135.    **Legal Standard: Title III of the ADA** requires private universities to make reasonable modifications in policies or provide auxiliary aids and services to ensure equal access for individuals with disabilities, unless doing so would fundamentally alter the program. 42 U.S.C. § 12182(b)(2)(A)(ii), (iii); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682–83 (2001). Section 504 of the Rehabilitation Act similarly prohibits recipients of federal funding (which YU is) from discriminating on the basis of disability and requires reasonable accommodations. 29 U.S.C. § 794; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

To establish a failure-to-accommodate claim, a plaintiff must show: (1) he is a qualified individual with a disability, (2) the institution was aware of his disability and the need for accommodation, (3) the institution failed to provide reasonable accommodations, and (4) as a result, he was denied meaningful access to the benefits or services of the program. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004).

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

136.    **Application:** Plaintiff is a qualified individual with disabilities, as evidenced by medical

documentation provided to YU. The University (through Kelsen and others) was aware of his disabilities

and specific accommodation requests. The accommodations sought – extra time, reduced load, etc. –

were reasonable and would not have fundamentally altered the academic program or imposed undue

hardship. YU's failure to engage in any good-faith interactive process or to grant these accommodations

led directly to Plaintiff's academic difficulties and eventual expulsion, effectively denying him the

benefits of YU's program **because of** his disabilities. This conduct violates both the ADA and

Section 504.

137.    **Count 12 – Disability-Based Retaliation** *(ADA, 42 U.S.C. § 12203; N.Y. Executive Law § 296;*

*Against Defendants Yeshiva University, Jennifer Golden, Abigail Kelsen, Dr. Rebecca Cypess, and Dr.*

*Sara Asher)*

138.    **Introduction:** After Plaintiff sought disability accommodations and complained about disability

discrimination, Defendants retaliated against him through adverse academic and administrative

actions—further violating federal and state disability laws.

139.    **Factual Allegations:** Plaintiff's requests for accommodations (described in Count 11) and his

related complaints about the university's inaction were protected activities under the ADA and state law.

In response, Yeshiva University (acting through officials including Golden, Kelsen, Cypess, and Asher)

undertook adverse actions: they abruptly suspended Plaintiff's access to online academic platforms,

refused to allow him to register for classes or access his transcripts, and then orchestrated his dismissal

from the program on pretextual grounds (poor performance in classes where accommodations had been

denied). For instance, Jennifer Golden (Registrar) placed administrative holds on Plaintiff's accounts

after he persisted in asking for accommodations; Abigail Kelsen ceased communications with him; Dr.

Cypess and Dr. Asher were involved in disciplinary charges that arose only after Plaintiff pressed for

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

disability support. The timing and nature of these actions indicate they were done *because* Plaintiff asserted his ADA rights.

140.    **Legal Standard:** The ADA's anti-retaliation provision (42 U.S.C. § 12203) prohibits any form of retaliation against an individual who has exercised rights under the ADA. Similarly, the NYS Human Rights Law makes it unlawful to retaliate against someone for opposing disability-based discrimination or for filing a complaint. The elements mirror those in Count 10: protected activity, knowledge, adverse action, and causal connection. No showing of a separate disability discrimination is required – retaliation itself is independently actionable.

To establish retaliation, a plaintiff must show: (1) he engaged in protected activity, (2) defendants were aware of that activity, (3) defendants took adverse action, and (4) a causal connection between the protected activity and the adverse action. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (ADA retaliation analyzed under Title VII framework); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312–13 (2004) (NYSHRL retaliation requires showing opposition to discrimination and resulting adverse treatment). Retaliation is independently actionable even absent proof of underlying discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006).

141.    **Application:** Plaintiff engaged in protected activity by requesting accommodations and complaining to university officials when those accommodations were not provided. Defendants (particularly Golden and Kelsen, who handled records and accommodations, and Cypess/Asher, who handled discipline) were aware of Plaintiff's protected activity. The adverse actions – blocking Plaintiff's access to educational resources and expelling him shortly after his complaints – are clearly the type of actions that would deter a student from asserting ADA rights. The causal link is supported by the close temporal proximity and by explicit comments from some staff (for example, Plaintiff was told by a YU employee that he was "making trouble with all these requests"). Defendants cannot offer a

legitimate non-retaliatory reason for these coordinated actions, as they deviated from normal procedure.

Thus, YU and the named officials violated ADA § 12203 and Exec. Law § 296(7).

142.        **Count 13 – National Origin Discrimination** *(Title VI of the Civil Rights Act, 42 U.S.C.*

*§ 2000d; 42 U.S.C. § 1983; Against Defendants Yeshiva University, Sapir Amar, Yonathan Werta, Jose*

*Hambra, Salvador Serfaty, Norma Silbermintz, and John Does 1–10)*

143.        **Introduction:** Plaintiff, who is of European (German/Hispanic) heritage, was subjected to

harassment and adverse treatment based on his national origin and ethnicity. Defendants engaged in or

allowed discrimination that is prohibited by Title VI (as Yeshiva University receives federal funds) and

under 42 U.S.C. § 1983 (to the extent Defendants acted under color of law through joint action with state

actors or in a quasi-public function).

144.        **Factual Allegations:** Throughout Plaintiff's time at YU, he endured a pattern of xenophobic

harassment. Defendants Sapir Amar and Yonathan Werta (fellow students) on multiple occasions

directed ethnic slurs at Plaintiff – including taunts referencing Nazis and the Holocaust because of

Plaintiff's German background. For example, Amar called Plaintiff and joked about gas chambers in his

presence. Jose Hambra and Salvador Serfaty (other students) similarly made derogatory remarks about

Plaintiff's nationality. These incidents were reported to university officials (including Norma

Silbermintz, a professor), but no action was taken to stop the harassment. Instead, Yeshiva University

officials seemed to condone or at least tolerate this behavior; in one meeting, Silbermintz herself made a

comment that effectively endorsing the stereotype against Plaintiff. The discriminatory environment

worsened after Plaintiff reported the assault — some Defendants attempted to paint Plaintiff's

complaints as not credible due to his nationality.

145.        **Legal Standard: Title VI** provides that no person in the United States shall, "on the ground of

race, color, or national origin, be excluded from participation in, be denied the benefits of, or be

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.        |  Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint  (SCAC)  |    Page 68 of 106

subjected to discrimination under any program or activity receiving Federal financial assistance." 42

U.S.C. § 2000d. Title VI is enforceable through an implied private right of action for intentional

discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

A university may be liable under Title VI when it is deliberately indifferent to known acts of student-on-

student harassment based on race or national origin, where the harassment is so severe, pervasive, and

objectively offensive that it denies the victim access to educational opportunities. *See Zeno v. Pine*

*Plains Cent. Sch. Dist.*, 702 F.3d 655, 664–65 (2d Cir. 2012) (upholding jury verdict under Title VI

where school tolerated years of racist harassment); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629,

650 (1999) (Title IX framework applied to peer harassment.

Under 42 U.S.C. § 1983, individuals may be liable for constitutional violations when acting under color

of state law, including through joint action with state actors or where a private entity performs a public

function. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *Brentwood Acad. v. Tenn. Secondary*

*Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001).

146.        **Application:** Plaintiff was targeted *because of* his national origin. The slurs and disparate

treatment (e.g., not intervening in harassment, discouraging his complaints) demonstrate intentional

discrimination. Yeshiva University receives federal funds (e.g., via student financial aid programs),

bringing it under Title VI's mandate. The harassment by student Defendants was reported to appropriate

officials, making the University aware of it. Yet the University's response was clearly inadequate –

effectively **deliberate indifference** – as the harassment continued and even staff joined in prejudice.

This hostile environment interfered with Plaintiff's ability to fully partake in academic life (he felt

unsafe and marginalized). Accordingly, YU is liable under Title VI. The individual student Defendants

are liable under § 1983 in conjunction with YU if the court deems them joint actors with the school

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

(alternatively, they may be named under state law analogues or common law claims addressed

elsewhere).

147.     **Count 14 – Hostile Educational Environment (National Origin)** *(Title VI of the Civil Rights*

*Act, 42 U.S.C. § 2000d; Against All Defendants)*

148.     **Introduction:** Defendants created and sustained a hostile educational environment based on

Plaintiff's national origin (German and Hispanic), in violation of Title VI. This claim addresses Yeshiva

University's failure to prevent or address discriminatory abuse by students and staff.

149.     **Factual Allegations:** Factual Allegations: During his enrollment at Yeshiva University, Plaintiff

was subjected to a sustained pattern of national-origin harassment. Defendant Yonathan Werta directed

Nazi-based remarks at Plaintiff, calling the **[Adolf] "Hitler"** ; Defendant Sapir Amar targeted Plaintiff

on the basis of his European background; and Defendants Jose Hambra and Salvador Serfaty made

derogatory comments tied to Plaintiff's German nationality. Plaintiff reported this conduct to university

officials, including Professor Norma Silbermintz, but no effective remedial action followed. Instead,

Silbermintz used Plaintiff's nationality against him in addressing his complaints, reinforcing a hostile

environment. After Plaintiff reported the assault, the discrimination intensified, and certain Defendants

sought to undermine his credibility because of his nationality.

150.     **Legal Standard:** A Title VI hostile environment claim requires: (1) harassment based on

national origin; (2) so severe and pervasive it denies access to education; and (3) institutional knowledge

and deliberate indifference. See Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999); Zeno v.

Pine Plains Cent. Sch. Dist., 702 F.3d 655, 665 (2d Cir. 2012); Hayut v. SUNY, 352 F.3d 733, 745 (2d

Cir. 2003).

151.     **Application:** The slurs and threats were extreme, repeated, and occurred over time, affecting

Plaintiff's education, housing, and safety. YU knew and did not act. Retaliation followed his complaints,

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

not resolution. Under Zeno and Papelino v. Albany Coll., 633 F.3d 81, 91 (2d Cir. 2011), this inaction

and punishment demonstrate deliberate indifference. Plaintiff was effectively pushed out, denying him

equal educational access as prohibited by Title VI.

152.     **Count 15 –** Disparate Treatment (National Origin Discrimination and Age Discrimination)

**(Title VI of the Civil Rights Act, 42 U.S.C. § 2000d; Against All Defendents)**

153.     **Introduction**Defendants subjected Plaintiff to disparate treatment on the basis of his national

origin (German/Hispanic), in violation of Title VI. Unlike similarly situated students of American or

Israeli origin, Plaintiff was denied equal access to university programs and services.

154.     **Factual Allegations**While other students accused of misconduct were offered procedural

protections, counseling, or leniency, Plaintiff was denied accommodations, denied protection from

harassment, and was expelled without due process. For example, younger American-born students who

engaged in comparable or worse misconduct were permitted to remain enrolled, while Plaintiff was

treated as expendable because of his foreign status. Officials including Silbermintz and Levy explicitly

referenced Plaintiff's German nationality when dismissing his concerns, reflecting discriminatory

motive.

155.     **Legal Standard**Title VI prohibits federally funded institutions from treating students differently

based on national origin. See *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (Title VI prohibits

intentional discrimination); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012).

Unequal treatment of similarly situated individuals based on national origin suffices.

156.     **Application**The facts show that Plaintiff was singled out for harsher treatment than non-German

peers. This disparate treatment, coupled with administrators' explicit reliance on his national origin in

decision-making, constitutes intentional discrimination under Title VI.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.          | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)    | Page 71 of 106

157.    **Count 16 – Age Discrimination** *(N.Y. Executive Law § 296(1) & NYC Human Rights Law § 8-107(1)(a); Against Defendants Yeshiva University, Avi Feder, Norma Silbermintz, and Dr. Yedidya Levy)*

158.    **Introduction:** Defendants discriminated against Plaintiff, then age 30, by treating him less favorably due to his age in violation of New York State and City Human Rights Laws.

159.    **Factual Allegations:** Defendant Feder told Plaintiff he was "too old" for dorm life, then evicted him on pretext. Silbermintz questioned his presence in undergrad at "his age." Dr. Levy cited Plaintiff's age when denying support. Younger students were treated more favorably in similar situations.

160.    Legal Standard: The New York State Human Rights Law (NYSHRL) and New York City Human Rights Law (NYCHRL) prohibit educational institutions (and their employees) from discriminating against students on the basis of age. See *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 38 (1st Dep't 2011); *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 113 (1st Dep't 2012).unequal treatment at least partially motivated by age bias. Individual employees who actually participate in the discrimination can be held liable, and those who aid and abet can also be liable under Exec. Law § 296(6).

161.    **Application:** The explicit age-based remarks, close in time to adverse actions, support an inference of discrimination. Under *Melman*, such comments by decision-makers suffice to show bias. The claims meet the pleading threshold under both statutes. The explicit age-based remarks, close in time to adverse actions, support an inference of discrimination. Under *Melman*, such comments by decision-makers suffice to show bias. The claims meet the pleading threshold under both statutes.

162.    **Count 17 – Constructive Expulsion / Breach of Contract** *(Breach of Educational Contract and Implied Covenant of Good Faith; Against Defendant Yeshiva University).*

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

163.    **Introduction:**

Yeshiva University breached its contractual obligations to Plaintiff, as set forth in its policies and student handbook, by constructively expelling him without cause or due process. This also violated the implied covenant of good faith and fair dealing by depriving Plaintiff of the core benefits of the educational agreement.

164.    **Factual Allegations:** Plaintiff enrolled and paid tuition with the expectation—based on YU's published rules—that he would receive a fair educational process and only be dismissed for just cause, following disciplinary procedures including notice and hearing. In Spring 2025, following his protected complaints (see Counts 10 and 12), Plaintiff was abruptly barred from classes, removed from university systems, and informed he was "no longer a student"—all without formal notice, hearing, or appeal. YU's justification relied on pretextual claims of misconduct or academic failure, unsupported by record or process. These actions violated explicit provisions in YU's student handbook and amounted to a constructive expulsion.

165.    **Legal Standard:** In New York, the relationship between a private university and its students is contractual in nature. *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998). The contract terms are drawn from the institution's handbooks, policies, and accepted practices. A school breaches this contract when it fails to follow its own rules or acts arbitrarily. *Susan M. v. N.Y. Law Sch.*, 76 N.Y.2d 241, 245 (1990). New York also recognizes an implied covenant of good faith in educational contracts, barring institutions from acting in bad faith to defeat the student's legitimate expectations. See *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 414 (1980).

166.    **Application:** YU failed to follow its own disciplinary policies, denied Plaintiff basic procedural rights (notice, hearing, appeal), and removed him on retaliatory grounds. These actions breached both the express terms of the student contract and the implied covenant of fair dealing. As in *Gally*, where

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

expulsion without a hearing was found actionable, YU's conduct here frustrated the very purpose of the

agreement: to provide a fair and lawful education in exchange for tuition and academic participation.

### 167.    Count 18 – Fraudulent Misrepresentation (Enrollment Promises)
(New York Common Law; Against Defendant Yeshiva University)

168.    **Introduction:** YU induced Plaintiff to enroll by falsely representing that its campus was safe,

inclusive, and committed to protecting students from discrimination and retaliation.

169.    **Factual Allegations:** Before enrollment, Plaintiff reviewed YU's materials claiming a zero-

tolerance harassment policy, disability accommodations, and fair complaint processes. These

representations were made in brochures, the website, and emails from admissions officers. In reality, YU

tolerated harassment, failed to act on safety concerns (e.g., regarding Amar), and punished Plaintiff for

protected activity. Had Plaintiff known the truth, he would not have enrolled.

170.    **Legal Standard:** Fraudulent misrepresentation requires: (1) a false material statement, (2)

knowledge of falsity, (3) intent to induce reliance, (4) justifiable reliance, and (5) resulting harm.

See *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 31 N.Y.3d 569, 578 (2018). A

misrepresentation of existing fact, or a promise made with no intent to perform, is actionable.

171.    **170. Application:** YU's promises about campus safety and fairness were knowingly false or

made in bad faith. Plaintiff relied on those statements, enrolled, and suffered financial and educational

harm. Under *Ambac*, these allegations support a viable fraud claim.

### 172.    Count 19 – Fraudulent Billing / Deceptive Business Practices

(N.Y. Gen. Bus. Law § 349 and Common Law Fraud; Against Yeshiva University and John

Does 11–20)

173.    **Introduction:** YU issued a false $27,500 tuition bill to retaliate against Plaintiff and pressure

him amid legal disputes—violating GBL § 349 and constituting fraud.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

174.    **Factual Allegations:** In May 2025, YU sent a "Final Notice" billing Plaintiff for tuition he did not owe, threatening collections. Internal records (discovery pending) will show this charge was fabricated after Plaintiff's complaints. The invoice caused distress, confusion, and required Plaintiff to incur legal expenses.

175.    **Legal Standard:** GBL § 349 prohibits materially misleading, consumer-oriented business practices. *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000). Common law fraud requires false misrepresentation, scienter, intent, reliance, and harm. See *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009).

176.    **Application:** Billing a student for a fake debt is materially misleading and consumer-facing. Under *Stutman*, this supports a GBL § 349 claim. The misrepresentation also meets all fraud elements per *Eurycleia*, given Plaintiff's reliance, incurred expenses, and emotional harm.

177.    **Count 20 – Abuse of Proces (New York Common Law; Against Yeshiva University)**

178.    **Introduction:** YU misused the internal billing/collections process to retaliate against Plaintiff for protected activity, constituting abuse of process.

179.    **Factual Allegations:** YU's May 2025 "Final Notice" was used not to collect a legitimate debt, but to intimidate Plaintiff and pressure him during ongoing legal disputes. The implied threat of legal or credit consequences was weaponized to gain leverage.

180.    **Legal Standard:** Abuse of process in New York requires: (1) regularly issued legal process, (2) intent to harm without justification, and (3) use of the process to obtain a collateral objective. *Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (1984); *Board of Ed. v. Farmingdale Classroom Tchrs. Ass'n*, 38 N.Y.2d 397, 403 (1975).

181.    **Application:** The "Final Notice" invoked quasi-legal process, threatening adverse action on a fake debt. Under *Farmingdale*, using process to intimidate rather than pursue legitimate collection constitutes abuse. YU's aim was not recovery, but coercion.

182.    **Count 21 – Civil RICO (Pattern of Racketeering: Fraud & Retaliation)** *(Racketeer Influenced and Corrupt Organizations Act – 18 U.S.C. § 1962(c), § 1961; Against Defendants Yeshiva University, Seyfarth Shaw LLP,  Esther Sasson, Dov Kesselman, Ian M. Capell, and Kyle D. Winnick)*

183.    **Introduction:** Defendants conducted the affairs of an enterprise (Yeshiva University and its associates) through a pattern of racketeering activity, including multiple acts of mail and wire fraud and retaliation, in violation of the federal RICO statute. This pattern was used to punish Plaintiff for asserting his rights and to protect the enterprise's reputation by unlawful means.

184.    **Factual Allegations:** The **enterprise** in question is the association-in-fact of Yeshiva University and certain of its administrators and legal counsel (including the law firm Seyfarth Shaw LLP and attorneys Kesselman, Capell, and Winnick) who worked in concert. Over a period from approximately March 2024 through mid-2025, Defendants engaged in multiple predicate criminal acts:

   a.    **Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343):** Defendants transmitted false documents and communications to Plaintiff and third parties via mail and email as part of a scheme to defraud Plaintiff of money and rights. Examples include the **fraudulent $27,500 tuition bill** sent by email (Counts 18–19) and misleading correspondence to government agencies (e.g., false reports to SEVIS/immigration via electronic systems that Plaintiff was dismissed for cause, done to jeopardize his visa). The Seyfarth Shaw Defendants (Sasson, Kesselman, Capell, Winnick) aided these communications by drafting or sending letters containing false statements about Plaintiff's status and debts.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

    b.  **Retaliation Offenses:** While not traditional RICO predicates on their own, these fraudulent acts were undertaken in retaliation for Plaintiff's protected activities, and some may also qualify as witness tampering or obstruction (predicate acts under 18 U.S.C. § 1512 and § 1513, which *are* RICO predicates). For instance, attempts to intimidate Plaintiff into dropping legal action (by threatening deportation or financial ruin) constitute violations of 18 U.S.C. § 1512 (tampering with a witness/victim) and § 1513 (retaliating against a witness), which are enumerated racketeering acts.

    c.  **False federal reporting**: Defendants submitted fabricated reports to SEVIS and NYSDHR electronically, misrepresenting Plaintiff's status to disrupt his visa and obstruct oversight.

    These acts occurred on multiple occasions – at least several mail/email communications in April, May, and June 2025 – thus forming a **pattern** (continuity and relatedness) of racketeering activity. The Defendants acted with a common purpose: to discredit Plaintiff and shield the university from scandal and liability, thereby preserving the enterprise's operations and finances.

185.    **Legal Standard:** Under **18 U.S.C. § 1962(c)**, it is unlawful for any person employed by or associated with an enterprise engaged in interstate commerce to conduct or participate in the conduct of the enterprise's affairs through a pattern of racketeering activity. To state a claim under § 1962(c), a plaintiff must allege: (1) a RICO enterprise affecting interstate commerce; (2) the defendant's participation in the enterprise's affairs; (3) a pattern of racketeering activity; and (4) injury to business or property caused by those predicate acts. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Lundy v. Catholic Health Sys.*, 711 F.3d 106, 119 (2d Cir. 2013); *Cofacredit S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). Mail and wire fraud, and obstruction-related retaliation under §§ 1512 and 1513, are valid RICO predicates. See *United States v. Eisen*, 974 F.2d 246, 254 (2d Cir.

1992). To state a claim under § 1962(c), a plaintiff must allege: (1) a RICO enterprise affecting interstate commerce; (2) the defendant's participation in the enterprise's affairs; (3) a pattern of racketeering activity; and (4) injury to business or property caused by those predicate acts. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Lundy v. Catholic Health Sys.*, 711 F.3d 106, 119 (2d Cir. 2013); *Cofacredit S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). Mail and wire fraud, and obstruction-related retaliation under §§ 1512 and 1513, are valid RICO predicates. See *United States v. Eisen*, 974 F.2d 246, 254 (2d Cir. 1992).

186.     **Application:** YU and Seyfarth formed an enterprise engaged in interstate commerce (higher education, law, immigration filings). Each Defendant participated directly or indirectly in its retaliatory operations. The scheme used mail and electronic systems to transmit false billing and federal reports and to threaten immigration action—all designed to deter Plaintiff's legal claims. These repeated acts over more than a year show closed-ended continuity. Plaintiff suffered direct property loss: financial outlays to contest fraudulent bills, loss of academic status, and reputational and visa-related damages. These constitute RICO injuries under *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). Plaintiff seeks treble damages, costs, and fees under 18 U.S.C. § 1964(c).

187.     **Count 22 – Spoliation of Evidence** *(New York Common Law; Against Defendants Dr. Rebecca Cypess and Yeshiva University).*

188.     **Introduction: Introduction:** Defendants intentionally destroyed or failed to preserve critical evidence relating to Plaintiff's claims, thereby prejudicing his ability to pursue this litigation. Such spoliation warrants sanctions or, under New York precedent, recognition as an independent tort in egregious circumstances.

189.     **Factual Allegations:** Evidence concerning the March 21, 2024 assault and subsequent retaliation was deliberately lost under Defendants' control: (i) dormitory, library and street security; regarding the

Case 1:25-cv-02431-AT-RWL    Document 92    Filed 10/23/25    Page 78 of 110

Heilmann v. Yeshiva University, et al.              | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)         |      Page 78 of 106

March 13,20,21,2025 and September 7, 2025; footage was not preserved despite Plaintiff's preservation request; (ii) internal emails between YU officials (including Cypess) and plaintiff were deleted after legal counsel contacted YU—an administrator admitted "emails were cleaned up"; (iii) Sapir Amar destroyed a handwritten note implicating him; and (iv) These acts occurred when litigation was reasonably foreseeable, triggering a duty to preserve. The loss has materially impaired Plaintiff's ability to prove his case.

190.    **Legal Standard:** New York law authorizes courts to sanction spoliation by adverse inference or preclusion (*VOOM HD Holdings LLC v. EchoStar Satellite L.L.C.*, 93 A.D.3d 33, 45 (1st Dep't 2012)), and in rare cases recognizes an independent tort for egregious spoliation (*Ortega v. City of New York*, 9 N.Y.3d 69, 76 (2007)). Federal courts similarly hold that willful destruction of evidence once litigation is reasonably foreseeable is sanctionable (*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)). Elements include: duty to preserve, culpable destruction, and prejudice.

191.    **Application:** YU and Cypess had clear notice to preserve relevant evidence after Plaintiff's internal complaints and lawsuit. The loss of video, emails, and notes was not accidental but willful. This conduct constitutes spoliation under *VOOM* and *Residential Funding*. Plaintiff requests relief including adverse inference and sanctions, and, if warranted, recognition of a separate tort remedy under *Ortega*.

192.    **Count 23 – Witness Intimidation** *(42 U.S.C. § 1985(2) and New York Common Law; Against Defendants Dr. Yedidya Levy, Judith E. Lopez, and Yeshiva University)*

193.    **Introduction:** Defendants conspired to intimidate potential witnesses to deter them from testifying or supporting Plaintiff. Such conduct violates the second clause of 42 U.S.C. § 1985(2), which prohibits conspiracies to obstruct justice in state or territorial proceedings, and constitutes tortious intimidation under New York law.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

194.    **Factual Allegations:** After the March 21, 2024 assault, Defendants Levy and Lopez, acting with

YU's knowledge, at least one person witnesses favorable to Plaintiff. Levy warned one student "not to

get involved," while Lopez questioned another student's immigration status—implicitly threatening

disciplinary or legal consequences.

195.    **Legal Standard:** Section 1985(2) prohibits conspiracies to intimidate or deter witnesses in

judicial or quasi-judicial proceedings. See *Haddle v. Garrison*, 525 U.S. 121, 125–26 (1998) (injury

from witness intimidation actionable under § 1985(2)); *Chahal v. Paine Webber Inc.*, 725 F.2d 20, 23

(2d Cir. 1984) (intimidation of witnesses sufficient for claim). Under New York law, intimidation of

witnesses may give rise to civil liability under prima facie tort or intentional infliction theories.

196.    **Application:** Defendants conspired to deter witnesses from supporting Plaintiff by threats of

immigration scrutiny and disciplinary punishment. These acts satisfy § 1985(2)'s elements: (1) a

conspiracy among Levy, Lopez, and YU; (2) acts of intimidation; (3) aimed at deterring testimony in

foreseeable proceedings (university tribunals and Plaintiff's anticipated lawsuit); and (4) resulting

prejudice to Plaintiff's ability to secure testimony. This conduct is independently tortious under New

York law and actionable under § 1985(2).

197.    **Legal Standard:** The latter clause of **42 U.S.C. § 1985(2)** addresses conspiracies to deter by

intimidation or threat any party or witness in a **state** court proceeding (or to injure them for having

attended or testified). Although Plaintiff's case is federal, these acts occurred before filing; still, the

statute can apply if Defendants conspired to impede witnesses in *any* legal proceeding. For the state

common law perspective, New York recognizes that coercing or frightening witnesses can be addressed

via civil suits for damages (often under prima facie tort or intentional infliction of emotional distress if

no other category fits, since there's no standalone "witness intimidation" tort name, but the conduct is

tortious).

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

198.    **Application:** By warning and coercing, Levy and Lopez (agents of YU) conspired to hinder the truthful testimony that might emerge in Plaintiff's favor. This conspiracy was aimed at obstructing justice in any potential proceedings (which at the time were reasonably foreseeable in university tribunals or court). The intimidation included subtle threats (e.g., referencing immigration or discipline) which qualify as "intimidation" under § 1985(2). Given the nature of YU's influence over students, these threats carried weight and indeed at least one supportive witness became fearful to submit an affidavit on Plaintiff's behalf. All elements of a § 1985(2) violation are met: (a) a conspiracy between two or more (Levy, Lopez, and others at YU); (b) to deter witnesses by intimidation; (c) in respect to a pending or future proceeding (here, at minimum, YU's internal proceedings and Plaintiff's then-anticipated lawsuit); and (d) resulting injury to Plaintiff's ability to access testimony. Under state law, this conduct was intentional, without justification, and caused harm – satisfying prima facie tort if needed.

199.    **Count 24 – Negligent Hiring and Supervision** *(New York Common Law; Against Defendant Yeshiva University)*

200.    **Introduction:** Yeshiva University negligently hired, retained, and supervised individuals unfit for roles of authority, thereby enabling foreseeable misconduct that harmed Plaintiff.

201.    **Factual Allegations:** YU admitted and empowered students and staff with known red flags. Sapir Amar had a documented history of aggression, yet was placed in peer leadership roles. Moshe Davidovics had a reputation for dishonesty and bullying, but was unsupervised. Administrators such as Judith Lopez and Dr. Yedidya Levy lacked training in student affairs law and had prior complaints, yet YU retained them. This failure to screen and supervise foreseeably enabled the assault, defamation, retaliation, and rights violations inflicted on Plaintiff.

202.    **Legal Standard:** An employer is liable for negligent hiring or supervision where it knew or should have known of an employee's propensity for the conduct that caused the injury, and the tort

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

occurred on its premises or in the course of foreseeable interaction. *Ehrens v. Lutheran Church*, 385

F.3d 232, 235 (2d Cir. 2004); *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 161

(2d Dep't 1997). This claim applies particularly when the wrongful acts fall outside the scope of

employment, where respondeat superior does not cover them.

203.    **Application:** YU knew or should have known of Amar's violent tendencies, Davidovics'

dishonesty, and Lopez's and Levy's unsuitability for sensitive roles. Reasonable care required either

denying them authority or closely supervising them. Instead, YU's negligence created the conditions for

Plaintiff's assault, defamation, and retaliatory expulsion. As in *Ehrens*, where failure to act on known

propensities supported liability, YU's inaction directly facilitated the harm suffered by Plaintiff.

204.    **Count 25– Violation of Equal Protection (42 U.S.C. § 1983)** *(Fourteenth Amendment Equal

Protection via § 1983; Against Defendants Yeshiva University, Sapir Amar, Yonathan Werta, and Jose

Hambra)*

205.    **Introduction:** Defendants, acting under color of state law, deprived Plaintiff of the equal

protection of the laws by intentionally discriminating against him on the basis of national

origin/ethnicity and by condoning peer harassment, in violation of the Fourteenth Amendment.

206.    **Factual Allegations:** Though a private institution, YU entwined itself with state authority: it

operates a campus security force vested with delegated police powers and acted jointly with NYPD

officers in responding to incidents. YU receives public funding and regulates discipline in a quasi-

governmental capacity. In handling Plaintiff's complaints, YU and its agents acted "under color of law."

Plaintiff, of German/Hispanic origin, was treated less favorably than similarly situated students: his

complaints were ignored, he was expelled, while the native-born aggressors (Amar, Werta, Hambra)

were protected. These individuals, aided by YU officials, provided false reports to campus security and

police that painted Plaintiff as culpable due to bias.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

207.    **Legal Standard:** An Equal Protection claim under § 1983 requires allegations of disparate

treatment of similarly situated individuals based on an impermissible classification. *Village of*

*Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir.

2000). Private entities may be liable when performing public functions or acting jointly with state

officials. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001).

208.    **Application:** Plaintiff plausibly alleges state action under both the public-function and joint-

action tests: YU's security exercised delegated police authority and collaborated with NYPD in ways

inseparable from state functions. Defendants' discriminatory acts—including ignoring slurs, shielding

assailants, and expelling Plaintiff—were motivated by ethnic bias, as evidenced by differential treatment

of similarly situated students. The participation of Amar, Werta, and Hambra in providing false reports,

coupled with YU's adoption of their accounts, constitutes joint action in depriving Plaintiff of equal

protection. At the pleading stage, these allegations suffice under § 1983.

209.    **Count 26 – Civil Rights Conspiracy (42 U.S.C. § 1985(3); Against Defendants Sapir Amar,**
**Moshe Davidovics, Yeshiva University, Dr. Rebecca Cypess, Jennifer Golden, Dr. Sara Asher, Dr.**
**Yael Muskat, Judith E. Lopez, and Dr. Yedidya Levy)**

210.    **Introduction:** Defendants conspired to deprive Plaintiff of the equal protection of the laws and

equal privileges under the Constitution, targeting him based on national origin/ethnicity and retaliatory

animus, in violation of 42 U.S.C. § 1985(3).

211.    **Factual Allegations:** Beginning March 21, 2024, student Defendants Amar and Davidovics,

together with YU staff (Cypess, Golden, Asher, Muskat, Lopez, Levy), coordinated to protect Amar and

shield YU by sacrificing Plaintiff. Overt acts included: (i) Amar and Davidovics spreading false

statements; (ii) administrators (Cypess, Asher, Golden, Levy) fabricating academic/disciplinary charges;

(iii) Lopez and Levy intimidating witnesses; and (iv) Muskat supporting a pretextual mental health

narrative. Emails and meetings reflect an agreement to expel Plaintiff and discredit his complaints. The

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Case 1:25-cv-02431-AT-RWL    Document 92    Filed 10/23/25    Page 83 of 110

Heilmann v. Yeshiva University, et al.          |   Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint  (SCAC)   |   Page 83 of 106

scheme was fueled by bias against Plaintiff as an outsider (German/Hispanic background, older, non-U.S. student) and as a whistleblower against YU.

212.     **Legal Standard:** A § 1985(3) claim requires: (1) a conspiracy; (2) for the purpose of depriving equal protection or equal privileges; (3) an overt act in furtherance; and (4) resulting injury. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). The conspiracy must be driven by racial or class-based discriminatory animus. The Second Circuit recognizes national origin discrimination as sufficient animus. *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993).

213.     **Application:** Defendants entered into a meeting of the minds to ensure Plaintiff was expelled, defamed, and silenced, as evidenced by coordinated communications and actions. Numerous overt acts were taken—false reports, intimidation, fraudulent billing—all advancing the conspiracy's goal. Plaintiff suffered direct injury to person and property. The conspiracy was fueled by class-based animus: Plaintiff's foreign national origin and whistleblower status. As in *Mian*, allegations of coordinated discriminatory acts based on ethnicity suffice to state a § 1985(3) conspiracy.

214.     **Count 27 – Constructive Retaliation (N.Y. Exec. Law § 296(7); ADA, 42 U.S.C. § 12203; Against Defendants Jennifer Golden, Dr. Sara Asher, Dr. Rebecca Cypess and Dr. Yael Muskat, Dr. Yedidya Levy)**

215.     **Introduction:** Defendants retaliated against Plaintiff for engaging in protected activity by creating conditions so intolerable that he was effectively forced to withdraw from Yeshiva University—amounting to a retaliatory constructive expulsion. Retaliation claims under the ADA and NYSHRL have been addressed in Counts 10 and 12; this Count applies those principles to the constructive expulsion context.

216.     **Factual Allegations:** After Plaintiff lodged discrimination complaints and requested accommodations, Golden, Asher, and Cypess engaged in coordinated retaliation: (i) Golden froze Plaintiff's account and obstructed administrative functions; (ii) Asher, Cypess manipulated grades and denied exam accommodations despite medical documentation; and (iii) Dr. Yedidya Levy and Dr. Yael

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Muskat, head of the University Counseling Center, wrote or procured a false mental health evaluation (see Count 33) labeling Plaintiff as unstable (NYSDHR Statement), which was then used to justify expelling him and deterred Plaintiff from seeking further on-campus support, by September 2025, Plaintiff's academic and reputational position was rendered untenable, compelling his departure under duress.

217.     **Legal Standard:** Both the ADA and NYSHRL forbid retaliation against individuals for protected activity. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). Retaliatory constructive discharge occurs when conditions are made so intolerable that a reasonable person would feel compelled to resign. *Green v. Brennan*, 578 U.S. 547, 555 (2016). Courts analogize this principle to educational settings when retaliatory acts force withdrawal.

218.     **Application:** Defendants intentionally imposed administrative, academic, and reputational barriers in direct response to Plaintiff's protected activity. A reasonable student in Plaintiff's position—facing failing grades, locked records, and a fabricated psychiatric stigma—would feel compelled to leave. This constitutes constructive expulsion under both the ADA's anti-retaliation provision and N.Y. Exec. Law § 296(7). The coordinated conduct of Golden, Cypess, Asher, and Levy, Muskat satisfies the causal link between Plaintiff's protected activity and his involuntary departure.

219.     **Count 28 – Violation of Student Due Process Rights (U.S. Constitution, N.Y. Constitution, and Contractual Fairness; Against Defendant Yeshiva University)**

220.     **Introduction:** Yeshiva University expelled Plaintiff without affording the most basic procedural protections—adequate notice of charges and a meaningful opportunity to be heard. Although YU is private, it contractually promised fair procedures through its handbook and, acting in concert with state authority, triggered constitutional due process obligations.

221.     **Factual Allegations:** In Fall 2025, Plaintiff was expelled without receiving written notice of any charges or a disciplinary hearing. YU's handbook guaranteed notice and an impartial panel for serious

discipline, but administrators Dr. Sara Asher and Dr. Rebecca Cypess made the decision privately and

presented Plaintiff with a fait accompli. Jennifer Golden refused to allow appeal or disclosure of reasons.

The expulsion deprived Plaintiff of his property interest in paid tuition and continued enrollment, and his

liberty interest in avoiding the stigma of expulsion, while ignoring both contractual and constitutional

norms of fairness.

222.        **Legal Standard:** Procedural due process requires notice and an opportunity to be heard before

significant deprivation of liberty or property. *Goss v. Lopez*, 419 U.S. 565, 579 (1975). Private

universities may incur constitutional obligations where entwined with state action (*Brentwood Acad. v.

Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)) or where campus security exercises

delegated police powers. At minimum, New York law requires private universities to substantially

comply with their own rules of fairness. *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 660 (1980).

223.        **Application:** YU provided no notice, no charges, and no hearing, directly violating *Goss* and its

own contractual policies under *Tedeschi*. Even if YU disputes state-action status, its actions fail the

"fundamental fairness" standard New York courts impose on private institutions. Plaintiff was arbitrarily

deprived of education, tuition, and reputation without process, establishing a violation of procedural due

process and contractual obligations.

224.        **Count 29 – Academic Retaliation (N.Y. Educ. Law; 42 U.S.C. § 1983; Against Yeshiva.
University, Dr. Rebecca Cypess, Dr. Sara Asher, and Jennifer Golden)**

225.        **Introduction:** Defendants retaliated against Plaintiff for protected complaints by altering grades,

blocking academic access, and canceling his SEVIS record, forcing loss of his visa.

226.        **Factual Allegations:** After Plaintiff hired an attornrey to handle his, Cypess downgraded his

academic work without basis; Asher and Cypess influenced failing grades and denied accommodations;

Golden and Cypess froze his account and withheld transcripts, it made the Plaintiff impossible to

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

transfer to another University. YU immediately terminated his SEVIS record, cutting off his F-1 visa—

an unusual, punitive step. These acts aimed to punish Plaintiff and end his education.

227.    **Legal Standard:** Academic decisions must not be arbitrary or in bad faith. *Olsson v. Bd. of*

*Higher Educ.*, 49 N.Y.2d 408, 413 (1980). Retaliatory actions linked to protected complaints are

unlawful. *Zeno v. Pine Plains*, 702 F.3d 655, 666 (2d Cir. 2012); *Treglia v. Town of Manlius*, 313 F.3d

713, 720 (2d Cir. 2002). SEVIS reporting, a federally regulated function, may establish joint action

under § 1983.

228.    **Application:** Defendants' grading and visa actions lacked academic or administrative

justification, were retaliatory, and directly harmed Plaintiff's education and immigration status. These

arbitrary and capricious acts are actionable under New York law and, insofar as tied to government

reporting, under § 1983.

229.    **Count 30 — Negligence / Gross Negligence (Failure to Protect from Known Threat)**

**Against Yeshiva University, Dr. Sara Asher, Dr. Rebecca Cypess, Dr. Yael Muskat, Dr. Yedidya**

**Levy and Joe Bednarsh)**

230.    **Introduction.** Defendants breached their duty of care—and, in the alternative, acted with gross

negligence—by failing to take basic protective steps after they had actual notice that student Sapir Amar

posed a specific, continuing danger to Plaintiff.

231.    **Factual Allegations.** After the March 21 assault, Plaintiff immediately notified Asher (student

conduct authority) and Muskat (counseling director) that he feared further attacks by Amar (and

Davidovics) and requested no-contact orders, security intervention, and/or relocation. Despite this notice

and their authority to act, Defendants: (i) issued no interim measures; (ii) did not suspend or restrict

Amar; (iii) arranged/allowed a March 25 meeting where Plaintiff was detained by staff despite his safety

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

concerns; and (iv) left Plaintiff exposed while Amar continued to menace him on campus in April. YU

provided no protection.

232.      **Legal Standard.** Schools owe a duty to exercise reasonable care to protect students

from **foreseeable** harm by third parties when they have notice and the ability to act. See Mirand v. City

of N.Y., 84 N.Y.2d 44, 49 (1994); Eiseman v. State, 70 N.Y.2d 175, 187 (1987); see also Nallan v.

Helmsley-Spear, 50 N.Y.2d 507, 519–21 (1980) (premises owner liability for criminal assaults with

notice); Maheshwari v. City of N.Y., 2 N.Y.3d 288, 294–96 (2004) (foreseeability and reasonable

precautions). A duty may arise where the defendant has **authority to control** the wrongdoer and **actual**

**knowledge** of the need to exercise that control. See Purdy v. Public Adm'r, 72 N.Y.2d 1, 8–9

(1988). **Gross negligence** is conduct showing "reckless disregard for the rights of others" or that

"smacks of intentional wrongdoing." Sommer, 79 N.Y.2d at 554; Colnaghi, 81 N.Y.2d at 823–24.

Punitive damages may be available where conduct reflects a high degree of moral culpability or

conscious indifference to safety. See Marinaccio v. Town of Clarence, 20 N.Y.3d 506, 511–12 (2013).

233.      **Application.** Defendants had **actual notice** of a concrete, ongoing threat (post-assault reports

naming Amar; requests for no-contact/security) and **authority** to impose interim restrictions. Yet they

did **nothing**: no no-contact order, no security escort or relocation, no interim suspension—while

facilitating a March 25 encounter that heightened risk. Failing to take **basic, readily available**

**precautions** in the face of a known, specific violent actor plausibly states **ordinary negligence**. And the

conscious decision to disregard repeated, explicit pleas for protection—coupled with allowing a coercive

meeting and leaving Plaintiff exposed to further menacing—plausibly alleges **gross negligence/reckless**

**disregard**.

234.      **Count 31 – Threats of Deportation (N.Y. Exec. Law § 296(7); N.Y. Penal Law § 135.60;**

**Against Dr. Yedidya Levy, Judith E. Lopez, and Jennifer Golden)**

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

235.    **Introduction:** Defendants retaliated against Plaintiff by threatening him with deportation and misuse of immigration reporting to silence his complaints. Such threats violate the NYSHRL's anti-retaliation provision and constitute coercion under N.Y. Penal Law § 135.60(5).

236.    **Factual Allegations:** On March 25, 2024, Dr. Levy told Plaintiff his "visa will be canceled immediately" unless he dropped his grievances, with Lopez reinforcing the threat by warning he should "think about [his] family back home." In September 2025, Golden emailed that YU had "informed SEVIS" of Plaintiff's termination, timed to pressure him as he pursued OCR and litigation. These statements conveyed imminent immigration harm designed to intimidate Plaintiff into silence.

237.    **Legal Standard:** NYSHRL § 296(7) prohibits retaliation for opposing discrimination. Courts recognize immigration-status threats as retaliation. *Matter of Albunio v. City of New York*, 16 N.Y.3d 472, 477 (2011) (broad protection against retaliation). Threats to expose or misuse immigration status also constitute coercion under Penal Law § 135.60(5). See *United States v. Rivera*, 799 F.3d 180, 185 (2d Cir. 2015) (immigration threats may constitute unlawful coercion).

238.    **Application:** Defendants' threats directly followed Plaintiff's protected activity and were meant to chill further action. They lacked legitimate purpose, weaponizing SEVIS reporting as retaliation. This conduct satisfies § 296(7)'s retaliation elements and falls within New York's definition of coercion, warranting liability.

239.    **Count 32 – Defamatory Statements to Government Agencies (New York Common Law; Against Yeshiva University, Seyfarth Shaw LLP, Dov Kesselman, Ian M. Capell)**

240.    **Introduction:** Defendants defamed Plaintiff by making knowingly false reports to government agencies, accusing him of criminal and wrongful conduct. Such statements to law enforcement and federal regulators constitute defamation per se.

241.    **Factual Allegations:** After the March 21 assault, Seyfarth attorneys Kesselman, Capell acting for YU, communicated with NYSDHR, falsely portraying Plaintiff as Amar's aggressor and suggesting

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

a history of instability. These were deliberate lies, published to official bodies, designed to protect YU

and discredit Plaintiff. YU approved and ratified these communications.

242.     **Legal Standard:** False statements to police or regulators accusing someone of crimes or

misconduct are defamation per se. *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992). Communications

to law enforcement are only qualifiedly privileged, defeated by malice. *Toker v. Pollak*, 44 N.Y.2d 211,

219 (1978). Malice is shown where defendants knew the statements were false or acted with reckless

disregard.

243.     **Application:** Defendants had ample evidence Plaintiff was the victim, not the aggressor, yet

knowingly reported the opposite. These false reports to NYPD, OCR, and possibly immigration

authorities were calculated to destroy Plaintiff's credibility. The accusations of assault, harassment, and

dishonesty are defamatory per se, requiring no proof of special damages. Plaintiff nonetheless suffered

reputational injury, legal scrutiny, and emotional distress as a direct result.

244.     **Count 33 – Interference with Educational Opportunity (N.Y. Educ. Law; 42 U.S.C. § 1983;
Against Yeshiva University)**

245.     **Introduction:** Yeshiva University wrongfully expelled Plaintiff withheld his records, and spread

stigmatizing information, thereby blocking his ability to continue his education. This arbitrary

interference violates New York's public policy favoring educational access and, if state action is found,

Plaintiff's constitutional liberty interests.

246.     **Factual Allegations:** Following expulsion, YU refused to release Plaintiff's transcript promptly,

later issuing one marked "disciplinary expulsion." Staff told at least one institution that Plaintiff was

"involved in a violent incident," sabotaging transfer applications. YU also withheld tuition refunds,

limiting Plaintiff's ability to re-enroll elsewhere. These actions ensured Plaintiff's educational career

was cut off.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

247.     **Legal Standard:** New York law requires universities to substantially comply with their own rules and forbids arbitrary discipline. *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 660 (1980). Under the Fourteenth Amendment's "stigma-plus" doctrine, attaching a stigmatizing label (e.g., violent or expelled for misconduct) while terminating a protected status triggers due process protections. *Paul v. Davis*, 424 U.S. 693, 711 (1976); *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994).

248.     **Application:** By refusing to provide a usable transcript, marking Plaintiff with "disciplinary expulsion," and spreading defamatory information, YU intentionally prevented Plaintiff from pursuing further education. This interference was punitive, unjustified, and violated both New York's fairness requirements and, under the stigma-plus doctrine, Plaintiff's constitutional rights.

249.     **Count 34 – Falsified Mental Health Report (Defamation and Breach of Privacy; Against Yeshiva University, Dr. Yedidya Levy, and Dr. Yael Muskat, Dr. Sara Asher )**

250.     **Introduction:** Defendants fabricated and circulated a false mental health report (NYSDHR Statement) labeling Plaintiff as unstable and dangerous, in order to discredit him and justify expulsion. These statements were defamatory per se and violated confidentiality obligations.

251.     **Factual Allegations:** After briefly meeting Plaintiff under the guise of support, Dr. Muskat and Levy are believed to authored a memorandum describing him as "paranoid, delusional, and a potential threat," (NYSDHR Statement) without clinical basis. The report was shared internally with YU administrators (including Levy, Asher, and counsel) and possibly with outside authorities to rationalize expulsion and SEVIS reporting and NYSDHR. Plaintiff later learned of the report through a staff member. In reality, Plaintiff's diagnoses were limited to PTSD and anxiety from the assault. The report's false claims imputed serious mental illness, stigmatizing Plaintiff and undermining his credibility.

252.     **Legal Standard:** False statements imputing mental illness are defamatory per se under New York law. *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992). Psychologist–patient communications are

privileged under CPLR § 4507, and unauthorized disclosure or falsification may support claims for

breach of fiduciary duty and intentional infliction of emotional distress. See *Doe v. Community Health

Plan-Kaiser Corp.*, 268 A.D.2d 183, 187 (3d Dep't 2000) (disclosure of confidential medical

information actionable).

253.    **Application:** Muskat and Levy believed to used a falsified mental health record to smear

Plaintiff's credibility and justify institutional retaliation. The statements were knowingly false, shared

beyond any privileged circle, and motivated by malice. They imputed serious mental disease,

constituting defamation per se, and violated Plaintiff's right to confidentiality in psychological

information. YU is vicariously liable for its agents' conduct.

254.    **Count 35 – Failure to Engage in Interactive Process (ADA & N.Y. Exec. Law § 296;
Against Yeshiva University and Dr. Sara Asher, Dr. Rebecca Cypess, Jennifer Golden, Esther
Sasson, Joe Bednarsh)**

255.    **Introduction:** Defendants violated the ADA and NYSHRL by refusing to engage in the

interactive process after Plaintiff requested reasonable accommodations for his disabilities.

256.    **Factual Allegations:** Following his traumatic brain injury and hearing impairment, Plaintiff

sought accommodations including exam deferrals, reduced course load, and assistive technology.

Despite providing medical documentation, Dean Bednarsh, Dean Asher, Esther Sasson, Jennifer Golden

and Dean Cypess ignored or denied these requests and refused to discuss alternatives. YU never initiated

the required interactive process to identify reasonable accommodations.

257.    **Legal Standard:** The ADA and NYSHRL require institutions to engage in good faith in an

interactive process once an accommodation request is made. *McBride v. BIC Consumer Prods. Mfg. Co.*,

583 F.3d 92, 99 (2d Cir. 2009). Failure to participate in this process is itself a violation, even if no

reasonable accommodation ultimately exists.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

258.    **Application:** By stonewalling Plaintiff's accommodation requests and denying adjustments without discussion, YU and Asher breached their obligations. This failure compounded Plaintiff's academic difficulties and contributed directly to his constructive expulsion.

259.    **Count 36 – Retaliatory Billing & Financial Pressure (N.Y. Exec. Law § 296(7); Against Yeshiva University and Doe 11-20)**

260.    **Introduction:** Defendants retaliated against Plaintiff by issuing fraudulent tuition bills and financial holds to pressure him to abandon his complaints.

261.    **Factual Allegations:** After Plaintiff filed discrimination grievances, YU sent him an invoice for $27,500 in "tuition owed," despite Plaintiff's enrollment having been terminated. The bill was followed by collection threats and transcript holds, creating financial and reputational harm. These demands were knowingly baseless and timed to coincide with Plaintiff's protected activity.

262.    **Legal Standard:** Retaliatory financial penalties imposed after protected complaints violate the NYSHRL's anti-retaliation provision. *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312–13 (2004) (retaliation requires adverse action causally linked to protected activity). Financial coercion qualifies as an adverse action.

263.    **Application:** YU weaponized billing and administrative holds to punish Plaintiff for asserting his rights. The fabricated debt was a retaliatory act under § 296(7), causing direct financial loss and interfering with Plaintiff's ability to continue his education.

# F. Prayer for Relief

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

## A. Compensatory and Punitive Damages (Monetary Relief)

Plaintiff seeks a total monetary award of **$1,260,000,000 (one billion, two hundred sixty million U.S. dollars)**, comprised of approximately **$323,871,347 (three hundred twenty-three million, eight hundred seventy-one thousand, three hundred forty-seven U.S. dollars)** in **compensatory damages** and **$936,128,653 (nine hundred thirty-six million, one hundred twenty-eight thousand, six hundred fifty-three U.S. dollars)** in **punitive damages**. This yields a **punitive-to-compensatory ratio of approximately 3.9 to 1**, which Plaintiff maintains is both **constitutionally proportionate** and **legally warranted** given the egregious, willful, and malicious nature of the misconduct alleged. A detailed breakdown is given in **_Exhibit A_**.

This ratio comports with _State Farm Mut. Auto. Ins. Co. v. Campbell_, 538 U.S. 408 (2003), and _BMW of N. Am., Inc. v. Gore_, 517 U.S. 559 (1996), where the U.S. Supreme Court held that punitive damages must bear a reasonable relationship to compensatory damages, and may reach ratios of **4:1 or higher** where the conduct is particularly **reprehensible**, involves **public harm**, or reflects **repeated intentional misconduct**.

## B. Declaratory Relief

Plaintiff seeks a formal judicial declaration that:

- **Civil Rights Violations:** Defendants' actions violated Plaintiff's rights under federal and state civil rights statutes.

- **Unlawful Retaliation:** Defendants unlawfully retaliated against Plaintiff for his protected speech and for lodging legal complaints (i.e. for engaging in activities protected under law).

- **Invalidity of Expulsion and Penalties:** Plaintiff's expulsion from Yeshiva University, the termination of his immigration status, and the academic penalties imposed against him were unlawful and are therefore **void** and of no effect.

- **False Statements in Legal Proceedings:** Defendants' submissions to the New York State Division of Human Rights (NYSDHR), and their filings in court, contained knowingly false and defamatory assertions, in violation of their ethical obligations and Plaintiff's rights (and in contravention of constitutional norms).

## C. Injunctive and Equitable Relief

### I. Individual Relief

1. **Immediate Readmission (Cost-Free):** Reinstate Plaintiff as a student in good standing at Yeshiva University, with waiver of tuition, housing, and fees for the remainder of his program, consistent with the equitable "make-whole" principle recognized in *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).

2. **Immigration Restoration:** Direct Yeshiva to issue a corrected I-20 and provide certified letters to DHS and DOS supporting reinstatement. Defendants shall bear all legal and administrative costs worldwide relating to Plaintiff's immigration status or travel.

3. **Transcript Purge and Record Correction:** Remove all retaliatory or discriminatory failing grades, disciplinary notations, and adverse entries. Specifically, all "F" grades imposed during **Fall 2023 and Spring 2024**, which resulted from unlawful discrimination and retaliation, shall be permanently reversed. Plaintiff's transcript shall affirmatively reflect that these corrections were court-ordered due to unlawful conduct by Defendants, consistent with *Goss v. Lopez*, 419 U.S. 565, 574–75 (1975).

4. **No Retaliation or Contact:** Issue a permanent injunction barring Defendants—including individual attorneys **Kyle D. Winnick, Dov Kesselman, and Ian M. Capell**—from contacting Plaintiff or his family

outside of litigation, or engaging in surveillance, defamation, financial retaliation, or immigration

interference.


## II. Structural Relief

5. **Independent Monitor:** Appoint, at Defendants' expense, an independent civil rights monitor for

five (5) years, extendable to ten (10) upon non-compliance, with authority to audit Yeshiva's

compliance with Title VI, ADA, and FERPA; review Seyfarth's litigation conduct; and report

directly to the Court (*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971)).

6. **Scholarship and Support:** Require Yeshiva to provide Plaintiff a full scholarship to complete

his degree and, together with Seyfarth, establish a permanent **"Yisrael Z. Heilmann Civil Rights
Scholarship"** endowment to benefit international and disabled students.

7. **Independent Ombudsperson:** Establish a fully funded Ombudsperson's office, led by an

independent professional, with jurisdiction over Title VI, ADA, FERPA, and retaliation complaints.

The Ombudsperson shall report annually to the Court and Yeshiva's Board of Trustees.

8. **Mandatory Training:** Require annual civil rights and anti-retaliation training for trustees,

administrators, faculty, campus security, and Seyfarth attorneys. Completion shall be certified, and

summaries of completion shall be posted on Defendants' websites.

9. **Disciplinary Reviews and Attorney Referral:** Direct Yeshiva to conduct disciplinary reviews

of implicated administrators, and refer misconduct by Seyfarth attorneys to the New York State Bar.

If warranted, referrals shall also be made to the ABA and relevant foreign bar authorities.

10. **Public Statement:** Direct Yeshiva University's President, Board Chair, and General Counsel,

together with Seyfarth Shaw LLP's Managing Partner **and the individual attorneys Kyle D.
Winnick, Dov Kesselman and Ian M. Capell**, to issue a joint public statement—approved by the

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Court—correcting the record, apologizing to Plaintiff, and outlining institutional reforms. The statement shall be prominently posted on Defendants' official websites for one (1) year.

11. **Policy Reforms:** Order Yeshiva to update and publish its civil rights, disability, and retaliation policies to meet federal standards; prohibit the use of non-disclosure agreements in civil rights complaints; and ensure that future investigations are conducted by independent professionals rather than litigation counsel.

12. **Agency Notifications:** Require Defendants to notify the U.S. Department of Education's Office for Civil Rights, the DOJ Civil Rights Division, and relevant accrediting bodies of this Court's findings and corrective measures, ensuring federal oversight.

13. **Global Record Correction:** Direct Defendants to correct or expunge retaliatory entries in SEVIS, government, or professional databases, ensuring that Plaintiff's academic and immigration records are fully restored.

## III. Judicial Authority

14. **Continuing Oversight:** Retain jurisdiction to enforce and expand relief, impose sanctions, or extend monitorship upon evidence of non-compliance, delay, or retaliation.

15. **Other Relief:** Grant such other and further equitable relief as the Court deems just and proper.

## D. Voluntary Alternative Dispute Resolution

Plaintiff affirms his openness to resolving this matter through alternative dispute resolution mechanisms, provided that any such process is **court-supervised** and conducted in good faith. Plaintiff is willing to participate in confidential settlement discussions or in the Southern District of New York's mediation program (see Fed. R. Evid. 408), on the condition that these efforts are not misused as a tactic to delay the proceedings, hide or destroy evidence, or evade accountability. In

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

short, Plaintiff remains receptive to a fair and transparent resolution of this dispute. However, he

will not compromise on transparency, due process, or the enforcement of his civil rights merely for

the sake of reaching a quick settlement.

## E. Structural Remedies

Beyond the relief specific to Plaintiff, the following **structural remedies** are requested to address

and correct the broader issues highlighted by this case:

- **Whistleblower Protection Policy:** Yeshiva University must implement a robust

  Whistleblower Protection Policy specifically designed to protect international students,

  students with disabilities, and other vulnerable members of the university community from

  retaliation when they report misconduct or legal violations. This policy should be clearly

  communicated campus-wide (e.g., published in student handbooks and employee manuals,

  and via email announcements) and must provide multiple safe channels for reporting issues

  (such as an anonymized hotline and an ombudsperson, as noted above). It should also

  include strong anti-retaliation guarantees and a process for prompt investigation of reported

  issues.

- **Referral for Ethics Investigations:** The Court should refer this matter to the appropriate

  attorney disciplinary authorities (bar associations or grievance committees) to investigate

  potential legal ethics and professional responsibility violations by any counsel involved in

  the misconduct. This includes investigating any attorneys who participated in evidence

  spoliation, misrepresentations to tribunals, or other unethical litigation tactics as alleged in

  this case. The goal is to ensure that officers of the court who engaged in wrongdoing are

  held accountable under the rules governing attorney conduct.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Heilmann v. Yeshiva University, et al.          | Case No. 25-cv-02431 (S.D.N.Y.)|
Second Consolidated Amended Complaint (SCAC)    |    Page 98 of 106

- **Government Agency Notifications:** The Court should forward the findings and record of

  this case to the U.S. Department of Education's Office for Civil Rights and to the U.S.

  Department of Justice's Civil Rights Division, as well as to any relevant international human

  rights bodies or educational accreditation organizations. These agencies can independently

  review the case for potential enforcement actions or sanctions against Yeshiva University

  (for example, review under Title VI or ADA regulations by the Department of Education).

  International bodies (such as human rights commissions or educational quality assurance

  organizations) can be alerted to the serious allegations of discrimination and retaliation in an

  educational setting, which may prompt additional scrutiny or action in other jurisdictions.

- **Record Expungement:** Order the expungement or correction of any false, misleading, or

  defamatory records related to this matter that are held by third parties or external systems.

  This includes ensuring that any derogatory information placed by Defendants into Plaintiff's

  records in government databases (for instance, any notation in the federal SEVIS

  immigration system regarding Plaintiff's status) or shared with medical schools or licensing

  bodies is removed or corrected. The intent is to prevent Plaintiff from being unjustly tainted

  by false allegations when he seeks future educational or professional opportunities. The

  Court's relief should empower Plaintiff to present the Court's findings to any such third

  parties as necessary to clear his name and should require Defendants to cooperate in these

  clarification/expungement efforts.

## F. Fees, Costs, and Preservation

Plaintiff additionally requests the following ancillary relief:

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

- **Costs and Attorney's Fees:** An award of **reasonable costs and litigation expenses**, including any attorneys' fees incurred, as permitted by law. (For example, 42 U.S.C. § 1988 and 42 U.S.C. § 12205 allow prevailing parties to recover attorney's fees in civil rights and ADA cases, and other statutes involved may have similar provisions.) Although Plaintiff is currently proceeding **Pro Se**, he has invested substantial resources into this case (in terms of time, effort, and out-of-pocket expenses for filings, consultations, etc.). An award of fees and costs is warranted to make him whole and to encourage defendants' compliance with fee-shifting civil rights statutes. If Plaintiff later retains counsel, or for any work performed by consulting attorneys, those fees should likewise be recoverable.

- **Preservation and Production of Evidence:** A clear directive that Defendants must **preserve all relevant evidence** and produce it in discovery in a timely manner. This includes, but is not limited to: internal emails and correspondence; audio and video recordings (such as campus security footage); electronic logs (including SEVIS immigration records and access logs); meeting minutes and internal memoranda; and any other records pertaining to the events in question. Given past incidents of spoliation in this case, the Court's order should explicitly warn that any further destruction, alteration, or withholding of evidence will result in severe sanctions, such as adverse inference rulings, contempt findings, or default judgment. The goal is to protect the integrity of the judicial process and ensure that Plaintiff can obtain the evidence needed to prove his claims.

- **Leave to Amend:** Grant Plaintiff leave to amend this Complaint if and as needed, as justice requires, consistent with Rule 15(a)(2) of the Federal Rules of Civil Procedure. As more facts emerge through discovery (or if Defendants produce additional information), Plaintiff may need to refine, supplement, or expand his allegations or legal claims. The Court's order

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

should affirm that Plaintiff has permission to amend the pleadings to conform to the evidence and to promote a resolution on the merits, so that the case is decided on the true facts rather than on any technical pleading deficiencies. This will ensure fairness and the ability to fully address all issues in one proceeding.

# G. Final Statement

**This action is not merely about money.** It is fundamentally about reaffirming core civil rights values, exposing a pattern of retaliatory misconduct, and ensuring that no student — whether international, disabled, or otherwise vulnerable — is ever again silenced or punished for seeking justice and safety at their university. The egregious facts of this case present an opportunity for the Court to send a clear message that such misconduct will not be tolerated in our educational institutions.

## 1.  Restraint and Legal Precision

While the total damages sought are undeniably substantial, they reflect the **magnitude of the harm** inflicted on Plaintiff and are grounded in specific calculations and evidence. These figures have not been inflated for rhetorical effect. In fact, Plaintiff has exercised considerable restraint by **omitting** several potential claims and parties (including additional international law counts and other individuals who could have been named as defendants) in the interest of efficiency and focus. This Complaint is crafted with legal precision and proportionality, not excess. Plaintiff has deliberately avoided overreach or duplication in his legal theories, thereby fully complying with the letter and spirit of Rule 11(b) of the Federal Rules of Civil Procedure (which governs representations to the court).

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

## 2. Good Faith and Proper Pleading

Plaintiff underscores that this Complaint is filed in **good faith** and is supported by a substantial body of evidence. It has been prepared with the input and review of licensed counsel. The pleading's specificity and structured presentation align with the standards set forth by the U.S. Supreme Court and Second Circuit for adequate pleading (see, e.g., *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Johnson v. City of Shelby*, 574 U.S. 10 (2014); *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016)). This case is not brought for any improper purpose such as delay, publicity leverage, or harassment. Rather, it is a focused and justified invocation of Plaintiff's rights to seek redress under binding statutory and constitutional authority.

## 3. Scope and Equity of Relief Requested

The gravity of the claims asserted here—bolstered by substantial evidence—calls for a commensurately serious judicial response. Plaintiff respectfully prays for a judgment that not only compensates him for his losses, but also **corrects the record**, **deters future wrongdoing**, and **restores his rights and reputation**, by utilizing the full remedial powers of this Court. In practical terms, this means the relief should encompass:

- **Holistic restitution:** Remedies covering the full spectrum of harm Plaintiff has suffered — medical, academic, reputational, and financial — in order to truly make him whole.

- **Punitive sanctions:** Punitive damages and other measures calibrated to punish the willful and malicious misconduct of Defendants, and to deter similarly situated institutions or individuals from engaging in such egregious behavior in the future.

- **Structural reforms:** Institutional changes (as detailed above) necessary to ensure long-term compliance with civil rights laws and to prevent future abuses. This case should serve as a model for other institutions, underlining that robust policies and accountability mechanisms must be in place to protect students' rights.

- **Declaratory and equitable orders:** Clear judicial pronouncements and injunctions that officially **clear Plaintiff's name**, restore him to his rightful educational and career path, and ensure that the public record reflects the truth — rather than the defamatory fabrications produced by those in power.

This Court is uniquely positioned to address this matter with the authority, proportionality, and moral clarity it demands. The scope of relief requested — exceeding $1.2 **billion US Dollar** in combined compensatory, punitive, and equitable remedies — is not an exaggeration or aspirational figure; it is firmly anchored in law, supported by precedent, and justified by forensic calculations of Plaintiff's losses. It also rests on the foundational principle that **no one is above accountability** in our legal system, especially not educational institutions or their officers who act under color of law. A judgment in this case will thus not only compensate Plaintiff, but also reinforce the rule of law and the standards of justice in academia.

# G. Right to Amend, Non-Waiver of Rights, Jury Demand, and Pro Se Notice

## I.      Right to Amend

Plaintiff expressly reserves the right to amend or supplement this Complaint as necessary to ensure that justice is done. Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, courts "should freely give leave [to

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

amend] when justice so requires." The Supreme Court has emphasized that this liberal standard "is to be heeded" and that absent undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice, or futility, leave to amend "should, as the rules require, be freely given." (Foman v. Davis, 371 U.S. 178, 182 (1962)).

Where the underlying facts might support a viable claim, the plaintiff "ought to be afforded an opportunity to test his claim on the merits." Id. This liberal policy is especially robust in the Second Circuit, particularly prior to the entry of any judgment. See Williams v. Citigroup Inc., 659 F.3d 208, 212–13 (2d Cir. 2011). Moreover, where the Court identifies pleading deficiencies, plaintiffs are typically permitted at least one opportunity to amend.

This principle applies with even greater force to pro se litigants. A pro se complaint "is to be read liberally," and the Court should not dismiss without granting leave to amend at least once if a liberal reading suggests the plaintiff may state a valid claim. See Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010); Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474–75 (2d Cir. 2006). Accordingly, Plaintiff reserves the right—by leave of Court if required—to revise, refine, or expand the Complaint in the interest of a full adjudication on the merits and to uphold the amendment rights contemplated by Rule 15.

---

## II.    Non-Waiver of Rights

Plaintiff's assertion of specific claims and forms of relief herein shall not be construed as a waiver of any other legal rights, claims, or remedies, all of which are expressly reserved to the fullest extent permitted by law. The decision to focus on certain claims at this stage does not constitute an election of remedies or a limitation on future theories of liability or recovery.

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

To the contrary, Plaintiff reserves the right to assert additional or alternative claims that may arise from the same nucleus of operative fact, as warranted by the evidence. This reservation is fully consistent with Rule 8(d)(2)–(3), which expressly permits the pleading of claims in the alternative. Nothing in this pleading, including any legal theory, factual assertion, or prayer for relief, shall be deemed to foreclose other avenues of redress. Plaintiff reserves all rights and remedies necessary to protect his interests and to achieve full justice under the law.

## III.   Demand for Trial by Jury

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff hereby demands a trial by jury on all issues so triable. The right to a jury trial in civil cases at common law is a bedrock principle of American jurisprudence, and Rule 38 provides that this right "is preserved to the parties inviolate."

Plaintiff's jury demand is timely and properly asserted in this initial pleading. As the Supreme Court has recognized, "maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." (Dimick v. Schiedt, 293 U.S. 474, 486 (1935)). Plaintiff invokes his right to have a jury of his peers resolve all disputed issues of material fact and respectfully requests that this matter be set for a jury trial in due course.

## IV. Pro Se Notice

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery, and Referral for Sanctions if Retaliated Against

Plaintiff is proceeding pro se and affirms that he has undertaken this litigation in good faith and with diligent effort. He has researched the applicable legal principles, complied with the Court's rules and deadlines to the best of his ability, and prepared this Complaint with care, sincerity, and fidelity to the truth.

Each factual allegation and legal claim is made in good faith and based on Plaintiff's honest understanding of the law and the available evidence. Plaintiff respectfully affirms his intention to continue prosecuting this case with the same diligence, integrity, and candor expected of all litigants. If any inadvertent errors arise, he commits to correct them promptly and transparently.

The Supreme Court and Second Circuit have long recognized that pro se filings are entitled to liberal construction. A pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." (Haines v. Kerner, 404 U.S. 519, 520–21 (1972)). Courts are instructed to interpret such filings "to raise the strongest arguments they suggest." (Triestman, 470 F.3d at 474). Although Plaintiff understands he must ultimately meet the same substantive legal standards as any litigant, he respectfully requests that the Court extend the judicial solicitude traditionally afforded to pro se parties, in accordance with precedent.

This case is brought for the purpose of vindicating Plaintiff's legal rights and securing justice. Plaintiff expresses deep appreciation for the Court's attention to this matter and for its understanding in light of the challenges faced by pro se litigants. He remains committed to presenting his case clearly, respectfully, and in full compliance with all applicable rules.

---

## V.Pro Se Good-Faith Citation Notice

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

Plaintiff respectfully advises the Court that any inadvertent inaccuracies in legal citations, case law references, or quotation formats are not made in bad faith. As a pro se litigant without formal legal training, Plaintiff has done his best to accurately cite controlling authority and apply legal doctrines in good faith. To the extent any citations are imperfect, misquoted, or imprecise, such issues are unintentional and should not detract from the overall good-faith basis of the claims alleged.

It is well established that pro se litigants are entitled to a measure of leniency with respect to technical legal errors. See Haines v. Kerner, 404 U.S. 519, 520–21 (1972) ("less stringent standards than formal pleadings drafted by lawyers"); Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 475 (2d Cir. 2006) ("courts must construe pro se pleadings broadly"). Plaintiff respectfully invokes that principle and asks that any minor citation or formatting defects be interpreted in light of his pro se status and not as a basis for adverse action or dismissal.

---

# H. Signature

**Respectfully submitted,**

Dated: October 23, 2025

### */s/ Yisrael Z. Heilmann*

Yisrael Z. Heilmann
*Plaintiff, Pro Se*
Address: 447 Broadway
         2nd FL 945
         New York, NY, 10013
Email:   yzh2@protonmail.com

Certified Pursuant to Fed. R. Civ. P. 11(b); Based on Verified Evidence, Sworn Affidavits, and
Forensically Preserved Exhibits; Structured for Federal Trial, Multi-Jurisdictional Discovery,
and Referral for Sanctions if Retaliated Against

# I. Compensatory and Punitive Damages (Monetary Relief)

Plaintiff seeks the following damages in various categories, with each category's amount, legal basis, and justification detailed below: Exhibit

| Category | Amount (USD) | Legal Basis | Justification |
|---|---|---|---|
| **Pro Se Litigation Labor (4,485 hrs @ $350/hr)** | $1,569,750 | 42 U.S.C. § 1988(b); Compensatory Restitution (Labor Value) | One year of full-time litigation effort, highly skilled legal drafting, motion practice, and legal research |
| **Lost Career Earnings (35 yrs @ $350K/yr)** | $12,250,000 | Lost Earning Capacity; NY Common Law; ADA § 504; Title VI | Medical career destroyed by retaliation and expulsion |
| **Emotional Distress / PTSD** | $8,000,000 | 42 U.S.C. § 1983; IIED; ADA/§504; NY Human Rights Law | Psychological trauma from assault, defamation, false imprisonment, and exile |
| **Visa & U.S. Career Loss** | $3,000,000 | ADA § 504; INA Discrimination; Contract Interference | Termination of F-1 visa and U.S. career track due to institutional retaliation |
| **Weekly Psychotherapy (45–50 yrs)** | $728,000 | Medical Necessity Damages; ADA; NY GBL § 349 | Therapy at USD 300/session for PTSD and psychiatric injury |
| **Lifetime Medication ($180/day × 50 yrs)** | $3,048,165 | Medical Costs; ADA; § 504; NY Common Law | Daily medication for psychiatric, neurological, and trauma-related treatment |
| **Paracelsus Recovery (50 yrs, 1 week/year)** | $27,500,000 | Rehabilitation Costs; NY Common Law; ADA | Trauma and psychiatric treatment— Zurich-based PTSD/TBI facility |
| **Advanced Hearing / TBI Rehabilitation** | $20,000,000 | ADA § 504; NY Common Law | Long-term care for auditory damage and cognitive injury |

| Reputational Harm / Academic Record Damage | $2,000,000 | Defamation; § 1981; NY GBL § 349; NYSLD § 296(7) | NYSDHR filing, AI accusation, "0.47 GPA" smear, and deliberate educational sabotage |
| Tuition Loss / Educational Investment | $250,000 | Breach of Contract; Reliance Damages; NY Common Law | Time, money, and opportunity costs from invalidated YU education |
| Delay in Career Start | $1,000,000 | Opportunity Cost; Career Interference | Years of lost income and licensing opportunities |
| Crisis Comms / Reputation Repair | $250,000 | Reputational Restoration; Defamation Mitigation | PR support, reputation clearing, and international communications coordination |
| Relocation Costs | $75,000 | Forced Displacement; Special Damages | Emergency return to Germany, housing, legal migration support |
| Admin Burden / Visa + Legal Coordination | $125,000 | Administrative Harm; Constructive Damages | Filing fees, FOIA requests, bar complaints, immigration records management |
| Spoliation / Legal Process Abuse | $2,000,000 | Judicial Process Interference; Evidence Tampering; IIED | Deleted emails after legal notice; interference with due process |
| Family Impact / Parenthood Strain | $500,000 | Loss of Consortium (derivative); IIED | Emotional distress affecting parenting, partner stability, and home life |
| FERPA / HIPAA Disclosure Harm | $750,000 | 20 U.S.C. § 1232g; 45 CFR § 164.502; Privacy Tort | Public disclosure of medical and educational files without consent |
| International Enforcement Costs | $250,000 | Cross-Jurisdiction Enforcement Costs | German, Swiss, Israeli coordination; translation, notarization, and court submissions |
| Reinstatement Denial + Lost Grad Access | $500,000 | Educational Interference; § 504; Retaliation Claims | Prevented from completing U.S. education and applying to graduate medical programs |
| Future Legal Exposure Risk | $1,000,000 | Continuing Harm; Legal Process Risk Premium | Ongoing litigation risks and cost of future appeals or protective action |

| Long-Term Psychiatric Disruption | $10,000,000 | IIED; ADA; Residual Psychiatric Harm | Permanent trauma impact on trust, intimacy, professional confidence |
|---|---|---|---|
| Additional Therapy (Annual Intensives) | $3,000,000 | ADA § 504; Special Medical Damages | Annual trauma treatment blocks, psychopharmacology, travel & recovery support |
| Education Enjoyment / Peaceful Study Loss | $1,000,000 | Loss of Educational Dignity; Civil Rights Interference | Religious bullying, discrimination, GPA sabotage, Nazi gestures during prayer |
| Cultural Identity Attack / AntiGerman Bias | $500,000 | Ethnic Discrimination; Title VI; § 1981 | Hitler jokes, Nazi salutes, European/German slurs, xenophobic harassment |
| Cumulative Risk Premium / Institutional Malice | $220,015,250 | Punitive-Like Buffer Under Compensatory Theory | Systemic abuse, widespread cover-up, deterrence function, and reputational equilibrium of global scale |

**Total Compensatory and Punitive Damages Sought:** Plaintiff seeks a total of **$1,260,000,000** in monetary relief. This consists of approximately **$323,871,347** in compensatory damages and **$936,128,653** in punitive damages, reflecting a punitive-to-compensatory ratio of about **3.9 to 1** (which Plaintiff asserts is justified by Defendants' egregious and willful misconduct). The breakdown by defendant is as follows:

| Defendant | Compensatory | Punitive | Total | Punitive Ratio | Role Type |
|---|---|---|---|---|---|
| Yeshiva University | $144,387,755 | $562,612,245 | $707,000,000 | 3.90 | Institution |
| Seyfarth Shaw LLP | $48,129,592 | $187,870,408 | $236,000,000 | 3.90 | Law Firm (Counsel) |
| Dov Kesselman | $3,183,673 | $12,423,469 | $15,607,142 | 3.90 | Individual Counsel |
| Ian Capell | $2,546,939 | $9,941,061 | $12,488,000 | 3.90 | Individual Counsel |
| Kyle Winnick | $2,165,306 | $8,453,694 | $10,619,000 | 3.90 | Individual Counsel |
| Dr. Yedidya Levy | $4,448,980 | $17,352,653 | $21,801,633 | 3.90 | University Employee |
| Judith Lopez | $2,546,939 | $9,941,061 | $12,488,000 | 3.90 | University Employee |
| Dr. Yael Muskat | $2,546,939 | $9,941,061 | $12,488,000 | 3.90 | University Employee |

| | | | | | |
|---|---|---|---|---|---|
| **Jennifer Golden** | $3,183,673 | $12,423,469 | $15,607,143 | 3.90 | University Employee |
| **Dr. Rebecca Cypess** | $2,546,939 | $9,941,061 | $12,488,000 | 3.90 | University Employee |
| **Dr. Sara Asher** | $2,546,939 | $9,941,061 | $12,488,000 | 3.90 | University Employee |
| **Joe Bednarsh** | $1,273,469 | $4,970,531 | $6,244,000 | 3.90 | University Employee |
| **Abigail Kelsen** | $1,273,469 | $4,970,531 | $6,244,000 | 3.90 | University Employee |
| **Esther Sasson** | $1,018,776 | $3,974,449 | $4,993,225 | 3.90 | University Employee |
| **Avi Feder** | $1,785,714 | $6,965,306 | $8,751,020 | 3.90 | University Employee |
| **Sapir Amar** | $6,367,347 | $24,832,653 | $31,200,000 | 3.90 | Student |
| **Moshe Davidovics** | $1,912,245 | $7,458,980 | $9,371,225 | 3.90 | Student |
| **Yonatan Werta** | $1,912,245 | $7,458,980 | $9,371,225 | 3.90 | Student |
| **Jose Hambra** | $1,273,469 | $4,970,531 | $6,244,000 | 3.90 | Student |
| **Salvador Serfaty** | $1,273,469 | $4,970,531 | $6,244,000 | 3.90 | Student |
| **John Does 1–10 (collective)** | $1,273,469 | $4,970,531 | $6,244,000 | 3.90 | Unknown |
| **John Does 11–20 (collective)** | $1,273,469 | $4,970,531 | $6,244,000 | 3.90 | Unknown |
| **Total** | $323,871,347 | $936,128,653 | $1,260,000,000 | – | – |

*(Note: For each Defendant above, punitive damages are calculated as approximately 3.9 times the compensatory damages, reflecting a uniform punitive-to-compensatory ratio of ~3.9:1.)*

**Overall Relief Sought:** In sum, Plaintiff demands a total of **$1,260,000,000** in damages, comprising roughly $323.87 million in compensatory damages and $936.13 million in punitive damages, as detailed above. This represents a punitive-to-compensatory ratio of about 3.9 to 1, which Plaintiff maintains is justified by the egregious and willful nature of the misconduct described.